UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

00-6309-Cr-DIMITROULEAS(s)(s)

UNITED STATES OF AMERICA,

        Plaintiff,

v.

FRED MORGENSTERN,

        Defendant.

_____/

GOVERNMENT'S RESPONSE TO DEFENDANT
FRED MORGENSTERN'S NOTICE OF OBJECTIONS
TO PRESENTENCE INVESTIGATION REPORT AND
INCORPORATED MEMORANDUM OF LAW

    The United States of America, through its undersigned Assistant United States Attorneys, files this response to defendant Fred Morgenstern's notice of objections to the presentence investigation report (PSI). The government will address each objection in the order contained in the defendant's notice. As to any factual disputes which are not already supported by the record, the government will be prepared to present witnesses and/or evidence at the sentencing hearing.

**Paragraphs 13-24 and 38-53**

    The basis for this objection is contained in the defendant's motion to redact the PSI (D.E. 1326), to which the government has already responded (D.E. 1340). The government's response is incorporated by reference. In sum, the government's position is that the PSI properly describes the overall conspiracy in which the



defendant had been charged.  It is irrelevant that he was permitted to plead to only one count of the second superseding indictment; the underlying facts of the RICO Conspiracy are appropriately contained within the PSI.  *See United States v. Legrano*, 659 F.2d 17, 18 (4th Cir. 1981); *United States v. Jones*, 856 F.2d 146, 148-49 (11th Cir. 1988).  And finally, there is absolutely nothing inappropriate with the government providing the Probation Department with the facts constituting the offense conduct as set forth in the PSI.  The final product is that of the Probation Department, not the government.

**Paragraph 25**

The defendant's objection to the first sentence of this paragraph is the use of the terms "paper ownership" and "nominee".[1] The testimony of Peggy Preston at the trial of codefendant Joseph Silvestri clearly established that the defendant was the true owner of Gold Coast Check Cashing, Margate, Florida.  Ms. Preston testified that she was hired by the defendant at Kinsman Merchant and that once the defendant acquired Gold Coast Check Cashing, the defendant placed her in charge of the store, as well as the other check cashing stores, where she managed them at the direction of the defendant (May 29, 2002, trial transcript at 189, 204, 214). Jason Crossen, who was only 21 or 22 at the time, had no background

---

[1]    Defendant's argument is really one of semantics, not substance.

or experience in check cashing stores, did not pay any money towards the purchase, and was put on the lease for the check cashing stores because he had no criminal record, unlike the defendant. (May 29, 2002, trial transcript at 212). Therefore, the information contained in the first sentence of this paragraph is an accurate statement and should remain.

Defendant also complains that the second sentence of this paragraph, which describes the fact that codefendant Mamone had assisted the defendant in carrying out a check kiting scheme, should be deleted because the defendant was not charged with this criminal activity and that it is irrelevant to his sentencing.[2] The prior check kiting scheme is described in the second superseding Indictment as part of the overall RICO Conspiracy charge (see paragraph 19 of Count 1) and therefore properly contained in the PSI. *United States v. Jones*, 856 F.2d 146 (11th Cir. 1988). Events that occurred because of this fraudulent scheme between the defendant and codefendant Mamone resulted in the change in ownership of the check cashing store. As a result of this scheme, codefendant Mamone incurred approximately $813,000 in losses. Because of this, Mamone transferred his interest in the check cashing store, which was being held in his wife's name, to

---

[2] The defendant's argument that somehow his prior activity with codefendant Mamone is lawful under Florida law, but could be construed as check kiting, is unpersuasive.

the defendant's nominee, Jason Crossen.[3]

This information provides an understanding as to why the defendant would be involved in the massive money laundering of the Alliance/Chemical Trust Funds through the check cashing store. The defendant had already been involved in criminal activity with this store and with his codefendants. It was therefore natural that he would continue with additional criminal activity involving the same associates once he acquired the check cashing store.

Finally, the defendant objects to the third sentence of this paragraph, arguing that it concerns criminal activity which does not involve the defendant. This is an incorrect statement. After defendant took control of Gold Coast Check Cashing, the defendant and his codefendants continued to negotiate checks, which were the proceeds of various criminal activities, as alleged as predicate acts in the RICO Conspiracy. This money laundering activity included assisting two other separate fraudulent boilerrooms, an illegal bookmaking business, and a loanshark operation. Therefore, this portion of the PSI correctly describes this criminal activity and should remain in the PSI.

### Paragraphs 26-30

Defendant complains that he should not be described as being a part of the South Carolina investment fraud; he asserts that he

---

[3]     Neither codefendant Mamone nor the defendant could obtain a check cashing store license because each had prior felony convictions.

4

was merely a processor of the fraud money but not part of the fraud itself.

This argument totally ignores the fact that all the checks received from the victims of the investment fraud had to be negotiated - that is exactly the service provided by the defendant to the Alliance/Chemical Trust fraud group based in South Carolina. That fact alone, without even considering the additional activities of the defendant, properly places him as an integral part of the fraud. As was described during the plea colloquy at pages 66-67, millions of dollars of fraud proceeds, in the form of Chemical Trust investor/victim checks, were transferred to the defendant and his check cashing store; they were sent by courier daily from Womack in South Carolina, whereupon the defendant caused them to be deposited into a number of local bank accounts as well as offshore in the Bahamas. These monies were then used to pay hundreds of thousands of dollars' worth of personal expenses of this defendant and codefendants, as well as to cover outstanding millions of dollars in civil settlements brought by investors in another investment program operated by codefendant David Morgenstern called "AFCM" (Americas Fidelity Capital Management). The funds were certainly not invested.

The defendant also assisted Virgil Womack in establishing a Florida corporation, Prestige Accounting Services, and various bank accounts. These were then used as an integral part of the Ponzi

scheme by allowing Womack to make purported interest payments to investors and to pay commissions to the agents, thereby allowing the fraud scheme to continue. All of these facts were admitted as true by the defendant while under oath during the plea colloquy. That in and of itself is a sufficient basis to overrule the defendant's objection.

Therefore, because the defendant's actions promoted the carrying on of the mail and wire fraud being commited in South Carolina and elsewhere, the description in the PSI is accurate and should remain unchanged.

**Paragraph 28**

This paragraph is an accurate statement and should remain (See argument above).

**Paragraph 31**

Defendant complains that he should not be merely linked with his brother, David Morgenstern, that his financial situation is different, that he never knew his personal expenses were being paid from a Swiss account, and that he was not part of the Wisconsin fraud.

As set forth above, the source of such payments were part of the Chemical Trust funds fraudulently obtained by the Womack group in South Carolina and then shipped via DHL to the defendant in Fort Lauderdale. Millions of dollars in Chemical Trust investor checks were transported at the defendant's direction to an offshore

account that was maintained by the defendant and his brother. Millions more of Chemical Trust funds were deposited into the defendant's Americas Resources account at Citibank; thereafter, the defendant wrote a number of Americas Resources checks, representing millions more in Chemical Trust funds, which were then deposited into his brother's AIBC bank account in the Bahamas.

The analysis of the Bahamian bank records and the disbursement of various amounts of Chemical Trust fraud proceeds to cover the personal expenses of the defendant, codefendant David Morgenstern, and relatives, was the subject of testimony during the Silvestri trial, specifically that of Marvin Harrison.  Specifically, Mr. Harrison testified that in the fall and winter of 1999, American Express bills for Fred and David Morgenstern, amounting to tens of thousands of dollars each month, were paid on the instructions of Fred and David Morgenstern by AIBC bank officials using funds traceable to the Chemical Trust deposits made into AIBC bank (May 31, 2002, trial testimony at 36-46).  Moreover, in December 1999, Fred Morgenstern wrote a series of checks on his Americas Resources account at Citibank, which consisted of Chemical Trust funds and which were deposited into his brother's AIBC bank account in the Bahamas.  Americas Resources/Chemical Trust funds credited to the AIBC account, 2.9 million dollars, were then used by David Morgenstern to settle an impending lawsuit brought by the "5 Star Global" investors in Wisconsin who had invested in David

Morgenstern's AFCM fraud scheme (May 31, 2002, trial testimony at 26-28, 35-36).

Clearly, defendant's claim that he was not involved in the unlawful use of Chemical Trust funds is not supported by the record and his objection should be denied.

**Paragraph 33**

The government agrees that this paragraph should be corrected to reflect codefendant John Mamone's name as the individual who received the cashier's checks from Weiss and then laundered the funds through his money market account.

**Paragraphs 57, 74 and 84**

Defendant objects to his role assessment as a organizer or leader, resulting in a four level increase. The government submits that the four level increase is appropriate.

U.S.S.G. Section 3B1.1 provides for a four level increase if the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive. Application Note 4 lists a number of factors that the court should consider: "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." Further,

as the Note explains, "there can, of course, be more than one person who qualifies as a leader or organizer" in any criminal activity.

Finally it should be noted that the second portion of 3B1.1(a) is in the disjunctive. In other words, other than finding that the defendant occupied a role of leader or organizer, the Court must also determine that the criminal activity involved five or more participants or that the operation was otherwise extensive. *See United States v. Holland*, 22 F.3d 1040, 1045 (11th Cir. 1994); *United States v. Hall*, 996 F.2d 284, 287 (11th Cir. 1993).

The facts underlying the defendant's conviction clearly qualify him as a leader or organizer of an extensive money laundering conspiracy. The defendant became a part of this conspiracy from the beginning and was the primary contact for the laundering of the fraud proceeds that were being generated from South Carolina. In that regard he was in charge of Gold Coast Check Cashing, where he directed his employees, which included Peggy Preston, Jason Crossen, Michael and Debbie Buccinna, and Mark Weiss, to process millions of dollars of the Alliance/Chemical Trust checks through various bank accounts and other check cashing stores. The defendant also caused substantial amounts of Alliance/Chemical funds to be wire transferred to an offshore bank for the benefit of the defendant and other members of the conspiracy.

In addition, after Virgil Womack was arrested on January 7, 2000, the defendant demonstrated his control over Alliance/Chemical Trust proceeds by arranging the transfer of over $900,000 of Chemical Trust investor fraud money to a criminal defense attorney for the representation of Womack in South Carolina.

All of these facts clearly demonstrate that the defendant exercised decision making authority by directing the manner in which the millions of dollars of fraud money were negotiated and deposited into a variety of accounts. Defendant further controlled and directed a number of individuals in that regard. Although the government is not obligated to demonstrate that there were five or more participants involved in the criminal activity, it is clearly the case here. These would include such individuals as Peggy Preston, Mark Weiss, Jason Crossen, Debbie Buccinna, Michael Buccinna, and Gary Christie.

There is also no question that the money laundering activity of which the defendant was an integral part clearly qualifies as "otherwise extensive." The money laundering activity continued from the summer of 1999 until the early part of 2000. Approximately $30 million dollars was received in South Florida by the defendant's organization, who then negotiated the checks at a number of local banks as well as check cashing stores. Much of the money was subsequently transferred offshore where it was utilized for the personal benefit of the conspirators.

These facts along with others were all admitted as true by the defendant during the plea colloquy.  Having once admitted under oath to the extensive criminal activity, he should not now be heard to complain.

The defendant's objection to the role assessment should be denied.

**Paragraphs 80-83, 87, and 90**

The defendant contends that U.S.S.G. 2S1.1 should not be applied to his conviction, arguing that the object of the money laundering count was 18 U.S.C. 1957 and that therefore U.S.S.G. 2S1.2 should apply.

The defendant's argument is based on a misreading of the guideline calculations contained in these paragraphs.  The defendant is not receiving a base offense level due to his plea to Count 14 of the second superseding indictment; rather the base offense level of 20 results from the defendant's plea to the single count information (See paragraph 80 of the PSI).  The guidelines in this regard are properly calculated and the defendant's objection should be denied.

**Paragraph 82**

The defendant objects to the base offense level of 20.  The government's response on this issue is contained above.

**Paragraph 83**

Defendant argues that he should not be held responsible for

11

a value of laundered funds of 20 to 35 million dollars,[4] claiming
that it should be reduced by the amount of money that was returned
by the defendant and his codefendant. Defendant's position is
legally and factually untenable.

Defendant claims that the amount of funds in this case should
be only "a little more than" $12 million.  He takes this position
based on the fact that in early January 2000, his brother, James
Morgenstern, returned approximately $17 million of Chemical Trust
fraud proceeds to the newly appointed receiver in the District of
South Carolina.  This event, however, occurred after Virgil Womack
and members of his organization were arrested in South Carolina and
the FBI executed search warrants at various locations in South
Florida, South Carolina and Arizona, including the defendant's
check cashing store and business office, and, after the U.S.
District Court in South Carolina issued a restraining order and
repatriation order against Fred Morgenstern and Falcon Trust on
January 11, 2000.  Notwithstanding the chronology of these events,
citing no authority, he requests credit for the returned fraud
proceeds.

In *United States v. Lane*, 2003 WL 1450019 (7th Cir. 2003), the
court recognized, in the context of a fraud case, that the purpose
of the loss calculation is to measure the magnitude of the crime at

---

[4]    Defendant does not contest, nor could he, the total
amount of money laundered was approximately 31 million dollars,
since it was acknowledged during the plea colloquy at 67 and 70.

the time it was committed.  In this case, the PSI is correct in assessing the actual loss for enhancement purposes at $31,000,000. The defendant is not entitled to an off-set to the extent of fraud proceeds returned by his brother.  These proceeds were returned only after the defendant became aware that the crime had been detected  and  law  enforcement  was  conducting  an  active investigation.

Courts which have considered whether the defendant should receive credit on fraud or loss amount based on repayment have rejected this same argument.  *See United States v. Daniels*, 148 F.3d 1260, 1261 (11th Cir. 1998)(partial reimbursement of funds did not change the amount the defendant had embezzled); *United States v. Norris*, 50 F.3d 959, 961 (11th Cir. 1995) (Repayment of fraud reduced the amount of restitution owed, but not the loss amount). As the court recognized in *Norris* when considering a fraud loss amount under U.S.S.G. 2F1.1 and in considering the commentary n. 7(b), the loss amount was to be determined as of the time the offense was discovered.  The defendant's son's repayment of a student loan did not alter the loss amount because it came "way too late" to reduce the loss. *United States v. Norris*, 50 F.3d at 961-62.  In *United States v. Bald*, 132 F.3d 1414,1416 (11th Cir. 1998), in the context of unauthorized credit card purchases, the court included all credit card charges in loss amount, even though some purchases were returned for credit even before detection.  As the

13

court stated, the crime was completed at the time the credit cards were used and an actual loss had resulted. *Id.* at 1416-17.

Such is the case here. The relevant crime of conspiracy to launder money was completed once the defendant accepted the $31 million dollars from the South Carolina fraud group and negotiated them through the various accounts. The money laundered amount is unaffected by whatever may have occurred later, particularly after the crime was detected. Therefore defendant's objection should be denied.

## Paragraph 89

Defendant complains that he was not given acceptance of responsibility because of his criminal contempt conviction in South Carolina. Defendant inappropriately attempts to argue the underlying facts of his criminal contempt, for which a full hearing was held in South Carolina before the finding of contempt was entered. During the Show Cause Hearing held on February 28, 2002,[5] the defendant testified and provided in essence the same excuses for his failure to appear in South Carolina. In addition, just as the defendant advances now, his counsel in South Carolina argued that the defendant's actions were not a willful act of contempt.

The district court rejected this argument and held the defendant in criminal contempt, subsequently sentencing him to 35

---

[5]    The government will provide the Court with a copy of the transcript should it desire to review it.

days incarceration. This Court should, as well, reject this defendant's arguments.

The commentary to U.S.S.G. 3E1.1 provides a number of considerations in determining whether a defendant qualifies for acceptance of responsibility. These include whether a defendant has voluntarily withdrawn from criminal conduct. *See* n.1(b). A conviction for criminal contempt seemingly demonstrates the defendant's continued criminal conduct. The government however would note that notwithstanding this conviction, the government entered into a written plea agreement in which it agreed to recommend a three level adjustment for acceptance of responsibility. Therefore based on the mere fact of the criminal contempt conviction, the government cannot support the denial of acceptance of responsibility.

However, the written plea agreement also provides that a recommendation for acceptance of responsibility is not required if the defendant fails or refuses to make a full, accurate and complete disclosure to the Probation Department of the circumstances surrounding the offense (See paragraph 8 of the plea agreement). As of this date, the defendant has yet to give the Probation Department a full statement of the circumstances surrounding the offense and therefore has not demonstrated an acceptance of responsibility for his conduct. His request for a three level adjustment should be rejected at this time.

15

**Paragraphs 87 and 90**

The calculations in these paragraphs will either remain the same or change based on the Court's rulings on the previous objections.

**Paragraphs 94 and 95**

The defendant contends that his criminal history is overrepresented and requests a departure under Sentencing Guidelines Section 4A1.3. The defendant contends that his prior conviction for criminal contempt should not be counted because it was not willful and that he should be granted a departure because his criminal history is overrepresented. The government submit that both his objection and his request for a departure should be denied.

U.S.S.G. 4A1.1(e) provides that one point should be added for each prior sentence not counted in the previous provisions (which relate to convictions resulting in greater periods of incarceration). Under these provisions, the defendant's criminal contempt conviction is properly counted as one additional criminal history point. Defendant, however, argues for a downward departure, contending that his criminal history is overrepresented.

In considering a departure on this ground, the Court should be guided by U.S.S.G. 4A1.3, Policy Statement concerning adequacy of criminal history category. Defendant contends that his criminal history significantly overrepresents the seriousness of his

16

criminal history or the likelihood that he will commit further crimes. However in reviewing the defendant's entire criminal history, including those which did not result in additional points, it reflects an individual who has consistently found himself on the wrong side of the law throughout his life. A criminal history category of III is appropriate and the defendant's motion for a downward departure should be denied.

## Paragraph 100

The government believes that this paragraph of the PSI should remain, but should be corrected with the following facts:

The structuring by this defendant took place from June 1, 2001, to October 10, 2001;

The total amount of deposits during this time period was $619,193.71; and,

These deposits were made at Union Planter's Bank, not SunTrust.

The government is prepared to support these facts at time of sentencing through testimony and/or exhibits.

## Paragraph 152

The government agrees that this paragraph should be corrected to indicate that the civil contempt in South Carolina has been resolved and is no longer pending.

<u>CONCLUSION</u>

WHEREFORE, for all the foregoing reasons, the government respectfully requests that this Honorable Court deny the defendant's objections to the PSI, except those that have been agreed to by the government.


Respectfully submitted,

MARCOS DANIEL JIMENEZ
UNITED STATES ATTORNEY


By:   _____
J. BRIAN McCORMICK
ASSISTANT UNITED STATES ATTORNEY
Court I.D. #A5500084
500 East Broward Boulevard
Suite 700
Fort Lauderdale, FL 33394
Telephone: (954) 356-7392
Fax:       (954) 356-7230



By:   _____
DIANA L.W. FERNANDEZ
ASSISTANT UNITED STATES ATTORNEY
Court I.D. #A5500017
500 East Broward Boulevard
Suite 700
Fort Lauderdale, FL 33394
Telephone: (954) 356-7392
Fax:       (954) 356-7230

<u>CERTIFICATE OF SERVICE</u>

    I hereby certify that a copy of the foregoing was served by fax and mail to the following on the _____ day of _____, 2003:


Michael J. Rosen, Esquire
2400 South Dixie Highway, Suite 105
Miami, Florida 33133


                                      DIANA L.W. FERNANDEZ
                                      ASSISTANT UNITED STATES ATTORNEY