

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6309-CR-DIMITROULEAS(s)(s)
CASE NO. 02-60101-CR-DIMITROULEAS

UNITED STATES OF AMERICA,          )
                                   )
                Plaintiff,         )
                                   )
        v.                         )
                                   )
FRED MORGENSTERN                   )
                                   )
                                   )
                Defendant.         )
_____)

04 - 60798

CIV - DIMITROULEAS

**APPENDIX OF EXHIBITS
TO
MOTION FOR HABEAS CORPUS RELIEF
PURSUANT TO 28 USC §2255**

MICHAEL J. ROSEN, P.A.
KYM BENNETTE, P.A. OF COUNSEL
2400 S. Dixie Highway, Suite 105
Miami, Florida 33133
Tel.: 305-858-9700
Fax: 305-856-3116



<u>INDEX</u>

Indictment                                                                                          A

Information                                                                                         B

Plea Agreement                                                                                      C

Presentence Investigation Report                                                                    D

Objections to Presentence Investigation Report                                                      E

Judgment and Conviction for Superseding Indictment and                                              F
Superseding Information

Transcript of Status Conference Held on May 21, 2002                                                G

Transcript of Plea of Guilty Held on May 21, 2002                                                   H

Transcript of Status Conference Held on January 31, 2003                                            I

Transcript of Status Conference Held on February 4, 2003                                            J

Transcript of Sentencing Held on April 18, 2003                                                     K

Affidavit of Fred Morgenstern                                                                       L

ii

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. OO-6309-CR-SEITZ(S) (5)

|       |        |         |
|-------|--------|---------|
| 18    | U.S.C. | 1962(d) |
| 18    | U.S.C. | 1963    |
| 18    | U.S.C. | 1955    |
| 18    | U.S.C. | 1956    |
| 18    | U.S.C. | 1957    |
| 18    | U.S.C. | 1511    |
| 18    | U.S.C. | 894     |
| 18    | U.S.C. | 892     |
| 18    | U.S.C. | 2       |

UNITED STATES OF AMERICA, Plaintiff,

**V.**

JOHN MAMONE,
        aka "Big John,"
JOSEPH RUSSO,
        aka "JR,"
FRED MORGENSTERN,
DAVID MORGENSTERN,
JOSEPH SILVESTRI,
MICHAEL BUCCINNA,
        aka "Mikey *Boots,* "
DAVID BELL,
JOHN O'SULLIVAN,
        aka "Johnnie 0,"
MARK WEISS,
MARK CARATTINI,
ANSON KLINGER,
FREDERICK SCAROLA
CHARLES CLAY, and
DOREEN RUSSO,

        Defendants.

AUG 14 2001
**CLARE.CE MADDOX**

SECOND SUPERSEDING INDICTMENT

The Grand Jury charges that:

1

## GENERAL ALLEGATIONS

1.      At times material to each count of this Indictment, Check Cashing Unlimited, Inc., d/b/a Check Cashing Unlimited, was a Florida corporation, whose business was located at 5701 Margate Blvd., Margate, Florida. Check Cashing Unlimited was engaged in the check cashing business, as well as in assisting the enterprise in the laundering of substantial proceeds derived from the commission of repeated criminal activity.

2.      At times material to each count of this Indictment, Gold Coast Check Cashing, Inc. was a Florida corporation, whose businesses were located at 5701 Margate Blvd., Margate, Florida, and at 3591 North Andrews Ave., Oakland Park, Florida, among other locations. Gold Coast Check Cashing, Inc. was engaged in the check cashing business, as well as in assisting the enterprise in the laundering of substantial proceeds derived from the commission of repeated criminal activity.

3.      At times material to each count of this Indictment, Checking Exchange, Inc., d/b/a Check Cashing Unlimited II, was a Florida corporation, whose business was located at 2603 N. Dixie Highway, Wilton Manors, Florida. Check Cashing Unlimited II was engaged in the check cashing business, as well as in assisting the enterprise in the laundering of substantial proceeds derived from the commission of several criminal acts.

4.      At times material to each count of this Indictment, Akel of Boca Raton, Inc., d/b/a Akel's Market, was a Florida corporation, whose business was located at 504 N.W. 6th Street; Pompano Beach, Florida. Akel's Market was engaged in the check cashing business, as well as in assisting the enterprise in the laundering of substantial proceeds derived from the commission of several criminal acts.

2

5.    At times material to each count of this Indictment, Gateway Transportation Services, Inc., was a Florida corporation, whose business was located at 7770 W. Oakland Park Blvd., Sunrise, Florida. Gateway Transportation Services was engaged in arranging for transportation of goods throughout the United States, as well as providing telephones and vehicles to members of the criminal enterprise to facilitate the commission of several racketeering acts.

6.    At times material to each count of this Indictment, International Mercantile Corporation, a/k/a IMC, Ltd., and IGT, Ltd., International Forex Exchange, were entities not registered to do business in the State of Florida. These entities were used to facilitate a telemarketing fraud operation within the Southern District of Florida.

7    At times material to each count of this Indictment, Americas International Bank Corporation, Limited (AIBC), was a bank registered to do business in the Bahamas, which was located in Nassau, Bahamas.

## COUNT 1

## INTRODUCTION

At all times relevant to this Indictment:

1.    The members and associates of the Trafficante Organized Crime Family of La Cosa Nostra (hereafter referred to as "the Trafficante Family"), were a criminal organization that operated in the Southern District of Florida, Tampa, Florida, and elsewhere.

2.    The Trafficante Family operated through groups of individuals headed by "captains," who were referred to as "capos" or "skippers." These groups, which were referred to as "crews," and "regimes," consisted of "made" members of the Trafficante Family, who were also referred to as "soldiers," and of non-member criminal associates of the Family.

3

3.     In the Southern District of Florida, Steve Raffa operated and maintained a "crew" for the Trafficante Family that engaged in various criminal acts, including loansharking, extortion, money laundering, bank fraud, dealing in stolen property and illegal gambling, among other crimes. The "crew" was directly supervised by defendant JOHN MAMONE who reported directly to Steve Raffa. This "crew" consisted of certain non-member criminal associates of the Trafficante Family.

4.     The Federal Bureau of Investigation conducted undercover investigations in which cooperating witnesses, who previously had been associated with organized crime groups that operated in the Southern District of Florida and elsewhere, worked in an undercover capacity for the purpose of gathering evidence concerning the criminal activities of the members as described below, as well as others engaged in criminal activities on behalf of other racketeering enterprises.

## THE ENTERPRISE

5.     At all times relevant to this Indictment, in the Southern District of Florida and elsewhere, defendants JOHN MAMONE, JOSEPH RUSSO, FRED MORGENSTERN, DAVID MORGENSTERN, JOSEPH SILVESTRI, MICHAEL BIJCCINNA, DAVID BELI, JOHN O'SULLIVAN, MARK CARATTINI, ANSON KLINGER, and MARK WEISS and other persons constituted an enterprise within the meaning of Title 18, United States Code, Section 1961 (4), that is, a group of individuals associated in fact. The purpose of the enterprise is to enrich its members through various criminal activities, including the making and collecting of extortionate loans, interference of commerce by threats of violence, money laundering, obstruction of state and local law enforcement, the operation of illegal gambling businesses, bank fraud, mail and wire fraud, the sale and receipt of stolen goods, interstate and foreign travel in aid of racketeering, obstruction of justice and through the collection of unlawful debt.

## THE CONSPIRACY

4

6.    From in or about 1995, the exact date being unknown to the Grand Jury, and continuing thereafter up to and including the date of the return of the Indictment, in the Southern District of Florida and elsewhere, the defendants,

JOHN MAMONE,
JOSEPH RUSSO,
FRED MORGENSTERN,
DAVID MORGENSTERN,
JOSEPH SILVESTRI,
MICHAEL BUCCINNA,
DAVID BELL,
JOHN O'SULLIVAN,
MARK WEISS,
MARK CARATTINI, and
ANSON KLINGER,

together with others, being persons employed by and associated with the enterprise described in paragraph 5 of this Count, which enterprise engaged in, and the activities of which affected, interstate and foreign commerce, knowingly and intentionally did combine, conspire, confederate, and agree together, and with each other, and with persons known and unknown to the Grand Jury, to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity as defined by Title 18, United States Code, Sections 1961(1) and (5) as set forth in paragraph 7 below, and through the collection of unlawful debts as defined by Title 18, United States Code, Section 1961(6), and as set forth in paragraph 8 below.

## PATTERN OF RACKETEERING ACTIVITY

7.    The pattern of racketeering activity that the defendants agreed would be committed in the conduct of the affairs of the enterprise consisted of multiple acts involving violations of the following laws:

A.    Sale and receipt of stolen goods, in violation of and indictable under Title 18,

5

United States Code, Section 2315;

B.     Engaging in monetary transactions in property derived from specified unlawful activity and conspiracy to do so, in violation of and indictable under Title 18, United States Code, Sections 1956 and 1957;

C.     Laundering of monetary instruments and conspiracy to do so, in violation of and indictable under Title 18, United States Code, Section 1956;

D.     Conducting, financing, managing, supervising and directing illegal gambling businesses, in violation of and indictable under Title 18, United States Code, Section 1955;

E.     Interstate travel or transportation in aid of racketeering enterprises, in violation of and indictable under Title 18, United States Code, Section 1952;

F.     Obstruction of state and local law enforcement, in violation of and indictable under Title 18, United States Code, Section 1511;

G.     Bank fraud, in violation of and indictable under Title 18, United States Code, Section 1344;

H.     Mail fraud, in violation of and indictable under Title 18, United States Code, Section 1341;

I.     Wire fraud, in violation of and indictable under Title 18, United States Code, Section 1343;

J.     Collection of extensions of credit by extortionate means and conspiracy to do so,

6

in violation of and indictable under Title 18, United States Code, Section 894;

K.    Making extortionate extensions of credit and conspiracy to do so, in violation of and indictable under Title 18, United States Code, Section 892; and, conspiracy to do so, in violation of and indictable under Title 18, United States Code, Section 892, and,

L.    Obstruction of Justice, in violation of and indictable under Title 18, United States Code, Section 1503

## COLLECTION OF UNLAWFUL DEBT

8.    The collection of unlawful debt through which the defendants and their coconspirators agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise consisted of the collection from various individuals of unlawful debts, as that term is defined by Title 18, United States Code, Section 1961(6), to wit: a) a debt which was incurred and contracted in gambling activity and which was incurred in connection with the business of gambling, which activity and business were in violation of the laws of the United States and Florida; and b) debts which were unenforceable under State and Federal law in whole and in part as to principal and interest because of the laws relating to usury and which were incurred in connection with the business of lending money at a rate usurious under State and Federal law, where the usurious rate was at least twice the lawfully enforceable rate.

## MANNER AND MEANS OF THE CONSPIRACY

9.    It was part of the conspiracy that each defendant agreed that a conspirator would commit at least two racketeering acts, or participate in the collection of at least one unlawful debt, in conducting the affairs of the enterprise.

10.    It was further part of the conspiracy that defendant JOHN MAMONE would supervise and direct members of the conspiracy in the commission of various criminal acts as set

forth in paragraph 7, above, for the economic benefit of the members of the enterprise.

11.    It was further part of the conspiracy that Steve Raffa and defendants JOHN MAMONE and MICHAEL BUCCINNA would supervise and coordinate the activities of the large-scale illegal gambling business that was operated by defendants MARK CARATTINI, ANSON KLINGER, and other coconspirators for the benefit of the enterprise.

12.    It was further part of the conspiracy that defendants MICHAEL BUCCINNA, MARK CARATTINI, ANSON KLINGER and other coconspirators would manage the day-to-day operation of the illegal gambling business on behalf of defendant JOHN MAMONE, which included the collection of gambling debts, among other activities.

13    It was further part of the conspiracy that defendant JOHN MANONE and other co-conspirators involved in the illegal gambling business would use a corrupt City of Margate police officer, to obstruct state and federal law enforcement investigations of the illegal gambling business being operated by the enterprise.

14.    It was part of the conspiracy that defendants JOHN MANONE, MICHAEL BUCCINNA, DAVID BELL, JOHN O'SULLIVAN, MARK WEISS, and other coconspirators would operate a loan shark business that involved making extortionate loans to borrowers and using threats of violence and physical violence in collecting debts from either borrowers or losing bettors who incurred gambling debts to the enterprise.

15.    It was further part of the conspiracy that defendant JOHN MAMONE and other coconspirators would negotiate counterfeit checks through check cashing stores under the control of the enterprise for the purpose of generating profits.

16.    It was further part of the conspiracy that defendant JOHN MAMONE. DAVID BELL, JOHN O'SULLIVAN and other conspirators would obtain and sell stolen property for the purpose of generating substantial profits on behalf of the enterprise.

17.    It was further part of the conspiracy that defendants JOHN MAMONE, FRED MORGENSTER.N, MICHAEL BUCCINNA, and other coconspirators would supervise and control the business operations of check cashing stores located in South Florida for the purpose of promoting and concealing the criminal activities engaged in by members of the enterprise

18.    It was further part of the conspiracy that defendants JOHN MAMONE, FRED MORGENSTERN, MICHAEL BUCCINNA, MARK WEISS and other coconspirators would use check cashing stores controlled by the enterprise as a means of collecting illegal proceeds from loan shark borrowers and losing bettors who were victims of the enterprise

19.    It was further part of the conspiracy that defendants JOHN MAMONE MORGENSTERN and other coconspirators would obtain substantial funds from area banks by initiating "check kiting" schemes that would engender operating funds for the enterprise

20.    It was further part of the conspiracy that defendants JOHN MAMONE DAVID BELL and other coconspirators would provide assistance to other coconspirators in the operation of telemarketing fraud schemes.

21.    It was further part of the conspiracy that defendants JOHN MAMONE JOSEPH RUSSO, MICHAEL BUCCINNA, MARK WEISS and other coconspirators would provide the services of various check cashing stores for the purpose of promoting the operation and concealment of the illegal proceeds derived from telemarketing fraud committed by other coconspirators and other persons for the enrichment of the enterprise.

22.    It was further part of the conspiracy that defendants JOHN MAMONE, FRED MORGENSTERN, DAVID MORGENSTERN, JOSEPH SILVESTRI, MICHAEL BUCCINNA, DAVID BELL, MARK WEISS and other coconspirators would assist a criminal group operating in South Carolina, which engaged in an investment fraud scheme involving mail and wire fraud in return for a share of the illegal proceeds obtained from investor/victims.

23.    It was further part of the conspiracy that the criminal group from South Carolina would send and transport personal checks in an aggregate amount exceeding $30,000,000 in criminally derived property obtained from defrauded investor/victims throughout the United States to defendants JOHN MAMONE, FRED MORGENSTERN, DAVID MORGENSTERN, MICHAEL BUCCINNA and other coconspirators for the purpose of promoting the investment fraud scheme and concealing the location of the criminally derived proceeds for the benefit of the enterprise.

24.    It was further part of the conspiracy that defendants JOHN MAMONE, FRED MORGENSTERN, DAVID MORGENSTERN, JOSEPH SILVESTRI, MICHAEL BUCCINNA, MARK WEISS and other coconspirators would further assist the criminal group from South Carolina by causing the depositing of personal checks from investor/victims into accounts maintained by the enterprise's check cashing stores.

25.    It was further part of the conspiracy that defendants FRED MORGENSTERN, DAVID MORGENSTERN, JOSEPH SILVESTRI and other coconspirators would assist the criminal group from South Carolina by transferring the illegally derived funds through various financial institutions in South Florida to bank accounts in the Bahamas, England and Switzerland. Said defendants were involved in these transactions for the purpose of promoting the investment fraud scheme and concealing the location of the criminally derived proceeds from

10

the victim/investors and law enforcement for the benefit of the enterprise.

26.    It was further a part of the conspiracy that defendant JOHN O'SULLIVAN would corruptly endeavor to obstruct justice by attempting to persuade another member of the enterprise not to provide truthful information and testimony to United States relating to the criminal involvement of other members of the enterprise.

27.    It was further part of the conspiracy that coconspirators would take all steps necessary to prevent the detection by law enforcement of the criminal activities for the benefit of the enterprise.

All in violation of Title 18, United States Code, Section 1962 (d)


## COUNT 2

1. From in or about 1995, and continuing thereafter up to and including the date of the return of this Indictment, in the Southern District of Florida and elsewhere, the defendants,

JOHN MAMONE,
MICHAEL BUCCINNA,
MARK CARATTINI,
ANSON KLINGER,
CHARLES CLAY,

and other persons known and unknown to the Grand Jury, knowingly conducted, financed, managed, supervised, directed, and owned all or part of an illegal gambling business which involved five or more persons who conducted, financed, managed, supervised, directed, and owned, all or part of such business and which had a gross revenue of two thousand dollars ($2,000) or more on one or more single day and was in substantially continuous operation for a period in excess of thirty days, and which business was in violation of the laws of the State of Florida, Section 849.25 and other applicable law.

All in violation of Title 18, United States Code, Sections 1955 and 2.

## COUNT 3

1.     From in or about 1999, and continuing thereafter up to and including January 30, 2001, in the Southern District of Florida, and elsewhere, the defendants,

**JOHN MAMONE,**
**FREDERICK SCAROLA,**
**CHARLES CLAY,**

and other persons unlawfully, willfully and knowingly did combine, conspire, confederate and agree together with each other and with others known and unknown to the Grand Jury to obstruct the enforcement of the criminal laws of the State of Florida, that is, Section 849.25 Florida Statutes and other applicable laws, with the intent to facilitate an illegal gambling business.

2.     At all times during the course of the conspiracy, defendant CHARLES CLAY was an appointed official of the State of Florida, that is, a sworn police officer of the City of Margate, Florida, Police Department.

3.     At all times during the course of the conspiracy, the defendant JOHN MAMONE and other coconspirators conducted, supervised, directed, and owned all or part of an illegal gambling business in Broward County, which said business included but was not limited to bookmaking in violation of the laws of the State of Florida.

4.     At all times during the course of the conspiracy, the defendant FREDERICK SCAROLA and other coconspirators conducted, supervised, directed, and owned all or part of an illegal gambling business in Broward County, which said business included but was not limited to bookmaking in violation of the laws of the State of Florida.

5.     At all times during the course of the conspiracy, the illegal gambling business involved five or more persons who conducted, financed, managed, supervised, directed and owned all or part of the business, and the business remained in substantially continuous

operation for a period in excess of thirty days.

## OVERT ACTS

In furtherance of the conspiracy and to effect the objects thereof, the defendants and their coconspirators committed in the Southern District of Florida, at least one of the following overt acts, among others.

1.     On or about February 4, 2000, in the Southern District of Florida, defendant FREDERICK SCAROLA advised defendant JOHN MAMONE that defendant CHARLES CLAY had recently learned that the FBI was investigating Gold Coast Check Cashing located in Margate, Florida.

2.     On or about February 4, 2000, in the Southern District of Florida, defendant FREDERICK SCAROLA informed another person that there was a source with the Margate Police Department, who warned FREDERICK SCAROLA of an FBI investigation of Gold Coast Check Cashing in Margate, Florida.

3.     On or about February 11, 2000, in the Southern District of Florida, defendant FREDERICK SCAROLA informed another person that based upon information provided by a Margate police officer that members of the illegal gambling business should refrain from visiting Gold Coast Check Cashing in Margate, Florida, because the business was under investigation by the FBI.

4. On February 11, 2000, in the Southern District of Florida, defendant FREDERICK SCAROLA met with defendant CHARLES CLAY at Bobby Rubino's Restaurant in North Lauderdale, Florida.

All in violation of Title 18, United States Code, Section 1511.

## COUNT 4

13

1. From in or about 1996, and continuing thereafter up to the date of this Indictment, in the Southern District of Florida, and elsewhere, the defendants,

JOHN MAMONE,
JOSEPH RUSSO,
MICHAEL BUCCINNA,
DAVID BELL,
JOHN O'SULLIVAN, and
MARK WEISS,

did knowingly conspire, confederate, and agree with each other and with other persons, known and unknown to the Grand Jury to make extortionate extensions of credit as defined by Title 18, United States Code, Section 891, to numerous individuals in South Florida,

All in violation of Title 18, United States Code, Section 892 (a)

## COUNT 5

From in or about 1996, and continuing thereafter up to and including the date of the return of this Indictment, in the Southern District of Florida and elsewhere, the defendants

JOHN MAMONE,
JOSEPH RUSSO,
MICHAEL BUCCINNA,
DAVID BELL,
JOHN O'SULLIVAN, and
MARK WEISS,

did knowingly and intentionally conspire, confederate, and agree with each other and with other persons known and unknown to the Grand Jury to participate in the use of extortionate means to collect and attempt to collect extensions of credit as defined by Title 18, United States Code, Section 891, from numerous individuals in South Florida.

All in violation of Title 18, United States Code, Section 894 (a) (1)

## COUNT 6

14

1.    From in or about 1997, and continuing thereafter up to and including the date of the return of this Indictment, in the Southern District of Florida and elsewhere, the defendants,

JOHN MAMONE,
FRED MORGENSTERN,
MICHAEL BUCCINNA,
MARK CARATTINI, and
ANSON KLINGER,

did knowingly conspire, confederate, and agree with each other and with other persons known and unknown to the Grand Jury to commit offenses against the United States, that is, to violate Title 18, United States Code, Sections 1956 (a) (1) (A) (i) and (B) (i)

## THE PURPOSE AND OBJECT OF THE CONSPIRACY

2.    It was the purpose and object of the conspiracy to knowingly and willfully conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, that is, the cashing of checks which involved the proceeds of specified unlawful activity, that is, illegal gambling businesses, in violation of Title 18, United States Code, Section 1955, and extortionate credit transactions, in violation of Title 18, United States Code, Sections 892 and 894; and with the intent to promote the carrying on of said specified unlawful activities, and knowing the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of said specified unlawful activities and knowing that the property involved represented the proceeds of some form of unlawful activity.

All in violation of Title 18, United States Code, Section 1956(h).

## COUNT 7

1.    From in or about 1998, and continuing thereafter up to and including in or about January 2000, at Broward County, in the Southern District of Florida and elsewhere, the defendants,

JOHN MAMONE, and
MICHAEL BUCCINNA,

15

did knowingly conspire, confederate, and agree with each other and with other persons known and unknown to the Grand Jury to commit offenses against the United States, that is, to violate Title 18, United States Code, Sections 1956(a) (1) (A) (i) and (B) (i) and 1957.

### THE PURPOSE AND OBJECTS OF THE CONSPIRACY

2.    It was the purpose and object of the conspiracy to knowingly and willfully conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, that is the cashing of checks obtained through a foreign currency exchange investment fraud, which involved the proceeds of specified unlawful activity, specifically, mail fraud, in violation of Title 18, United States Code, Section 1341, and wire fraud, in violation of Title 18, United States Code, Section 1343, with the intent to promote the carrying on of said specified unlawful activities, and knowing the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of said specified unlawful activities and knowing that the property involved represented the proceeds of some form of unlawful activity.

3.    It was also the purpose and object of the conspiracy to knowingly and willfully engage and attempt to engage in monetary transactions affecting interstate and foreign commerce in criminally derived property that was of a value greater than $10,000, which was derived from specified unlawful activity, that is, mail fraud in violation of Title 18, United States Code, Section 1341, and wire fraud in violation of Title 18, United States Code, Section 1343, which property was obtained from a foreign currency exchange investment fraud.

All in violation of Title 18, United States Code, Section 1956(h).

### COUNT 8 - 10

1.    On or about the dates enumerated as to each of these Counts of the Indictment, in the Southern District of Florida and elsewhere, the defendant,

JOHN MAMONE,

and other persons did knowingly engage and attempt to engage and did aid and abet, counsel, command, induce, and procure and cause the engaging and attempts to engage in the following monetary transactions in various amounts, as described below, each transaction occurring on or about the date indicated and constituting a separate count of the Indictment, by, through and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, that is, the deposit, withdrawal, and. transfer of funds, such property having been derived from specified unlawful activity, specifically, mail fraud, in violation of Title 18, United States Code, Section 1341, and wire fraud, in violation of Title 18, United States Code, Section 1343, which property was from a foreign currency exchange fraud.

| COUNT | DATE | AMOUNT | MONETARY TRANSACTION |
|---|---|---|---|
| 8 | November 10, 1999 | $30,000.00 | Negotiation at Akel's Market of check Number #002567209, payable to International Mercantile Corp. drawn on account at the Huntington Bank |
| 9 | November 10, 1999 | $20,000.00 | Negotiation at Akel's Market of check Number #002567210, payable to International Mercantile Corp. drawn on account at the Huntington Bank |
| 10 | November 17, 1999 | $30,000.00 | Negotiation at Akel's Market of check Number #002567221, payable to International Mercantile Corp. drawn on account at the Huntington Bank |

All in violation of Title 18, United States Code, Section 1957 and 2.

COUNTS 11 - 13

1       On or about the dates enumerated as to each of these Counts of the Indictment, in the Southern District of Florida and elsewhere, the defendant, JOHN MAMONE, and other persons did knowingly engage and attempt to engage and did aid and abet, counsel, command, induce, and procure and cause the engaging and attempts to engage in the following monetary

17

transactions in various amounts, as described below, each transaction occurring on or about the date indicated and constituting a separate count of the Indictment, by, through and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, that is, the deposit, withdrawal, and transfer of funds, such property having been derived from specified unlawful activity, specifically, mail fraud, in violation of Title 18, United States Code, Section 1341, and wire fraud, in violation pf Title 18, United States Code, Section 1343, Code, Section 1341, and wire fraud, in violation of Title 18, United States Code, Section 1343, which property was obtained from a foreign currency exchange investment fraud and lottery scheme.

| COUNT | DATE | AMOUNT | MONETARY TRANSACTION |
|---|---|---|---|
| 11 | July 7, 1999 | $11,189.80 | Deposit of three checks payable to IGT, Inc., International Gaming Trust, and International Gaming & Trust into account of Check Cashing Unlimited II, at Pointe Bank. |
| 12 | July 28, 1999 | $15,000.00 | Deposit of check payable to IGT, Inc into account of Check Cashing Unlimited II, at Republic Security Bank. |
| 13 | December 1, 1999 | $30,000.00 | Deposit of three checks payable to International Mercantile Corp. into account of Check Cashing Unlimited II, at Republic Security Bank |

All in violation of Title 18, United States Code, Sections 1957 and 2.

COUNT 14

1.    From in or about July 1999, and continuing thereafter up to and including in or about November 2000, at Broward County, in the Southern District of Florida and elsewhere, the defendants,

JOHN MAMONE,
JOSEPH RUSSO,
FRED MORGENSTERN,

DAVID MORGENSTERN,
JOSEPH SILVESTRI,
MICHAEL BUCCINNA,
DAVID BELL,
MARK WEISS, and
DOREEN RUSSO,

did knowingly and intentionally conspire, confederate, and agree with each other and with other persons known and unknown to the Grand Jury to commit offenses against the United States, that is, to violate Title 18, United States Code, Sections 1956 (a) (1) (A) (i) and (B) (i) and 1957.

## THE PURPOSE AND OBJECTS OF THE CONSPIRACY

2.      It was a purpose and object of the conspiracy to knowingly and willfully conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, that is the cashing of checks obtained from a South Carolina based investment fraud, which involved the proceeds of specified unlawful activity, specifically, mail fraud, in violation of Title 18, United States Code, Section 1341, and wire fraud, in violation of Title 18, United States Code, Section 1343, with the intent to promote the carrying on of said specified unlawful activities and knowing the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of said specified unlawful activities and knowing that the property involved represented the proceeds of some form of unlawful activity.

3.      It was also a purpose and object of the conspiracy to knowingly and willfully engage and attempt to engage in monetary transactions affecting interstate and foreign commerce in criminally derived property that was of a value greater than $10,000, which was derived from specified unlawful activity, that is, mail fraud in violation of Title 18, United States Code, Section 1341, and wire fraud in violation of Title 18, United States Code, Section 1343, which property was obtained from a South Carolina based investment fraud.

All in violation of Title 18, United States Code, Section 1956 (h).

## COUNT 15

1.    On or about September 21, 1999, in the Southern District of Florida, and elsewhere, the defendants,

JOHN MAMONE,
FRED MORGENSTERN,

and other persons did knowingly engage and attempt to engage in a monetary transaction by, through and to a financial institution affecting interstate and foreign commerce in criminally derived property of a value greater than $10,000, that is the exchange of twenty-one monetary instruments in the amount of approximately $1,046,451, such property having been derived from specified unlawful activities, that is, mail fraud in violation of Title 18, United States Code, Section 1341 and wire fraud in violation of Title 18, United States Code, Section 1343, which property was obtained from a South Carolina based investment fraud.

All in violation of Title 18, United States Code, Sections 1957 and 2.

COUNTS 16 - 45

1.    On or about the dates enumerated as to each of these Counts of the Indictment, in the Southern District of Florida, and elsewhere, the defendants,

JOHN MAMONE,
FRED MORGENSTERN,
DAVID MORGENSTERN,
JOSEPH SILVESTRI,
MICHAEL BUCCINNA,
MARK WEISS,

and other persons did knowingly engage and attempt to engage and did aid and abet, counsel, command, induce, and procure and cause the engaging and attempts to engage in the following monetary transactions in various amounts, as described below, each transaction occurring on or about the date indicated and constituting a separate count of the Indictment, by, through and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, that is, the deposit, withdrawal, and transfer of funds, such property having been derived from specified unlawful activity, specifically, mail fraud, in violation of Title 18, United States Code, Section 1341, and wire fraud, in violation of Title 18, United States

Code, Section 1343, which property was obtained from a South Carolina based investment fraud.

| COUNT | DATE | AMOUNT | MONETARY TRANSACTION |
|---|---|---|---|
| 16 | August 9, 1999 | $2,800,000.00 | Outgoing wire transfer from Admiralty Bank to Barclays Bank, New York for AIBC at Barclays Bank, the Bahamas |
| 17 | September 29, 1999 | $261,914.21 | Deposit of Chemical Trust Checks into Gold Coast - Admiralty Bank, account number 300139047 |
| 18 | December 1, 1999 | $577,296.94 | Deposit of Chemical Trust Checks into Gold Coast - Admiralty Bank, account number 300139047 |
| 19 | October 12, 1999 | $297,000.00 | Deposit of Chemical Trust Checks into Americas Resource Citibank, account number 3200395518 |
| 20 | October 12, 1999 | $449,578.26 | Deposit of Chemical Trust Checks into Gold Coast - Admiralty Bank, account number 300139047 |
| 21 | October 12, 1999 | $262,259.16 | Deposit of Chemical Trust Checks into Gold Coast Admiralty Bank, account number 300139047 |
| 22 | October 12, 1999 | $250,940.77 | Deposit of Chemical Trust Checks into Gold Coast Admiralty Bank, account number 300139047 |

| 23 | October 20, 1999 | $425,000.00 | Outgoing wire transfer from Citibank to The Falcon Trust, in Barclays Bank, London, England, Account Number 63772677 |
| 24 | October 22, 1999 | $266,602.02 | Deposit of Chemical Trust Checks into Americas Resource Citibank, account Number 3200395518 |
| 25 | October 28, 1999 | $233,294.52 | Deposit of Chemical Trust Checks into Americas Resource Citibank, account Number 3200395518 |
| 26 | November 3, 1999 | $550,000.00 | Outgoing wire transfer from Citibank to The Falcon Trust, in Barclays Bank, London, England, Account Number 63772677 |
| 27 | November 4, 1999 | $1,000,000.00 | Outgoing wire transfer from Citibank to The Falcon Trust, in Barclays Bank, London, England, Account Number 63772677 |
| 28 | November 5, 1999 | $500,000.00 | Withdrawal of funds by check drawn on the account of Americas Resource Citibank |
| 29 | November 15, 1999 | $1,000,000.00 | Outgoing wire transfer from Citibank to The Falcon Trust, in Barclays Bank, London, England, Account Number 63772677 |
| 30 | November 15, 1999 | $402,137.00 | Deposit of Chemical Trust Checks into Americas Resource Citibank, account Number 3200395518 |
| 31 | November 16, 1999 | $292,244.32 | Deposit of Chemical Trust Checks into Americas Resource Citibank, account number 3200395518 |
| 32 | November 17, 1999 | $350,000.00 | Deposit of Chemical Trust Checks into Americas Resource Citibank, account number 3200395518 |
| 33 | November 18, 1999 | $500,000.00 | Withdrawal of funds by check drawn on the account of Americas Resource Citibank |

| 34 | December 1, 1999 | $374,180.24 | Deposit of Chemical Trust Checks into Americas Resource Citibank, account number 3200395518 |
| 35 | December 7, 1999 | $1,250,174.70 | Deposit of Chemical Trust Checks into Americas Resource Citibank, account number 3200395518 |
| 36 | December 15, 1999 | $258,654.13 | Deposit of Chemical Trust Checks into Americas Resource Citibank, account number 3200395518 |
| 37 | December 17, 1999 | $500,000.00 | Outgoing wire transfer from Citibank to The Falcon Trust, in Barclays Bank, London, England, Account Number 63772677 |
| 38 | December 20, 1999 | $500,000.00 | Withdrawal of funds by check drawn on account of Americas Resource Citibank |
| 39 | December 21, 1999 | $651,567.00 | Deposit of Chemical Trust Checks into Americas Resource Citibank, account number 3200395518 |
| 40 | December 21, 1999 | $598,990.00 | Deposit of Chemical Trust Checks into Americas Resource Citibank, account number 3200395518 |
| 41 | December 22, 1999 | $827,689.00 | Deposit of Chemical Trust Checks into Americas Resource Citibank, account number 3200395518 |
| 42 | December 23, 1999 | $300,358.99 | Deposit of Chemical Trust Checks into Americas Resource Citibank, account number 3200395518 |
| 43 | December 28, 1999 | $622,159.55 | Deposit of Chemical Trust Checks into Americas Resource Citibank, account number 3200395518 |
| 44 | December 29, 1999 | $297,019.68 | Deposit of Chemical Trust Checks into Americas Resource Citibank, account number 3200395518 |
| 45 | December 31, 1999 | $500,000.00 | Withdrawal of funds by check drawn on account of Americas Resource Citibank |

All violation of Title 18, United States Code, Sections 1957 and 2.

COUNTS 46 - 47

1.    On or about the dates enumerated as to each of these Counts of the Indictment, in the Southern District of Florida, and elsewhere, the defendants,

JOHN MAMONE,
FRED MORGENSTERN

and other persons did knowingly engage and attempt to engage and did aid and abet, counsel, command, induce, an& procure and cause the engaging and attempts to engage in the following monetary transactions in various amounts, as described below, each transaction occurring on or about the date indicated and constituting a separate count of the Indictment, by, through and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, that is, the deposit, withdrawal, and transfer of funds, such property having been derived from specified unlawful activity, specifically, mail fraud, in violation of Title 18, United States Code, Section 1341, and wire fraud, in violation of Title 18, United States Code, Section 1343, which property was from a South Carolina based investment fraud

| COUNT | DATE | AMOUNT | FINANCIAL TRANSACTION |
|-------|------|--------|------------------------|
| 46 | December 21, 1999 | $313,284.47 | Wire transfer of Chemical Trust funds from Merrill Lynch account number 735- 07998 titled Check Cashing Unlimited into account number 0020012751 at Peninsula Bank in the name of Gold Coast Check Cashing |
| 47 | December 23, 1999 | $50,000.00 | Wire transfer of Chemical Trust funds from Merrill Lynch account number 735- 07998 titled Check Cashing Unlimited into account number 0020012751 at Peninsula Bank in the name of Gold Coast Check Cashing |

All violation of Title 18, United States Code, Sections 1957 and 2.

COUNTS 48 - 49

1.    On or about the dates enumerated as to each of these Counts of the Indictment in the Southern District of Florida, and elsewhere, the defendants,

24

JOHN MAMONE,
FRED MORGENSTERN,
MARK CARATTINI,

and other persons did knowingly engage and attempt to engage and did aid and abet, counsel, command, induce, and procure and cause the engaging and attempts to engage in the following monetary transactions in various amounts, as described below, each transaction occurring on or about the date indicated and constituting a separate count of the Indictment, by, through and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, that is, the deposit, withdrawal, and transfer of funds, such property having been derived from specified unlawful activity, specifically, mail fraud, in violation of Title 18, United States Code, Section 1341, and wire fraud, in violation of Title 18, United States Code, Section 1343, which property was from a South Carolina based investment fraud.

| 48 | December 21, 1999 | $50,000.00 | Wire transfer of Chemical Trust funds from Merrill Lynch account number 735-07998 titled Check Cashing Unlimited into account number 0055226706 at Bank Atlantic in the name of Premier Tickets, Inc. |
| 49 | January 19, 2000 | $70,000.00 | Wire transfer of Chemical Trust funds from Merrill Lynch account number 735-07A02 titled J. M. & Sons Enterprises, Inc. into account number 0055226706 at Bank Atlantic in the name of Premier Tickets, Inc. |

All violation of Title 18, United States Code, Sections 1957 and 2.

## COUNTS 50 - 53

1. On or about the dates enumerated as to each of these Counts of the Indictment, in the Southern District of Florida, and elsewhere, the defendants,

JOHN MAMONE,
JOSEPH RUSSO,

25

FRED MORGENSTERN,
DOREEN RUSSO,

and other persons did knowingly engage and attempt to engage and did aid and abet, counsel, command, induce, and procure and cause the engaging and attempts to engage in the following monetary transactions in various amounts, as described below, each ransaction occurring on or about the date indicated and constituting a separate count of the Indictment, by, through and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, that is, the deposit, withdrawal, and transfer of funds, such property having been derived from specified unlawful activity, specifically, mail fraud, in violation of Title 18, United States Code, Section 1341, and wire fraud, in violation of Title 18, United States Code, Section 1343, which property was from a South Carolina based investment fraud.

| 50 | January 12, 2000 | $100,000.00 | Wire transfer of Chemical Trust funds from Merrill Lynch account number 735-07998 titled Check Cashing Unlimited into account number 1090007136287 at First Union Bank in the name of DOREEN RUSSO |
| 51 | January 12, 2000 | $100,000.00 | Negotiation of check payable to Linda DiCamilio from the account of DOREEN RUSSO at First Union Bank |
| 52 | April 10, 2000 | $30,000.00 | Negotiation of check from a Merrill Lynch account of J.M.& Son Enterprises, Inc. payable to DOREEN RUSSO |
| 53 | October 10, 2000 | $142,000.00 | Deposit of check payable to DOREEN RUSSO into account of DOREEN RUSSO at First Union National Bank |

All violation of Title 18, United States Code, Sections 1957 and 2.

COUNTS 54 - 55

1.    On or about the dates enumerated as to each of these Counts of the Indictment, in the Southern District of Florida, and elsewhere, the defendants,

26

JOHN MAMONE,
FRED MORGENSTERN,
DAVID BELL,

and other persons did knowingly engage and attempt to engage and did aid and abet, counsel,

command, induce, and procure and cause the engaging and attempts to engage in the following

monetary transactions in various amounts, as described below, each transaction occurring on or

about the date indicated and constituting a separate count of the Indictment, by, through and to a

financial institution, affecting interstate and foreign commerce, in criminally derived property of

a value greater than $10,000, that is, the deposit, withdrawal, and transfer of funds, such property

having been derived from specified unlawful activity, specifically, mail fraud, in violation of

Title 18, United States Code, Section 1341, and wire fraud, in violation of Title 18, United States

Code, Section 1343, which property was from a South Carolina based investment fraud.

| 54 | February 3, 2000 | $100,000.00 | Chemical Trust funds from Merrill Lynch account number 735-07A02 titled J. M. & Sons Enterprises, Inc into account number 55971657 at Bank Atlantic in the name of Gateway Transportation. |
| 55 | February 10, 2000 | $75,000.00 | Chemical Trust funds from Merrill Lynch account number 735-07A02 titled J. M. & Sons Enterprises, Inc into account number 55971657 at Bank Atlantic in the name of Gateway Transportation. |

All violation of Title 18, United States Code, Sections 1957 and 2.

## FORFEITURE

1. Count 1 of this Indictment is re-alleged and hereby incorporated herein by reference

for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 1963

Through the pattern of racketeering activity, defendants

JOHN MAMONE,
JOSEPH RUSSO,

27

FRED MORGENSTERN,
DAVID MORGENSTERN,
JOSEPH SILVESTRI,
MICHAEL BUCCINNA,
DAVID BELL,
JOHN O'SULLIVAN,
MARK CARATTINI,
AbTSON KLINGER, and
MARK WEISS,

1. acquired and maintained interests in violation of Title 18, United States Code, Section 1962, which interests are subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963 (a) (1);13 ...An interest in, security of, claims against, and property and contractual rights which afford a source of influence over the enterprise named and described herein which they established, operated, controlled, conducted, and participated in the conduct.

All violation of Title 18, United States Code, Sections 1957 and 2.

## FORFEITURE

1.     Count 1 of this Indictment is realleged and hereby incorporated herein by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 1963.

Through the pattern of racketeering activity, defendants

JOHN MAMONE,
JOSEPH RUSSO,
FRED MORGENSTERN,
DAVID MORGENSTERN,
JOSEPH SILVESTRI,
MICHAEL BUCCINNA,
DAVID BELL,
JOHN O'SULLIVAN,
MARK CARATTINI,
ANSON KLINGER, and
MARK WEISS,

i.     acquired and maintained interests in violation of Title 18, United States Code, Section 1962, which interests are subject to forfeiture to the United States pursuant to Title 18,

United States Code, Section 1963 (a) (1),

      ii.    an interest in, security of, claims against, and property and contractual rights which afford a source of influence over the enterprise named and described herein which they established, operated, controlled, conducted, and participated in the conduct of, in violation of Title 18, United States Code, Section 1962, which interests, securities, claims, and rights are subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963 (a) (2),

      iii.    property constituting and derived from proceeds which the defendants obtained, directly and indirectly, from racketeering activity in violation of Title 18, United States Code, Section 1962, which property is subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963 (a) (3) Such forfeitable interests include, but are not limited to, the following:

      A.    Approximately $35,000,000 in United States currency and interest and proceeds that the defendants obtained, directly and indirectly, from the aforesaid pattern of racketeering activity during the period charged in Count 1, in violation of Title 18, United States Code, Sections 1962 and 1963 (a) (3).

      B.    All interest in Gold Coast Check Cashing, Inc., doing business as Gold Coast Check Cashing, a Florida corporation, located at 5701 Margate Blvd., Margate, Florida and at 3591 N. Andrews Ave., Oakland Park, Florida.

      C.    All interest in Check Cashing Unlimited, Inc., a Florida corporation doing business as Check Cashing Unlimited, located at 5701 Margate Blvd., Margate, Florida

      D.    All interest in Gateway Transportation Services, Inc., a Florida corporation, whose business address was 7770 W. Oakland Park Blvd., Sunrise, Florida.

      E.    All interest in J.M. and Sons Enterprises, Inc., a

Florida Corporation, whose business is 1960 Augusta Terrace, Coral Springs, Florida

      F. All interest in one parcel of real estate located at 11255 S.W. 93rd Court, Miami, Florida.

If any of the above-described forfeitable property as a result of any act or omission of a defendant or the defendants:

1. cannot be located upon the exercise due diligence;

2. has been transferred to, sold to, or deposited with a third person;

3. has been placed beyond the jurisdiction of the court;

4. has been substantially diminished in value; or,

5. has been commingled with other property which cannot be subdivided without difficulty; it is the intent of the United States, pursuant to Title 18, United States Code, Section 1963(m), to seek forfeiture of any other property of said defendants up to the value of the above-described forfeitable property, including but not limited to:

(a)    One parcel of real estate located at 1960 Augusta Terrace, Coral Springs, Florida;

(b)    One parcel of real estate known as 7534 Estrella Circle, Boca Raton, Florida;

(c)    One parcel of real estate located at 4973 NW $115$th Terr, Coral Springs, Florida.

(d)    One parcel of real estate located at 7705 Andes Lane, Parkland, Florida.

All pursuant to Title 18, United States Code, Section 1963.

2. Counts 6 through 55 of this Indictment are re-alleged and hereby incorporated by reference herein for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 982. As a result of the offenses charged in Counts **six** through fifty of this Indictment, defendants:

JOE MAMONE,
JOSEPH RUSSO,
FRED MORGENSTERN,
DAVID MORGENSTERN,
JOSEPH SILVESTRI,
MICHAEL BUCCINNA,
DAVID BELL,
MARK WEISS
MARK CARATTINI,
ANSON KLINGER, and
DOREEN RUSSO,

shall forfeit to the United States all property, real and personal, involved in the aforesaid offenses and all property traceable to such property, as to which property the defendants are jointly and severally liable, including but not limited to the following:

A.    All property to be forfeitable in paragraphs 1 (A) through 1(F) of the Forfeiture Section of this Indictment relating to Count One of this Indictment, as set forth above, which is incorporated herein by reference as if set forth in full.

If any of the above-described forfeitable property as a result of any act or omission of a defendant or the defendants:

1.    cannot be located upon the exercise due diligence;

2.    has been transferred to, sold to, or deposited with a third person;

3.    has been placed beyond the jurisdiction of the court;

4.    has been substantially diminished in value; or

5    has been commingled with other property which cannot be subdivided without difficulty;

It is the intent of the United States, pursuant to Title 18, United States Code, Section 982, to seek forfeiture of any other property of said defendants up to the value of the above-described forfeitable property, including but not limited to:

(a)    One parcel of real estate located at 1960 Augusta Terrace, Coral Springs, Florida;

(b)    One parcel of real estate known as 7534 Estrella Circle, Boca Raton, Florida;

(c)    One parcel of real estate located at 4973 NW 115th Terr, Coral Springs, Florida.

(d)    One parcel of real estate located at 7705 Andes Lane, Parkland, Florida.

All pursuant to Title 18, United States Code, Section 982.

A TRUE BILL

FORE PERSON
UNITED STATES ATTORNEY
BRIAN McCORMICK
ASSISTANT UNITED STATES ATTORNEY
A  FERNANDEZ
ASSISTANT UNITED STATES ATTORNEY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NUMBER **02-60101**

18 U.S.C. 1952
18 U.S.C. 2       **CR-DIMITROULEAS**

**MAGISTRATE** JUDGE
SNOW

UNITED STATES OF AMERICA,

        Plaintiff,

v.

FRED MORGENSTERN,

        Defendant.

_____/

INFORMATION

THE UNITED STATES ATTORNEY CHARGES:

1.    On or about November 4, 1999, in the Southern District of

Florida and elsewhere, the defendant, FRED MORGENSTERN, did use and

cause to be used a facility in interstate and foreign commerce with

intent to distribute the proceeds of an unlawful activity,

proceeds derived from a violation of Title 18, United States Code,

Section 1956, that is, an outgoing wire transfer of $1,000,000.00

from Citibank, Americas Resources account, to Barclay's Bank,

London, England.

All in violation of Title 18, United States Code, Sections

1952 and 2.


GUY A. LEWIS
UNITED STATES ATTORNEY


J. BRIAN MCCORMICK
ASSISTANT UNITED STATES ATTORNEY


DIANA L.W. FERNANDEZ
ASSISTANT UNITED STATES ATTORNEY

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6309-CR-DIMIROULEAS(S)(S)



FILED
JUl 19 2002
LARRY W. PROPES, CLERK
U. S. DISTRICT COURT

8.02-CR-714

UNITED STATES OF AMERICA,

       Plaintiff,

v.

FRED MORGENSTERN,

       Defendant.
_____/

FILED by _____ D.C.
MAY 21 2002
CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. FT. LAUD.

## PLEA AGREEMENT

The United States of America and FRED MORGENSTERN (hereinafter referred to as the "defendant") enter into the following agreement:

1. The defendant agrees to plead guilty to Count 14 of the second superseding indictment, which count charges the defendant with conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 1956(h). The object of the conspiracy to which the defendant agrees to plead guilty is a violation of Title 18, United States Code, Section 1957 (engaging in a monetary transaction in property derived from specified unlawful activity).

2. The defendant also agrees to waive indictment and plead guilty to a one-count information charging a violation of Title 18, United States Code, Section 1952 (Interstate and foreign travel or transportation in aid of racketeering enterprises).





3.    The United States agrees to seek dismissal of the remaining counts of the second superseding indictment, as to this defendant, after sentencing.

4.   The defendant is aware that the sentence will be imposed in conformity with the Federal Sentencing Guidelines and Policy Statements (hereinafter "Sentencing Guidelines"), and that the applicable guidelines will be determined by the Court relying in part on the results of a Pre-Sentence Investigation by the Court's probation office, which investigation will commence after the guilty plea has been entered.   The defendant is also aware that, under certain circumstances, the Court may depart from the applicable guideline range and impose a sentence that is either more severe or less severe than the guidelines range.   Knowing these facts, the defendant understands and acknowledges that the Court has the authority to impose any sentence within and up to the statutory maximum authorized by law for the offense identified in paragraphs 1 and 2 and that the defendant may not withdraw the plea solely as a result of the sentence imposed.

5.  The defendant also understands and acknowledges that the Court may impose a statutory maximum term of imprisonment of up to ten years on Count 14, followed by a term of supervised release of up to three years.   In addition, the Court may impose a fine of up to $250,000, or twice the amount of the criminally derived property, whichever is greater, and must impose restitution.   As to the information, the defendant understands

2

that the Court may impose a maximum term of imprisonment of up to
five years on Count 1 of the information, a fine of $250,000,
followed by a term of supervised release of up to three years.
The government recommends that no fine be imposed in this matter
in lieu of forfeiture and restitution. The maximum total term of
imprisonment is 15 years and the maximum term of supervised
release is 6 years.

6. The defendant further understands and acknowledges that,
in addition to any sentence imposed under paragraph 5 of this
agreement, a special assessment in the amount of $100.00 will be
imposed on the defendant on each count. The defendant agrees
that any special assessment imposed shall be paid at the time of
sentencing.

7. The government reserves the right to inform the Court
and the probation office of all facts pertinent to the sentencing
process, including all relevant information concerning the
offenses committed, whether charged or not, as well as concerning
the defendant and the defendant's background. Subject only to
the express terms of any agreed-upon sentencing recommendations
contained in this agreement, the government further reserves the
right to make any recommendation as to the quality and quantity
of punishment.

8. The United States agrees that it will recommend at
sentencing that the Court reduce by three levels the sentencing
guideline level applicable to the defendant's offense, pursuant

3

to Section 3E1.1 of the Sentencing Guidelines, based upon the defendant's recognition and affirmative and timely acceptance of personal responsibility. However, the United States will not be required to make this sentencing recommendation if the defendant: (1) fails or refuses to make full, accurate and complete disclosure to the probation office of the circumstances surrounding the relevant offense conduct; (2) is found to have misrepresented facts to the government prior to entering this plea agreement; or (3) commits any misconduct after entering into this plea agreement, including but not limited to committing a state or federal offense, violating any term of release, or making false statements or misrepresentations to any governmental entity or official.

9. The defendant agrees to the entry of a forfeiture order (jointly and severally liable with Virgil Womack and other coconspirators in this case) pursuant to Title 18 U.S.C. Section 982 and/or restitution order (without accruing interest) in the amount of $31,273,273.58. The United States agrees that the defendant shall receive credit against this judgment amount for the repatration of $17,769,346.22 transferred from Barclays Bank, London, England, Account #63772677 in the name of the "Falcon Trust Co. Ltd." The defendant further voluntarily surrenders, and agrees not to contest the forfeiture of, all property subject to forfeiture pursuant to Title 18, United States Code, Section 982, which includes any property in possession of the court-

4

appointed Receiver in the matter of <u>United States v. Womack</u> in the District of South Carolina, Greenville Division, and any other assets which may be located by the United States at a future time and subject to forfeiture under that Section, or as substitute property thereof. The defendant further agrees to prevent the disbursement, relocation or encumbrance of any such property subject to forfeiture and agrees to fully assist the United States in the recovery and return to the United States of any such property, or portions thereof, wherever located. The defendant further agrees to make a full and complete disclosure of all assets over which the defendant ever exercised control, currently has control, individually or jointly, or those which are held or controlled by any nominee. With respect to property subject to forfeiture under Title 18, United States Code, Section 982, the defendant further agrees to take whatever steps are necessary to pass clear title to the United States, including, but not limited to, the surrender of title and the signing of any other documents necessary to effectuate such transfers. The defendant further agrees not to file any claim or otherwise object to any civil forfeiture proceedings brought against any property subject to forfeiture.

10. The United States agrees that it will not recommend an upward departure from the guidelines under U.S.S.G. Section 5K as determined by the Court based upon the nature of the offense, the

5

defendant's relevant offense conduct, or the background of the defendant.

11. The defendant agrees that he shall cooperate fully with this Office by:

(a) providing truthful and complete information and testimony, and producing documents, records and other evidence, when called upon by this Office, whether in interviews, before a grand jury, or at any trial or other Court proceeding; and,

(b) appearing at such grand jury proceedings, hearings, trials, and other judicial proceedings, and at meetings, as may be required by this Office.

12. The government reserves the right to evaluate the nature and extent of the defendant's cooperation and to make the defendant's cooperation, or lack thereof, known to the Court at the time of sentencing. If in the sole and unreviewable judgment of the government the defendant's cooperation is of such quality and significance to the investigation or prosecution of other criminal matters as to warrant the Court's downward departure from the sentence required by the Sentencing Guidelines, the government may at or before sentencing make a motion pursuant to Section 5K1.1 of the Sentencing Guidelines, or a Rule 35 motion subsequent to sentencing, reflecting that the defendant has provided substantial assistance and recommending a reduction in sentence. The defendant acknowledges and agrees, however, that nothing in this Agreement may be construed to require the

6

government to file such a motion and that the government's assessment of the nature, value, truthfulness, completeness, and accuracy of the defendant's cooperation shall be binding on the defendant.

13. The defendant understands and acknowledges that the Court is under no obligation to grant a government motion pursuant to Title 18, United States Code, 5K1.1 of the Sentencing Guidelines or Rule 35 of the Federal Rules of Criminal Procedure, as referred to in paragraph 12 of this agreement, should the government exercise its discretion to file such a motion.

14. The defendant is aware that Title 18, United States Code, Section 3742 affords the defendant the right to appeal the sentence imposed in this case. Acknowledging this, in exchange for the undertakings made by the United States in this plea agreement, the defendant hereby waives all rights conferred by Title 18, United States Code, Section 3742 to appeal any sentence imposed, including any restitution or forfeiture order, or to appeal the manner in which that sentence was determined, unless (1) the sentence exceeds the maximum permitted by statute, (2) the sentence is the result of an upward departure from the guideline range the Court establishes at sentencing, and/or (3) the Court decides not to follow one or more of the sentencing recommendations made pursuant to paragraph 8, above. The defendant further understands that nothing in this agreement shall affect the government's right and/or duty to appeal as set

7

forth in 18 U.S.C. § 3742(b). However, if the United States appeals the defendant's sentence pursuant to Section 3742(b), the defendant shall be released from the above waiver of appellate rights. The defendant understands that, although the defendant will be sentenced in conformity with the Sentencing Guidelines, by this agreement the defendant waives the right to appeal the sentence on the basis that the sentence is the result of an incorrect application of the Sentencing Guidelines.

15. The defendant is aware that the sentence has not yet been determined by the Court. The defendant also is aware that any estimate of the probable sentencing range or sentence that the defendant may receive, whether that estimate comes from the defendant's attorney, the government, or the probation office, is a prediction, not a promise, and is not binding on the government, the probation office or the Court. The defendant understands further that any recommendation that the government makes to the Court as to sentencing, whether pursuant to this agreement or otherwise, is not binding on the Court and the Court may disregard the recommendation in its entirety. The defendant understands and acknowledges, as previously acknowledged in paragraph 4 above, that the defendant may not withdraw his plea based upon the Court's decision not to accept a sentencing

8

recommendation made by the defendant, the government, or a recommendation made jointly by both the defendant and the government.

16. This is the entire agreement and understanding between the United States and the defendant. There are no other agreements, promises, representations, or understandings.

GUY A. LEWIS
UNITED STATES ATTORNEY

Date: 5/21/02

J. BRIAN McCORMICK
ASSISTANT UNITED STATES ATTORNEY

Date: 5/21/02

DIANA L.W. FERNANDEZ
ASSISTANT UNITED STATES ATTORNEY

Date: 5/21/02

JAMES PAVLOCK
SENIOR TRIAL ATTORNEY

Date: 05/21/2002

FRED MORGENSTERN
DEFENDANT

Date: 5/21/02

WILLIAM M. NORRIS, ESQ.
ATTORNEY FOR DEFENDANT

9

## POSITION OF PARTIES WITH
## RESPECT TO SENTENCING FACTORS

|  |  |  |
|---|---|---|
| **RE:** | **Fred Morgenstern** | |
| **SD/FL PACTS No:** | 66010 | |
| **DOCKET NO:** | 00-6309-CR-Dimitrouleas | |
| | 02-60101-CR-Dimitrouleas | |
| **OBJECTIONS DUE BY:** | **March 28, 2003** | |
| **DATE AVAILABLE for DISCLOSURE:** | March 14, 2003 | |

I have read the presentence investigation completed by the United States Probation Office.

\_\_\_\_\_ There are no disputed facts.

\_\_\_\_\_ There are unresolved factual
disputes which are attached.


_____        _____

(Defendant)                                  (Date)


_____        _____        Miami, Florida
                                                                                              _____
(Defense Attorney)                     (Date)                              (Location)
Michael J. Rosen


_____        _____        Ft. Lauderdale, Florida
                                                                                              _____
(Assistant U.S. Attorney)            (Date)                              (Location)
J. Brian McCormick

Return To:    Edward L. Cooley
                     U. S. Probation Officer
                     Federal Courthouse Building
                     299 East Broward Blvd., Room 409
                     Ft. Lauderdale, FL 33301-1865

C O N F I _ E N T I A L
PROPERTY OF U.S. COURTS.

This document is not to be disclosed to any party not officially involved in the pre and post sentencing aspects of this case without approval of the Court, Rule 32(b)(3), (6)(A)

**SD/FL PACTS #66010**

# UNITED STATES DISTRICT COURT
## FOR THE
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| UNITED STATES OF AMERICA | )PRESENTENCE INVESTIGATION REPORT |
| | ) |
| v. | ) **Docket No. 00-6309-CR-Dimitrouleas(s)(s)** |
| | ) **Docket No. 02-60101-CR-Dimitrouleas** |
| Fred Morgenstern | ) **Defendant No. 3** |
| | ) **Defendant No. 1** |
| | ) **Guideline Manual: 1999** |
| | ) |

---

**Prepared for:**      The Honorable William P. Dimitrouleas
U. S. District Judge

**Prepared by:**      Edward L. Cooley
U. S. Probation Officer
299 E. Broward Blvd., Room 409
Ft. Lauderdale, FL 33301-1168
(954) 769-5532

<u>Assistant U. S. Attorney</u>
J. Brian McCormick
Diana L. W. Fernandez
500 East Broward Blvd.
Seventh Floor
Fort Lauderdale, FL 333394
(954)356-7255

<u>Defense Counsel</u>
Michael J. Rosen
2400 South Dixie Highway, #105
Miami, FL 33133-3141
(305)858-9700

**Sentence Date:**      April 18, 2003, Fort Lauderdale, FL

1

**Offense:** Docket No. 00-6309-CR-Dimitrouleas(s)(s)
<u>**Fifty-Five Count Second Superseding Indictment:**</u>
Count Fourteen: Conspiracy to commit money laundering, 18 U.S.C. § 1956(h), a class C felony

**Docket No. 02-60101-CR-Dimitrouleas**
<u>**One Count Information:**</u>
Using a facility in interstate and foreign commerce with intent to distribute the proceeds of an unlawful activity, 18 U.S.C. § 1952, a class D felony

**Penalty:** <u>**Docket No. 00-6309-CR-Dimitrouleas(s)(s)**</u>:
0 to 10 years imprisonment, $70,000,000 fine and $100 assessment

<u>**Docket No. 02-60101-CR-Dimitrouleas:**</u>
0 to 5 years imprisonment, $250,000 fine and $100 assessment

**Arrest Date:** <u>**Docket No. 00-6309-CR-Dimitrouleas:**</u>
October 26, 2000

<u>**Docket No. 02-60101-CR-Dimitrouleas:**</u>
May 21, 2002

**Release Status:** <u>**Docket No. 00-6309-CR-Dimitrouleas(s)(s)**</u>
November 13, 2000: Released on a $200,000 personal surety bond with 10% deposit and Pretrial Services supervision.
March 25, 2002: Bond revoked
July 12, 2002: Case transferred pursuant to Rule 20 to the District of South Carolina
July 23, 2002: Released on unsecured personal surety bond with Pretrial Services supervision

<u>**Docket No. 02-60101-CR-Dimitrouleas**</u>
July 23, 2002: Released on unsecured personal surety bond with Pretrial services supervision

**Detainers:** None

2

| | |
|---|---|
| **Codefendants:** | **Docket No. 00-6309-CR-Dimitrouleas(s)(s)** |

| | |
|---|---|
| Steve Raffa<br>a/k/a "Uncle Steve" | 12/06/00: Indictment dismissed |
| John Mamone<br>a/k/a "Big John" | 12/19/01: Pled guilty to Count One of the second superseding indictment.<br>9/16/02: 115 months imprisonment and three years supervised release<br>12/2/02: Restitution in the amount of $4,302, 899.71 ordered. |
| David Morgenstern | 5/21/02: Pled guilty to Count Fourteen of the second superseding indictment.<br>Sentencing is pending. |
| Joseph Silvestri | 6/6/02: Found guilty by jury as to Counts Fourteen and Sixteen through Forty-Five of the second superseding indictment.<br>Sentencing is pending. |
| Julius Bruce Chiusano | 7/30/01: Pled guilty to Count Six of the superseding indictment<br>11/9/01: 18 months imprisonment, 3 years supervised release and $100 special assessment |
| Michael Buccinna<br>a/k/a "Mikey Boots" | 1/28/02: Pled guilty to Count One of second superseding indictment<br>4/15/02: 58 months imprisonment, three years supervised release and $100 assessment |
| Jeffrey Bass | 10/2/01: Pled guilty to Count Two of the superseding indictment.<br>6/14/02: Four years probation and $10,000 fine |
| Frederick Scarola | Pending trial |

3

| | |
|---|---|
| Giuseppe Bellitto a/k/a "Joe Baldy" | 7/23/01: Pled guilty to Count Two of the superseding indictment 9/28/01: 5 months imprisonment, 3 years supervised release, $20,000 fine and $100 special assessment |
| Mark Carattini | 1/24/02: Pled guilty to Count One of the second superseding indictment 8/22/02: 15 months imprisonment and three years supervised release |
| Paul Difilippi | 8/9/01: Placed on 6 months pretrial diversion 2/11/02: Pretrial diversion successfully completed 2/26/02: Indictment dismissed |
| Anson Klinger | 1/29/02: Pled guilty to a one count superseding information 4/11/02: Three years probation and $100 assessment |
| Joseph Spitaleri | 6/4/01: Pled guilty to Count One of the indictment 11/13/01: 58 months imprisonment, 3 years supervised release, $1,757,438.17 restitution and $100 special assessment |
| Charles Clay | 4/1/02: Indictment dismissed |
| Peggy Preston | 10/3/01: Pled guilty to a one count superseding information 8/16/02: Four years probation |

4

| | |
|---|---|
| Mark Weiss | 5/17/02: Pled guilty to Count 14 of the second superseding indictment.<br>7/25/02: Five years probation |
| Jacolyn Baruch | 10/2/01: Pled guilty to Count Two of the indictment<br>9/25/02: Five years probation and $2,000 fine |
| David Bell | 2/4/02: Pled guilty to Count One of the second superseding indictment<br>8/16/02: 30 months imprisonment and three years supervised release<br>11/15/02: Restitution in the amount of $475,000 ordered |
| Joseph Russo a/k/a "JR" | 3/8/02: Pled guilty to Count 20 of the second superseding indictment<br>Sentencing is pending |
| John O'Sullivan a/k/a "Johnnie O" | 1/17/02: Pled guilty to Count One of the second superseding indictment<br>6/17/02: 11 months imprisonment, three years supervised release and $1,000 fine |
| Doreen Russo | 3/8/02: Pled guilty to a one count superseding information<br>7/31/02: Three years probation. $10,000 fine and $130,000 restitution |

## Docket No. 02-60101-CR-Dimitrouleas:

None

| | |
|---|---|
| **Related Cases:** | Docket No. 00-6206-CR-Zloch |
| | Docket No. 01-6161-CR-Dimitrouleas |
| | Docket No. 02-60100-CR-Dimitrouleas |

**Date Available for Disclosure:**                    **Date Report Revised:**
March 14, 2003

### Identifying Data

| | |
|---|---|
| **Date of Birth:** | October 28, 1948 |
| **Age:** | 53 |
| **Race:** | White/non-Hispanic |
| **Sex:** | Male |

| | |
|---|---|
| **S.S. #:** | 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 |
| **FBI #:** | 836639P9 |
| **USM #:** | 83239-012 |
| **Other ID #:** | FDLE# 03833495 |

| | |
|---|---|
| **Education:** | Some college |
| **Dependents:** | Three(wife and two children) |
| **Citizenship:** | United States |

| | |
|---|---|
| **Legal Address:** | 1400 N.W. 15th Court, #205 |
| | Boca Raton, FL 333486 |
| | (561) 362-7443 |

| | |
|---|---|
| **Alias:** | Frederick Earl Morgenstern (true name) |
| | Fred Morgenstern |
| | Fred Morganstern |
| | Fred E. Morganstern |

6

## PART A. THE OFFENSE

### Charge(s) and Conviction(s)

1.  **On May 21, 2002, the defendant pled guilty to Count 14 of a second superseding indictment in Case No. 00-6309-CR-Dimitrouleas(s)(s) charging him with conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). At the same time, he pled guilty to a one count information in Case No. 02-60101-CR-Dimitrouleas charging him with using a facility in interstate and foreign commerce with intent to distribute proceeds of an unlawful activity, in violation of 18 U.S.C. § 1952.**

2.  Pursuant to a written plea agreement, the government agrees to dismiss the remaining counts of Docket No. 00-6309-CR-Dimitrouleas(s)(s) after sentencing.  It is also agreed that the United States will not oppose a three level reduction for acceptance of responsibility pursuant to § 3E1.1. This is conditioned upon the defendant making a full and complete disclosure to the probation department regarding the offense.

3.  The United States and the defendant agree, that as it pertains to Count 14 of Docket No. 00-6309-CR-Dimitrouleas(s)(s), the object of the conspiracy to which the defendant is pleading guilty is engaging in monetary transactions in property derived from specified unlawful activity, in violation of 18 U.S.C. § 1957.

4.  The defendant agrees to the entry of a forfeiture order and/or a restitution order in the amount of $31,273,273.58.  The United States and the defendant agree that the defendant shall receive credit against this judgement in the amount of $17,769,346.22 transferred from Barclays Bank, London, England, Account No. 63772677 in the name of Falcon Trust Co. Ltd. The defendant also agrees to voluntarily surrender and not contest the forfeiture of all property subject to forfeiture, including any property in possession of the court appointed receiver in the matter of United States v. Womack in the District of South Carolina, and any other assets that may be located by the United States at a future time which may be subject to forfeiture.

5.  The defendant agrees to prevent the disbursement, relocation or encumbrance of any such property subject to forfeiture.  The defendant agrees to make a full and complete disclosure of all assets over which he has exercised control, currently has control, or those which are held or controlled by any nominee.

6.  The United States agrees that it will not recommend an upward departure from the applicable guideline range based on the nature of the offense, the defendant's relevant conduct, or the defendant's background.

7.    The defendant agrees that he will cooperate fully with the Office of the United States Attorney as requested. Following his cooperation, the government reserves the right to evaluate and make the court aware of the nature and extent of the defendant's cooperation. The government may make a motion for a downward departure pursuant to § 5K1.1 of the sentencing guidelines and/or 18 U.S.C. § 3553(e) reflecting the defendant's substantial assistance.

8.    On February 6, 2002, the government filed a motion for revocation of bond based on the following facts. On January 14, 2002, the Honorable G. Ross Anderson, Jr., U.S. District Court Judge, District of South Carolina, issued an Order and Rule to Show Cause in District of South Carolina Civil Case No 00-CV-236 requiring the defendant to appear in the federal courthouse in Greenville, South Carolina on January 31, 2002. The defendant subsequently failed to appear and an arrest warrant charging the defendant with criminal contempt was issued. On February 1, 2002, the defendant was arrested pursuant to the warrant and subsequently returned to the District of South Carolina. On February 28, 2002, a hearing was held in the District of South Carolina and the court found the defendant guilty of criminal contempt in Case No. 8:00-cr27. He was subsequently sentenced to 35 days imprisonment. On March 25, 2002, a hearing was held in the Southern District of Florida regarding the government's motion for revocation of bond. At that time, the court revoked the defendant's bond based on his conviction in the South Carolina criminal contempt matter. On July 12, 2002, the defendant's cases were transferred pursuant to Rule 20 to the District of South Carolina, and on July 23, 2002, the defendant was again released on bond. According to U.S. Pretrial Services Officer Kathleen Shannon Hunt, the defendant has complied with all aspects of his supervision since his release on July 23, 2002.

**Related Cases**

9.    On April 10, 2001, Joseph Spitaleri pled guilty to Counts Six through Eighteen which charge him with money laundering in Docket No. 00-6206-CR-Zloch. On February 8, 2002, he was sentenced to 24 months imprisonment, three years supervised release, $7,500 fine and $1,300 special assessment.

10.   On August 8, 2001, Irving Harold Weiss pled guilty to a one count information which charges him with conspiracy to structure financial transactions in Docket No. 01-6161-CR-Dimitrouleas. On October 19, 2001, Weiss was sentenced to five months imprisonment, three years supervised release and $100 special assessment.

8

11.    On May 21, 2002, David Morgenstern was charged in a one count information with using a facility in interstate and foreign commerce with intent to distribute proceeds of an unlawful activity, in violation of 18 U.S.C. § 1952. The circumstances of this offense are the same as the circumstances in Docket No. 02-60101-CR-Dimitrouleas which is part of the instant offense. Sentencing is this case is pending.

**The Offense Conduct**

**Docket No. 00-6309-CR-Dimitrouleas(s)(s)**

12.    The following was written by Assistant United States Attorney Diana Fernandez and J. Brian McCormick and is based upon a review of the indictments returned in this case.

13.    Members and associates of the Trafficante Organized Crime Family of La Cosa Nostra (the Trafficante Family) were a criminal organization that operated in the Southern District of Florida, Tampa, Florida and elsewhere. The Trafficante Family operated through groups of individuals headed by "captains", also referred to as "capos" or "skippers". These groups, referred to as "crews" and "regimes", consisted of "made" members or "soldiers" of the Trafficante Family and other non-member criminal associates of the family.

14.    In South Florida, Steve Raffa operated and maintained a crew for the Trafficante Family that engaged in various criminal acts including loansharking, extortion, money laundering and illegal gambling, among other crimes. The crew, consisting of made members of the Trafficante Family and certain non-member criminal associates, was directly supervised by John Mamone. Mamone reported directly to Raffa.

15.    The Federal Bureau of Investigation (FBI) conducted undercover investigations using confidential witnesses who had previously been associates with organized crime groups that operated in South Florida and elsewhere. The indictment returned on October 24, 2000 charges the defendants with conspiring to violate the Racketeer Influenced and Corrupt Organizations Act (RICO), in violation of 18 U.S.C. § 1962(c), and sets forth as the objects of this conspiracy the sale and receipt of stolen goods, in violation of 18 U.S.C. § 3215, engaging in monetary transactions in property derived from specified unlawful activity and conspiracy to do so, in violation of 18 U.S.C. §§1956 and 1957, laundering of monetary instruments and conspiracy to launder money, in violation of 18 U.S.C. §1956, conducting, financing, managing, supervising and directing illegal gambling businesses, in violation of 18 U.S.C. § 1955, interstate travel or transportation in aid of racketeering enterprises, in violation of 18 U.S.C. § 1952, obstruction of state and local law enforcement, in violation of

9

18 U.S.C. § 1511, bank fraud, in violation of 18 U.S.C. § 1344, mail fraud, in violation of 18 U.S.C. § 1341, wire fraud, in violation of 18 U.S.C. § 1343, collection and conspiracy to collect extortionate extensions of credit, in violation of 18 U.S.C. §894 and making extortionate extensions of credit, in violation of 18 U.S.C. § 892. These offenses are also substantively charged against the defendants as applicable in Counts Two through Seventy of the indictment.

16.     From approximately 1998 through 2000, Joseph Spitaleri operated several boiler rooms located in South Florida and New York. During this time period, his main partners were John Finkelstein, Joseph Lafratta, John Pacaro and John Mamone. This group employed numerous salespersons to defraud prospective investors by telephone. Among the schemes that were perpetrated were lottery clubs and foreign currency exchange frauds.

17.     Spitaleri and his partners were most successful in using the foreign currency exchange scheme. Their salespeople convinced investors to expend hundreds of thousands of dollars in the purchase of futures and/or options in the foreign currency exchange markets. In reality, no money was ever invested by Spitaleri or his partners. The salespersons were fully aware that no funds were ever going to be invested. Spitaleri and Pacaro formed several corporations that were used in perpetrating this fraud. and among those were International Mercantile Corporation (IMC), Forex Financial Group, World Wide Exchange Corporation and International Forex Exchange

18.     Over the course of the foreign currency exchange fraud, Spitaleri and his partners used several local banks to cash checks received from investors/victims. During 1998 and 1999, the banks began to refuse to accept the numerous investor/victim checks from the defendant and his partners. Ultimately, the accounts were closed because the financial transactions involving the third party checks from investor/victims were suspicious in nature.

19.     Beginning in 1998, Spitaleri and his partners began cashing the investor/victim checks through these check cashing stores for the purpose of promoting the mail fraud activity relating to the foreign currency exchange and to conceal the nature of the fraud scheme. Mamone and his associates who were operating the check cashing stores normally charged 3% as a fee for handling these checks. Spitaleri joined this particular enterprise for the purpose of promoting and concealing the criminal activity occurring at the boiler rooms that he and his partners were operating. Spitaleri supervised several salespeople in these boiler room operations. The investigation revealed hundreds of investors/victims incurred losses from the foreign currency investment fraud, for a total amount of about $4,000,000. Many of the investment checks written to Spitaleri and his partner were negotiated through Check Cashing

10

Unlimited, Check Cashing Unlimited II and Akel's Market. Check Cashing Unlimited (later called Gold Coast Check Cashing), located in Margate, Florida, became the base of operation for Mamone's criminal activity. Check Cashing Unlimited II in Wilton Manors, Florida, owned by Julius Bruce Chiusano and Irving Weiss, was also used by members of the conspiracy. Akel's Market, a check cashing store located in Pompano Beach, Florida, was also used to launder the illegal profits of this criminal activity.

20.   Chiusano was a secret owner of Check Cashing Unlimited II, a check cashing store located in Wilton Manors, Florida. Irving Weiss was the paper owner of the store through a corporation called I.H. Weiss, Inc. Chiusano could not be named as an owner of record because of his questionable financial background. The business was used by members of the conspiracy to conceal some of the proceeds engendered from their criminal activity. Chiusano conspired with other members of the Trafficante Family from 1997 through October 2000 to conduct financial transactions affecting interstate commerce by cashing several checks from victims who had invested in a foreign currency exchange fraud.

21.   In about 1998, Mamone introduced Chiusano to Spitaleri. At that time, Chiusano and Irving Weiss agreed to assist Spitaleri by cashing checks received from investors/victims of the fraudulent scheme. Chiusano was aware that the proceeds from this fraud were the result of a scheme involving the use of the mail and telephones. Chiusano also agreed to structure financial transactions involving any negotiations of checks in excess of $10,000. Although the check cashing store was required by law to file Currency Transaction Reports (CTRs) with the government when deposits or withdrawals exceeded $10,000, Chiusano and Irving Weiss agreed to structure Spitaleri's transactions by creating false records at the check cashing store. In doing that, even though Spitaleri received the full amount of the check, the records reflected that there were no cash disbursements over $10,000 and no CTRs had to be filed.

22.   Chiusano and Weiss were paid a fee for cashing the checks. Usually, this fee would amount to about 3% of the amount of the checks. At the time the transactions occurred, Chiusano knew that the purpose was to assist Spitaleri and Mamone in concealing the source and location of the proceeds obtained from mail and wire fraud.

23.   Chiusano assisted Mamone and Spitaleri by negotiating checks at Check Cashing Unlimited II. On July 7, 1999, Chiusano negotiated a check for $11,189.80. On July 28, 1999, he negotiated a check for $15,000, and on December 1, 1999, he negotiated a check for $30,000. These checks were obtained from investors/victims of the foreign currency exchange fraud.

24.    During the course of the conspiracy, Mamone began assisting Spitaleri in his telemarketing business by providing several check cashing stores as a means to conceal the illegal profits that were being generated from the foreign currency exchange scheme.

25.    In the summer of 1999, paper ownership of Check Cashing Unlimited was transferred to Fred Morgenstern through a nominee, Jason Crossen, and the store was renamed Gold Coast Check Cashing.    Prior to that time, Mamone had assisted Fred Morgenstern in carrying out a check kiting scheme by utilizing the bank accounts of Check Cashing Unlimited.    Thereafter, Mamone and his associates continued to use this check cashing store, as well as Check Cashing Unlimited II and Akel's Market, to continue to launder proceeds from the various illegal activities.

26.    In mid-1999, Fred and David Morgenstern, Joseph Silvestri and other members of the conspiracy became involved in an investment fraud scheme orchestrated by Virgil Womack and based in Greenville, South Carolina.    This mail/wire fraud involved the soliciting of investments from victims throughout the United States in the name of Chemical Trust.    Victims were induced to invest thousands of dollars after being promised that the investment was guaranteed by a bond and an extremely high rate of return.    In reality, Womack operated a Ponzi scheme in that he had no intention of returning most of the investments.    Most of the investments were from the elderly or those with limited resources.    Over the course of six months, approximately $56,000,000 was collected from investors/victims.    A substantial portion of the proceeds which were received by Womack's office were then forwarded daily, generally by DHL, to Fred Morgenstern in South Florida.    Many of the checks were laundered through check cashing stores and various bank accounts located in South Florida.

27.    Womack used an entity called U.S. Guarantee Corporation to furnish a fraudulent bond to each investor to convince them that their investment was insured.    A percentage of each investment was unlawfully diverted to U.S. Guarantee and thereafter sent to Silvestri, Alvin Tang and other conspirators.    Silvestri unlawfully received approximately $400,000 in Chemical Trust funds, most of which were transferred to his bank account in the Bahamas.

28.    During the period that the Chemical Trust fraud was being carried out, approximately $30,000,000 was sent to David and Fred Morgenstern in South Florida to promote the ongoing fraud by Womack.

29.    In the summer of 1999, the Gold Coast Check Cashing account at Citibank was closed by the bank due to the suspicious activity relating to the Chemical Trust victim checks. At that time, Silvestri assisted Fred Morgenstern in opening new accounts at Admiralty Bank so that the money laundering could continue. Thereafter, Fred Morgenstern opened a number of accounts at Citibank to further the fraud. These accounts accepted Chemical Trust investor check deposits amounting to approximately $20,000,000. From these accounts, Fred Morgenstern caused the transfer of most all of the investor deposits to other overseas accounts, notably the accounts at Barclays Bank in the United Kingdom (to which over $10,000,000 was transferred from Americas Resources) and to Bahamian accounts (to which approximately $6,700,000 was transferred from Americas Resources). On January 10, 2000, Fred Morgenstern transferred several hundred thousand dollars of investor funds on deposit in Citibank to a criminal defense attorney for purposes of having the attorney represent Womack on the fraud charges in Greenville, South Carolina.

30.    In addition to the transfers from the accounts, over $6,000,000 in Chemical Trust investor funds was transferred directly into an account in Great Britain by Womack. This account received a total of over $16,000,000 in Chemical Trust funds, most of which was recovered by the court-appointed receiver in the Womack case.

31.    An analysis of Bahamian bank records reveals that Chemical Trust investor funds were used to pay Fred and David Morgenstern's' personal expenses (particularly hundreds of thousands of dollars worth of American Express bills reflecting purchases of first-class air tickets, jewelry, a computer, electronics equipment and vacation packages) and to pay a $2,900,000 settlement arising out of an investment fraud committed by David and Fred Morgenstern in Wisconsin. Also, approximately $6,000,000 of Chemical Trust funds was transferred to an account in Switzerland controlled by David Morgenstern and his wife, Victoria, and to an attorney in England. These were used to pay personal expenses of Fred and David Morgenstern and others.

32.    In September of 1999, Mamone attempted to negotiate 21 individual investor checks, for a total amount of $1,046,451, at Akel's Market. Mamone attempted to conceal the nature and source of these investor checks by presenting them to this check cashing store. These checks were not negotiated by Akel because of the suspicious circumstances; however, Mamone returned the checks to Fred Morgenstern who negotiated them elsewhere.

13

33.  In about January 2000, Mamone also obtained approximately $813,000 in investor/victim checks from the Chemical Trust fraud from Fred Morgenstern. Mamone negotiated these checks at Check Cashing Unlimited II through codefendant Irving Weiss. The defendant received cashier's checks from Irving Weiss and then laundered the funds through his money market accounts at Merrill Lynch with the intent to conceal the nature and source of the illegal monies. These funds were then distributed to other members of the enterprise as well as to himself.

34.  Specifically, in early 2000, Mamone and Bell caused $175,000 in funds derived from the Chemical Trust fraud to be transferred from the Merrill Lynch accounts to Gateway Transportation.

35.  During this same time period, Preston, on behalf of Fred Morgenstern, received hundreds of thousands of dollars in checks from investors/victims of the Chemical Trust Investment fraud that Morgenstern and others were involved in. These funds were being forwarded generally by DHL to her from coconspirators involved in the fraud and based in South Carolina. Preston, at the direction of Morgenstern, negotiated these third party checks and received either cash or cashier's checks. Some were processed through a number of accounts controlled by Morgenstern, including Gold Coast Check Cashing; others were negotiated through different check cashing stores.

36.  From August 1999 through December 1999, Peggy Preston was employed by Fred Morgenstern, a codefendant on the original indictment, as one of the managers at Gold Coast Check Cashing located in Margate, Florida. Based on her acknowledged prior employment in the banking industry, she was aware of the requirement by check cashing stores to file CTRs when they were involved in withdrawals or deposits which exceeded $10,000.

37.  After negotiating the checks, Preston would return to Gold Coast Check Cashing with amounts that exceeded $10,000 and provide the money to Fred Morgenstern, who utilized it for both business and personal matters. This was all done without the filing of any CTRs as required. During the time period charged, Preston was responsible for negotiating Chemical Trust Investment checks totaling at least $1,700,000 at a variety of check cashing stores.

38.  In 1999, David Bell was employed at Gateway Transportation in Fort Lauderdale, Florida. This company was involved in freight hauling throughout the United States. The freight company was involved in stealing items from the shipments and giving the items to Mamone for resale. The government was unable to estimate the value of the stolen goods. Mamone owned the trucking company through his wife, Grace. In

14

1999, Mamone and Bell began associating with the Rubbo family. The Rubbo family operated a foreign currency exchange fraud similar to Spitaleri's. The Rubbos operated boilerrooms that employed salesmen who defrauded investors located throughout the country. Mamone and Bell provided boilerroom salesmen to the Rubbos in return for a percentage of the proceeds from the telemarketing fraud. In return, Mamone and Bell received in excess of $300,000 from the operating accounts of the Rubbos. These proceeds were divided by Mamone, Bell and the salesmen they recruited. It is estimated that Mamone was responsible for promoting approximately $1,000,000 through the Rubbo boilerrooms. These checks from the investors/victims in this fraud were also funneled through the check cashing stores and financial institutions by members of the enterprise.

39. Furthermore, Mamone sent part of the proceeds to his partner, Joseph Russo, through Russo's wife, Doreen. Two checks were made payable to Doreen Russo: one for $100,000 dated January 12, 2000; the other for $30,000 dated April 10, 2000. Doreen Russo deposited the checks and then issued a check from her account to the wife of an incarcerated drug dealer in the amount of $100,000. She also issued a check for $30,000 to a real estate developer in Coconut Grove as a down payment to purchase two luxury condominiums. Over the next few weeks, Doreen Russo invested another $110,000 of her husband's funds in this project. In actuality, these were purchases on behalf of her husband, who intended to purchase these units with his partner, John Mamone, who was also using his wife as a nominee.

40. In the summer of 2000, Joseph Russo became concerned that Mamone was about to be indicted in the instant case. Joseph Russo then withdrew from the investment in the condominiums and thereafter approximately $140,000 was sent by check to Doreen Russo from the condominium developer. Doreen Russo immediately used the funds to pay off a second mortgage on their home, which previously had been titled in the name of Doreen Russo's parents. This money was directed in such a manner to hinder the IRS and FBI from following the money trail.

41. The illegal gambling operation consisted of sports betting and high-stakes card games. A favorite location for these card games was the Café Sportivo, located in Pompano Beach, Florida. Codefendant Giuseppe Bellitto supervised the illegal gambling operation at Café Sportivo, under the direction of Steve Raffa. The sports bookmaking operation involved numerous bookmakers who reported to Steve Raffa, John Mamone and other members of the Trafficante Crime Family. The Trafficante Family, through Raffa and Mamone, also protected the bookmakers. On occasion, Mamone protected bookmakers associated with the enterprise who were being "muscled" by other organized crime families attempting to take over their offices.

42.    Among the bookmakers directly under the control of Raffa and Mamone for the Trafficante Family was Jeffrey Bass, Ralph Lento, Jacolyn Baruch, Mark Carattini, Al Polito, and Giuseppe Bellitto. The day-to-day management of the illegal gambling operation was handled by John Mamone, who was responsible for setting betting limits and assuring the collections of gambling debts. Mamone assisted bookmakers who were associated with the organization by collecting debts from losing bettors. Mamone also made extortionate loans to bookmakers in order to finance their gambling offices. Carattini and Bass received extortionate loans from Mamone because of losses incurred in his bookmaking operation. Bass consistently borrowed substantial amounts of money from Mamone at extortionate rates because of losses incurred in his bookmaking operation, as well as debts incurred from his own personal gambling losses. At one point, Bass owed Mamone approximately $400,000. In 1998, a friend of Bass' paid this full amount to Mamone, who immediately transferred the monies to offshore accounts which he (Mamone) maintained. Also in the mid-1990's, Al Polito, a cooperating government witness, borrowed approximately $40,000 from Mamone for expenses related to his bookmaking operation.

43.    From 1995 to October 2000, Giuseppe Bellitto managed Café Sportivo, a small café located in Pompano Beach. Florida. Bellitto participated in the sports bookmaking operation, managed and supervised high-stakes card games conducted at the Café Sportivo and assisted in the collection of debts from losing bettors. In 1998, Bellitto left his position at Café Sportivo and became involved in a check cashing store located in Wilton Manors, Florida. His partner in that business was Steve Raffa.

44.    In approximately 1997, Bass became involved in the illegal gambling business which consisted of several bookmakers who were supervised and under the protection of the Trafficante Organized Crime Family. Jeffrey Bass was involved in sports betting. From 1997 to January 2001, Bass operated a substantial sports bookmaking operation in South Florida under the protection of John Mamone. The illegal gambling business employed over five persons in his operation. Mamone lent Bass funds for the operation of his bookmaking business and assisted Bass in the collection of gambling debts. Mamone also directed Bass' bookmaking business by setting betting limits and approving new bettors.

45.    In approximately 1998, Jacolyn Baruch became involved in the illegal gambling business which consisted of several bookmakers who were supervised and under the protection of the Trafficante Organized Crime Family. She was involved in sports betting.

46.     From 1998 to January 2001, Baruch operated a substantial sports bookmaking operation in South Florida under the protection of John Mamone. The illegal gambling business employed over five persons in the operation. Mamone also directed Baruch's bookmaking business by setting betting limits and approving new bettors. Mamone protected Baruch's operation when another organized crime family attempted to gain control of her bookmaking operation.

47.     Collections were made on behalf of the enterprise by Mamone, Buccinna, Russo, O'Sullivan and others. From late 1997, Mamone and members of the organization used the check cashing stores to collect loanshark proceeds from victims for the purpose of promoting and concealing the illegal activity. Direct and/or indirect threats of violence or violence itself was used to collect the weekly payments. It is estimated that Mamone was responsible for approximately $500,000 in extortionate loans during this time.

48.     On two occasions, Mamone himself used direct physical violence in the attempted collection of loanshark payments. The first occasion took place in approximately 1997, when Mamone beat Michael Campagnano for nonpayment and caused physical injury to him. This assault took place at Check Cashing Unlimited. The second occasion took place in March 2000, when Mamone, accompanied by Buccinna and Bell, attempted to collect a delinquent loanshark payment from Al Polito, a cooperating government witness. At that time, Mamone physically assaulted Polito causing bodily injury. The government advised that although Bell was aware that an extortionate collection from Polito was to be made, it was not reasonably foreseeable for Bell to have known that violence would be used by Mamone.

49.     In late 1997, Raffa opened a check cashing store in Wilton Manors, Florida called Cash 96. At the same time, Mamone and Joe Russo opened a check cashing store in Margate, Florida called Check Cashing Unlimited (later called Gold Coast). Mamone and Joseph Russo used their wives as nominee owners because both were convicted felons and could not be licensed in the State of Florida. The organization utilized these and two other check cashing stores, Check Cashing Unlimited II in Wilton Manors and Akel's Market in Pompano Beach, to launder illegal proceeds from boilerrooms, extortionate loans and gambling.

50.     For approximately three years, Mamone and Russo employed Michael Buccinna as a manger of Check Cashing Unlimited/Gold Coast. Under the direction of Mamone and Russo, Buccinna assisted in the gambling activities. Buccinna also assisted in collection payments on extortionate loans for Mamone and Russo. Mark Weiss joined the enterprise as a runner. He transported currency and checks to and from the various check cashing stores and banks for Mamone and later Fred and David

17

Morgenstern. Mark Weiss also assisted in attempts to collect extortionate loans by telephone.

51.  Also in 1997, Mamone and Joseph Russo were involved in a business investment with Michael Braverman. This resulted in Joseph Russo and Mamone assaulting Braverman and Huey Steinhart. Steinhart had introduced Braverman to Joseph Russo and Mamone. Based upon the evidence, the government does not consider this a collection of an extortionate loan, but rather an assault because Braverman had defrauded Mamone and Russo of approximately $40,000.

52.  During the period covered by the indictment, Mamone had several loansharking victims who had borrowed money from the Trafficante Family at a rate of two to five points per week (104% to 260% per annum). One such loan was extended to codefendant Spitaleri in late 1998. Mamone provided Spitaleri an extortionate loan in the amount of $50,000 and charged him three points per week (156% per annum). Other victims included Jeffrey Bass, Al Polito, Bruce Chiusano, Adam Cougill and Michael Campagnano.

53.  Mamone was placed on house arrest in early November 2000 on the original indictment in this matter. While under house arrest, Mamone enlisted John O'Sullivan to make collections from a victim, Jeffrey Bass, to whom Mamone had made an extortionate loan. Over the next several months, O'Sullivan met with Bass and collected several thousand dollars in loanshark payments on behalf of Mamone. On several occasions, O'Sullivan made implicit threats in order to convince Bass to continue to make his payments. On several occasions, O'Sullivan attempted to persuade Bass not to cooperate with the government against the other members of the enterprise who were under indictment.

**Docket No. 02-60101-CR-Dimitrouleas**

54.  According to Assistant United States Attorney J. Brian McCormick, the offense conduct for this case is the same as the offense conduct as it pertains to the defendant and his brother, David Morgenstern, in Docket No. 00-6309-CR-Dimitrouleas. Specifically, it involves the transfer through various financial institutions of about $35,000,000 in illegally obtained funds through the fraud in South Carolina involving Chemical Trust.

18

### Role Assessment

### Docket No. 00-6309-CR-Dimitrouleas(s)(s)

55.    Steve Raffa, a/k/a "Uncle Steve", operated and maintained a crew in South Florida for the Trafficante Family. The indictment was dismissed against Raffa after his death. Raffa was an associate of the Trafficante Family and organized and supervised the criminal enterprise charged in the indictment. The enterprise involved five or more participants and was otherwise extensive. Raffa participated in illegal gambling businesses, the collection of extortionate extensions of credit, laundering of proceeds, the receipt and transfer of stolen property and obstruction of state and local law enforcement. He was an organizer or leader and a four level increase pursuant to § 3B1.1(a) would have been appropriate.                 •

56.    John Mamone, a/k/a "Big John", supervised the crew and reported directly to Raffa. He oversaw the crew's illegal activities. Mamone organized and supervised the criminal enterprise charged in the indictment, and the enterprise involved five or more participants and was otherwise extensive. He participated in illegal gambling businesses, the collection of extortionate extensions of credit, laundering of proceeds, the receipt and transfer of stolen property and obstruction of state and local law enforcement. In total, based upon the evidence, Mamone was responsible for laundering illegal proceeds in the amount of approximately $3,500,000. These proceeds were derived from mail/wire fraud, loansharking and illegal gambling. According to the government, Mamone is responsible for restitution in the amount of $1,757,438.17 which is owed to the victims of the fraud perpetrated by Spitaleri and $1,800,000 which is owed to the victims of the Chemical Trust fraud. He qualifies for a four level increase pursuant to § 3B1.1(a).

57.    Fred and David Morgenstern are responsible for laundering illegal proceeds that totaled approximately $35,000,000. All of these proceeds were derived from the mail/wire fraud initiated out of the Chemical Trust fraud in South Carolina. They were organizers or leaders of this facet of the offense which involved at least five participants or was otherwise extensive. Therefore, a four level increase pursuant to §3B1.1(a) is warranted.

58.    Julius Bruce Chiusano owned Check Cashing Unlimited II in Wilton Manors, Florida. He is responsible for about $56,190 that represents the proceeds of the currency exchange fraud that were laundered through his store. He does not qualify for either an aggravating or mitigating role adjustment.

19

59.   Michael Buccinna, a/k/a "Mikey Boots", assisted the enterprise by receiving illegal proceeds from the criminal activity and by collecting extortionate extensions of credit. According to the government, he is responsible for laundering not more than $100,000 which was derived from the Chemical Trust fraud. He does not qualify for either an aggravating or mitigating role adjustment.

60.   Jeffrey Bass, a/k/a "the Professor", was involved in the operation of an illegal gambling business involving sports betting. Since Bass supervised in excess of five individuals, a four level increase pursuant to § 3B1.1(b) is warranted.

61.   Giuseppe Bellitto, a/k/a "Joe Baldy", was hired by Steve Raffa to manage an illegal gambling business comprised of sports betting and high stakes card games at Café Sportivo in Pompano Beach, Florida. He does not qualify for either an aggravating or mitigating role adjustment.

62.   Mark Carattini joined this group as a bookmaker under the protection of the Trafficante Organized Crime Family. He does not qualify for either an aggravating or mitigating role adjustment.

63.   Anson Klinger was a professional gambler who transmitted wagering information to Costa Rica and other places for himself and other gamblers. He does not qualify for either an aggravating or mitigating role adjustment.

64.   Joseph Spitaleri is responsible for laundering approximately $4,000,000 in fraud proceeds during this offense. He and John Pacaro formed about 15 corporations employing more than five individuals that were used to perpetuate the foreign currency exchange scheme. Spitaleri was an organizer or leader of a criminal activity involving five or more participants. A four level increase pursuant to § 3B1.1(a) is warranted.

65.   Peggy Preston was employed by Fred Morgenstern as a manager at Gold Coast Check Cashing. She received a total of about $1,700,000 from victims of the Chemical Trust Investment fraud. She negotiated these checks and received cash or cashier's checks, but failed to file currency transaction reports for amounts in excess of $10,000. She does not qualify for either an aggravating or mitigating role adjustment.

66.   Mark Weiss transported checks and proceeds of the illegal activity and attempted to collect extortionate extensions of credit by telephone. He is responsible for laundered funds totaling more than $70,000 but not more than $120,000. He does not qualify for either an aggravating or mitigating role adjustment.

67.   Jacolyn Baruch was involved in the operation of an illegal gambling business involving sports betting. Since Baruch supervised in excess of five individuals, a four level increase pursuant to § 3B1.1(b) is warranted.

68.   David Bell assisted in laundering some of the South Carolina fraud proceeds and assisted in collecting extortionate extensions of credit. On one occasion, during the collection of an extortionate extension of credit, Bell was present when Mamone physically assaulted Al Polito. He is responsible for laundering illegal proceeds in the amount of approximately $475,000. These funds were derived from mail/wire fraud from the Rubbo boilerrooms and the South Carolina fraud. Bell has agreed to pay $300,000 in restitution to the victims of the Rubbo fraud and $175,000 to the victims of the Chemical Trust fraud. He does not qualify for either an aggravating or mitigating role adjustment.

69.   Joseph Russo, a/k/a "JR", was a partner in the check cashing business with Mamone and engaged in loansharking and laundering about $130,000 from the Chemical Trust fraud proceeds. He does not qualify for either an aggravating or mitigating role adjustment.

70.   John O'Sullivan, a/k/a "Johnnie O", assisted Mamone by making ECT collections and by attempting to dissuade other coconspirators from cooperating against leaders of the enterprise. He also received stolen property from Gateway Transportation, through Mamone, the value of which is undetermined. Therefore, the government indicated that the value of the stolen property should be less than $5,000. He does not qualify for either an aggravating or mitigating role adjustment.

71.   Doreen Russo was a nominee owner of the check cashing store for a time and assisted her husband, Joseph Russo, by transferring monies derived from the South Carolina fraud for the benefit of her husband. She does not qualify for either an aggravating or mitigating role adjustment.

72.   Joseph Silvestri was a broker who arranged for U.S. Guarantee Corporation to issue fraudulent bonds to investors in order to assist in the Alliance/Chemical Trust fraud. Additionally, he instructed the managers of U.S. Guarantee on how to prepare bogus financial statements and supervised the managers in preparing fraudulent responses to be given to sellers and selling agents. He organized the conspiracy to launder the proceeds of those frauds by joining and assisting the Womacks and the Morgensterns in laundering approximately $35,000,000 by helping them open South Florida bank accounts. A four level upward adjustment for his role as an organizer is warranted.

### Offense Level Computation

78.   Pursuant to § 1B1.11(a), the Court shall use the guidelines manual in effect on the date the defendant is sentenced, unless the use of that book violates the ex post facto clause of the United States Constitution. In that case, the Court shall use the guidelines manual in effect on the date the offense was committed. The guideline manuals for 1999 and 2001 were compared, with the earlier addition producing a lower total offense level. Therefore, the 1999 manual was used in applying the guidelines.

79.   Count Fourteen of Docket No. 00-6309-CR-Dimitrouleas(s)(s) charges the defendant with conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). The object of the conspiracy was engaging in monetary transactions in property derived from specified unlawful activity, in violation of 18 U.S.C. § 1957. The guideline for a violation of 18 U.S.C. § 1957 is found in § 2S1.2 of the guidelines.

80.   The Information in Docket No. 02-60101-CR-Dimitrouleas charges the defendant with using and causing to be used a facility in interstate and foreign commerce with intent to distribute the proceeds derived from a violation of 18 U.S.C. § 1956, in violation of 18 U.S.C. § 1952. The guideline for a violation of 18 U.S.C. § 1952 is found in § 2E1.2. Pursuant to § 2E1.2(a)(2), the base offense level is 6 or the base offense level applicable to the underlying unlawful activity. The underlying unlawful activity was money laundering, in violation of 18 U.S.C. § 1956, and the guideline for that offense is found in § 2S1.1 of the guidelines.

81.   Count 14 of Docket No. 00-6309-CR-Dimitrouleas(s)(s) and the Information in Docket No. 02-60101-CR-Dimitrouleas are grouped together pursuant to § 3D1.2(b) because the counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan. Pursuant to § 3D1.3(a), when counts are grouped together pursuant to § 3D1.2(b), the offense level applicable is the offense level, determined in accordance with Chapter Two and Parts A, B and C of Chapter Three, for the most serious of the counts comprising the Group. In this case, the Information in Docket No. 02-60101-CR-Dimitrouleas results in the highest offense level. Therefore, § 2S1.1 is the applicable guideline section.

82.   **Base Offense Level:** The guideline for 18 U.S.C. §1956 is found in § 2S1.1(a)(2) of the guidelines. That section provides that an offense involving money laundering has a base offense level of 20.                                                              **20**

23

83.     **Specific Offense Characteristics:** Since the value of the funds was more than $20,000,000 but not more than $35,000,000, ten levels are added pursuant to § 2S1.1(b)(2)(K).                                                                                                  **+10**

84.     **Adjustment for Role in the Offense:** Since the defendant was the leader or organizer of a criminal activity that involved five or more participants or was otherwise extensive, there is a four level increase pursuant to § 3B1.1(a).                                        **+4**

85.     **Victim Related Adjustment:** None                                                                                                                    **0**

86.     **Adjustment for Obstruction of Justice:** None                                                                                                **0**

87.     **Adjusted Offense Level (Subtotal):**                                                                                                          **34**

88.     **Chapter Four Enhancements:** None                                                                                                              **0**

89.     **Adjustment for Acceptance of Responsibility:**     As of completion of the presentence report, the defendant has not provided a statement to the probation officer. In addition, on February 28, 2002, the defendant was convicted of the offense of criminal contempt in District of South Carolina Case No. 8:00-27. The basis of that case was his failure to appear in court in a civil proceeding in the District of South Carolina on January 31, 2002. As a result, pursuant to § 3E1.1, comment. (n.1(b)), the defendant does not qualify for a reduction for acceptance of responsibility because he has failed to voluntarily withdraw from criminal conduct.
                                                                                                                                                        **0**

90.     **Total Offense Level:**                                                                                                                       **34**

## PART B.  THE DEFENDANT'S CRIMINAL HISTORY

### Juvenile Adjudication(s)

91.     None

24

**Adult Criminal Conviction(s)**

|  | Date of Arrest | Charge/Agency | Date Sentence Imposed/ Disposition | Guideline/ Points |
|---|---|---|---|---|
| 92. | 6/4/76 (age 27) | Theft over $150, Sheriff's Office, Hamilton County, OH | Dkt# unknown 6/22/77: Sentenced to 2 to 5 years imprisonment suspended, five years probation and $68,600 restitution. 9/7/82: Probation terminated | § 4A1.2(e)(3)  **0** |

According to a presentence report completed in the Eastern District of Tennessee in 1987. the defendant and his brother, David Morgenstern, were charged in a check kiting scheme involving $68,600 belonging to Fifth Third Bank of Cincinnati, Ohio. Prior to the termination of his probation, the defendant paid $14,000 in restitution to avoid having his probation violated and entered into an agreement with the bank to pay an additional $25,000.

|  | Date of Arrest | Charge/Agency | Date Sentence Imposed/ Disposition | Guideline/ Points |
|---|---|---|---|---|
| 93. | 2/19/86 (age 37) | Ct. 1: Conspiracy to commit bank fraud, Cts. 10, 12, 14, 16, 18, 20, 22, 24, 26 and 28: Misapplication of bank funds, Cts. 11, 13, 15, 17, 19, 21, 23, 25, 27, and 29: Transporting in interstate commerce securities valued over $5,000, Federal Bureau of Investigation, Eastern District of Tennessee | Dkt# 3-86-07 12/12/86: Found guilty as to Cts. 1 through 29. 4/6/87: Ct. 1, sentenced to three years imprisonment. Cts. 10 through 29, sentenced to three years imprisonment, each count concurrent with one another but consecutive to Ct. 1. 1/28/92: Paroled 1/22/95: Parole terminated | § 4A1.1(a)  **3** |

25

According to information contained in the presentence report prepared in this case, the defendant, his brother David Morgenstern and James Thomas Sisk, Jr. opened bank accounts at various financial institutions in the names of Resource Trade Corporation, Financial Reserve Corporation and Transcoal Corporation. The defendants then issued checks drawn on one corporate account and deposited the checks into another corporate account knowing there was insufficient funds to cover the checks. The defendants also obtained cashier's checks using checks drawn on corporate accounts knowing there were insufficient funds on deposit to cover the checks. Investigation revealed that in 1979, the defendant and his brother had taken over operation of S.A.M. Coal Company located in Middlesboro, Kentucky. Shortly thereafter, the bank with whom the company did business began to experience numerous overdrafts on the company's checking accounts, and many local merchants were not honoring company payroll checks. As a result, the bank closed all of the company's accounts. In 1980, the defendant and his brother moved the company across state lines into Tennessee and opened 21 checking accounts at a local bank in Tazewell, Tennessee. The company continued to experience cash flow problems, and the defendants began operating the company on funds obtained through the check kiting scheme. After the check kiting scheme was discovered, it was determined that the defendants had obtained about $7.1 million through the scheme. Of this amount, about $2.7 million was utilized to pay creditors and cover everyday operating expenses. The bank was able to seize $2.9 million that was on deposit in various company accounts. The defendant and his brother subsequently repaid $2 million to the bank.

The defendant served his term of parole in the Northern District of Florida. A review of his probation file indicates that during his term of parole, he was arrested on felony theft and forgery charges on three occasions. However, the charges were not prosecuted by local authorities. During this term, the defendant was employed as a consultant to a contracting company involved in the production of homes in Palm Bay, Florida. According to notes made by his federal parole officer, numerous complaints involving the defendant's work ethics and the legalities of his work were received. The defendant was also reprimanded on numerous occasions for failure to submit timely reports and other required documents. On January 22, 1995, the defendant's parole was allowed to terminate after the U.S. Parole Commission declined to take any action against the defendant regarding his new felony arrests.

| 94. | 2/1/02<br>(age 53) | Criminal contempt, U.S.<br>Marshal's Service, Southern<br>District of Florida | Dkt# 8:00-cr27<br>3/7/02: Found guilty<br>by court, sentenced to<br>35 days imprisonment<br>with credit for 35 days<br>time served | § 4A1.1(c) |

<u>1</u>

On January 14, 2002, the Honorable G. Ross Anderson, Jr., U.S. District Court Judge, District of South Carolina, issued an Order and Rule to Show Cause requiring the defendant to appear in person at 10:00 a.m. on January 31, 2002 at the federal courthouse located in Greenville, South Carolina in Case No. 8:00-27/6:00-236-13. On January 18, 2002, the defendant was served with a copy of the order. On January 31, 2002, he failed to appear at the hearing and the court issued a warrant for his arrest. On February 1, 2002, the defendant was arrested pursuant to the warrant in the Southern District of Florida and was subsequently transported to South Carolina. At a hearing on February 28, 2002, the defendant testified that his failure to appear was the result of his decision to abide by a condition of his bond in the instant offense that required him to obtain prior approval of the court before traveling out of the Southern District of Florida. The government presented evidence indicating the defendant had sought and been granted permission to travel outside of the district on several previous occasions. The court found that the defendant was well aware of the procedure for requesting permission to travel outside of the district and as a result, he was guilty of criminal contempt.

## Criminal History Computation

95.  The defendant has four criminal history points and a criminal history category of III (Chapter Five, Part A).

## Other Criminal Conduct

| Date of<br>Arrest | Charge | Agency | Disposition |
|---|---|---|---|
| 96. 12/22/76<br>(age 28) | Passing bad checks | Police Dept.,<br>Cincinnati, Oh | Dkt# unknown<br>Case dismissed |

No other information is available.

| | | | | |
|---|---|---|---|---|
| 97. | 8/12/93<br>(age 44) | Uttering a forged<br>instrument | Sheriff's Office,<br>Bay County, FL | Dkt# 93-1611<br>1/7/94: No<br>Information<br>filed |

No other information is available.

| | | | | |
|---|---|---|---|---|
| 98. | 9/8/94<br>(age 45) | Grand theft | Sheriff's Office,<br>Bay County, FL | Dkt# 94-1756<br>1/23/95: No<br>Information<br>filed |

According to information contained in the defendant's federal probation file, the defendant was arrested after the owner of Casa Blanca Builders in Panama City, Florida accused the defendant of entering the business and removing tools valued in excess of $300. The charges were dismissed after the defendant produced documents precluding the prosecutor from establishing ownership of the disputed property.

| | | | | |
|---|---|---|---|---|
| 99 | 10/18/94<br>(age 45) | Grand theft | Sheriff's Office,<br>Bay County, FL | Dkt# 94-2037<br>3/13/95: No<br>Information<br>filed |

According to information obtained from the defendant's federal probation file, the defendant was arrested after it was determined he had rented two sets of four foot scaffolding on March 1, 1994 which were never returned. The charges were dismissed after the prosecutor determined that the investigating law enforcement officer had failed to identify the defendant as the receiver of the property.

100. According to Assistant United States Attorney (AUSA) J. Brian McCormick, the government has evidence that in March 2002, the defendant was involved in a structuring of financial transactions scheme in which he deposited a total of $455,204.71 at various Suntrust Central Florida Bank branches through his wife's corporation, From Home, Inc. None of the deposits was over $10,000, and four of the deposits ranged from $9,227.11 to $9,628.02. According to AUSA McCormick, the deposits were done in a manner that indicates the defendant was attempting to avoid currency reporting requirements. Investigation into this offense by the government is continuing, and the defendant has not yet been charged with a criminal offense.

**Pending Charges**

101.    None

**Other Arrests**

| Date of Arrest | Charge | Agency | Disposition |
|---|---|---|---|
| 102.   11/3/80 (age 32) | Theft by deception | State Police, Frankfort, KY | Dkt# and disposition unknown |

No other information is available.

## PART C.  OFFENDER CHARACTERISTICS

**Personal and Family Data**

103.    In March 1987, a presentence investigation report was prepared by the U.S. Probation Office in the Eastern District of Tennessee in Case No. 3-86-07. Unless otherwise stated, the defendant's social history has been verified with information contained in that report.

104.    The defendant was born on October 28, 1948 in Dayton, Ohio to Harold Morgenstern and Jayne Hopkins Morgenstern. His father, age 91, resides at 408 N.E. 23rd Avenue, Pompano Beach, Florida. He was previously employed as a vice president and general manager of a meat packing firm in Cincinnati, Ohio, but he has been retired since 1973. The defendant's mother died in 1992 at the age of 78 from lymphoma and a heart attack. Although previously employed as a school teacher prior to having children, she was subsequently a housewife. The defendant has three siblings. Margaret Bernstein, age 62, is married, resides in Las Cruces, New Mexico and is a retired school teacher. James Morgenstern, age 58, is married, resides at 900 Bonaventure Way, Lawrenceville, Georgia and is employed as a real estate attorney. David Morgenstern, the defendant's identical twin brother, age 54, is unemployed, married and resides at 7534 Estrella Circle, Boca Raton, Florida. He is a codefendant in the instant offense. The defendant reported he had a normal upbringing with very loving and supportive parents. He states he enjoyed a very close relationship with his mother prior to her death. He continues to enjoy a close relationship with his father and siblings who are aware of his current legal difficulties and remain supportive.

29

105. On June 12, 2002, the defendant's father was interviewed by telephone by the probation officer preparing David Morgenstern's presentence report. During the interview, the defendant's father verified the defendant's social history as reported by the defendant and as contained in the previous presentence report. The defendant's father stated that the defendant is very intelligent and as a result, it is difficult for him to understand his son's involvement in the instant offense. He stated the defendant enjoyed a good upbringing, and he will remain supportive of the defendant in any way possible. He was very surprised by the defendant and his brother's arrest in the instant offense in light of their previous federal conviction in Tennessee.

106. The defendant resided with his parents in Cincinnati, Ohio until 1974 when he moved out on his own. In 1976 or 1977, he moved to Middlesboro, Kentucky where he resided for about one year. He then moved to Harrigut, Tennessee where he resided until 1981 or 1982 when he moved to Covington, Kentucky. In 1985, he moved to San Francisco, California where he resided for one year. He then moved to Fort Lauderdale, Florida where he resided until 1989 when he was incarcerated on federal charges. Following his parole in 1992, he moved to Panama City, Florida where he resided until 1995, when he moved to Boca Raton, Florida. He has resided in Boca Raton, Florida since, and until his arrest in February 2002, he had resided at 18233 Fresh Lake Way, Boca Raton, Florida for about one year. Prior to this residence, the defendant and his family reportedly leased a residence for two years located at 19622 Biscayne Bay Blvd., Boca Raton, Florida for $2,200 per month. On June 25, 2002, a home visit was conducted at the Fresh Lake Way residence by the probation officer. The residence is a three bedroom, three bathroom single family home located in a middle income neighborhood. At that time, it was occupied by the defendant, his wife and their two teenage children. The defendant's wife confirmed that the rent is $1,850 per month.

107. Following the defendant's release on bond in July 2002, the defendant, his wife and two children moved to 1400 N.W. 15th Court, #205, Boca Raton, Florida. They lease this apartment for $1,100 per month. According to the defendant's pretrial services officer, this residence is a three bedroom, two bathroom apartment located next to Boca Raton High School.

108. On May 19, 1984, the defendant married Chari Hayes, age 46, in Covington, Kentucky. This marriage remains intact and has resulted in two children. Lauren Morgenstern, age 18, and Adam Morgenstern, age 17, reside with their mother in Boca Raton, and according to the defendant, both are students at Grand View Preparatory School located in Boca Raton. According to the defendant, his wife is employed assisting him with his business ventures. On June 25, 2002, the defendant's wife was interviewed in person by the probation officer and verified this relationship.

30

She described the defendant as a good husband and excellent father to their children. She is unsure about her future plans but stated she may move herself and the children to be close to the prison where the defendant is designated.

109. According to the defendant, his wife is suffering from alcoholism. She was arrested in November 2002 for driving on a suspended license and was sentenced to 60 days in jail. While incarcerated, she was given counseling but began drinking again after her release. She reportedly has a driving under the influence charge pending in Manatee County, Florida. The defendant hopes she will be court ordered into substance abuse counseling as a result of that case.

**Physical Condition**

110. The defendant is a white male, five feet ten inches tall, 175 pounds with light brown hair and blue eyes. He does not have any tattoos or significant identifying scars and reports several health issues.

111. According to the defendant, about three years ago he was diagnosed with hypertension that is controlled with medication. According to information obtained from the defendant's physician, Dr. Nick Ieremia, M.D., the defendant has been seen at his office located in Boca Raton, Florida for treatment on numerous occasions between December 1999 and September 2001. However, Dr. Ieremia declined to provide a diagnosis, type of treatment or medication prescribed.

112. According to information obtained from the Broward County Jail, Division of Inmate Health Services, while incarcerated there, the defendant was diagnosed with hypertension and was prescribed Verapramil, Cardura and Zantac.

113. According to the defendant, he also has been under the care of Dr. Pamela Loftus, a plastic surgeon in Boca Raton, Florida, for the removal of various sun spots on his skin. The defendant explained that both his parents had previously been diagnosed with skin cancer, and the removal of the spots is precautionary. A written request for medical records was forwarded to Dr. Loftus but a response was not provided.

**Mental and Emotional Health**

114. The defendant denies any history of mental or emotional problems.

**Substance Abuse**

115.    The defendant denies any history of drug abuse. He states that he briefly experimented with cocaine and marijuana in the 1960s but has not used any illegal substances since. He began to consume alcohol when he was about 16 years of age, but while in college he drank heavily. He now consumes alcohol in the form of wine on an occasional basis but not to the point of intoxication. However, the defendant feels he may benefit from alcohol abuse counseling due to his earlier abuse.

116.    According to the defendant's wife, he is more than a social drinker and may have a problem with alcohol abuse.

117.    According to the defendant's pretrial services officer, the defendant submitted to urinalyses on January 7, 2003, January 16, 2003, January 23, 2003 and January 28, 2003. All urine samples tested negative for illicit substances.

**Educational and Vocational Skills**

118.    From 1963 until 1966, the defendant attended Aiken High School located in Cincinnati, Ohio. According to transcripts obtained from this school, he graduated with a standard high school diploma on June 14, 1966. The transcripts indicate his grades were average.

119.    From 1966 until 1972, the defendant was enrolled at Miami University-Oxford, Ohio. According to transcripts obtained from this school, he completed a total of 161.5 credit hours and had a cumulative grade point average of 1.956. He was enrolled in the school of business but did not obtain a degree.

120.    From January 1997 until May 1997, the defendant completed bible courses at Calvary Chapel Bible College located in Fort Lauderdale, Florida. This information was verified with transcripts obtained from this college.

**Employment Record**

121.    From 1998 until the present, the defendant stated he has been self-employed as a consultant through his corporation, Interlogixx Ventures, Inc. (Interlogixx), which at first operated from offices located at 3840 West Hillsboro Blvd., Deerfield Beach, Florida, but is now being run from his residence. According to the Florida Division of Corporations, this corporation was filed on March 2, 1999 and is active. The defendant's wife is listed as the sole officer of the corporation. However, the defendant concedes that this is his business. This was also confirmed by his wife.

Recently, the defendant's wife began participating in the defendant's consulting business. According to the defendant, they hope she will be able to run the business if he is incarcerated.

122. According to the defendant, he earns income through this corporation by providing consulting services to other individuals who are starting various types of businesses. He advises them for a fee as to how to market products, form business relationships, etc., and attracts clients through word of mouth. According to the defendant, this corporation maintains no significant assets other than cash maintained in a corporate bank account. The corporation currently has one client, Stassi Interaxx, Inc. According to a copy of a contract for services executed January 3, 2003 provided by the defendant's pretrial services officer, the defendant receives $6,000 per month for his consulting services. The defendant was unsure of his income through this business activity in the past but estimated he grossed $200,000 to $300,000 per year. He takes money from the corporate account to pay personal expenses as needed. According to the defendant, the corporate account currently has a balance of about $200. The probation officer requested that the defendant provide financial statements, income tax returns, bank records and other documentation pertaining to this business, and this information is pending.

123. From 1999 to the present, the defendant stated he has also been self-employed through his corporation, From Home, Inc., which is being run from his residence. According to the Florida Division of Corporations, this corporation was filed on September 29, 1999 and is active. The defendant's wife is listed as the sole officer of the corporation. However, the defendant concedes that this is his business. Recently, the defendant's wife began participating in the defendant's consulting business. According to the defendant, they hope she will be able to run the business if he is incarcerated. According to the defendant, this business earns income in the same manner as Interlogixx Ventures, Inc. He estimates this business has gross receipts of about $20,000 per month and net income of about $1,200 per month. The corporation maintains a checking account that the defendant estimated has a current balance of about $500. There are no other assets of this corporation. The probation officer requested that the defendant provide financial statements, income tax returns, bank records and other documentation pertaining to this business, and this information is pending.

124. In 2001, the defendant states he was also self employed for a short period of time through his corporation, Resource Trade Group, which operated from 3840 West Hillsboro Blvd., Deerfield Beach, Florida. According to the defendant, he formed this corporation to do consulting for businesses in bankruptcy. He states the consulting generally involved research and planning in bankruptcy proceedings. He reports that

the business only handled one contract for $58,000. However, since he had borrowed against the contract, he never actually received any income because the funds were used to directly compensate creditors. It should be noted that according to the Florida Division of Corporations, this corporation was filed on June 19, 1996 and remains active. The defendant is listed as the sole officer of the corporation. For the reasons stated previously, the probation officer has not been able to ascertain if any of the defendant's records pertaining to this business are available. According to the Internal Revenue Service, there is no record of this corporation filing income tax returns.

125.  From 1996 until 1998, the defendant states he was self-employed as a consultant through the corporate entity Merritt Advisors Group, Inc. (Merrit), which operated from an office located at 3840 West Hillsboro Blvd., Deerfield Beach, Florida. He states that he had a 1/3 interest in this corporation along with Ormando Gomez and Venadette Stevens. According to the Florida Division of Corporations, this corporation was filed on July 14, 1997 and is in active but delinquent status. The defendant is listed as the sole officer of the corporation which last filed an annual report on May 21, 2001. According to the defendant, this corporation conducted the same business activity as Interlogixx. For the reasons stated previously, the probation officer has not been able to ascertain if any of the defendant's records pertaining to this business are available. According to the Internal Revenue Service, there is no record of this corporation filing income tax returns.

126.  From 1995 until 1998, the defendant states he was self-employed as a consultant through his corporation, Kinsman, Merchant and Associates, Inc., which operated from an office located at 3840 West Hillsboro Blvd., Deerfield Beach, Florida. According to the Florida Division of Corporations, this corporation was filed on March 31, 1995 and was administratively dissolved for failure to file an annual report on September 21, 2001. The defendant was listed as the sole officer of this corporation. According to the defendant, this corporation conducted the same business activity as Interlogixx and Merrit. For the reasons stated previously, the probation officer has not been able to ascertain if any of the defendant's records pertaining to this business are available. According to information provided by the Internal Revenue Service, this corporation reported total income of $1,464,749 in 1996 and $6,878,822 in 1997. In 1996, the net taxable income was $0, and in 1997, the net taxable income was <$947,049>.

127.  From 1992 until 1995, the defendant states he was self-employed as the owner of Project Group, Inc. which was a home construction company located in Panama City, Florida. According to the Florida Division of Corporations, this corporation was filed on February 13, 1992 and was administratively dissolved for failure to file an annual

report on August 26, 1994. The defendant and his wife were listed as the officers of this corporation. The defendant was unable to recall any specifics related to this business. The defendant was on parole and under the supervision of the United States Probation Office during this time. A review of his probation file indicates that during this time he was also involved with a company named Florida Home Builders which he listed as his employer. Apparently, the defendant was involved in the remodeling or construction of homes on behalf of Florida Home Builders through Project Group, Inc., or another company named Precision Cabinets & Millwork, Inc., of which his wife was listed as the sole principal. During this time, numerous complaints were received by the probation office regarding the defendant's work and several civil suits were filed by disgruntled customers. According to the defendant, he ceased this business activity when he moved to South Florida in 1995.

128.    According to the defendant, he has always been employed as a business consultant of some kind or another. He states that over the years, he has formed many companies and corporations for specific projects or ideas. After he completed the project, he allowed the corporation to dissolve. According to the Florida Division of Corporations, the defendant has been involved in the following corporations

129.    Merit Capital Group, Inc. was filed on January 27, 1998 and administratively dissolved for failure to file an annual report on September 21, 2001. The corporation listed its address as 3840 West Hillsboro Blvd., #156, Deerfield Beach, Florida, and the defendant was the sole officer.

130.    Strategic Intercapital Corp. was filed on November 21, 1997 and administratively dissolved for failure to file an annual report on September 22, 2000. The corporation listed its address as 3840 West Hillsboro Blvd., #206, Deerfield Beach, Florida, and the defendant was the sole officer.

131.    First Capital Equities, Inc. was filed on October 8, 1996 and administratively dissolved for failure to file an annual report on September 21, 2001. The corporation listed its address as 3840 West Hillsboro Blvd., #156, Deerfield Beach, Florida, and the defendant was the sole officer.

132.    First Capital Holdings, Inc. was filed on October 8, 1996 and administratively dissolved for failure to file an annual report on September 21, 2001. The corporation listed its address as 3840 West Hillsboro Blvd., #156, Deerfield Beach, Florida, and the defendant was the sole officer.

133. Fund Equities Management, Inc. was filed on October 8, 1996 and is active. The last annual report was filed on May 17, 2001. The corporation lists its address as 3840 West Hillsboro Blvd., #156, Deerfield Beach, Florida, and the defendant is the sole officer.

134. Capital Design Strategies, Inc. was filed on October 8, 1996 and is active. The last annual report was filed on May 21, 2001. The corporation lists its address as 4901 N.W. 17th Way, #407, Fort Lauderdale, Florida, and the defendant is the sole officer.

135. First Capital Acceptance Corp. was filed on September 25, 1996 and administratively dissolved for failure to file an annual report on September 21, 2001. The corporation listed its address as 3840 West Hillsboro Blvd., #156, Deerfield Beach, Florida, and the defendant was the sole officer.

136. Geneva World Ventures, Inc. was filed on July 26, 1996 and administratively dissolved for failure to file an annual report on September 21, 2001. The corporation listed its address as 3840 West Hillsboro Blvd., #156, Deerfield Beach, Florida, and the defendant was the sole officer.

137. The Americas Resource Corp. was filed on July 22, 1996 and is active. The last annual report was filed on May 17, 2001. The corporation lists its address as 3840 West Hillsboro Blvd., #206, Deerfield Beach, Florida, and the defendant is the sole officer.

138. First Capital Leasing Corp. was filed on July 22, 1996 and is active. The last annual report was filed on May 17, 2001. The corporation lists its address as 3840 West Hillsboro Blvd., #156, Deerfield Beach, Florida, and the defendant is the sole officer.

139. The Adbank Companies, Inc. was filed on May 22, 1996 and administratively dissolved for failure to file an annual report on September 21, 2001. The corporation listed its address as 3840 West Hillsboro Blvd., #156, Deerfield Beach, Florida, and the defendant was the sole officer.

140. Emerald Point Builders, Inc. was filed on January 3, 1994 and administratively dissolved for failure to file an annual report on September 21, 2001. The corporation listed its address as 3840 West Hillsboro Blvd., #156, Deerfield Beach, Florida, and the defendant was the sole officer.

141.  Project Trades & Constructors, Inc. was filed on December 18, 1992 and administratively dissolved for failure to file an annual report on December 5, 1994. The corporation listed its address as 1401 West 12th Street, Lynn haven, Florida, and the defendant and his wife were the officers.

142.  According to the Auto Track database, the defendant was also involved in the following Nevada corporations.

143.  Comstock Gold Mint was filed on March 8, 1988 and was revoked on December 1, 1999. The defendant, Robert Alverez, Bill Presley and W. Dale McGhie were listed as the officers.

144.  Sleepsource International, Ltd. was filed on March 8, 1988 and has subsequently been revoked. However, the date of revocation is not indicated. W. Dale McGhie and the defendant were listed as the officers.

145.  The defendant was incarcerated from January 1989 until January 1992. According to the previous presentence investigation report, prior to his incarceration, the defendant reported that he had previously been employed as the chief operating officer of Financial Reserve Corporation based out of Atlanta, Georgia, as a consultant for Capital Strategies of Cincinnati, Ohio, as director of community relations for The Breakthrough Foundation located in San Francisco, California and as an office manager for The Advisory Group located in Fort Lauderdale, Florida.

**Financial Condition: Ability To Pay**

146.  The following information was obtained by interviewing the defendant, examining his financial records, and by conducting an independent investigation of other sources as outlined in the analysis below.

Assets & Liabilities Summary

Cash

| | | |
|---|---|---|
| Personal checking account(Union Planters) | $ | 300 |
| Money market account(E-Trade) | | 300 |
| Corporate checking account (From Home, Inc.) | | 500 |
| Corporate checking account (Interlogixx) | | 200 |

37

Unencumbered assets

| | | |
|---|---|---:|
| 1990 Buick Century | $ | 1,500 |
| 1991 Dodge Spirit | | 1,900 |
| 1995 Dodge Intrepid | | 5,900 |
| **TOTAL ASSETS** | **$** | **10,600** |

Unsecured Debts

| | |
|---|---:|
| Judgement Case No. 98-7044-CIV-Seitz | $ 3,750,000 |
| IRS tax liens | 143,611 |
| Collection accounts | 8,000 |
| Credit cards | 61,497 |
| **TOTAL UNSECURED DEBTS** | **$ 3,963,108** |
| **Net Worth** | **<$ 3,952,508>** |

Monthly Cash Flow

Income

| | | |
|---|---|---:|
| Defendant's net income | $ | 5,700 |
| Spouse's net income | | 2,100 |
| **TOTAL INCOME** | **$** | **7,800** |

Reported Living Expenses

| | | |
|---|---|---:|
| Rent | $ | 1,100 |
| Telephone | | 450 |
| Electric | | 225 |
| Groceries | | 650 |
| Transportation | | 700 |
| Auto insurance | | 450 |
| Clothing | | 400 |
| Minimum installment payments | | 900 |
| Medical | | 700 |
| Storage | | 300 |
| Children's tuition | | 1,500 |
| **TOTAL REPORTED EXPENSES** | **$** | **7,375** |

152.    As stated previously in the presentence report, the defendant is a defendant in District of South Carolina Civil Case No. 00-CV-236 (U.S. v. Virgil Womack, et. al.). According to AUSA J. Brian McCormick and information obtained by the U.S. Probation Office in the District of South Carolina, this civil case is directly related to the Chemical Trust investment fraud scheme in which the defendant and his brother were involved and victims were defrauded of over $30,000,000. This civil case was originally filed in January 2000 at which time the court issued a series of orders including an order for the defendant to repatriate all Chemical Trust funds held in overseas bank accounts. In January 2002, a motion was filed by the government and a court appointed receiver for an order finding the defendant in civil contempt for failing to repatriate the funds held in overseas accounts and converting the funds to his own personal use. Following a hearing, the court found that on August 23, 2000, two transfers were made from a Swiss account to the American Express accounts of the defendant and his brother in the amounts of $27,975 and $34,975, respectively. In addition, another $16,785.15 was transferred from a Bahamian account to an American Express account he shared with his father. At another hearing on February 28, 2002, the government introduced videotapes which recorded a meeting on July 5, 2000 between the defendant, his attorney, Laurie Bolch, and an FBI confidential informant in which the defendant acknowledged that his "organizations handled $37 million dollars" of Chemical Trust funds, and that "substantially all that I handled is recoverable." On March 5, 2002, the defendant testified that he did not have control over the funds and asserted that his brother, David, had control. On March 7, 2002, the court found the defendant in civil contempt and committed him to the custody of the U.S. Marshal until he repatriates and disgorges $2.8 million dollars that was transferred to a Swiss bank account during the fraud and disgorges the $27,975 and $16,785 that was transferred to American Express accounts he controlled following the issuance of a restraining order. This case remains pending.

153.    According to the defendant, he has either been named as a defendant, or expects to be named as a defendant in a civil RICO case in Birmingham, Alabama. The defendant was unsure about the specifics of this case. According to the U.S. Probation Office in the Northern District of Alabama, there is no record of a pending case involving the defendant.

154.    On September 23, 1998, a complaint was filed in the Southern District of Florida by the U.S. Securities and Exchange Commission against the defendant, his brother David, Bernadette Stevens and Amquest International, Ltd. (Amquest) in Case No. 98-7044-CIV-Dimitrouleas. A review of the complaint indicates that in 1996, a private offering of securities issued by Amquest, which was owned or controlled by the defendant, his brother and Stevens, was held through which the ownership and value of the shares was misrepresented. As a result, Amquest investors were bilked out of $3.4 million. On October 18, 2000, the court entered a final judgement against the defendant, his brother and Amquest in the amount of $3.75 million payable within 30 days. On January 16, 2001, the court entered a final judgement against Stevens in

the amount of $143,684.67.  On November 29, 2000, the court entered an order granting the defendants until February 17, 2001 to pay the $3.75 million.  On March 5, 2001, the Securities and Exchange Commission and a Special Master filed a motion for order to show cause against the defendants based on the fact no payments or funds had been received.  The defendants responded by filing motions with the court alleging the funds were subject to a freeze order in the instant offense and District of South Carolina Case No. 00-CV-236.  The judgement remains outstanding.

155.    According to information obtained from the Southern District of Ohio and the Northern District of Florida, the defendant has been the subject of numerous other civil complaints, and numerous judgements for significantly lesser amounts than in Southern District of Florida Case No. 98-7044-CIV-Seitz have been entered by local courts.  Some of these judgements date back to the 1970s, and the probation office in each of these districts was unable to ascertain if any of the judgements are still valid.

156.    The defendant reported that he is currently able to pay his reported monthly expenses with he and his wife's income received through his business ventures.  However, no documentation of income or expenses has been provided by the defendant.

157.    According to the Internal Revenue Service, the defendant's adjusted gross income from 1996 through 2000 was $24,339, $41,528, $48,702, $33,456 and $66,912, respectively.  Information as to the defendant's adjusted gross income for the year 2001 has been requested and is pending.

158.    The defendant's financial history is questionable and he apparently has been involved in fraudulent conduct in the past that has resulted in both civil and criminal sanctions. However, he has a significant negative net worth and is subject to a period of lengthy incarceration and restitution in the instant offense.  Therefore, it does not appear he has the ability to pay a fine in this case.

## PART D.  SENTENCING OPTIONS

### Custody

159.    **Statutory Provisions: Docket No. 00-6309-CR-Dimitrouleas(s)(s):** The term of imprisonment is 0 to 10 years, 18 U.S.C. § 1957(b)(1).

160.    **Statutory Provisions: Docket No. 02-60101-CR-Dimitrouleas:** The term of imprisonment is 0 to 5 years, 18 U.S.C. § 1952(a)(1)(A).

161.    **Guideline Provisions:** Based on a total offense level of 34 and a criminal history category of III, the guideline imprisonment range is 188 to 235 months.  Pursuant to § 5G1.2(d), if the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, the sentence imposed on one or more of

the other counts shall run consecutively. However, in this case, the statutory maximum sentence in Docket No. 00-6309-CR-Dimitrouleas(s)(s) is 10 years and the statutory maximum sentence in 02-60101-CR-Dimitrouleas is five years, resulting in a possible total statutorily authorized maximum sentence of 180 months. Therefore, pursuant to § 5G1.1(a), the guideline imprisonment range is 180 months.

### Supervised Release

162.   **Statutory Provisions: Docket No. 00-6309-CR-Dimitrouleas(s)(s):** If a term of imprisonment is imposed, the Court may impose a term of supervised release of not more than three years, 18 U.S.C. § 3583(a),(b)(2).

163.   **Statutory Provisions: Docket No. 02-60101-CR-Dimitrouleas:** If a term of imprisonment is imposed, the Court may impose a term of supervised release of not more than three years, 18 U.S.C. § 3583(a),(b)(2).

164.   **Guideline Provisions:** Supervised release is required if the Court imposes a term of imprisonment of more than one year or when required by statute, § 5D1.1(a). If a sentence of imprisonment of one year or less is imposed, a term of supervised release is optional, § 5D1.1(b). The guideline range for a term of supervised release is at least two years but not more than three years, § 5D1.2(a)(2).

### Probation

165.   **Statutory Provisions: Docket No. 00-6309-CR-Dimitrouleas(s)(s):** A sentence of probation may not be imposed because the defendant is being sentenced at the same time to a term of imprisonment for the same or a different offense, 18 U.S.C. § 3561(a)(3).

166.   **Statutory Provisions: Docket No. 02-60101-CR-Dimitrouleas:** A sentence of probation may not be imposed because the defendant is being sentenced at the same time to a term of imprisonment for the same or a different offense, 18 U.S.C. § 3561(a)(3).

167.   **Guideline Provisions:** As the applicable guideline range is in Zone D of the Sentencing Table, the defendant is not eligible for probation, § 5B1.1 (a).

### Fines

168.   **Statutory Provisions: Docket No. 00-6309-CR-Dimitrouleas(s)(s):** The maximum fine is $70,000,000, 18 U.S.C. § 1957(b)(2). A special assessment of $100 is mandatory, 18 U.S.C. § 3013.

169. **Statutory Provisions: Docket No. 02-60101-CR-Dimitrouleas:** The maximum fine is $250,000, 18 U.S.C. § 3571(b)(3). A special assessment of $100 is mandatory, 18 U.S.C. § 3013.

170. **Guideline Provisions:** The fine range for the instant offense is from $17,500 to $70,000,000, § 5E1.2 (c)(4).

**Restitution**

171. **Statutory Provisions:** The court shall order the defendant to make restitution to the victims of the offense, 18 U.S.C. § 3663A(a)(1). Restitution in the amount of $13,503,927.36 is owed to the victims of the Chemical Trust investment fraud. According to AUSA J. Brian McCormick, restitution should be made through the court appointed receiver in District of South Carolina Case No. 00-CV-236

172. **Guideline Provisions:** Restitution shall be ordered, § 5E1.1.

**PART E.    FACTORS THAT MAY WARRANT A DEPARTURE**

173. None

**PART F.    IMPACT OF THE PLEA AGREEMENT**

174. None

Respectfully submitted,

By: _____
     Edward L. Cooley
     U.S. Probation Officer

Approved:

_____
Richard W. Janes, Supervising
U.S. Probation Officer

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 02-60101-CR-DIMITROULEAS(s)(s)

UNITED STATES OF AMERICA,    )
                             )
              Plaintiff,     )
    v.                       )
                             )
FRED MORGENSTERN             )
                             )
                             )
              Defendant.     )
_____)

## DEFENDANT'S NOTICE OF OBJECTIONS
## TO PRESENTENCE INVESTIGATION REPORT

Comes now the Defendant, **FRED MORGENSTERN**, by and through undersigned counsel, and files his Objections to the Presentence Investigation Report as follows:

### THE OFFENSE CONDUCT

It is noted that the offense conduct was written by the United States, not the probation office. Accordingly, its tone and verbiage reads as if, with every breath, Fred Morgenstern was living the fraud so vastly alleged in the indictment. Therefore, it is virtually impossible to effectively challenge every sentence. After final completion of the sentencing presentation, the Court will hopefully understand Fred Morgenstern is not what the offense conduct conveys in its message. Further, Fred Morgenstern does not shirk from his responsibility and role in the offense.

**Paragraph 13-24; 38-53.**    This is the subject of a Motion to Redact from Pre-Sentence Investigation Report. This motion is adopted and incorporated herein.

1

United States vs. Fred Morgenstern
Case 02-60101-Cr-Dimitrouleas

**Paragraph 25.**       Defendant objects to the use of the term "nominee" in reference to Jason Crossen. Defendant also objects to the term "paper ownership" with reference to Check Cashing Unlimited. Although the distinctions in these terms may be subtle, it may also be important. Fred Morgenstern does not deny that he had a significant role in Check Cashing Unlimited. Fred Morgenstern does not deny involvement in financial and investment decisions with this entity. However, Jason Crossen, not only was a real person, but was really involved in the business. He was not only the sole stockholder, but was actively involved in the daily business activities of the company.

The subtlety of this starting paragraph will become apparent as the sentencing of Fred Morgenstern evolves. However, the specific objection is that paragraph 25 implies that Fred Morgenstern started in the summer of 1999 with a paper transfer of ownership to enter the fraud when, in fact, at least a year before any of the conduct alleged in this case, Jason Crossen and Fred Morgenstern opened four sites for Check Cashing Unlimited with its own purpose and its own business plan. Remembering that the government wrote the Offense Conduct, paragraph 25 makes it appear that this is the beginning of a criminal conspiracy by Fred Morgenstern starting with a hidden ownership. This is not true. Defendant moves to strike the first sentence of paragraph 25.

The Defendant also moves to strike the second sentence of paragraph with reference to a check kiting scheme. This is outside the scope of any "South Carolina" conduct; references prior criminal conduct that has neither been presented to the Court, nor has the Defendant been charged and convicted and is irrelevant to the sentencing in this matter. Moreover, there is lawful conduct

2

United States vs. Fred Morgenstern
Case 02-60101-Cr-Dimitrouleas

in the State of Florida for check cashing entities, which conduct can be misconstrued to be check kiting.

The Defendant also moves to strike the third sentence in that it pertains to the RICO conduct of co-defendants that have nothing to with Mr. Morgenstern's plea of guilt in this matter; hence, it is irrelevant and prejudicial. (See Motion to Redact from Pre-Sentence Investigation Report.)

**Paragraph 26-30.**    Defendant is submitting a corollary pleading, which will be filed subsequent to these objections, entitled Defendant's Sentencing Memorandum. Requesting the Court's forgiveness, due to the complexity of this case and how the pre-sentence report was prepared, the tone of the reading of these paragraphs simply imply a story version of the indictment rather than a fair and independent depiction of the true facts.

Fred Morgenstern does not deny being involved with the financial aspects emanating from the South Carolina fraud of Virgil Womack. However, the Defendant, Fred Morgenstern, had nothing to with the substantive fraudulent conduct of Womack. Fred Morgenstern was not indicted in the Womack case. Paragraph 26, however, reads that Fred Morgenstern "became involved in an investment fraud scheme".

Does one object to a half truth in a pre-sentence investigation report where the real truth lays inferred within the paragraph, but the verbiage in the paragraph is, not completely accurate. The difficulty here is trying to pound a square peg into a round hole. The truncated format for federal sentencing requires a defendant to object under Rule 32 and the court to make specific findings (or state that it is not considering the allegation or conduct) rather than simply allowing for a sentencing proceeding.

3

United States vs. Fred Morgenstern
Case 02-60101-Cr-Dimitrouleas

Defendant objects to being included within the investment fraud scheme itself which is not true.

The Defendant does recognize, however, his role in the South Carolina fraud was on the financial side of the scheme and had nothing to do with the fraud conduct.

Defendant adopts and incorporates into the objections, Defendant's explanations as set forth in the Sentencing Memorandum with reference to the above paragraphs.

**Paragraph 28.**      Similarly, the language of "promot(ing) the ongoing fraud by Womack" implies that the Defendant knowingly began this process aware of Womack's scheme. This is not true. While Womack may have utilized these funds to promote his ongoing fraud, Fred Morgenstern did not. (See Sentencing Memorandum).

**Paragraph 31.**      Fred Morgenstern cannot be linked with the financial aspects of this illegal conduct with David Morgenstern. It is inaccurate to say "Fred and David Morgenstern," with reference to anything pertaining to finances in this case. Fred Morgenstern never traveled first class. Fred Morgenstern neither traveled to Europe nor bought jewelry. Fred Morgenstern did take his first vacation in twenty years Colorado in December of 1999. Fred Morgenstern was not involved in an investment fraud in Wisconsin. Fred Morgenstern was unaware of any payments made for the benefit of Fred Morgenstern or any personal expenses of Fred Morgenstern from a Swiss account owned and controlled by David Morgenstern and his wife, Victoria. See also, the corollary **paragraph 152** which more accurately sets forth Fred Morgenstern's financial benefit which was a payment on an American Express card shared by Fred and his father in the amount of $16,785.15 (which was utilized to purchase computer equipment for a bank customer, and of no personal benefit

4

United States vs. Fred Morgenstern
Case 02-60101-Cr-Dimitrouleas

to Fred Morgenstern). The $16,000.00 amount was repaid by Fred Morgenstern's father in order
to satisfy the civil contempt finding in South Carolina against Fred Morgenstern. (See Consent
Order attached hereto as Exhibit A). It is noteworthy that the $2.9 million dollar Consent Order was
satisfied with a $16,000.00 payment with the express approval of the Receiver and the Department
of Justice.

It is essential for this Court to recognize, when considering the proper sentence to impose,
that Fred had nothing to do with the "Womack" funds once they left his check cashing store. (See
Consent Order, Exhibit A, for Judge Anderson's finding that Fred Morgenstern has no control over
the European funds at issue). In fact, Fred never had control over these funds.

**Paragraph 33.** Defendant objects to the last two paragraphs which Defendant believes
refers to Mamone and not himself, as Fred Morgenstern did not have a Merrill Lynch account.

**Paragraph 57, 74 and 84.** Defendant objects to the role assessment applying a 4 point level
increase as organizer and leader of the money-laundering operation as this assessment is
inappropriate for Fred Morgenstern. Fred Morgenstern's role was that of a processor. Fred received
South Carolina funds, deposited same and sent funds when he was told to send them. He did not
organize or lead anyone. While it may be money laundering, this in and of itself, it is not a basis
to find a role increase.

It is incorrect to combine David and Fred Morgenstern; it is done only because they are
brothers. Their conduct could not be more different. Whatever David Morgenstern's role was, it
certainly was not Fred's role. David was head of the European investment front, Fred was not.
David traveled, invested the Womack dollars, Fred did not. Fred was responsible for the cashing

5

United States vs. Fred Morgenstern
Case 02-60101-Cr-Dimitrouleas

of the checks, period.

Fred's role is worthy of neither a mitigating nor an aggravating role adjustment.

The Eleventh Circuit recognized in *United States vs. Rodriguez de Varon*, 175 F.3d 930 (11th Cir. 1999)(en banc) that this is a fact-intensive inquiry. Id at 944. First, 'the district court must measure the defendant's role against the relevant conduct for which (he) was held accountable at sentencing.... Second, the district court may also measure the defendant's role against the other participants to the extent that they are discernable, in that relevant conduct. Id. At 945.

It is not Defendant's exact role or status in the criminal activity rather an assessment of Defendant's culpability in the context of all circumstances. *United States vs. Shonubi*, 998 F.2d 84 (2nd Cir. 1993).

**Paragraph 80-83, 87 and 90.**    Defendant objects to the guideline of §2S1.1, which is the guideline under §1956. It was the clear intention of all parties (and the Court) for the pleas in this matter to be a violation of §1957 (§2S1.2), not §1956. (This will be elaborated in a future pleading).

**Paragraph 82.**    Defendant objects to the base offense level of 20. The proper guideline for a §1956(h) offense, where the object of the conspiracy is a §1957 violation, is the guideline base offense of 17, pursuant to §2S1.2 of the 1999 Sentencing Guidelines. The plea colloquy clearly establishes that all parties, including the government, were in agreement that defendant was pleading to a conspiracy to violate §1957. (See page 24, Change of Plea Transcript, May 21, 2002).

6

United States vs. Fred Morgenstern
Case 02-60101-Cr-Dimitrouleas

**Paragraph 83.**     Defendant objects to the Specific Offense Characteristic contained in Paragraph 83 calculating the value of funds to be within the range of $20,000,000 to $35,000,000 and attributing a **10 level increase** to Defendant's offense level pursuant to 2S1.(b)(2)(k). The "value" of the funds should be reduced, taking into account the amount of funds already repatriated from Barclays Bank, London, England as referenced in Paragraph 4 of the PSR. The Defendant voluntarily returned $17,769,346.22 in this matter. The loss therefore should be reduced by this amount, making the total loss or "value" a little more than $12,000,000. This "value" amount corresponds to a **9 level increase** pursuant to §2S1.(b)(2)(J).

**Paragraph 89.**     Defendant objects to Paragraph 89 in that it fails to give a reduction for Defendant's acceptance of responsibility. Defendant has pleaded guilty to the offense conduct and will be filing a written statement of acceptance of responsibility to the probation office. Furthermore, the basis for not awarding Defendant acceptance of responsibility stemming from Defendant's criminal contempt conviction warrants further examination and evaluation by this Court.

Briefly stated, Defendant was convicted of criminal contempt for his failure to appear in a South Carolina court proceeding. The mitigating circumstances of this situation does not warrant an increase in criminal history. Defendant's non-appearance was due to a misunderstanding and miscommunication with his counsel. At the time defendant was required to appear in court in South Carolina, defendant was on bond in the Southern District of Florida in the instant matter. As such, Defendant was not free to travel without the express permission of the probation office or Court Order. Defendant's South Carolina attorney at the time advised Defendant that his appearance

7

United States vs. Fred Morgenstern
Case 02-60101-Cr-Dimitrouleas

was not necessary in South Carolina as they were expecting the hearing to be continued or postponed at the last minute. Defendant relied on this representation and, accordingly, did not make arrangements to travel to South Carolina.

Upon learning there would be no continuance, Defendant purchased a ticket to travel to the hearing. Defendant did not leave as he understood there would be a violation of his South Florida bond.

Denying Defendant his acceptance of responsibility reduction based on this event is not what the Sentencing Commission had in mind when it drafted the application notes to 3E1.1. Clearly the intent behind the comment to 3E1.1(n.1(b)) is to penalize a defendant who continues to engage in wilful criminal conduct. The factual background behind defendant's criminal contempt conviction evidences defendant's willingness to avoid engaging in further criminal conduct. Defendant meets and satisfies all the other criterial contained in the commentary (n. 1a-h) and therefore should not be denied acceptance of responsibility on this basis.

Further, in addition to satisfying the criteria under subsection §3E1.1(a), Defendant also qualifies for an additional one level reduction under subsection (b)(2) as defendant entered a timely plea of guilty. Accordingly, Defendant should be granted a reduction in his offense level of **3 levels.**

**Paragraphs 87 and 90.** Defendant objects to the calculation in paragraphs 87 and 90 based on the previously stated objections.

8

United States vs. Fred Morgenstern
Case 02-60101-Cr-Dimitrouleas

### CRIMINAL HISTORY

**Paragraph 94 and 95.**          Defendant objects to the addition of 1 point for the criminal
c......... conviction outlined in paragraph 94. As set forth in detail in Defendant's objection to
par........ 89 pertaining to Defendant's acceptance of responsibility, the conviction for this offense
of cr....... contempt was not wilful and is not a true representation of Defendant's criminal history.
The a....... on of this point puts Defendant's criminal history in a Category III, which over represents
Defen..... 's true criminal history.

          Pursuant to 4A1.3 "[i]f reliable information indicates that the criminal history category does
not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that
the defendant will commit other crimes, the court may consider imposing a sentence departing from
the otherwise applicable guideline range." USSG §4A1.3. The policy statement to section 4A1.3
states there may be cases where a defendant's criminal history category significantly over-
represents the seriousness of a defendant's criminal history or the likelihood that the defendant will
commit further crimes. In these instances, the court should consider a downward departure from
the guidelines. USSG §4A1.3. The guidelines use the example of a defendant with two misdemeanor
convictions close to ten years prior to the instant offense and no other evidence of prior criminal
behavior in the intervening period as a basis for a downward departure in criminal history.

          In the instant case, but for the conviction for criminal contempt, Defendant's previous
offense, which was assessed 3 criminal history points, occurred almost thirteen (13) years before
the offense conduct in the instant matter. The timing and pattern of the criminal contempt
conviction warrants a downward departure as the Defendant's criminal history is over represented

9

MICHAEL J. ROSEN, P.A.
2400 SOUTH DIXIE HIGHWAY · SUITE 105 · MIAMI, FLORIDA 33133 · TEL (305) 858-9700 · FACSIMILE (305) 858-7299

United States vs. Fred Morgenstern
Case 02-60101-Cr-Dimitrouleas

by the addition of the 1 point to his criminal history score.

It is well within the discretion of the District Court to depart downward in Defendant's criminal history category if the Court finds that the defendant's criminal history category is over represented. See U.S. v. Smith, 289 F.3d 696 (11th Cir. 2002); U.S. v. Weaver, 920 F.2d 1570 (11th Cir. 1991)(The district court departure downward and decreased defendant's criminal history score by one increment stating that the prescribed punishment was excessive as a deterrent which is simply a different way of stating that the defendant's criminal history score over-represented the likelihood that he [defendant] would recidivate); U.S. v. Collins, 915 f.2d 618 (11th Cir. 1990)( the district court adequately stated the reason for the downward departure, i.e. that the defendant was not likely to commit further crimes in the future; however, the district court did not follow the correct procedure in departing as it failed to consider the possible sentences under the next criminal history category).   Accordingly, Defendant respectfully requests a downward departure of his Criminal History category.

**Paragraph 100.**      There seems to be a point of contention in this regard.  In order to preserve the objection, Defendant objects at this time to paragraph 100 as it relates to Defendant's involvement in the structuring of financial transactions. This, hopefully, can be resolved before sentencing.

**Paragraph 152.**      Defendant objects to paragraph 152 in that it states this case is still pending.  This case has been concluded and contempt purged with the $16,000.00 payment.

10

United States vs. Fred Morgenstern
Case 02-60101-Cr-Dimitrouleas

Respectfully submitted,
MICHAEL J. ROSEN, ESQ.
Fla. Bar No. 183719
2400 South Dixie Highway, Suite 105
Miami, Florida 33133
(305) 858-9700

_____
Michael J. Rosen

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was mailed this 28th of

March, 2003, to: AUSA, Brian McCormick, and AUSA, Diana Fernandez, United States Attorney's

Office500 E. Broward Blvd. 7th Floor, Ft. Lauderdale, Florida 33394; USPO, Ed Cooley, US

Probation Office, 299 E Broward Blvd, Room 409, Ft. Lauderdale, Florida 33301; 33394;Brian

McComb, Counsel for Defendant, David Morgenstern, 3458 S.E. Dixie Highway, Stuart, Florida

34997.

_____
MICHAEL J. ROSEN, ESQ.
Fla. Bar No. 183719
2400 South Dixie Highway, Suite 105
Miami, Florida 33133
(305) 858-9700 (telephone)
9305) 858-7299(facsimile)

11



FILED
JUL 2 9 2002
LARRY W. PROPES, CLERK
U. S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

United States of America,                    )     CRIMINAL NO.: ~~8.00-27~~
                                              )
        v.                                    )
                                              )     8.02-CR- 714
Virgil Womack, et al.                         )
                                              )
_____              )
                                              )     CIVIL NO.: ~~6:00-236-13~~
United States of America                      )
                                              )
        v.                                    )
Fred morgenstern                              )
Alliance Trust, a.k.a. Alliance-T, Inc.,      )
a.k.a. AT, Inc., Chemical Trust, Cardinal     )
Trust, a.k.a. Cardinal T, Inc., Carver        )
Trust, a.k.a. Carver T, Inc., Continental     )
Trust, Hampton Trust, Heart-Land Trust,       )
Hersheys Trust, Three Rivers Trust,           )
a.k.a. TRT, Inc., Merrit Pierce Trust,        )
a.k.a. MPT, Inc., United Marketing Trust,     )
a.k.a. UMT, Inc., U.S. Guarantee Corp.,       )     CONSENT ORDER
Gold Coast Check Cashing, Inc., Virgil W.     )
Womack, George H. Williamson, Sr.,            )
Charlotte Womack, Clifton Wilkinson,          )
Fred Morgenstern, Lewey L. Cato, III,         )
Alvin A. Tang, and Joseph R. Silvestri,       )
                                              )
        Defendants,                           )
                                              )
_____              )
                                              )
Prestige Accounting Services, Inc., ACC Capital )
Consultants, Inc., The Falcon   Trust Company, Ltd., )
America's Fidelity Assurance Company, Ltd.,   )
New Millennium Management, Manufacturers      )
Fidelity and Guaranty   Company, Ltd., America's )
Resource Corp., MICA Securities, Inc., MICA   )
Enterprises, Inc., U.C.B.M. (Bahamas), Ltd., Triple )
W Builders, Inc., Merrit Advisors Group, Inc., )
Adbank Companies, Intercontinental Capital    )
Management, Ltd., JRAM, Allan J. Clarke,      )
Americas Fidelity Capital Management, Ltd.,   )
Americas International Bank Corp., Ltd., Standard )
Atlantic, Inc., FTS Entities, Ltd., Risk Management )
Group, Ltd., Bruce Forrester, Nelson Jarnagin, )
James Morgenstern, David Morgenstern, Victoria )
Morgenstern, Slattocks Invest, S.A., Bayswater )
Commercial Inc., and Commercial Holdings,     )
                                              )
        Relief Defendants.                    )
_____              )

Original Document
Located in 8.02-712



EXHIBIT
A



This matter comes before this Court, on motion of Robert C. Wilson, Jr., attorney for Fred Morgenstern, with the consent of Beattie B. Ashmore, Receiver, and James R. Pavlock, Senior Trial Attorney, Department of Justice, representing the Plaintiff.

The Civil Contempt Order entered against Fred Morgenstern on March 7, 2002 required that Defendant Fred Morgenstern purge his civil contempt by 1) repatriating and disgorging to the Receiver the $2.8 million transferred from Americas International Bank Corporation to the "Slattocks Invest, S.A." account #21444; 2) by disgorging to the court-appointed Receiver $27,975 transferred from said Slattocks account on or about August 23, 2000 in payment of his American Express card bill; and 3) by disgorging to the court-appointed Receiver $16,785 transferred from Americas International Bank Corp., Inc. in payment of Defendant's American Express card bill.

Upon further investigation since the entry of this civil contempt order, the government is satisfied that Defendant Fred Morgenstern no longer has control over the $2.8 million transferred to the "Slattocks Invest, S. A." account and accordingly has determined that is impossible for Fred Morgenstern to purge his contempt in this respect. Further, the government has agreed to accept payment in settlement of items 2 and 3 of the civil contempt order upon payment by Defendant Morgenstern of $6,300.00 and the payment of $1,500.00 per week for seven (7) weeks, thereafter. Further, Fred Morgenstern has entered into a plea agreement in the United States District Court Southern District of Florida, case number 00-6309-CR-Dimitrouleas, in which the defendant agrees to provide full and complete disclosure of all assets over which he has exercised control. The Plea Agreement is incorporated by reference and attached hereto (Exhibit A). Accordingly, it is

ORDERED that the said Fred Morgenstern be, and hereby is, released from

incarceration upon his payment, to the Receiver in this matter, of the sum of $6,300.00.

And it is further

ORDERED that Fred Morgenstern shall pay the sum of $1,500.00 per week for

seven (7) weeks thereafter to complete his purging himself of his civil contempt, as held

by this Court. And it is further

ORDERED that Fred Morgenstern does hereby release, surrender, and abandon

any claim or title or interest otherwise in the monies described above and agrees to

forfeiture of said monies. And it is further

ORDERED that, should the said Fred Morgenstern fail to complete the weekly

payment schedule, as provided in this Order, he will then promptly surrender himself to

the proper authorities for return to an appropriate Federal holding facility, until such time

as he completely purges himself of his civil contempt of this Court.


G. ROSS ANDERSON, JR.
UNITED STATES DISTRICT JUDGE

Dated: 7/22 , 2002
Anderson, South Carolina

I so move:

Robert C. Wilson, Jr.
Attorney for Fred Morgenstern


We consent:

Beattie B. Ashmore
Receiver

James R. Pavlock        AUSA
Senior Trial Attorney    D of S.C.
United States Department of Justice

3

# United States District Court

## Southern District of Florida

### FT. LAUDERDALE DIVISION

UNITED STATES OF AMERICA

v.

FRED MORGENSTERN

**JUDGMENT IN A CRIMINAL CASE**
(For Offenses Committed On or After November 1, 1987)

**Case Number: 00-6309-CR-DIMITROULEAS(s)(s)**

| | |
|---|---|
| Counsel For Defendant: | Michael J. Rosen |
| Counsel For The United States: | J. Brian McCormick |
| | Diana L.W. Fernandez |
| Court Reporter | Robert Rycoff |

The defendant pleaded guilty to Count 14(s)(s) of the Indictment. Accordingly, the defendant is adjudged guilty of such count(s) which involves the following offense(s):

| TITLE/SECTION NUMBER | NATURE OF OFFENSE | DATE OFFENSE CONCLUDED | COUNT |
|---|---|---|---|
| 18 U.S.C. § 1956(h) | Money Laundering Conspiracy | October 24, 2000 | 14(s)(s) |

The defendant is sentenced as provided in the following pages of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

The remaining Counts are dismissed on the motion of the United States.

**IT IS FURTHER ORDERED** that the defendant shall notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant shall notify the court and United States attorney of any material change in the defendant's economic circumstances.

Defendant's Soc. Sec. No.  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
Defendant's Date of Birth: October 28, 1948
Deft's U.S. Marshal No.:  83239-012

Defendant's Mailing Address:
1400 NW 15th Court, #205
Boca Raton, Florida 33486

Defendant's Residence Address:
1400 NW 15th Court, #205
Boca Raton, Florida 33486

Date of Imposition of Sentence:
April 18, 2003

WILLIAM P. DIMITROULEAS
United States District Judge

April 22, 2003

USDC FLSD 245B (Rev 3/01) - Judgment in a Criminal Case                                      Page 2 of 6

DEFENDANT: FRED MORGENSTERN
CASE NUMBER: 00-6309-CR-DIMITROULEAS(s)(s)

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of **61 Months** as to Count 14(s)(s). The sentence imposed in case number 02-60101-CR-DIMITROULEAS (60 Months) is to run consecutive to the sentence imposed in this case, for **a total term of imprisonment of 121 Months**.

The defendant is remanded to the custody of the United States Marshal.

## RETURN

I have executed this judgment as follows:

_____

_____

_____

_____

Defendant delivered on _____ to _____

at _____, with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By:_____
Deputy U.S. Marshal

AO 245 (Rev 3/01) - Judgment in a Criminal Case                                                   Page 3 of 6

DEFENDANT: FRED MORGENSTERN
CASE NUMBER: 00-6309-CR-DIMITROULEAS(s)(s)

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term **3 years**, to run concurrent with the 3 year term of supervised release imposed in case number 02-60101-CR-DIMITROULEAS.

The defendant shall report to the probation office in the district to which the defendant is released within 72 hours of release from custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.
The defendant shall not illegally possess a controlled substance.

*For offenses committed on or after September 13, 1994:*

The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter.

**The defendant shall not possess a firearm, destructive device, or any other dangerous weapon.**

If this judgment imposes a fine or a restitution obligation, it shall be a condition of supervised release that the defendant pay any such fine or restitution that remains unpaid at the commencement of the term of supervised release in accordance with the Schedule of Payments set forth in the Criminal Monetary Penalties sheet of this judgment.

The defendant shall comply with the standard conditions that have been adopted by this court (set forth below).

**The defendant shall also comply with the additional conditions on the attached page.**

## STANDARD CONDITIONS OF SUPERVISION

1    The defendant shall not leave the judicial district without the permission of the court or probation officer;
2    The defendant shall report to the probation officer as directed by the court or probation officer and shall submit a truthful and complete written report within the first five days of each month;
3    The defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;
4    The defendant shall support his or her dependents and meet other family responsibilities;
5    The defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons;
6.   The defendant shall notify the probation officer **at least ten (10) days prior** to any change in residence or employment;
7    The defendant shall refrain from the excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;
8.   The defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;
9.   The defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;
10.  The defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the probation officer;
11.  The defendant shall notify the probation officer within **seventy-two (72) hours** of being arrested or questioned by a law enforcement officer;
12.  The defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;
13.  As directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

USDC FLSD 245B (Rev 3/01) - Judgment in a Criminal Case                                                     Page 4 of 6

DEFENDANT: FRED MORGENSTERN
CASE NUMBER: 00-6309-CR-DIMITROULEAS(s)(s)

## SPECIAL CONDITIONS OF SUPERVISION

The defendant shall also comply with the following additional conditions of supervised release:

The defendant shall provide complete access to financial information, including disclosure of all business and personal finances, to the U.S. Probation Officer

The defendant shall maintain full-time, legitimate employment and not be unemployed for a term of more than 30 days, unless excused by the U.S. Probation Officer. Further, the defendant shall provide documentation, including but not limited to, pay stubs, contractual agreements, W-2 Wage and Earnings Statements, and any other documents requested by the U.S. Probation Office.

The defendant shall not be engaged in any business that offers securities, investments, or business opportunities to the public. The defendant is further prohibited from engaging in telemarketing, direct mail or national advertising campaigns for business purposes without the permission of the U.S. Probation Officer.

The defendant shall obtain prior written approval from the U.S. Probation Officer before entering into any self-employment.

USDC FLSD 245B (Rev 3/01) - Judgment in a Criminal Case          Page 5 of 6

DEFENDANT: FRED MORGENSTERN
CASE NUMBER: 00-6309-CR-DIMITROULEAS(s)(s)

## CRIMINAL MONETARY PENALTIES

The defendant shall pay the following total criminal monetary penalties in accordance with the schedule of payments set forth in the Schedule of Payments.

| Total Assessment | Total Fine | Total Restitution |
|---|---|---|
| $100.00 | None | $13,375,927.36 |

It is further ordered that the defendant shall pay restitution in the amount of $13,375,927.36. During the period of incarceration, payment shall be made as follows: (1) if the defendant earns wages in a Federal Prison Industries (UNICOR) job, then the defendant must pay 50% of wages earned toward the financial obligations imposed by this Judgment in a Criminal Case; (2) if the defendant does not work in a UNICOR job, then the defendant must pay $25.00 per quarter toward the financial obligations imposed in this order. These payments do not preclude the government from using other assets or income of the defendant to satisfy the restitution obligations.

Upon release of incarceration, the defendant shall pay restitution at the rate of 10% of monthly gross earnings, until such time as the court may alter that payment schedule in the interests of justice. The U.S. Bureau of Prisons, U.S. Probation Office and U.S. Attorney's Office shall monitor the payment of restitution and report to the court any material change in the defendant's ability to pay.

The defendant shall make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C § 3664(I), all nonfederal victims must be paid in full prior to the United States receiving payment.

| Name of Payee | Total Amount of Loss | Amount of Restitution Ordered | Priority Order or Percentage of Payment |
|---|---|---|---|
| Bettie B. Ashmore Court Appointed Rcvr. District of SC, Case No. 02-CV-236 Price, Paschal & Ashmore 644 East Washington St. Greenville, SC 29601 | | $13,375,927.36 | |

*Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18, United States Code, for offenses committed on or after September 13, 1994 but before April 23, 1996.

DEFENDANT: FRED MORGENSTERN
CASE NUMBER: 00-6309-CR-DIMITROULEAS(s)(s)

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties shall be due as follows:

    A.  Lump sum payment of **$100.00** due immediately.

Unless the court has expressly ordered otherwise in the special instructions above, if this judgment imposes a period of imprisonment, payment of criminal monetary penalties shall be due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court, unless otherwise directed by the court, the probation officer, or the United States attorney.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

**The assessment/fine/restitution is payable to the U.S. COURTS and is to be addressed to:**

    **U.S. CLERK'S OFFICE**
    **ATTN: FINANCIAL SECTION**
    **301 N. MIAMI AVENUE, ROOM 150**
    **MIAMI, FLORIDA 33128**

**The assessment/fine/restitution is payable immediately. The U.S. Bureau of Prisons, U.S. Probation Office and the U.S. Attorney's Office are responsible for the enforcement of this order.**

    Joint and Several

Defendant Name, Case Number, and Joint and Several Amount:

Co-conspirators in case number 00-6309-CR-DIMITROULEAS (David Morgenstern, John Mamone and David Bell)

    The defendant shall forfeit the defendant's interest in the following property to the United States:

    **$31,273,273.58**

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) community restitution, (6) fine interest (7) penalties, and (8) costs, including cost of prosecution and court costs.

USD ... ... 4.... Rev. 3/01) - Judgment in a Criminal Case                                                           Page 2 of 6

DEFENDANT: FRED MORGENSTERN
CASE NUMBER: 02-60101-CR-DIMITROULEAS

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of **60 Months**, as to Count 1. This term is to run consecutive to the term imposed in case number 00-6309-CR-DIMITROULEAS(s)(s) **(61 Months)**, for a **total term of imprisonment of 121 Months.**

The defendant is remanded to the custody of the United States Marshal.

## RETURN

I have executed this judgment as follows:

_____

_____

_____

_____

Defendant delivered on _____ to _____

at _____, with a certified copy of this judgment.


_____
UNITED STATES MARSHAL


By:_____
Deputy U.S. Marshal

DEFENDANT: FRED MORGENSTERN
CASE NUMBER: 02-60101-CR-DIMITROULEAS

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term **3 years**, to run concurrently with the 3 year term of supervised release imposed in case 00-6309-CR-DIMITROULEAS(s)(s).

The defendant shall report to the probation office in the district to which the defendant is released within 72 hours of release from custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.
The defendant shall not illegally possess a controlled substance.

*For offenses committed on or after September 13, 1994·*

The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter.

**The defendant shall not possess a firearm, destructive device, or any other dangerous weapon.**

If this judgment imposes a fine or a restitution obligation, it shall be a condition of supervised release that the defendant pay any such fine or restitution that remains unpaid at the commencement of the term of supervised release in accordance with the Schedule of Payments set forth in the Criminal Monetary Penalties sheet of this judgment.

The defendant shall comply with the standard conditions that have been adopted by this court (set forth below).

**The defendant shall also comply with the additional conditions on the attached page.**

## STANDARD CONDITIONS OF SUPERVISION

1.   The defendant shall not leave the judicial district without the permission of the court or probation officer;
2.   The defendant shall report to the probation officer as directed by the court or probation officer and shall submit a truthful and complete written report within the first five days of each month;
3.   The defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;
4.   The defendant shall support his or her dependents and meet other family responsibilities;
5    The defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons;
6.   The defendant shall notify the probation officer **at least ten (10) days prior** to any change in residence or employment;
7.   The defendant shall refrain from the excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;
8    The defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;
9.   The defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;
10.  The defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the probation officer;
11.  The defendant shall notify the probation officer within **seventy-two (72) hours** of being arrested or questioned by a law enforcement officer;
12.  The defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;
13.  As directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

USDC FLSD 245B (Rev 3/01) - Judgment in a Criminal Case                                    Page 4 of 6

DEFENDANT: FRED MORGENSTERN
CASE NUMBER: 02-60101-CR-DIMITROULEAS

## SPECIAL CONDITIONS OF SUPERVISION

The defendant shall also comply with the following additional conditions of supervised release:

The defendant shall provide complete access to financial information, including disclosure of all business and personal finances, to the U.S. Probation Officer.

The defendant shall maintain full-time, legitimate employment and not be unemployed for a term of more than 30 days, unless excused by the U.S. Probation Officer. Further, the defendant shall provide documentation, including but not limited to, pay stubs, contractual agreements, W-2 Wage and Earnings Statements, and any other documents requested by the U.S. Probation Office.

The defendant shall not be engaged in any business that offers securities, investments, or business opportunities to the public. The defendant is further prohibited from engaging in telemarketing, direct mail or national advertising campaigns for business purposes without the permission of the U.S. Probation Officer.

The defendant shall obtain prior written approval from the U.S. Probation Officer before entering into any self-employment.

USDC FLSD 245B (Rev 3/01) - Judgment in a Criminal Case                                                    Page 5 of 6

DEFENDANT: FRED MORGENSTERN
CASE NUMBER: 02-60101-CR-DIMITROULEAS

## CRIMINAL MONETARY PENALTIES

The defendant shall pay the following total criminal monetary penalties in accordance with the schedule of payments set forth in the Schedule of Payments.

| Total Assessment | Total Fine | Total Restitution |
|------------------|------------|-------------------|
| $100.00 | N/A | N/A |

*Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18, United States Code, for offenses committed on or after September 13, 1994 but before April 23, 1996.

DEFENDANT: FRED MORGENSTERN
CASE NUMBER: 02-60101-CR-DIMITROULEAS

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties shall be due as follows:

    A.  Lump sum payment of **$100.00** due immediately.

Unless the court has expressly ordered otherwise in the special instructions above, if this judgment imposes a period of imprisonment, payment of criminal monetary penalties shall be due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court, unless otherwise directed by the court, the probation officer, or the United States attorney.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

**The assessment/fine/restitution is payable to the U.S. COURTS and is to be addressed to:**

    **U.S. CLERK'S OFFICE**
    **ATTN: FINANCIAL SECTION**
    **301 N. MIAMI AVENUE, ROOM 150**
    **MIAMI, FLORIDA 33128**

**The assessment/fine/restitution is payable immediately. The U.S. Bureau of Prisons, U.S. Probation Office and the U.S. Attorney's Office are responsible for the enforcement of this order.**

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) community restitution, (6) fine interest (7) penalties, and (8) costs, including cost of prosecution and court costs.

```
              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF FLORIDA
              FORT LAUDERDALE DIVISION

UNITED STATES OF AMERICA,     )   CASE NO. 00-6309-CR-WPD
                              )
              Plaintiff,      )
                              )
                              )
         -v-                  )
                              )
FRED MORGENSTERN,             )
DAVID MORGENSTERN,            )
JOSEPH SILVESTRI,             )
                              )   Fort Lauderdale, Florida
              Defendants.     )   May 21, 2002
_____)   9:02 a.m.


              TRANSCRIPT OF STATUS CONFERENCE

       BEFORE THE HONORABLE WILLIAM P. DIMITROULEAS

                  U.S. DISTRICT JUDGE

APPEARANCES:
                      J. BRIAN MCCORMICK, ESQ.
                      DIANA FERNANDEZ, ESQ.
                      JAMES R. PAVLOCK, ESQ.
                      Assistant U.S. Attorneys
                      Appearing on behalf of the Plaintiff

                      WILLIAM NORRIS, ESQ.
                      Appearing on behalf of Defendant
                      Fred Morgenstern

                      SCOTT SAKIN, ESQ.
                      Appearing on behalf of Defendant
                      David Morgenstern

                      RICHARD SHARPSTEIN, ESQ.
                      Appearing on behalf of Defendant
                      Joseph Silvestri

Reporter              ROBERT A. RYCKOFF
                      Official Court Reporter
                      299 East Broward Boulevard
                      Fort Lauderdale, Florida 33301
                      954-769-5657
```

(Call to order of the Court.)

THE COURT:  United States versus Fred Morgenstern, David Morgenstern and Joseph Silvestri.  If counsel would announce their appearances for the record.

MS. FERNANDEZ:  Good morning, Your Honor.

AUSA Diana Fernandez and Brian McCormick and special trial attorney James Pavlock for the Government.

MR. SHARPSTEIN:  Good morning, Your Honor.

Richard Sharpstein for Mr. Silvestri, who is present in the court.

MR. NORRIS:  Good morning, Your Honor.

William Norris for Fred Morgenstern, who is present.

Also, David Morgenstern is present, but Scott Sakin, who is his counsel, is not here yet.

THE COURT:  Do you know if he is coming this morning?

MR. NORRIS:  My understanding was yes, but I haven't been in touch with him this morning, so I don't know why he is not --

MS. FERNANDEZ:  Your Honor, as far as I understand, the mistrial was granted in the murder case, so we believe Mr. Sakin should be here this morning.

THE COURT:  Okay.  We will wait then.

(Pause.)

THE COURT:  Mr. Sakin is here.

MR. SAKIN:  Judge, good morning.

1          Scott Sakin on behalf of David Morgenstern.

2          THE COURT:  What's your status, Mr. Sakin, as far as

3   the trial in Miami?

4          MR. SAKIN:  The trial was mistried, so I am here.

5          THE COURT:  Okay.

6          So no problems --

7          MR. SAKIN:  My prediction of a remote mistrial

8   obviously was off because it was, indeed, granted, Your Honor.

9          THE COURT:  All right.

10          But it's not being rescheduled anytime in the near

11   future?

12          MR. SAKIN:  No, it's not.  I am available to take

13   care of the proceedings here.

14          THE COURT:  Okay.

15          All right.  How about the Government's motion to

16   resolve tape recording related issues?  What's your position on

17   that, Mr. Sharpstein?

18          MR. SHARPSTEIN:  Your Honor, I met with the

19   Government after our last hearing.

20          I have no objection or challenge to the authenticity

21   issues or the preliminary foundational issues, such as the

22   warrant.

23          I do have some relevance motions and matters that we

24   could bring up just at the start of trial.  They won't take

25   long.

1          That's out position as far as that's concerned.

2          THE COURT:  Mr. Norris.

3          MR. NORRIS:  Your Honor, there has been active plea

4    negotiations going on and tying that together is -- I mean

5    there are loose threads.

6          As far as the tapes are concerned, there are no

7    pending motions.  There are some questions.  And we are going

8    to continue to look to predicate as far as voice identification

9    and things like that are concerned.

10         THE COURT:  I guess that's what the Government wants

11   to resolve this morning if they can.

12         How about you, Mr. Sakin, what's your position?

13         MR. SAKIN:  David Morgenstern wishes to take a plea.

14   We have discussed it with the Government.  And I believe there

15   is going to be a plea pursuant to Rule 20.  The transfer of

16   this case is to the District of So. n Carolina where he has a

17   pending case.  And that was discussed last night.

18         THE COURT:  I am not going to transfer the case.  If

19   he wants to take a plea, it will have to be here.  I am not

20   postponing the case and then he goes to South Carolina and then

21   for some reason he decides not to take the plea in South

22   Carolina.

23         MR. SAKIN:  Judge, is it possible to take the plea

24   here and do the disposition in South Carolina along with the

25   case he has in South Carolina?

5

1          THE COURT:  What's the Government's position on that?

2          MS. FERNANDEZ:  That would be fine with the

3    Government, Your Honor.

4          THE COURT:  I have no problem taking a plea here, and

5    I have no problem transferring the case for disposition in

6    South Carolina if the South Carolina Judge will take it, but if

7    he won't take it, then I am going to dispose of the case.

8          MR. SAKIN:  I understand.

9          I know that's what he wants to do.  We had a whole

10   thing worked out with South Carolina.

11         Obviously if -- I know the Court's concern here is

12   that if he says he is going to take a plea and doesn't do the

13   plea, that sets you back here.

14         I know normally the plea and disposition is done

15   before the same Court, but I would imagine if the Judge there

16   has no objection and the Government has no objection and you

17   have no objection, there is no reason why it couldn't be done

18   that way.

19         THE COURT:  I have no problem doing that just as long

20   as Mr. Morgenstern understands that if something falls through

21   and South Carolina doesn't take the position, then I am going

22   to do the sentencing.  If he is willing to plea under those

23   parameters, then I will be more than happy to take the plea.

24   If not, then I have got reservations about doing a Rule 20

25   literally on the eve of trial where the Government has been

6

1    taking a position all along that they want to try the cases

2    together.

3             So let me put Mr. Morgenstern's case on recall and

4    you can discuss it with him.

5             MR. SAKIN:  May I step outside with Mr. Morgenstern?

6             THE COURT:  Yes.

7             MR. SAKIN:  Thank you.

8             THE COURT:  Mr. Norris, how much more time do you

9    need with Mr. Morgenstern to figure out if it's going to be a

10   plea or a trial?

11            MR. NORRIS:  Okay.  That's a direct question.  I have

12   trouble giving a direct answer because part of Fred

13   Morgenstern's resolution depends on David Morgenstern's

14   resolution because it's been dealt with as a package deal.  But

15   I would say 15 minutes -- you know, we would know whether we

16   are going forward or not within 15 minutes.

17            THE COURT:  All right.  Let's take a recess for 15

18   minutes and then we will see what we can resolve on the case.

19            (Recess taken at 9:10 a.m. until 9:32 a.m.)

20            THE COURT:  United States versus Fred Morgenstern.

21   What's the status on Mr. Morgenstern's case?

22            MR. NORRIS:  Your Honor, Mr. Morgenstern wishes to

23   enter a negotiated plea.  There is going to be a superseding

24   information.

25            THE COURT:  All right.

```
 1            And when does he want to do that?

 2            MS. FERNANDEZ:  Your Honor, if I might suggest -- in

 3   discussion with defense counsel -- I think the Court is aware

 4   that these discussions were continuing last night and then more

 5   particularly right now on the break -- the Government as to

 6   Fred Morgenstern could have available all the necessary -- the

 7   information and everything else for the plea by 2:00 o'clock

 8   today if the Court has time available.

 9            THE COURT:  I do.

10            MS. FERNANDEZ:  I would suggest that we set it down

11   for a plea at that time.

12            THE COURT:  All right.

13            So I will reset Mr. Morgenstern's case for 2:00

14   o'clock.

15            How about David Morgenstern?

16            MR. SAKIN:  Judge, we are in the same position.

17   There are some documents the Government wants to prepare that

18   we will have to go over.  And I can certainly make myself

19   available this afternoon at 2:00 o'clock.

20            THE COURT:  All right.

21            So we will reset David Morgenstern for 2:00 o'clock.

22            How about Mr. Silvestri's case?

23            MR. SHARPSTEIN:  We are ready for trial, Your Honor.

24            THE COURT:  Is the Government ready?

25            MS. FERNANDEZ:  Your Honor, as to Mr. Silvestri, as
```

1   long as the two pleas occur today, the Government would ask for

2   just a brief continuance -- my suggestion is until Tuesday --

3   to continue to proceed to trial.

4          In particular, Your Honor, the Government had

5   prepared obviously for all three defendants proceeding to

6   trial. We had estimated the trial for all three to last

7   approximately three weeks. I think given the couple of days

8   that we are asking for, we would be able to cut back our

9   presentation substantially reducing the trial time we would

10  estimate to approximately one week or probably one week and a

11  day or so.

12         And as I recall, Your Honor, Mr. Sharpstein at the

13  last status conference had indicated he was not available for

14  this Friday.

15         So that would put 's for four days of trial next week

16  and then possibly one or two days the following week and I

17  would suggest that would complete the trial.

18         So it would be a substantial savings of judicial time

19  and jury time in order to do that.

20         THE COURT: Let's do this on Mr. Silvestri: We will

21  pick a jury tomorrow on him at 9:00 o'clock. I have got

22  meeting tomorrow afternoon in Miami. So all we will do is pick

23  a jury tomorrow morning. And I have got hearings Thursday

24  morning. So we won't resume the trial until Thursday at 1:00

25  o'clock. And Mr. Sharpstein wanted to be off on Friday. So we

1    will be off on Friday.  So we will only pick a jury and try the

2    case Thursday afternoon of this week and then we will have the

3    four days of next week.

4            I am reluctant to start jury selection on Tuesday of

5    the second week of a jury panel because I think it's harder to

6    get a jury when you are doing that.

7            So we will see everybody here tomorrow at 9:00

8    o'clock for selection on Mr. Silvestri.

9            And if something happens with either or both of the

10   Morgensterns, then there is a possibility we would select a

11   jury on all three at 9:00 o'clock tomorrow.

12           So we will see Mr. Silvestri back tomorrow at 9:00

13   and the Morgensterns at 2:00 o'clock this afternoon.

14           MR. SHARPSTEIN:  I don't think this is going to be a

15   problem actually, but the following Friday, June 7th, I have an

16   issue that I have to be out of town.  I don't think we are even

17   going to get there, but I just wanted to alert the Court if we

18   run into that.

19           THE COURT:  Okay.  If we do, we will just be off on

20   that Friday.

21           Okay.  So we will be in recess until 2:00 o'clock on

22   the Morgensterns.

23           (Proceedings concluded at 9:36 a.m.)

24

25

10

1

2

3                              REPORTER'S CERTIFICATION

4

5        I hereby certify that the foregoing is a true and accurate

6    transcript of the proceedings recorded by me and reduced to

7    typewriting at my direction.

8

9

10                              Court Reporter

11                              Robert Ryckoff

12

13

14

15                         Date:

16

17

18

19

20

21

22

23

24

25

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

UNITED STATES OF AMERICA,   )  CASE NO. 00-6309-CR-WPD
                        )
          Plaintiff,   )
                        )
      -v-          )
                        )
FRED MORGENSTERN,       )
DAVID MORGENSTERN,      )
                        )  Fort Lauderdale, Florida
         Defendants.  )  May 21, 2002
_____)  2:26 p.m.

TRANSCRIPTS OF PLEAS OF GUILTY

BEFORE THE HONORABLE WILLIAM P. DIMITROULEAS

U.S. DISTRICT JUDGE

APPEARANCES:

                J. BRIAN MCCORMICK, ESQ.
                DIANA L.W. FERNANDEZ, ESQ.
                Assistant United States Attorneys
                      -and-
                JAMES R. PAVLOCK, ESQ.
                Senior Trial Attorney
                Appearing on behalf of the Plaintiff

                WILLIAM NORRIS, ESQ.
                Appearing on behalf of Defendant
                Fred Morgenstern

                SCOTT SAKIN, ESQ.
                Appearing on behalf of Defendant
                David Morgenstern

Reporter           ROBERT A. RYCKOFF
                Official Court Reporter
                299 East Broward Boulevard
                Fort Lauderdale, Florida 33301
                954-769-5657

1          (Call to order of the Court.)

2          THE COURT:  Okay.  United States versus Fred

3    Morgenstern and David Morgenstern.  If counsel would announce

4    their appearances for the record.

5          MR. MCCORMICK:  Brian McCormick, Diana Fernandez and

6    James Pavlock for the United States, Your Honor.

7          MR. NORRIS:  William Norris for Fred Morgenstern, who

8    is present, and we are ready to proceed.

9          MR. SAKIN:  Judge, good afternoon.

10         Scott Sakin on behalf of David Morgenstern.

11         We are going to have this signed in just another 30

12   seconds.

13         THE COURT:  Okay.

14         (Pause.)

15         THE COURT:  Mr. Norris, what's the status on Fred

16   Morgenstern's case?

17         MR. NORRIS:  We are prepared to withdraw our

18   previously entered plea of not guilty and enter a plea of

19   guilty to count 14 and a Superseding Information.

20         THE COURT:  All right.

21         If Mr. Morgenstern could approach the podium.

22         And, Mr. Sakin, what's David Morgenstern's position?

23         MR. SAKIN:  Judge, we wish to enter a plea also to

24   count 14 and the Superseding Indictment pursuant to the Plea

25   Agreement, which we have handed up to the Court.

1    THE COURT:  All right.

2    And if Davie Morgenstern also could approach the

3  podium.

4    (Pause.)

5    THE COURT:  And if we can swear both defendants in.

6    FRED MORGENSTERN AND DAVID MORGENSTERN, DEFENDANTS,

7  SWORN.

8    THE COURT:  Do you understand that you are now under

9  oath and if you answer any of my questions falsely, your

10  answers may later be used against you in another prosecution

11  for perjury or making a false statement, David Morgenstern?

12    DEFENDANT DAVID MORGENSTERN:  Yes, I understand.

13    THE COURT:  And Fred Morgenstern.

14    DEFENDANT FRED MORGENSTERN:  I do.

15    THE COURT:  Now, count 14, the money laundering

16  conspiracy, does that have a maximum of 10 or 20 years in

17  prison?

18    MR. MCCORMICK:  Ten years, Your Honor.

19    THE COURT:  Okay.

20    And is that what you want to do, plead guilty to

21  count 14, money laundering conspiracy, and the Superseding

22  Information, which charges using a facility in interstate and

23  foreign commerce with the intent to distribute the proceeds of

24  an unlawful activity, and throw yourself on the mercy of the

25  Court, David Morgenstern?

4

1    DEFENDANT DAVID MORGENSTERN:  Yes.

2    THE COURT:  And Fred Morgenstern.

3    DEFENDANT FRED MORGENSTERN:  Yes.

4    THE COURT:  Now, it's anticipated that Fred

5 Morgenstern is going to be sentenced by me, is that correct,

6 Mr. Norris?

7    MR. NORRIS:  No, Your Honor.  It's understood that

8 that will be transferred as -- if it is accepted in South

9 Carolina -- that it will be --

10    THE COURT:  So both defendants are going to try to go

11 to South Carolina?

12    MR. NORRIS:  Yes, sir.

13    THE COURT:  All right.

14    MR. NORRIS:  But if that doesn't go through, then he

15 will sentenced in this court.

16    THE COURT:  All right.

17    Let me just say this:  If the South Carolina Judge

18 doesn't want to take these cases, but wants to transfer the

19 South Carolina cases down here for a plea, I have no problem

20 doing it either way.  In other words, I don't have any problem

21 transferring the sentencings up to South Carolina for him to do

22 everything.  I have no problem if he wants to transfer his case

23 down here under a Rule 20 for sentencing or for a change of

24 plea and sentencing.  So it doesn't matter to me.

25    Do you understand that, Mr. Sakin?

1    MR. SAKIN:  Yes, sir, I do.

2    THE COURT:  And Mr. Norris.

3    MR. NORRIS:  Yes, sir.

4    THE COURT:  Do you understand that, David

5  Morgenstern?

6    DEFENDANT DAVID MORGENSTERN:  Yes, sir, I do.

7    THE COURT:  Fred Morgenstern.

8    DEFENDANT FRED MORGENSTERN:  I do.

9    THE COURT:  But if for some reason he wants to keep

10  his case and he doesn't want to take this case, that means that

11  I have to do the sentencing.  Do you understand that, David

12  Morgenstern?

13    DEFENDANT DAVID MORGENSTERN:  Yes, I do.

14    THE COURT:  And do you understand that, Fred

15  Morgenstern?

16    DEFENDANT FRED MORGENSTERN:  I do.

17    THE COURT:  And if for some reason you don't get

18  sentenced in South Carolina, then that would not be a ground to

19  withdraw your guilty plea.  You would be stuck with your guilty

20  plea.  And I would give you what I think is a fair sentence.

21  Do you understand that, David Morgenstern?

22    DEFENDANT DAVID MORGENSTERN:  Yes.

23    THE COURT:  And Fred Morgenstern.

24    DEFENDANT FRED MORGENSTERN:  I do.

25    THE COURT:  All right.

6

1          And these questions I am going to ask you are going

2    to be to satisfy myself that both of you are making this

3    decision freely and voluntarily so that if either I sentence

4    you or the Judge in South Carolina sentences you, then either

5    one of us could be satisfied that you made this decision freely

6    and voluntarily, and I wouldn't let you wiggle out of this

7    decision later on if you changed your mind if I decide you are

8    doing it freely and voluntarily here today.  Do you understand

9    that, David Morgenstern?

10          DEFENDANT DAVID MORGENSTERN:  Yes.

11          THE COURT:  And Fred Morgenstern.

12          DEFENDANT FRED MORGENSTERN:  I do.

13          THE COURT:  All right.

14          If you plead guilty, I am going to adjudicate both of

15   you guilty.  I will defer sentencing.  I will order a

16   Presentence Investigation Report.  I will set sentencing for

17   August 1st at 9:30 in the morning on Fred Morgenstern and at

18   10:00 o'clock in the morning on David Morgenstern here in this

19   courtroom.  Do you understand that, David Morgenstern?

20          DEFENDANT DAVID MORGENSTERN:  Yes.

21          THE COURT:  And Fred Morgenstern.

22          DEFENDANT FRED MORGENSTERN:  I do.

23          THE COURT:  And obviously if the South Carolina Judge

24   accepts the transfer of this case, then those dates would be

25   canceled and he would set his own dates up in South Carolina.

1    Do you understand that, David Morgenstern?

2              DEFENDANT DAVID MORGENSTERN:  Yes, I do.

3              THE COURT:  Fred Morgenstern.

4              DEFENDANT FRED MORGENSTERN:  I do.

5              THE COURT:  But if these dates aren't canceled, then

6    you need to be here on August 1st at 9:30.  Do you understand

7    that, Fred Morgenstern.

8              DEFENDANT FRED MORGENSTERN:  I do.

9              THE COURT:  And at 10:00 o'clock.  Do you understand

10   that, you David Morgenstern?

11             DEFENDANT DAVID MORGENSTERN:  Yes, I do.

12             THE COURT:  Now, at that time I will listen to what

13   you have to say, your lawyer has to say, the prosecutor, and

14   anybody else, and I will give you what I think is a fair

15   sentence.  Do you understand that David Morgenstern?

16             DEFENDANT DAVID MORGENSTERN:  Yes, I do.

17             THE COURT:  And Fred Morgenstern.

18             DEFENDANT FRED MORGENSTERN:  I do.

19             THE COURT:  You may not think it's fair, your lawyer

20   may not think it's fair, the prosecutor may not think the

21   sentence is fair, but I will think it's fair.  Do you

22   understand that, David Morgenstern?

23             DEFENDANT DAVID MORGENSTERN:  Yes, I do.

24             THE COURT:  And Fred Morgenstern.

25             DEFENDANT FRED MORGENSTERN:  I do.

1    THE COURT:  Now, at the time of sentencing, we are

2  going to score up your sentencing guidelines and we are going

3  to come up with a recommended sentencing range that Congress

4  thinks I should consider in your case.  Do you understand that,

5  David Morgenstern?

6    DEFENDANT DAVID MORGENSTERN:  Yes.

7    THE COURT:  And Fred Morgenstern.

8    DEFENDANT FRED MORGENSTERN:  I do.

9    THE COURT:  Have you and your attorney talked about

10  how the Sentencing Guidelines might apply to your case, David

11  Morgenstern?

12    DEFENDANT DAVID MORGENSTERN:  Yes.

13    THE COURT:  And Fred Morgenstern.

14    DEFENDANT FRED MORGENSTERN:  Yes.

15    THE COURT:  Do you understand that I am not going to

16  be able or the South Caroline Judge wouldn't be able to

17  determine the guidelines sentence for your case until after the

18  Presentence Report has been completed and you and the

19  Government have had an opportunity to challenge the reported

20  facts and the application of the guidelines recommended by the

21  Probation Officer, David Morgenstern?

22    DEFENDANT DAVID MORGENSTERN:  Yes.

23    THE COURT:  And Fred Morgenstern.

24    DEFENDANT FRED MORGENSTERN:  I do.

25    THE COURT:  And do you understand that the sentence

1  that I actually impose or that the South Carolina Judge

2  actually imposes may be different from any estimate your lawyer

3  or anybody else may have given you, David Morgenstern?

4          DEFENDANT DAVID MORGENSTERN:  Yes.

5          THE COURT:  And Fred Morgenstern.

6          DEFENDANT FRED MORGENSTERN:  Yes.

7          THE COURT:  And if you were to get a higher sentence

8  than you were hoping for, that would not be a ground to

9  withdraw your guilty plea.  Do you understand that, David

10  Morgenstern?

11          DEFENDANT DAVID MORGENSTERN:  Yes.

12          THE COURT:  And Fred Morgenstern.

13          DEFENDANT FRED MORGENSTERN:  Can you just repeat

14  that?

15          THE COURT:  If you get a higher sentence than you

16  were hoping for, that's a chance you take by your open plea and

17  it would not be grounds to withdraw your guilty plea.  Do you

18  understand that, Fred Morgenstern?

19          DEFENDANT FRED MORGENSTERN:  I do.

20          THE COURT:  Do you need any more time to talk to your

21  lawyer about that?

22          DEFENDANT FRED MORGENSTERN:  No.

23          I misunderstood one word you said, but I heard it the

24  second time.

25          THE COURT:  All right.

10

```
1              Do you also understand that after your guideline

2    raping has been determined that the Court has the authority in

3    some circumstances to depart from the guidelines and impose a

4    sentence that is either more severe or less severe than the

5    sentence called for by the guidelines, David Morgenstern?

6              DEFENDANT DAVID MORGENSTERN:  Yes.

7              THE COURT:  And Fred Morgenstern.

8              DEFENDANT FRED MORGENSTERN:  Yes.

9              THE COURT:  And if the Judge were to do an upward

10   departure, that's a chance you take by your open plea and it

11   would not be grounds to withdraw your guilty plea.  Do you

12   understand that, David Morgenstern?

13             DEFENDANT DAVID MORGENSTERN:  Yes.

14             THE COURT:  And Fred Morgenstern.

15             DEFENDANT FRED MORGENSTERN:  Yes.

16             THE COURT:  Do you also understand that parole has

17   been abolished and that if you are sentenced to prison, you

18   will not be released on parole, David Morgenstern?

19             DEFENDANT DAVID MORGENSTERN:  Yes.

20             THE COURT:  And Fred Morgenstern.

21             DEFENDANT FRED MORGENSTERN:  Yes.

22             THE COURT:  The actual percentage of the sentence

23   that you do in custody is between you and the Bureau Of

24   Prisons.  Any good time or early release laws, if they are

25   applicable to your case, aren't part of these plea
```

1    negotiations.  Do you understand that, David Morgenstern?

2              DEFENDANT DAVID MORGENSTERN:  Yes.

3              THE COURT:  And Fred Morgenstern.

4              DEFENDANT FRED MORGENSTERN:  Yes.

5              THE COURT:  And understanding all these things, is

6    this what you want to do, plead guilty to these two charges and

7    throw yourself on the mercy of the Court, David Morgenstern?

8              DEFENDANT DAVID MORGENSTERN:  Yes.

9              THE COURT:  And Fred Morgenstern.

10             DEFENDANT FRED MORGENSTERN:  Yes.

11             THE COURT:  Do you also understand that if for some

12   reason something should happen and you decide not to plead

13   guilty in South Carolina, the negotiations fall through and

14   either because you want to go to trial or the prosecutors up

15   there want to go to trial or the South Carolina Judge won't

16   accept some plea, that that's a chance you take by your open

17   plea on these cases and it would not be a ground to withdraw

18   your guilty plea on these two charges?  Do you understand that,

19   David Morgenstern?

20             DEFENDANT DAVID MORGENSTERN:  Yes.

21             THE COURT:  And Fred Morgenstern.

22             DEFENDANT FRED MORGENSTERN:  I do.

23             THE COURT:  In other words, these pleas are not

24   contingent on the pleas happening in South Carolina.  Do you

25   understand that, David Morgenstern?

```
 1              DEFENDANT DAVID MORGENSTERN:  Yes, I do.

 2              THE COURT:  And Fred Morgenstern.

 3              DEFENDANT FRED MORGENSTERN:  I do.

 4              THE COURT:  And let me say I don't even know who the

 5      Judge is in South Carolina.  I haven't talked to him.  I don't

 6      anticipate that happening, but if it happens, it's my intention

 7      that this case is closed, and the only thing left to be done in

 8      this case is just for me or the South Carolina Judge to

 9      sentence you.  Do you understand that, David Morgenstern?

10              DEFENDANT DAVID MORGENSTERN:  Yes, I do.

11              THE COURT:  And Fred Morgenstern.

12              DEFENDANT FRED MORGENSTERN:  I do.

13              THE COURT:  Now, I have before me before two

14      nine-page Plea Agreements.

15              Is this your signature on page 9, David Morgenstern?

16              DEFENDANT DAVID MORGENSTERN:  Yes.

17              THE COURT:  And is this your signature on page 9,

18      Fred Morgenstern?

19              DEFENDANT FRED MORGENSTERN:  It looks to me, yes.

20              THE COURT:  Do you want to take it over to Fred

21      Morgenstern and ask him if that's his signature?

22              (Pause.)

23              THE COURT:  Is that your signature, Fred Morgenstern?

24              DEFENDANT FRED MORGENSTERN:  Yes, it is.

25              THE COURT:  And is that your signature on both of the
```

1    documents, Mr. McCormick?

2            MR. MCCORMICK:  It is, Your Honor.

3            THE COURT:  And is that your signature on both of the

4    documents, Ms. Fernandez?

5            MS. FERNANDEZ:  Yes, it is, Your Honor.

6            THE COURT:  And is that your signature on both of the

7    documents, Mr. Pavlock?

8            MR. PAVLOCK:  Yes, Your Honor.

9            THE COURT:  And is that your signature on Mr. Fred

10   Morgenstern's document, Mr. Norris?

11           MR. NORRIS:  Yes, it is, Your Honor.

12           THE COURT:  And is that your signature on David

13   Morgenstern's document, Mr. Sakin?

14           MR. SAKIN:  Yes, sir.

15           THE COURT:  Did you have an opportunity to read and

16   discuss these Plea Agreements with your lawyer before you

17   signed it, David Morgenstern?

18           DEFENDANT DAVID MORGENSTERN:  Yes.

19           THE COURT:  And Fred Morgenstern.

20           DEFENDANT FRED MORGENSTERN:  Yes.

21           THE COURT:  Does the Plea Agreement represent in its

22   entirety any understanding you have with the Government, David

23   Morgenstern?

24           MR. SAKIN:  Judge, there are a couple of other things

25   that are not in the Plea Agreement that I know the Government

1    is going to mention to the Court.

2         THE COURT:  Let's hear about them now.

3         MR. SAKIN:  There was the forfeiture of the house.

4         MR. PAVLOCK:  Yes.

5         MR. SAKIN:  And there is also an issue just regarding

6    his bond.

7         Those are the other two areas.

8         MR. PAVLOCK:  I can address the forfeiture issue,

9    Your Honor.

10        The defendant, David Morgenstern, has requested that

11   his home in which his wife and five children live at Estrella

12   Circle in Boca Raton, Florida, be excused or be excepted from

13   any kind of forfeiture proceeding, and the agreement of the

14   Government is that to the extent that the property is not

15   traceable -- payments on the purchase or mortgage payments --

16   ongoing mortgage payments -- are not traceable in any way to

17   the Chemical Trust fraud proceeds from investors, that the

18   Government would not seek to forfeit that property.

19        Now, with respect to substitute (phonetic) property,

20   the Government could move against that property -- the

21   substitute property -- potentially, and to that extent might

22   inquire to Mr. David Morgenstern with respect to the equity in

23   the property and the nature of the mortgage.  He tells me that

24   the nature of the mortgage is held by a partner of -- actually

25   Gabriel McEnroe (phonetic), who is a defendant in the South

1  against this home in Boca?

2          MR. SAKIN:  Judge, it's simple.

3          The way I understand it, there is a forfeiture

4  provision and we have agreed to the forfeiture.  We have asked

5  the Government to agree not to go after the home as a

6  substitute asset for the forfeiture, and provided that the fund

7  was not purchased with any of the Chemical Trust or illegal

8  proceeds, the Government has agreed not to do that.  And also

9  provided that the home was not involved in any way from any of

10  the monies that were used in the fraud, the Government has

11  agreed to do that.

12          He is not intending to pay down the mortgage.  He

13  doesn't have the money to pay down the mortgage.  So that whole

14  other part of it, I don't think is --

15          MR. PAVLOCK:  That was the only other concern, Your

16  Honor.

17          I apologize if I was unclear.

18          THE COURT:  All right.

19          So if I understand correctly, the home isn't subject

20  to forfeiture in the Plea Agreement, except as it would be

21  substitute --

22          MR. PAVLOCK:  It could be, yes.

23          THE COURT:  You know, if you can't get the money from

24  the other things, then you could go after his other assets and

25  this is another asset.

1    Carolina case.

2            So it is with the understanding that the Government

3    would have full recourse to move against any kind of mortgage

4    interest in the property that may be held by Gabriel McEnroe

5    (phonetic) or a partner of his or any company that may be

6    controlled by him.

7            And, secondly, Your Honor, with respect to the

8    equity, is that the Government would understand that normal

9    mortgage payments would be made on this property throughout,

10   and that there would be no extraordinary payment of substitute

11   property of assets, let's say a $100,000 or a $200,000 payment,

12   which would reduce the mortgage, that that would not occur such

13   that it would preclude the Government from going after that

14   kind of property.

15           With that, Your Honor --

16           THE COURT:  I don't understand what you said.

17           MR. PAVLOCK:  I am sorry, Your Honor.

18           Just the fact that if he paid down the mortgage

19   tomorrow after we made this agreement to the extent of $200,000

20   or $300,000, that we would not be precluded from then going

21   after that property; that we are expecting the mortgage

22   payments to be made on an ongoing basis as they are being made

23   now.

24           THE COURT:  Mr. Sakin, why don't you tell me what

25   your client hopes to accomplish vis-a-vis the forfeiture

1    So you are not asking me to forfeit this home, except
2    as it could possibly be substitute proceeds or substitute
3    amounts for the forfeiture that you aren't able to realize
4    otherwise?
5         MR. PAVLOCK:  That's correct.
6         MR. SAKIN:  Well, no.
7         The Government agreed not to go after the home as a
8    substitute asset unless it was discovered that the home was
9    purchased with Chemical Trust money, which is the illegal
10   money.
11        THE COURT:  That's the second thing I was about to
12   get to.
13        So the first thing is that this house isn't -- could
14   be named as property in the forfeiture order?
15        MR. PAVLOCK:  That's correct, Your Honor.
16        THE COURT:  But that if you don't get all the
17   proceeds that are covered by the forfeiture order, you are
18   normally entitled to go after substitute property to make up
19   the difference.  Is that right?
20        MR. PAVLOCK:  That's correct.
21        THE COURT:  But in this case you won't do that unless
22   the house was bought with these proceeds from this Chemical
23   Trust bank fraud or he paid the mortgage from those fraudulent
24   proceeds?
25        MR. PAVLOCK:  Exactly.

18

1          And, Your Honor, Mr. Morgenstern has represented that

2    that is not the case, and we wish to confirm that before we

3    make that promise.

4          THE COURT:  Okay.

5          And then, secondly, you won't go after the house if

6    he just continues to make the mortgage payments; that he can't

7    dump a bunch of money into the house and shield that from being

8    seized as part of the forfeiture order?

9          MR. PAVLOCK:  Exactly, Your Honor.

10         MR. SAKIN:  Yes, that's all accurate.  That's my

11   understanding.

12         THE COURT:  Do you understand that, David

13   Morgenstern?

14         DEFENDANT DAVID MORGENSTERN:  Yes, I do.

15         THE COURT:  So if they can show that some of the

16   proceeds from this fraudulent activity either bought the house

17   or paid the mortgage on the house, then they can sell the house

18   out from underneath you to make up any difference that may be

19   owing under the forfeiture order.  Do you understand that?

20         DEFENDANT DAVID MORGENSTERN:  Yes.

21         THE COURT:  Additionally, if you pay down the

22   mortgage and shield assets in that fashion, then they can go

23   after your house to make up any deficiencies.  Do you

24   understand that?

25         DEFENDANT DAVID MORGENSTERN:  Yes.

19

1      THE COURT:  But absent those two things, then they

2 will leave your house at the address in Boca alone.  Do you

3 understand that?

4      DEFENDANT DAVID MORGENSTERN:  Yes.

5      THE COURT:  Are there any other aspects of the plea

6 negotiations that we haven't discussed as to David Morgenstern?

7      MR. SAKIN:  I told him the Rule 20 -- you have

8 covered that already -- and the Government has indicated they

9 are going to do what they have to do to facilitate the Rule 20,

10 and unless the Judge in South Carolina says no, we expect the

11 case to proceed by Rule 20, but that's not really -- Your Honor

12 has made it clear.  If the case is not Rule 20'd, you are going

13 to take care of sentencing here.

14      THE COURT:  Do you understand that, David

15 Morgenstern?

16      DEFENDANT DAVID MORGENSTERN:  Yes.

17      (Pause.)

18      THE COURT:  Normally a Rule 20 goes up to the other

19 Judge to take a plea and do the sentencing and if you don't

20 take the plea, then it comes back for trial.

21      I am not willing to send the case up under that

22 circumstance.  I am willing to send it up for sentencing.

23      So that if for some reason the South Carolina Judge

24 doesn't want to sentence you, then it just comes back to me

25 just for sentencing and not for a trial.

1          If I am going to do the trial, I might as well do it

2    tomorrow when I going to do Mr. Silvestri's trial.

3          Do you understand that, David Morgenstern?

4          DEFENDANT DAVID MORGENSTERN:  Yes, I do, sir.

5          THE COURT:  Do you understand that, Fred Morgenstern?

6          DEFENDANT FRED MORGENSTERN:  I am sorry.  We were --

7          MR. NORRIS:  We were talking, Your Honor.  I

8    apologize.

9          THE COURT:  Normally a Rule 20 sends a case to

10   another district for a plea and sentencing.  Do you understand

11   that?

12         (Pause.)

13         THE COURT:  Do you understand that, Fred Morgenstern?

14         DEFENDANT FRED MORGENSTERN:  Yes.

15         THE COURT:  Okay.

16         I am not willing to send the case up there for a plea

17   because Rule 20 says if you don't take a plea up there, it

18   comes back to me for a trial.  The South Carolina Judge won't

19   try the case.  If you were to change your mind or the

20   negotiations break down -- it may be something -- it may not

21   even be due to your fault.  It may be the South Carolina

22   prosecutors that scuttle the thing.  So the case would come

23   back to me for a trial.  I am not willing to send the case up

24   there when it may come back for a trial.  If I am going to try

25   it, I might as well try it tomorrow with Mr. Silvestri.

21

1       Do you understand that, Fred Morgenstern?

2       DEFENDANT FRED MORGENSTERN:  I do.

3       THE COURT:  So the case will go up there.  Normally

4    it would go up for a plea and sentencing.  We are just sending

5    it up for a sentencing.  And if the South Carolina Judge for

6    some reason doesn't want to do the sentencing, then it would

7    come back to me for sentencing.  Do you understand that?

8       DEFENDANT FRED MORGENSTERN:  Yes, I do.

9       THE COURT:  And I have also said that if for some

10   reason he wants to send his case down to me, I don't have any

11   problem.  I will be more than happy to take his case on a Rule

12   20.  Do you understand that?

13      DEFENDANT FRED MORGENSTERN:  Yes.

14      THE COURT:  But, again, if for some reason the case

15   doesn't get transferred up to South Carolina, then I am going

16   to do the sentencing.  Do you understand that, Fred

17   Morgenstern?

18      DEFENDANT FRED MORGENSTERN:  I do.

19      THE COURT:  Okay.

20      So does the Plea Agreement represent in its entirety

21   any understanding you have with the Government other than what

22   we have talked about here this afternoon here in open court,

23   David Morgenstern?

24      DEFENDANT DAVID MORGENSTERN:  I believe the answer is

25   yes.  It contains everything --

1       THE COURT:  Except for the forfeiture and the Rule

2   20?

3       DEFENDANT DAVID MORGENSTERN:  Yes, it does.

4       THE COURT:  And we have talked about that?

5       DEFENDANT DAVID MORGENSTERN:  Yes.

6       THE COURT:  So except for the -- what we talked

7   about, about your house in Boca, the forfeiture provisions and

8   the Rule 20 provisions, this Plea Agreement contains in its

9   entirety any understanding you have with the Government, is

10  that correct, David Morgenstern?

11      DEFENDANT DAVID MORGENSTERN:  Yes.

12      THE COURT:  And except for the Rule 20 that we have

13  talked about here in open court, does this Plea Agreement

14  represent in its entirety any understanding you have with the

15  Government, Fred Morgenstern?

16      DEFENDANT FRED MORGENSTERN:  Yes.

17      THE COURT:  Do you understand the terms of the

18  Plea Agreement, David Morgenstern?

19      DEFENDANT DAVID MORGENSTERN:  Yes.

20      THE COURT:  Fred Morgenstern.

21      DEFENDANT FRED MORGENSTERN:  Yes.

22      THE COURT:  Has anyone made any other or different

23  promises or assurances of any kind to you in an effort to get

24  you to plead guilty in this case, David Morgenstern?

25      DEFENDANT DAVID MORGENSTERN:  No.

23

```
 1          THE COURT:  Fred Morgenstern.
 2          DEFENDANT FRED MORGENSTERN:  No.
 3          THE COURT:  Do you understand that the terms of the
 4   Plea Agreement are merely recommendations to the Court, and
 5   that I could reject those recommendations without permitting
 6   you to withdraw your plea of guilty, and I could impose a
 7   sentence that is more severe than you may have anticipated,
 8   David Morgenstern?
 9          DEFENDANT DAVID MORGENSTERN:  Yes.
10          THE COURT:  And Fred Morgenstern.
11          DEFENDANT FRED MORGENSTERN:  Yes.
12          THE COURT:  And when I say, "I," that would also
13   apply to the South Carolina Judge.  He could do the same thing.
14   Do you understand that, David Morgenstern?
15          DEFENDANT DAVID MORGENSTERN:  Yes.
16          THE COURT:  And Fred Morgenstern.
17          DEFENDANT FRED MORGENSTERN:  Yes.
18          THE COURT:  And understanding all these things, is
19   this what you want to do, plead guilty to these two charges and
20   throw yourself on the mercy of the Court, David Morgenstern?
21          DEFENDANT DAVID MORGENSTERN:  Yes.
22          THE COURT:  And Fred Morgenstern.
23          DEFENDANT FRED MORGENSTERN:  Most mercifully.
24          THE COURT:  Now, the original money laundering
25   conspiracies were in count 6 and 14 of the Second Superseding
```

```
 1   Indictment. Weren't they 20-year maximums or am I wrong on
 2   that, Mr. McCormick?
 3        MR. McCORMICK: Count 14 is a conspiracy count and
 4   it's a double object conspiracy. The first object of the
 5   conspiracy is a violation of the substantive 1956 statute and
 6   that's a 20-year maximum. And the second object is a violation
 7   of 1957, which is a 10-year maximum.
 8        THE COURT: So you are only going after the second
 9   object?
10        MR. McCORMICK: That's correct, Your Honor.
11        THE COURT: How about count six? Does that also
12   carry a maximum of 20 years?
13        MR. McCORMICK: Count six I don't think is part of
14   the --
15        THE COURT: Yes, but I tell the defendants --
16        MR. McCORMICK: I am sorry.
17        THE COURT: -- what they are facing so they
18   understand what all the charges would have been had they gone
19   to trial.
20        MR. McCORMICK: Count six is a 20-year offense, Your
21   Honor, I believe.
22        THE COURT: All right.
23        So Fred and David Morgenstern were both charged in
24   count one, conspiracy to commit racketeering, which carries a
25   maximum of 20 years in prison and a maximum fine of $250,000,
```

1    but by your plea that conspiracy to commit racketeering charge

2    is going to be dismissed at the time of sentencing whether it's

3    here or in South Carolina.  Do you understand that, David

4    Morgenstern?

5              DEFENDANT DAVID MORGENSTERN:  Yes.

6              THE COURT:  And Fred Morgenstern.

7              DEFENDANT FRED MORGENSTERN:  Yes.

8              THE COURT:  Count six is only against Fred

9    Morgenstern.  That charges money laundering conspiracy, which

10   carries a maximum of 20 years in prison or a $500,000 fine or

11   twice the value of funds that were used in the transaction, but

12   that's going to be dismissed at the time of sentencing.  Do you

13   understand that, Fred Morgenstern?

14             DEFENDANT FRED MORGENSTERN:  That's dismissed, yes?

15             THE COURT:  Right.

16             DEFENDANT FRED MORGENSTERN:  Yes.

17             THE COURT:  Count 14 is a dual object conspiracy.

18   The first object would have carried 20 years in prison with a

19   maximum fine of $500,000 or twice the value of the funds

20   involved in the transaction, but by your pleas here today the

21   Government is only proceeding under the second object of the

22   money laundering conspiracy, which carries a maximum of 10

23   years in prison and a $250,000 fine.

24             Is that also twice the value of the funds involved?

25             MR. MCCORMICK:  Yes, Your Honor.

26

1           THE COURT:  So you are pleading guilty to money

2     laundering conspiracy.  You are not facing the possible 20

3     years in prison that was the first object of the conspiracy in

4     the Second Superseding Indictment, but you are facing the

5     ten-year maximum and a quarter of a million dollar fine or

6     twice the value of the funds involved in the transaction.  Do

7     you understand that, David Morgenstern?

8           DEFENDANT DAVID MORGENSTERN:  Yes.

9           THE COURT:  And Fred Morgenstern.

10          DEFENDANT FRED MORGENSTERN:  I do.

11          THE COURT:  Now, in counts 15 through 55, Fred

12    Morgenstern is charged, in counts 16 through 45, David

13    Morgenstern is charged with engaging in monetary transactions

14    in property derived from specified unlawful activity.  Each of

15    those counts carries a maximum of ten years in prison and a

16    maximum fine of $250,000, but all of those counts are going

17    dismissed at the time of sentencing.  Do you understand that,

18    David Morgenstern?

19          DEFENDANT DAVID MORGENSTERN:  Yes.

20          THE COURT:  And Fred Morgenstern.

21          DEFENDANT FRED MORGENSTERN:  I do.

22          THE COURT:  Now, the Information charges interstate

23    or foreign transportation of -- it charges interstate or

24    foreign travel or transportation in aid of racketeering

25    enterprises, which carries a maximum of five years in prison

27

1    and a $250,000 fine, and you are pleading guilty to that

2    Superseding Information.  Do you understand that, David

3    Morgenstern?

4              (Pause.)

5              DEFENDANT DAVID MORGENSTERN:  Yes.

6              THE COURT:  Do you understand that, Fred Morgenstern?

7              MR. NORRIS:  Your Honor, may I -- in way of

8    clarification of Fred Morgenstern's answer -- as the Court has

9    just gone over -- the various counts on this area within the

10   Indictment are twenty and ten-year counts.

11             The Information charges a five-year count, and as

12   presented in the Information, he understands it and accepts it

13   and waives Indictment, and all of that.

14             The only point of clarification is in the Plea

15   Agreement it's referred -- the statute is referred to by its

16   title, which is interstate and foreign travel or transportation

17   in aid of racketeering enterprises.

18             The money laundering was as described in the

19   Information and in the Indictment as the Chemical Trust fraud,

20   and nothing else is intended by the reference in the statute

21   title to racketeering enterprises.

22             With that point of clarification, which I think

23   changes nothing, but just to make it clear what the

24   understanding and intent is --

25             THE COURT:  Let me see if I understand.

29

1           MR. NORRIS:  And that's --

2           THE COURT:  And is that your understanding, Fred

3    Morgenstern?

4           (Pause.)

5           DEFENDANT FRED MORGENSTERN:  Just one second, Your

6    Honor.

7           THE COURT:  Okay.

8           (Pause.)

9           DEFENDANT FRED MORGENSTERN:  All that being said, I

10   believe my answer is I do or yes.

11          THE COURT:  So, again, is that what you are doing,

12   pleading guilty to the violation of 18, United States Code,

13   Section 1952(a)(1), which carries a maximum of five years in

14   prison and a $250,000 fine, Fred Morgenstern?

15          DEFENDANT FRED MORGENSTERN:  Yes.

16          THE COURT:  And David Morgenstern.

17          DEFENDANT DAVID MORGENSTERN:  Yes.

18          THE COURT:  Now, the Informations are a little

19   different in that they are different banks, I guess, and

20   different amounts, but other than that the charges are pretty

21   much the same, is that correct, Mr. McCormick?

22          MR. MCCORMICK:  They are, Your Honor.

23          THE COURT:  Do you understand that, David

24   Morgenstern?

25          DEFENDANT DAVID MORGENSTERN:  Yes, I do.

30

THE COURT:  And Fred Morgenstern.

DEFENDANT FRED MORGENSTERN:  I do.

THE COURT:  Now, if you are sentenced to prison in August or whenever the South Carolina Judge were to sentence you, the Court could put you on a period of three years of supervised release when you got out of prison, and if you violated the supervised release, the Court could bring you back in front of the Court, there wouldn't be a hearing -- there wouldn't be a trial -- there would be a hearing, but there wouldn't be a trial -- and if the Court were satisfied that you had violated the rules of supervised release, the Court could send you back to prison for up to two years.  Do you understand that, David Morgenstern?

DEFENDANT DAVID MORGENSTERN:  Yes.

THE COURT:  And Fred Morgenstern.

DEFENDANT FRED MORGENSTERN:  Yes.

THE COURT:  And there would be a $100 special assessment due at the time of sentencing.  Do you understand that, David Morgenstern?

DEFENDANT DAVID MORGENSTERN:  Yes.

THE COURT:  Actually I guess there would be a $200 special assessment.

So it would be $100 per count.  So there would be a total of a $200 special assessment due at the time of sentencing.

```
 1              Do you understand that, David Morgenstern?

 2              DEFENDANT DAVID MORGENSTERN:  Yes.

 3              THE COURT:  And Fred Morgenstern.

 4              DEFENDANT FRED MORGENSTERN:  Yes.

 5              THE COURT:  Plus the Court could order restitution.

 6    Do you understand that, David Morgenstern?

 7              DEFENDANT DAVID MORGENSTERN:  Yes.

 8              THE COURT:  And Fred Morgenstern.

 9              DEFENDANT FRED MORGENSTERN:  I do.

10              THE COURT:  Plus there are forfeiture provisions that

11    we are going to talk about.  Do you understand that, David

12    Morgenstern?

13              DEFENDANT DAVID MORGENSTERN:  Yes.

14              THE COURT:  And Fred Morgenstern.

15              DEFENDANT FRED MORGENSTERN:  Yes.

16              THE COURT:  And the Government is going to recommend

17    that no fine be imposed in this case.  Do you understand that,

18    David Morgenstern?

19              DEFENDANT DAVID MORGENSTERN:  Yes.

20              THE COURT:  And Fred Morgenstern.

21              DEFENDANT FRED MORGENSTERN:  Yes.

22              THE COURT:  But you understand that recommendation is

23    persuasive, not controlling, on me.  If I don't follow it, if I

24    impose a fine, or if the South Carolina Judge were to do it,

25    that's a chance you take by your open plea and it would not be
```

```
 1    grounds to withdraw your guilty plea.  Do you understand that,
 2    David Morgenstern?
 3            DEFENDANT DAVID MORGENSTERN:  Yes.
 4            THE COURT:  And Fred Morgenstern.
 5            DEFENDANT FRED MORGENSTERN:  I do.
 6            THE COURT:  So the maximum sentence that you would be
 7    facing on these two charges would be 15 years in prison,
 8    followed by up to six years of supervised release.  Do you
 9    understand that, David Morgenstern?
10            DEFENDANT DAVID MORGENSTERN:  Yes.
11            THE COURT:  And Fred Morgenstern.
12            DEFENDANT FRED MORGENSTERN:  I do.
13            THE COURT:  Also in return for you pleading guilty,
14    the Government is going to recommend that the Court reduce your
15    sentence by three levels if you score level 16 or above based
16    on your acceptance of responsibility.  Do you understand that,
17    David Morgenstern?
18            DEFENDANT DAVID MORGENSTERN:  Yes.
19            THE COURT:  And Fred Morgenstern.
20            DEFENDANT FRED MORGENSTERN:  I do.
21            THE COURT:  However, the Government won't have to
22    make that recommendation if you, one, fail or refuse to make a
23    full, accurate and complete disclosure to the Probation Office
24    of the circumstances surrounding the case or, two, it's found
25    that you misrepresented facts to the Government prior to
```

1    pleading guilty or, three, you commit any misconduct after

2    pleading guilty, including, but not limited to, breaking the

3    law, lying or violating a term of any presentence release if

4    it's applicable in your case.  Do you understand that, David

5    Morgenstern?

6            DEFENDANT DAVID MORGENSTERN:  Yes.

7            THE COURT:  And Fred Morgenstern.

8            DEFENDANT FRED MORGENSTERN:  I do.

9            THE COURT:  And if you violated any of those

10   conditions, you would be stuck with your guilty plea and the

11   Government wouldn't have to recommend the reduction for

12   acceptance of responsibility.  Do you understand that, David

13   Morgenstern?

14           DEFENDANT DAVID MORGENSTERN:  Yes.

15           THE COURT:  And Fred Morgenstern.

16           DEFENDANT FRED MORGENSTERN:  Yes.

17           THE COURT:  And as I mentioned earlier the

18   Government's recommendations are persuasive, not controlling,

19   on me.  If I don't follow the recommendations, if I don't give

20   you credit for acceptance of responsibility or if the South

21   Carolina Judge doesn't, that's a chance you take by your open

22   plea and it would not be grounds to withdraw your guilty plea.

23   Do you understand that, David Morgenstern?

24           DEFENDANT DAVID MORGENSTERN:  Yes.

25           THE COURT:  And Fred Morgenstern.

34

1       DEFENDANT FRED MORGENSTERN:  I do.

2       THE COURT:  And you are agreeing to a forfeiture

3   order in this case with joint and several liability with Virgil

4   Womack and other coconspirators in the case in the amount of

5   $31,273,273.58.  Is that your understanding, David Morgenstern?

6       DEFENDANT DAVID MORGENSTERN:  Yes.

7       THE COURT:  And Fred Morgenstern.

8       DEFENDANT FRED MORGENSTERN:  Excuse me just a

9   moment.

10      (Pause.)

11      DEFENDANT FRED MORGENSTERN:  I understand.

12      THE COURT:  The Government is going to agree that you

13  should get credit for $17,769,346.22 that was transferred from

14  Barclays Bank to the Falcon Trust Company Ltd.  Is that your

15  understanding, David Morgenstern?

16      DEFENDANT DAVID MORGENSTERN:  Yes.

17      THE COURT:  And Fred Morgenstern.

18      DEFENDANT FRED MORGENSTERN:  Yes.

19      THE COURT:  But again the Government's --

20      MR. SAKIN:  I am sorry to interrupt.

21      This is a very minor clarification.

22      Where it talks about the $17,769,000 from Barclays

23  Bank, not all of it came from Barclays Bank.  Most of it did.

24  Some of it came, though, from Fred Morgenstern.  But the amount

25  is correct that that amount has been repaid.

MR. PAVLOCK: That's correct, Your Honor. About $15,000,000 came from Falcon Trust and the remaining came from a domestic (phonetic) bank.

THE COURT: All right.

But the bottom line is the Government is agreeing that out of the $31,000,000 forfeiture order, $17,769,346.22 is to be subtracted or given credit to the Morgensterns, is that correct?

MR. PAVLOCK: Yes, Your Honor.

THE COURT: And is that your understanding, David Morgenstern?

DEFENDANT DAVID MORGENSTERN: Yes.

THE COURT: And Fred Morgenstern.

DEFENDANT FRED MORGENSTERN: Yes, it is.

THE COURT: But, again, the Government's positions are persuasive, not controlling, on the Court. If for some reason me or the South Carolina Judge didn't want to give you that credit, that's a chance you take by your open plea and it would not be grounds to withdraw your guilty plea. Do you understand that, David Morgenstern?

DEFENDANT DAVID MORGENSTERN: Yes.

THE COURT: And Fred Morgenstern.

DEFENDANT FRED MORGENSTERN: Yes.

(Pause.)

THE COURT: And you are agreeing to cooperate with

36

1    the Government in their satisfying this forfeiture order.  Do

2    you understand that, David Morgenstern?

3            DEFENDANT DAVID MORGENSTERN:  Yes, sir.

4            THE COURT:  And Fred Morgenstern.

5            DEFENDANT FRED MORGENSTERN:  Yes.

6            THE COURT:  The Government is not going to recommend

7    an upward departure based upon the nature of the offense, your

8    relevant conduct or your background.  Is that your

9    understanding, David Morgenstern?

10            DEFENDANT DAVID MORGENSTERN:  Yes.

11            THE COURT:  And Fred Morgenstern.

12            DEFENDANT FRED MORGENSTERN:  Yes, it is.

13            THE COURT:  But, again, that position is persuasive,

14   not controlling, on the Court.  If for some reason on my own or

15   if the Probation Officer on her own wanted to recommend an

16   upward departure, that's a chance you take by your open plea

17   and it would not be grounds to withdraw your guilty plea.  Do

18   you understand that, David Morgenstern?

19            DEFENDANT DAVID MORGENSTERN:  Yes.

20            THE COURT:  And Fred Morgenstern.

21            DEFENDANT FRED MORGENSTERN:  I do.

22            THE COURT:  You are also -- excuse me -- the

23   Government is also going to consider you for substantial

24   assistance.  Do you understand that, David Morgenstern?

25            DEFENDANT DAVID MORGENSTERN:  Yes.

1       THE COURT:  And Fred Morgenstern.

2       DEFENDANT FRED MORGENSTERN:  My pleasure.

3       THE COURT:  But it's up to the Government's sole and

4  unreviewable judgment as to whether or not your cooperation is

5  of such a quality and significance to their investigation so as

6  to warrant their giving the Court the discretion to do a

7  downward departure.  Do you understand that, David Morgenstern?

8       DEFENDANT DAVID MORGENSTERN:  Yes.

9       THE COURT:  And Fred Morgenstern.

10       DEFENDANT FRED MORGENSTERN:  I do.

11       THE COURT:  If they don't file the motion for

12  substantial assistance, unless their failure to do so is done

13  in bad faith or on unconstitutional grounds, then the Court

14  can't do a downward departure unless it comes up with some

15  other reason other than substantial assistance.  Do you

16  understand that, David Morgenstern?

17       DEFENDANT DAVID MORGENSTERN:  Yes.

18       THE COURT:  And Fred Morgenstern.

19       (Pause.)

20       DEFENDANT FRED MORGENSTERN:  I understand.

21       THE COURT:  And, again, as I mentioned earlier, the

22  Government's recommendations are persuasive, not controlling,

23  on me.  If for some reason they make a motion for substantial

24  assistance and I don't follow it, I don't do a downward

25  departure, that's a chance you take by your open plea and it

38

1   would not be grounds to withdraw your guilty plea.  Do you

2   understand that, David Morgenstern?

3            DEFENDANT DAVID MORGENSTERN:  Yes.

4            THE COURT:  And Fred Morgenstern.

5            DEFENDANT FRED MORGENSTERN:  I do.

6            THE COURT:  You are also giving up your right to

7   appeal any judgment and sentence which the Court may impose in

8   this case.  Do you understand that, David Morgenstern?

9            DEFENDANT DAVID MORGENSTERN:  Yes.

10           THE COURT:  And Fred Morgenstern.

11           DEFENDANT FRED MORGENSTERN:  I do.

12           THE COURT:  Now, you can always take a sentence (sic)

13  that would exceed the statutory maximum or if I were to do an

14  upward departure or if the Court decided not to follow one of

15  the sentencing recommendations, then you could take an appeal

16  in those situations.  Do you understand that, David

17  Morgenstern?

18           DEFENDANT DAVID MORGENSTERN:  Yes.

19           THE COURT:  And Fred Morgenstern.

20           DEFENDANT FRED MORGENSTERN:  I do.

21           THE COURT:  The Government retains its right to take

22  an appeal.  Do you understand that, David Morgenstern?

23           DEFENDANT DAVID MORGENSTERN:  Yes.

24           THE COURT:  And Fred Morgenstern.

25           DEFENDANT FRED MORGENSTERN:  I do.

39

```
1          THE COURT:  But if they take an appeal, that would

2    release you from your waiver of your appellate rights.  Do you

3    understand that, David Morgenstern?

4          DEFENDANT DAVID MORGENSTERN:  Yes.

5          THE COURT:  And Fred Morgenstern.

6          DEFENDANT FRED MORGENSTERN:  I do.

7          THE COURT:  And understanding all these things, is

8    this what you want to do, plead guilty and throw yourself on

9    the mercy of the Court, David Morgenstern?

10          DEFENDANT DAVID MORGENSTERN:  Yes.

11          THE COURT:  And Fred Morgenstern.

12          DEFENDANT FRED MORGENSTERN:  Yes, Your Honor.

13          THE COURT:  Are there any other aspects of the Plea

14    Agreement that I have neglected to discuss with the

15    Morgensterns, Mr. McCormick?

16          MR. MCCORMICK:  I don't believe so, Your Honor.

17          THE COURT:  Ms. Fernandez.

18          MS. FERNANDEZ:  I know of no others, Your Honor.

19          THE COURT:  Mr. Pavlock.

20          MR. PAVLOCK:  No, Your Honor.

21          THE COURT:  Mr. Norris.

22          MR. NORRIS:  No, Your Honor.

23          THE COURT:  Mr. Sakin.

24          MR. SAKIN:  No, sir.

25          THE COURT:  Any other parts of the Plea Agreements
```

40

1    that I have neglected to discuss with you, David Morgenstern?

2                    DEFENDANT DAVID MORGENSTERN:  No.

3                    THE COURT:  Fred Morgenstern.

4                    DEFENDANT FRED MORGENSTERN:  Anything you failed to

5    say?

6                    No, there is nothing you failed to do.

7                    THE COURT:  Okay.  Before accepting your pleas of

8    guilty, I must determine whether or not your offers to plead

9    guilty are done freely and voluntarily with full knowledge of

10   the various rights that you give up by such a plea and also

11   whether your offer to plead guilty is done with a sufficient

12   understanding of the possible consequences of that plea.

13                    If at any time you do not understand what I am

14   saying, I want you to stop me so that you can consult with your

15   attorney and receive an explanation or so that I can explain

16   anything you don't understand.  Will you do that, David

17   Morgenstern?

18                    DEFENDANT DAVID MORGENSTERN:  Yes, I will.

19                    THE COURT:  And Fred Morgenstern.

20                    DEFENDANT FRED MORGENSTERN:  Yes.

21                    THE COURT:  How old are you, David Morgenstern?

22                    DEFENDANT DAVID MORGENSTERN:  I am 53 years old.

23                    THE COURT:  Fred Morgenstern.

24                    DEFENDANT FRED MORGENSTERN:  53 years old.  Eleven

25   minutes older than him.

41

1        THE COURT:  How far have you gone in school, David

2  Morgenstern?

3        DEFENDANT DAVID MORGENSTERN:  Through college.

4        THE COURT:  Fred Morgenstern.

5        DEFENDANT FRED MORGENSTERN:  Five-and-a-half years

6  without graduating.

7        THE COURT:  So you can read and write okay, David

8  Morgenstern?

9        DEFENDANT DAVID MORGENSTERN:  Yes, sir.

10        THE COURT:  Fred Morgenstern.

11        DEFENDANT FRED MORGENSTERN:  Yes.

12        THE COURT:  What type of work have you done most of

13  your life, David Morgenstern?

14        DEFENDANT DAVID MORGENSTERN:  Well, two principal

15  work ethics, consulting and cooking.

16        THE COURT:  Fred Morgenstern.

17        DEFENDANT FRED MORGENSTERN:  Building and consulting.

18        THE COURT:  Do you know what a "felony" is, David

19  Morgenstern?

20        DEFENDANT DAVID MORGENSTERN:  Yes, I do.

21        THE COURT:  Fred Morgenstern.

22        DEFENDANT FRED MORGENSTERN:  Yes.

23        THE COURT:  Have you ever pled guilty to a felony

24  before, David Morgenstern?

25        DEFENDANT DAVID MORGENSTERN:  Not pled, but I have

42

1    been adjudicated guilty.

2          THE COURT:  So you went to trial and got convicted?

3          DEFENDANT DAVID MORGENSTERN:  Yes, sir.

4          THE COURT:  How about you, Fred Morgenstern.

5          DEFENDANT FRED MORGENSTERN:  The same.

6          THE COURT:  So you went to trial and got convicted?

7          DEFENDANT FRED MORGENSTERN:  Yes, but never pled.

8          THE COURT:  Okay.

9          And you understand by your pleas here today, I am

10   going to be adjudicating you guilty, which will make you a

11   convicted felon and cause you to lose certain civil rights like

12   your right to vote, your right to hold public office, your

13   right to serve on a jury, and some other rights?   Do you

14   understand that, David Morgenstern?

15         DEFENDANT DAVID MORGENSTERN:  Yes, I do.

16         THE COURT:  And Fred Morgenstern.

17         DEFENDANT FRED MORGENSTERN:  Yes.

18         THE COURT:  So you have been in a trial before.  So

19   you understand what you are giving up by this guilty plea here

20   today?  You understand what your rights your giving up, what's

21   involved in a trial, David Morgenstern?

22         DEFENDANT DAVID MORGENSTERN:  Yes, I do.

23         THE COURT:  And Fred Morgenstern.

24         DEFENDANT FRED MORGENSTERN:  Yes, I do.

25         THE COURT:  Was it the same trial or different

43

1    trials?

2                DEFENDANT DAVID MORGENSTERN:  The same trial, sir.

3                THE COURT:  Do you have any history of mental

4    illness, David Morgenstern?

5                DEFENDANT DAVID MORGENSTERN:  Not long term.

6                THE COURT:  Fred Morgenstern.

7                DEFENDANT FRED MORGENSTERN:  None at all.

8                THE COURT:  Have you ever seen a psychiatrist, David

9    Morgenstern?

10               DEFENDANT DAVID MORGENSTERN:  Yes, I have.

11               THE COURT:  When was the last time?

12               DEFENDANT DAVID MORGENSTERN:  About 20 years ago.

13               THE COURT:  And at that time did the doctor say that

14   you needed to be in a mental hospital?

15               DEFENDANT DAVID MORGENSTERN:  No.  It was a drug

16   addictive related problem.

17               THE COURT:  Have you ever been in a mental hospital

18   before?

19               DEFENDANT DAVID MORGENSTERN:  Only relevant to my use

20   of drugs.

21               THE COURT:  And how long ago was the last time you

22   were in a mental hospital?

23               DEFENDANT DAVID MORGENSTERN:  About 25 years.

24               THE COURT:  And back then did the doctor say it was

25   okay for you to leave or did you escape or how did you get out?

44

1        DEFENDANT DAVID MORGENSTERN:  I did not escape.  They

2   did let me go after the drug treatment process.

3        THE COURT:  All right.

4        So you are okay to make this important decision here

5   today?

6        DEFENDANT DAVID MORGENSTERN:  That was back in 1976.

7   So I have recovered.

8        THE COURT:  And you are okay to make this important

9   decision here today?

10       DEFENDANT DAVID MORGENSTERN:  Yes, I am, sir.

11       THE COURT:  How about you, Fred Morgenstern?  Have

12   you ever seen a psychiatrist?

13       DEFENDANT FRED MORGENSTERN:  No, not professionally.

14       THE COURT:  Okay.

15       You are okay to make this important decision here

16   today?

17       DEFENDANT FRED MORGENSTERN:  I am.

18       THE COURT:  Were you under the influence of drugs or

19   alcohol when this crime occurred, David Morgenstern?

20       DEFENDANT DAVID MORGENSTERN:  No, sir.

21       THE COURT:  Fred Morgenstern.

22       DEFENDANT FRED MORGENSTERN:  No.

23       THE COURT:  Are you now under the influence of any

24   drugs or intoxicants that would affect your understanding of

25   these proceedings, David Morgenstern?

1          DEFENDANT DAVID MORGENSTERN:  No, I am not.

2          THE COURT:  Fred Morgenstern.

3          DEFENDANT FRED MORGENSTERN:  No.

4          THE COURT:  Can you hear me okay and understand me

5    okay, David Morgenstern?

6          DEFENDANT DAVID MORGENSTERN:  Yes, sir.

7          THE COURT:  Fred Morgenstern.

8          DEFENDANT FRED MORGENSTERN:  Yes.

9          THE COURT:  Is there anything wrong with you mentally

10   or physically which would prevent you from understanding this

11   proceeding, David Morgenstern?

12         DEFENDANT DAVID MORGENSTERN:  No, sir.

13         THE COURT:  Fred Morgenstern.

14         DEFENDANT FRED MORGENSTERN:  No.

15         THE COURT:  Do you feel like you are in full

16   possession of your faculties at this time, David Morgenstern?

17         DEFENDANT DAVID MORGENSTERN:  Yes, I do.

18         THE COURT:  Fred Morgenstern.

19         DEFENDANT FRED MORGENSTERN:  Yes.

20         THE COURT:  Now, you have heard the announcement of

21   the plea bargain.  Is that your understanding of what you are

22   doing here today, David Morgenstern?

23         DEFENDANT DAVID MORGENSTERN:  Yes.

24         THE COURT:  And Fred Morgenstern.

25         DEFENDANT FRED MORGENSTERN:  Yes.

1          THE COURT:  And did you discuss that plea bargain

2   with your lawyer, David Morgenstern?

3          DEFENDANT DAVID MORGENSTERN:  Yes, I did.

4          THE COURT:  And Fred Morgenstern.

5          DEFENDANT FRED MORGENSTERN:  Yes.

6          THE COURT:  Did your attorney or anyone else make any

7   promises to you in private other than what was announced here

8   in open court, David Morgenstern?

9          DEFENDANT DAVID MORGENSTERN:  No.

10         THE COURT:  Fred Morgenstern.

11         DEFENDANT FRED MORGENSTERN:  None.

12         THE COURT:  Do your attorney or anyone else threaten

13  you or force you to enter this guilty plea, David Morgenstern?

14         DEFENDANT DAVID MORGENSTERN:  No.

15         THE COURT:  Fred Morgenstern.

16         DEFENDANT FRED MORGENSTERN:  No.

17         THE COURT:  Now, there was some talk earlier about

18  this being a package deal.  If that's the case, has that

19  affected your decision to plead guilty here today, David

20  Morgenstern?

21         DEFENDANT DAVID MORGENSTERN:  No.

22         THE COURT:  Fred Morgenstern.

23         DEFENDANT FRED MORGENSTERN:  No.

24         THE COURT:  Did you say it was okay with your lawyer

25  to make the announcement changing your plea from not guilty to

47

1  guilty on count 14 of the Second Superseding Indictment, David

2  Morgenstern?

3           DEFENDANT DAVID MORGENSTERN:  Yes.

4           THE COURT:  And Fred Morgenstern.

5           DEFENDANT FRED MORGENSTERN:  Yes.

6           THE COURT:  And did you say it was okay with you for

7  your lawyer to enter the guilty plea on the Superseding

8  Information, David Morgenstern?

9           DEFENDANT DAVID MORGENSTERN:  Yes.

10          THE COURT:  And Fred Morgenstern.

11          DEFENDANT FRED MORGENSTERN:  Yes.

12          THE COURT:  And are you pleading guilty because you

13 are guilty of these two charges, David Morgenstern?

14          DEFENDANT DAVID MORGENSTERN:  Yes.

15          THE COURT:  And Fred Morgenstern.

16          DEFENDANT FRED MORGENSTERN:  Yes.

17          THE COURT:  Now, before entering this plea of guilty,

18 have you had enough time to discuss with your attorney the

19 nature of the charges, any possible defenses you might have and

20 your chances of winning your case at trial, David Morgenstern?

21          DEFENDANT DAVID MORGENSTERN:  Yes.

22          THE COURT:  And Fred Morgenstern.

23          DEFENDANT FRED MORGENSTERN:  Yes.

24          THE COURT:  And do you need any more time to discuss

25 any of those things or anything else with your lawyer, David

```
1   Morgenstern?

2              DEFENDANT DAVID MORGENSTERN:  No.

3         THE COURT:  And Fred Morgenstern.

4              DEFENDANT FRED MORGENSTERN:  No.

5         THE COURT:  Now, have you been furnished with a copy

6   of the Superseding Information that's been filed against you,

7   David Morgenstern?

8              DEFENDANT DAVID MORGENSTERN:  Yes, I have.

9         THE COURT:  And Fred Morgenstern.

10             DEFENDANT FRED MORGENSTERN:  Yes.

11        THE COURT:  Do you understand that charge -- that new

12  charge against you in the Superseding Information, David

13  Morgenstern?

14             DEFENDANT DAVID MORGENSTERN:  Yes, I do.

15        THE COURT:  And Fred Morgenstern.

16             DEFENDANT FRED MORGENSTERN:  Yes.

17        THE COURT:  Now, you have a constitutional right to

18  be charged by an Indictment of a Grand Jury, but you can waive

19  that right and consent to being charged by an Information of

20  the U.S. Attorney.  Do you understand that, David Morgenstern?

21             DEFENDANT DAVID MORGENSTERN:  Yes.

22        THE COURT:  And Fred Morgenstern.

23             DEFENDANT FRED MORGENSTERN:  Yes.

24        THE COURT:  Instead of an Indictment, these felony

25  charges have been brought by the U.S. Attorney by the filing of
```

49

1    an Information.  Do you understand that, David Morgenstern?

2            DEFENDANT DAVID MORGENSTERN:  Yes.

3            THE COURT:  And Fred Morgenstern.

4            DEFENDANT FRED MORGENSTERN:  Yes.

5            THE COURT:  Unless you waive Indictment, you may not

6    be charged with a felony unless the Grand Jury finds by a

7    return of an Indictment that there is probable cause to believe

8    that a crime has been committed and you committed it.  Do you

9    understand that, David Morgenstern?

10           DEFENDANT DAVID MORGENSTERN:  Yes.

11           THE COURT:  And Fred Morgenstern.

12           DEFENDANT FRED MORGENSTERN:  Yes.

13           THE COURT:  If you don't waive the Indictment, the

14   Government could present the case to a Grand Jury and ask them

15   to indict you.  Do you understand that, David Morgenstern?

16           DEFENDANT DAVID MORGENSTERN:  Yes.

17           THE COURT:  And Fred Morgenstern.

18           DEFENDANT FRED MORGENSTERN:  Yes.

19           THE COURT:  Now, a Grand Jury is composed of at least

20   16 and not more than 23 persons and at least 12 of them must

21   find that there is probable cause to believe you committed the

22   crime with which you are charged before you could be indicted.

23   Do you understand that, David Morgenstern?

24           DEFENDANT DAVID MORGENSTERN:  Yes.

25           THE COURT:  And Fred Morgenstern.

1    DEFENDANT FRED MORGENSTERN:  Yes.

2    THE COURT:  And the Grand Jury might or might not

3    indict you.  Do you understand that, David Morgenstern?

4    DEFENDANT DAVID MORGENSTERN:  Yes.

5    THE COURT:  And Fred Morgenstern.

6    DEFENDANT FRED MORGENSTERN:  Yes.

7    THE COURT:  If you waive Indictment by the Grand

8    Jury, the case will proceed against you on the U.S. Attorney's

9    Information just as though you had been indicted.  Do you

10   understand that, David Morgenstern?

11   DEFENDANT DAVID MORGENSTERN:  Yes.

12   THE COURT:  And Fred Morgenstern.

13   DEFENDANT FRED MORGENSTERN:  Yes.

14   THE COURT:  Have you discussed waiving your right to

15   an Indictment by the Grand Jury with your attorney, David

16   Morgenstern?

17   DEFENDANT DAVID MORGENSTERN:  Yes.

18   THE COURT:  And Fred Morgenstern.

19   DEFENDANT FRED MORGENSTERN:  Yes.

20   THE COURT:  And do you understand your right to an

21   Indictment by a Grand Jury, David Morgenstern?

22   DEFENDANT DAVID MORGENSTERN:  Yes, I do.

23   THE COURT:  And Fred Morgenstern.

24   DEFENDANT FRED MORGENSTERN:  Yes.

25   THE COURT:  Have any threats or promises been made to

1    induce you to waive this Indictment, David Morgenstern?

2            DEFENDANT DAVID MORGENSTERN:  None.  No.

3            THE COURT:  Fred Morgenstern.

4            DEFENDANT FRED MORGENSTERN:  No.

5            THE COURT:  And do you wish to waive your right to an

6    Indictment on this Superseding Information charge, David

7    Morgenstern?

8            DEFENDANT DAVID MORGENSTERN:  Yes, I do.

9            THE COURT:  And Fred Morgenstern.

10           DEFENDANT FRED MORGENSTERN:  Yes.

11           THE COURT:  And is there any reason why your client

12   should not waive Indictment on the Superseding Information,

13   Mr. Sakin?

14           MR. SAKIN:  No.  Your Honor, it's in his best

15   interests to do.

16           THE COURT:  Mr. Norris.

17           MR. NORRIS:  No, Your Honor.

18           THE COURT:  Okay.

19           Do you have a copy of the Waiver Of Indictment form

20   or if not, I will send it on out and ask if you all could

21   execute that at this time?

22           (Pause.)

23           THE COURT:  I have before me a Waiver Of Indictment.

24           I guess I need to put in the Case Number 00-6309-CR.

25           MR. PAVLOCK:  It may be a different --

52

1          MS. FERNANDEZ:  Your Honor, the Informations would be

2    separate case numbers.

3          THE COURT:  It would be a separate case number?

4          MS. FERNANDEZ:  They are not superseding.  They stand

5    as separate charges.

6          THE COURT:  All right.

7          So we will have to get the case number and then put

8    that in, I guess, when we get it.

9          So it will be an 02 number, I guess.

10          And is that your signature, David Morgenstern, on

11    this Waiver Of Indictment?

12          DEFENDANT DAVID MORGENSTERN:  Yes.

13          THE COURT:  I said David while I am looking at Fred.

14          DEFENDANT DAVID MORGENSTERN:  I am sorry.

15          It is Fred's.

16          THE COURT:  Is that your signature on this Waiver Of

17    Indictment, Fred Morgenstern?

18          DEFENDANT FRED MORGENSTERN:  Yes, sir, it is.

19          THE COURT:  Is that your signature, Mr. Norris?

20          MR. NORRIS:  It is, Your Honor.

21          THE COURT:  Is that your signature on the Waiver Of

22    Indictment, David Morgenstern?

23          DEFENDANT DAVID MORGENSTERN:  Yes.

24          THE COURT:  And is that your signature, Mr. Sakin?

25          MR. SAKIN:  Yes, it is.

1    THE COURT:  All right.

2    And I will go ahead and sign my name to that.

3    And did you read and discuss this Waiver Of

4    Indictment with your lawyer before you signed it, David

5    Morgenstern?

6    DEFENDANT DAVID MORGENSTERN:  Yes.

7    THE COURT:  And Fred Morgenstern.

8    DEFENDANT FRED MORGENSTERN:  Yes.

9    THE COURT:  Okay.

10   So we will go ahead and file these two Waiver Of

11   Indictments and we will put the case number in when the clerk

12   assigns it.

13   Now, before accepting your plea of guilty -- wait a

14   minute.  I have got to say something else before that.

15   Is this what you want to do, plead guilty to this

16   Superseding Information and count 14 of this Superseding

17   Indictment where the Grand Jury charges from in or about July

18   of 1999, and continuing thereafter up to and including in or

19   about November of 2000, in Broward County, in the State of

20   Florida, that both of you two, along with John Mamone, Joseph

21   Russo, Joseph Silvestri, Michael Buccinna, David Bell, Mark

22   Weiss and Doreen Russo, did knowingly and intentionally

23   conspire, confederate, and agree with each other and with other

24   persons known and unknown to the Grand Jury to commit offenses

25   against the United States, and that it was the purpose and

54

1    object of the conspiracy -- are they pleading both to count --

2    to paragraphs 2 and 3 under count 14?

3              Mr. McCormick.

4              MR. MCCORMICK:  One second, Your Honor.

5              (Pause.)

6              MR. MCCORMICK:  The plea only addresses count 3 of

7    count 14, which is a 1957 violation.

8              THE COURT:  Okay.

9              And it was the purpose and object of the conspiracy

10   to knowingly and willfully engage and attempt to engage in

11   monetary transactions affecting interstate and foreign commerce

12   in criminally derived property that was of a value greater than

13   $10,000, which was derived from specified unlawful activity,

14   that is, mail fraud and wire fraud, which property was obtained

15   from a South Carolina based investment fraud.

16             Is that what you want to do, plead guilty to the

17   second aspect of count 14, David Morgenstern?

18             DEFENDANT DAVID MORGENSTERN:  Paragraph 3?

19             THE COURT:  Right.

20             DEFENDANT DAVID MORGENSTERN:  Yes.

21             THE COURT:  And Fred Morgenstern.

22             DEFENDANT FRED MORGENSTERN:  Yes.

23             THE COURT:  Now, in paragraph 2, which charged that

24   it was the purpose and object of the conspiracy to knowingly

25   and willfully conduct and attempt to conduct financial

1   transactions affecting interstate and foreign commerce, that

2   is, the cashing of checks obtained from a South Carolina based

3   investment fraud, which involved the proceeds of specified

4   unlawful activity, specifically, mail fraud and wire fraud,

5   with the intent to promote the carrying on of said specified

6   unlawful activities, and knowing the transactions were designed

7   in whole or in part to conceal and disguise the nature,

8   location, source, ownership and control of the proceeds of the

9   specified unlawful activities and knowing that the property

10  involved represented the proceeds of some form of unlawful

11  activity, you are not pleading guilty to that second paragraph.

12  Do you understand that, David Morgenstern?

13          DEFENDANT DAVID MORGENSTERN:  Yes, I do.

14          THE COURT:  And Fred Morgenstern.

15          DEFENDANT FRED MORGENSTERN:  Yes.

16          THE COURT:  But you are pleading guilty to this

17  Information, which charges that on or about August 9th of 1999

18  as to David Morgenstern, and on or about November 4th of 1999

19  as to Fred Morgenstern, in the Southern District of Florida,

20  and elsewhere, that you did use and cause to be used a facility

21  in interstate and foreign commerce with the intent to

22  distribute the proceeds of an unlawful activity, that is,

23  proceeds derived from Title 18, United States Code, Section

24  1956, that is, an outgoing wire transfer of 2.8 million dollars

25  as to David Morgenstern from Admiralty Bank to Barclays Bank in

56

1    New York, and $1,000,000 from Citibank, Americas Resource

2    Account, to Barclays Bank in London as to Fred Morgenstern, and

3    in David Morgenstern's situation, it was for the account of

4    Americas International Bank Corporation, Ltd., in Barclays

5    Bank, the Bahamas.

6            Is that what you want to do, plead guilty to that

7    Information, David Morgenstern?

8            DEFENDANT DAVID MORGENSTERN:  If I understand right,

9    Judge, it boils down to 1952(a)(1) --

10           THE COURT:  Right.

11           DEFENDANT DAVID MORGENSTERN:  -- but not 1956?

12           Is that -- is my understanding --

13           THE COURT:  You are pleading guilty to a violation of

14   18, United States Code, Section 1952(a)(1), which prohibits you

15   from distributing the proceeds of an unlawful activity and that

16   unlawful activity was 1956.

17           DEFENDANT DAVID MORGENSTERN:  So I am pleading guilty

18   to 1952 --

19           THE COURT:  Right.

20           DEFENDANT DAVID MORGENSTERN:  Yes, sir.

21           THE COURT:  Is that correct, Mr. McCormick?

22           MR. MCCORMICK:  That is correct, Your Honor.

23           THE COURT:  So is that what you want to do, plead

24   guilty to that Superseding Information that I just read to you,

25   David Morgenstern?

57

DEFENDANT DAVID MORGENSTERN:  Yes.

THE COURT:  And Fred Morgenstern.

DEFENDANT FRED MORGENSTERN:  I am just getting a clarification.

MR. NORRIS:  What we were just discussing, Judge, is that in the final paragraph, it's all in violation of Title 18, United States Code, Sections 1952(a)(1) and (2).

THE COURT:  Yes.

(2) is the aider and abettor.

You are pleading guilty to a 1952 violation, which is violated when you distribute proceeds derived from a 1956 violation.

Do you understand that, Fred Morgenstern?

DEFENDANT FRED MORGENSTERN:  I do.

THE COURT:  And is that what you want to do, plead guilty to that Superseding Information that I just read to you, Fred Morgenstern?

DEFENDANT FRED MORGENSTERN:  Yes.

THE COURT:  And you understand the maximum possible punishments provided by law, David Morgenstern?

DEFENDANT DAVID MORGENSTERN:  Yes.

THE COURT:  And Fred Morgenstern.

DEFENDANT FRED MORGENSTERN:  Was that five years, Your Honor?

THE COURT:  On the Information, ten years on count

58

1    14, for a total of 15 years.

2         DEFENDANT FRED MORGENSTERN:  Yes, I do understand.

3         THE COURT:  But by your open plea, you are hoping

4    that the Judge is going to give you a break at the time of

5    sentencing, is that correct, David Morgenstern?

6         DEFENDANT DAVID MORGENSTERN:  Yes, sir.

7         THE COURT:  And Fred Morgenstern.

8         DEFENDANT FRED MORGENSTERN:  Yes.

9         THE COURT:  Now, at the time of sentencing, the

10   Government is going to move to dismiss the conspiracy to commit

11   racketeering charge in count one, the conspiracy to commit

12   money laundering charge in count six only as to Fred

13   Morgenstern, the engaging in monetary transactions in counts 15

14   through 55 as to Fred Morgenstern and in counts 16 through 45

15   as to David Morgenstern.

16        Is that your understanding, David Morgenstern?

17        DEFENDANT DAVID MORGENSTERN:  Yes.

18        THE COURT:  And Fred Morgenstern.

19        DEFENDANT FRED MORGENSTERN:  Yes.

20        THE COURT:  Do you need me to read to you the

21   Indictment with those dismissed charges or not, David

22   Morgenstern?

23        DEFENDANT DAVID MORGENSTERN:  No.

24        THE COURT:  Fred Morgenstern.

25        DEFENDANT FRED MORGENSTERN:  No, I don't.

1    THE COURT:  So you understand what you were charged

2  with and what's going to be dismissed, David Morgenstern?

3    DEFENDANT DAVID MORGENSTERN:  Yes.

4    THE COURT:  And Fred Morgenstern.

5    DEFENDANT FRED MORGENSTERN:  Yes.

6    THE COURT:  Now, when you plead guilty, you give up

7  certain constitutional rights.  You give up your right to a

8  trial by jury and the right to the assistance of a lawyer

9  during that trial.  Do you understand that, David Morgenstern?

10    DEFENDANT DAVID MORGENSTERN:  Yes, sir.

11    THE COURT:  And Fred Morgenstern.

12    DEFENDANT FRED MORGENSTERN:  Yes, Your Honor.

13    THE COURT:  Do you understand that you give up your

14  right to require the Government to prove your guilt beyond and

15  to the exclusion of every reasonable doubt, David Morgenstern?

16    DEFENDANT DAVID MORGENSTERN:  Yes.

17    THE COURT:  And Fred Morgenstern.

18    DEFENDANT FRED MORGENSTERN:  Yes, Your Honor.

19    THE COURT:  Do you understand that you give up your

20  right to confront, that is, to see, hear and cross examine the

21  Government witnesses, David Morgenstern?

22    DEFENDANT DAVID MORGENSTERN:  Yes.

23    THE COURT:  And Fred Morgenstern.

24    DEFENDANT FRED MORGENSTERN:  Yes.

25    THE COURT:  Do you understand that you give up your

1  right to compel, that is, to require the attendance of

2  witnesses to come to court and to testify in your defense,

3  David Morgenstern?

4          DEFENDANT DAVID MORGENSTERN:  Yes.

5          THE COURT:  Fred Morgenstern.

6          DEFENDANT FRED MORGENSTERN:  Yes, Your Honor.

7          THE COURT:  Do you understand that you give up your

8  right to refuse to testify, that is, you give up your right to

9  remain silent, which is also sometimes called the right against

10 self-incrimination, David Morgenstern?

11         DEFENDANT DAVID MORGENSTERN:  Yes.

12         THE COURT:  Fred Morgenstern.

13         DEFENDANT FRED MORGENSTERN:  Yes, Your Honor.

14         THE COURT:  That means if you went to trial, you

15 would have had the right on your own part to decline to testify

16 unless you voluntarily elected to do so in your own defense.

17 Do you understand that, David Morgenstern?

18         DEFENDANT DAVID MORGENSTERN:  Yes.

19         THE COURT:  And Fred Morgenstern.

20         DEFENDANT FRED MORGENSTERN:  Yes, Your Honor.

21         THE COURT:  And if you decided not to testify at a

22 trial or if you decided not to put on any evidence, those facts

23 couldn't have been used against you.  Do you understand that,

24 that, David Morgenstern?

25         DEFENDANT DAVID MORGENSTERN:  Yes.

1    THE COURT:  And Fred Morgenstern.

2    DEFENDANT FRED MORGENSTERN:  Yes.

3    THE COURT:  And do you understand that you give up

4 your right to appeal any matter relating to your case,

5 including any judgment and sentence which the Court may impose,

6 except as to the validity of the sentence as we previously

7 discussed, David Morgenstern?

8    DEFENDANT DAVID MORGENSTERN:  Yes.

9    THE COURT:  And Fred Morgenstern.

10    DEFENDANT FRED MORGENSTERN:  Yes.

11    THE COURT:  That means if you went to trial and got

12 convicted, you could have taken an appeal saying the jury

13 wasn't fair or I wasn't fair, but when you plead guilty, you

14 give up that right to appeal.  Do you understand that, David

15 Morgenstern?

16    DEFENDANT DAVID MORGENSTERN:  Yes.

17    THE COURT:  And Fred Morgenstern.

18    DEFENDANT FRED MORGENSTERN:  Yes.

19    THE COURT:  And do you understand that if you are not

20 a natural born American citizen that by pleading guilty to a

21 crime, it can affect your citizenship rights and it can lead to

22 deportation, David Morgenstern?

23    DEFENDANT DAVID MORGENSTERN:  Yes.

24    THE COURT:  And Fred Morgenstern.

25    DEFENDANT FRED MORGENSTERN:  Yes.

62

1              THE COURT:  And were you born in this country, David

2    Morgenstern?

3              DEFENDANT DAVID MORGENSTERN:  Yes.

4              THE COURT:  And Fred Morgenstern.

5              DEFENDANT FRED MORGENSTERN:  Yes.

6              THE COURT:  So if the answer is yes to him, then it

7    would be yes to you.

8              DEFENDANT FRED MORGENSTERN:  It's going to be pretty

9    close.

10             Dayton, Ohio.

11             DEFENDANT DAVID MORGENSTERN:  Unless Ohio is

12   exempted.

13             Excuse me.

14             THE COURT:  And understanding all these rights, is

15   this what you want to do, give up all these rights and enter

16   this guilty plea here today, David Morgenstern?

17             DEFENDANT DAVID MORGENSTERN:  Yes.

18             THE COURT:  And Fred Morgenstern.

19             DEFENDANT FRED MORGENSTERN:  Yes.

20             THE COURT:  You understand you are making that

21   decision today to give up all these rights, you can't come back

22   tomorrow, next week or next year and say, Judge, I made a

23   mistake, I didn't know what was going on on May 21st, my lawyer

24   was no good, or any one of a number of other reasons?  Are you

25   making a decision today that you are willing to live by, David

63

1   Morgenstern?

2           DEFENDANT DAVID MORGENSTERN:  Yes.

3           THE COURT:  And Fred Morgenstern.

4           DEFENDANT FRED MORGENSTERN:  Yes, I am.

5           THE COURT:  And do you understand by pleading guilty

6   here today, you may not be giving your lawyer a chance to

7   finish any investigation that he might have otherwise wanted to

8   have conducted?  Is this what you want to do, plead guilty here

9   today and finish up the case here today, except for sentencing

10  in August, David Morgenstern?

11          DEFENDANT DAVID MORGENSTERN:  Yes.

12          THE COURT:  And Fred Morgenstern.

13          DEFENDANT FRED MORGENSTERN:  Yes.

14          THE COURT:  And how long did you live in Dayton,

15  Ohio, David Morgenstern?

16          DEFENDANT DAVID MORGENSTERN:  I never lived there,

17  sir, just born there.

18          DEFENDANT FRED MORGENSTERN:  I lived there a little

19  longer.

20          THE COURT:  How long did you live there?

21          DEFENDANT FRED MORGENSTERN:  Well, I was there eleven

22  minutes earlier.

23          THE COURT:  Would the Government summarize the facts

24  as to both defendants?

25          MR. PAVLOCK:  Yes, Your Honor.

1    Your Honor, if this matter were to proceed to trial,

2    the Government would prove the following to establish the

3    defendants' guilt as to count 14 in the Indictment, which

4    charges that the defendants conspired to commit money

5    laundering in violation of Title 18, United States Code,

6    Section 1956(h).

7    The Government's proof would consist of testimonial

8    evidence of various witnesses, T-III interceptions conducted in

9    early 2000, evidence obtained through search warrants at Gold

10   Coast Check Cashing and Check Cashing Unlimited II in Margate,

11   Florida, and the offices of Virgil Womack in South Carolina,

12   among other locations, as well as evidence obtained through

13   subpoenas and legal assistance treaty requests from various

14   financial institutions located in South Florida, the Bahamas

15   and the United Kingdom.

16   The evidence would show the following:  As set forth

17   in the Indictment, the instant matter concerns criminal

18   activity involving David and Fred Morgenstern, Joseph Silvestri

19   and their coconspirators who were involved in numerous

20   fraudulent schemes.

21   Specifically, beginning in or about November, 1998,

22   and continuing through January 2000, the defendants'

23   coconspirators Virgil and Charlotte Womack and several other

24   individuals operated a business in Seneca, South Carolina, to

25   facilitate the marketing and sale of fraudulent guaranteed

1    high-yield investment opportunities.  Their business was known

2    by several "Trust" names, such as Alliance Trust and Chemical

3    Trust" -- collectively referred to here as the "Chemical

4    Trust" -- which were created to lend an appearance of

5    legitimacy and to defraud investors.  In connection with the

6    operation of the business, Womack opened a number of bank

7    accounts under these various trust names in the Southern

8    District of Florida and in South Carolina for the purpose of

9    depositing investor checks and transferring funds.

10         After creating Chemical Trust and opening bank

11    accounts, Womack solicited insurance agents and other

12    investment brokers across the country to convince their

13    investor clients to purchase their investments.  Womack and his

14    coconspirators created manuals for the investment salesmen, and

15    made certain representations in the manuals related to their

16    experience and to the nature of these investments.  Womack

17    promised high rates of return that were guaranteed.  All of

18    these representations were false.

19         Womack also falsely represented that the Chemical

20    Trust investments were completely secured by a multi-billion

21    dollar corporation known as U.S. Guarantee of Scottsdale,

22    Arizona, which, in reality, was a complete sham.

23         Defendant Joseph Silvestri introduced Womack to the

24    principals of U.S. Guarantee, and assisted Womack in opening

25    Florida bank accounts in the name of Chemical and Alliance

1    Trust in order to deposit investment checks.

2          Typically, after an investor's check was forwarded by

3    the agent to Womack's office in South Carolina, Womack would

4    issue a laminated bond issued by U.S. Guarantee, which was

5    forwarded to the unsuspecting investor.  These bonds were

6    worthless.

7          Defendant Silvestri received commissions from U.S.

8    Guarantee, which were nothing more than the original investor

9    funds, in return for his facilitating the transfer of investor

10   funds to U.S. Guarantee's accounts in Arizona.

11          Over several months in late 1999 and early 2000, the

12   Womacks and other coconspirators defrauded over 1,200 victims,

13   many of whom were elderly, and took in over $50,000,000 in

14   fraud proceeds.  That actually went on in the better part of

15   1999 and increased in volume toward the later part of 1999.

16          In the summer of 1999, Joseph Silvestri introduced

17   Fred Morgenstern to Virgil Womack in West Palm Beach, Florida,

18   and in August, 1999, Womack began to transfer millions of

19   Chemical Trust fraud proceeds to defendants Fred and David

20   Morgenstern.  Initially, 2.8 million dollars in Chemical Trust

21   fraud proceeds was transferred from Womack's Alliance Trust

22   account at Admiralty Bank in Florida to the Morgensterns'

23   account in the Bahamas.  Thereafter, Womack began to courier

24   daily bundles of Chemical Trust investor checks to defendant

25   Fred Morgenstern's office in Florida, where defendant Fred

1    Morgenstern would deposit them into local Florida bank

2    accounts, including those in the name of Gold Coast Check

3    Cashing, Americas Resource Corporation and the Bahamian bank of

4    Americas International Bank Corp., Ltd., at which the defendant

5    David Morgenstern maintained accounts.  From these Florida and

6    Bahamian bank accounts, defendants Fred and David Morgenstern

7    made further transfers of the Chemical Trust funds and used

8    millions of dollars of such funds to pay settlements in

9    litigation initiated by investors in other fraud schemes, pay

10   personal experiences and transfer funds to overseas bank

11   accounts under their control.

12           Defendant Fred Morgenstern also assisted Virgil

13   Womack in establishing a Florida corporation and opening

14   various bank accounts in the name of "Prestige Accounting

15   Services" out of which Womack would make purported interest

16   payments and pay agent commissions and operating expenses.

17           In total, approximately $31,000,000 in Chemical Trust

18   fraud proceeds were transferred on number occasions through

19   bank accounts controlled by Fred and David Morgenstern in the

20   Southern District of Florida, the Bahamas and the United

21   Kingdom.

22           The Government would prove that the defendants Fred

23   and David Morgenstern during the conspiracy were aware that the

24   proceeds were derived from a mail and wire fraud scheme that

25   was based in South Carolina, effected control over these funds,

1   and that the transfer of the money involved financial

2   institutions either insured by FDIC or were in commercial

3   banks.

4           As to the Information against David Morgenstern.

5           As to the single count Information charging David

6   Morgenstern with using and causing to be used a facility in

7   interstate and foreign commerce in violation of Title 18,

8   United States Code, Section 1952, the Government would be

9   prepared to prove the following:  That on or about August 9,

10  1999, David Morgenstern, in the Southern District of Florida,

11  caused an outgoing wire transfer of 2.8 million dollars from

12  Admiralty Bank to Barclays Bank, New York, for the account of

13  Americas International Bank Corporation, Limited, at Barclays

14  Bank, the Bahamas.  These monies were the laundered proceeds of

15  the Chemical Trust fraud and were used by the defendant David

16  Morgenstern for his own benefit to settle a civil fraud claim

17  brought by Charles Finch-Knightley, the Lord Guernsey, in

18  England.

19          Information against Fred Morgenstern.

20          As to this single count Information charging Fred

21  Morgenstern with using and causing to be used a facility in

22  interstate and foreign commerce in violation of 18, U.S.C.,

23  1952, the Government would be prepared to prove the following:

24  That on November 4, 1999, Fred Morgenstern, in the Southern

25  District of Florida, caused an outgoing wire transfer of

1    $1,000,000 from Morgenstern's Americas Resource account at

2    Citibank to David Morgenstern's Falcon Trust account at

3    Barclays Bank, London, England.  These monies were the

4    laundered proceeds of the Chemical Trust fraud.

5         THE COURT:  Do you take any exception or objection to

6    the facts as summarized, Mr. Sakin?

7         MR. SAKIN:  No, sir.

8         THE COURT:  Mr. Norris.

9         MR. NORRIS:  No, Your Honor.

10        THE COURT:  Do you stipulate that had the case gone

11   to trial, I would have sent your client's case to the jury, Mr.

12   Sakin?

13        MR. SAKIN:  I stipulate, yes.

14        THE COURT:  Mr. Norris.

15        MR. NORRIS:  Yes, sir.

16        THE COURT:  And do you stipulate that Mr. Pavlock's

17   factual recitation contains the essential elements of the

18   crime, Mr. Sakin?

19        MR. SAKIN:  Yes, he set forth the elements of the

20   crime.

21        THE COURT:  And Mr. Norris.

22        MR. NORRIS:  It does, Your Honor.

23        THE COURT:  Do you now admit to committing the acts

24   as set forth in these two charges and to which you have pled

25   guilty, David Morgenstern?

1    DEFENDANT DAVID MORGENSTERN:  I am sorry, sir.  Could

2  you repeat that?

3    THE COURT:  Do you now admit to committing the acts

4  as set forth in these two charges and to which you have pled

5  guilty, David Morgenstern?

6    DEFENDANT DAVID MORGENSTERN:  Yes.

7    THE COURT:  And Fred Morgenstern.

8    DEFENDANT FRED MORGENSTERN:  Yes, Your Honor.

9    THE COURT:  And do you understand if you went to

10  trial, the Government would have had to have proven each

11  essential element of each crime beyond a reasonable doubt,

12  David Morgenstern?

13    DEFENDANT DAVID MORGENSTERN:  Yes.

14    THE COURT:  And Fred Morgenstern.

15    DEFENDANT FRED MORGENSTERN:  Yes.

16    THE COURT:  And do you understand what the essential

17  elements of both crimes are, David Morgenstern?

18    DEFENDANT DAVID MORGENSTERN:  Yes.

19    THE COURT:  And Fred Morgenstern.

20    DEFENDANT FRED MORGENSTERN:  Yes, Your Honor.

21    THE COURT:  And do you understand by pleading guilty

22  here today, you give up any and all defenses to these charges,

23  David Morgenstern?

24    DEFENDANT DAVID MORGENSTERN:  Yes.

25    THE COURT:  And Fred Morgenstern.

1    DEFENDANT FRED MORGENSTERN:  Yes, Your Honor.

2    THE COURT:  For example, you could have argued that

3    the wiretap was no good, that they didn't have enough evidence

4    against you, I should have disqualified myself, and there may

5    be other defenses to these charges.  You could have argued that

6    Mr. Sakin was in trial for the last few weeks and isn't ready

7    on the case.  There may be other defenses.  But if you plead

8    guilty, you give up any and all defenses.  Is that what you

9    want to do, David Morgenstern?

10    DEFENDANT DAVID MORGENSTERN:  Yes, I do.

11    Judge, I would like to ask my attorney one question.

12    THE COURT:  Go ahead.

13    Is that what you want to do, Fred Morgenstern?

14    DEFENDANT FRED MORGENSTERN:  Yes, Your Honor.

15    (Pause.)

16    DEFENDANT DAVID MORGENSTERN:  Thank you, Judge, for

17    that --

18    THE COURT:  All right.

19    Do you still want to stick with your guilty plea,

20    David Morgenstern?

21    DEFENDANT DAVID MORGENSTERN:  Yes.

22    THE COURT:  And you understand by pleading guilty,

23    you give up any and all defenses, any and all complaints, David

24    Morgenstern?

25    DEFENDANT DAVID MORGENSTERN:  Yes.

72

1          THE COURT:  And is that what you want to do?

2          DEFENDANT DAVID MORGENSTERN:  Yes.

3          THE COURT:  And I have been talking about a

4    Superseding Information.  I guess it's going to be a separate

5    charge.  And that both charges are going to try to be

6    transferred to South Carolina.  Do you understand that, David

7    Morgenstern?

8          DEFENDANT DAVID MORGENSTERN:  Yes.

9          THE COURT:  And Fred Morgenstern.

10          DEFENDANT FRED MORGENSTERN:  Yes.

11          THE COURT:  All right.

12          There being no exception or objection to the facts as

13    summarized, there having been a stipulated factual basis, I

14    find the facts which the Government is prepared to prove are

15    sufficient to constitute both count 14 of the Superseding

16    Indictment and the new Information.

17          Let the record reflect that I find both defendants

18    alert and intelligent.

19          I further find that both defendants have freely,

20    voluntarily and intelligently entered their pleas of guilty

21    based upon the open pleas announced here earlier with no

22    promises or threats and without any mental impediment of any

23    kind.

24          I further find that the defendants have had the

25    advice and counsel of competent lawyers with whom they say they

```
 1   are satisfied.
 2          And having found the facts to be sufficient to accept
 3   such a plea, I will ask you one more time if it is still your
 4   desire to plead guilty as previously announced, David
 5   Morgenstern?
 6          DEFENDANT DAVID MORGENSTERN:  Yes, it is.
 7          THE COURT:  Fred Morgenstern.
 8          DEFENDANT FRED MORGENSTERN:  Yes, Your Honor.
 9          THE COURT:  And you patched up any differences you
10   had with Mr. Sakin, David Morgenstern?
11          DEFENDANT DAVID MORGENSTERN:  Yes, sir.
12          THE COURT:  You are okay with him?
13          DEFENDANT DAVID MORGENSTERN:  We have -- no problem,
14   sir.
15          THE COURT:  Okay.
16          Are you satisfied that your client understands the
17   charges and the consequences of his plea, Mr. Sakin?
18          MR. SAKIN:  Yes, I am, Your Honor.
19          THE COURT:  And Mr. Norris.
20          MR. NORRIS:  I am, Your Honor.
21          THE COURT:  Do you fully understand what's going on
22   at this proceeding, David Morgenstern?
23          DEFENDANT DAVID MORGENSTERN:  Yes, I do.
24          THE COURT:  Fred Morgenstern.
25          DEFENDANT FRED MORGENSTERN:  Yes, Your Honor.
```

1    THE COURT: Do you have any questions to ask me about

2    what's gone in your case so far today, David Morgenstern?

3    DEFENDANT DAVID MORGENSTERN: No, sir.

4    THE COURT: Fred Morgenstern.

5    DEFENDANT FRED MORGENSTERN: No, sir, Your Honor.

6    THE COURT: Okay. I find that you, David

7    Morgenstern, and you, Fred Morgenstern, understand the nature

8    of the charges against you and appreciate the consequences of

9    pleading guilty, that you understand that by pleading guilty

10   that you waive each and every one of the rights of a defendant

11   that I have already mentioned to you, and that you have

12   knowingly, intelligently and voluntarily waived these rights,

13   and the Court hereby accepts your guilty pleas.

14        At this time I am going to adjudicate both of you

15   guilty of both crimes, defer sentencing, order a Presentence

16   Investigation Report.

17        Someone from the Probation Department will be coming

18   up to the jail to interview Fred Morgenstern. I need you to be

19   open and honest with them so that I can find out as much as I

20   can about you so that I can make a fair decision in August if

21   it's not transferred to South Carolina. Do you understand

22   that, Fred Morgenstern?

23        DEFENDANT FRED MORGENSTERN: Yes, Your Honor.

24        THE COURT: Does the Government have any objection to

25   David Morgenstern's remaining out under the same conditions of

1    pretrial release?

2          MR. MCCORMICK:  No, Your Honor, but we further have

3    agreed with the defendant to change a condition of bond

4    concerning the house arrest on the defendant David Morgenstern

5    with the Court's permission.  Our recommendation is that

6    Mr. David Morgenstern be permitted to be on a curfew, rather

7    than house arrest for the time periods, I think --

8          MR. SAKIN:  It was 11:00 p.m. until 6:00 a.m.

9          MR. MCCORMICK:  That's correct.

10         And we would also ask that Mr. David Morgenstern be

11   ordered to submit to random drug testing as well.

12         MR. SAKIN:  That's correct.

13         And, Judge, we also agreed that he would report once

14   a week to Mr. Churchill (phonetic), who is here from Pretrial

15   Services.

16         THE COURT:  All right.  I will grant those changes,

17   and if someone would provide a proposed order to that effect, I

18   will be more than happy to change that.

19         Mr. David Morgenstern, that's acceptable to you that

20   instead of being on house arrest, you will have a curfew from

21   11:00 p.m. to 6:00 a.m., and you will undergo random drug

22   testing and see Mr. Churchill once a week?

23         DEFENDANT DAVID MORGENSTERN:  Yes, sir.

24         THE COURT:  I will grant that modification.

25         MR. SAKIN:  Thank you.

```
1          THE COURT:  So, David Morgenstern, you are going to
2   need to meet with the Probation Officer and they will explain
3   to you how you can cooperate with them in their conducting this
4   background check.  I need you to be open and honest with them
5   so that I can find out as much as I can about you or the South
6   Carolina Judge can so that a fair decision can be made in
7   August.  If you were not to cooperate can them, if you were not
8   to show up for sentencing or if you were to get yourself
9   arrested between now and sentencing, obviously any of those
10  three things would not go very well for you on your open plea.
11  Do you understand that, David Morgenstern?
12          DEFENDANT DAVID MORGENSTERN:  Yes.
13          THE COURT:  Is there anything else we need to discuss
14  on either of these cases, Mr. McCormick?
15          MR. MCCORMICK:  I don't believe so, Your Honor.
16          THE COURT:  Ms. Fernandez.
17          MS. FERNANDEZ:  Nothing else, Your Honor.
18          THE COURT:  Mr. Pavlock.
19          MR. PAVLOCK:  No, Your Honor.
20          Thank you.
21          THE COURT:  Mr. Norris.
22          MR. NORRIS:  No, Your Honor.
23          THE COURT:  Mr. Sakin.
24          MR. SAKIN:  No, sir.
25          THE COURT:  Anything else you want to say, David
```

77

```
1    Morgenstern?

2              DEFENDANT DAVID MORGENSTERN:  No, sir.

3              THE COURT:  Fred Morgenstern.

4              DEFENDANT FRED MORGENSTERN:  No, Your Honor.

5              THE COURT:  Okay.  Unless the South Carolina Judge

6    declines the transfer, I won't be seeing you guys again.  If he

7    if he should decline the transfer, then we will see everybody

8    back here August 1st at 9:30 and 10:00 o'clock respectively.

9    Okay.

10             MR. SAKIN:  Judge, the new Information will have a

11   new case number, so we will just get that later on then.

12             THE COURT:  Right.

13             MR. SAKIN:  Okay.  Fine.

14   Thank you.

15             MR. MCCORMICK:  Thank you, Your Honor.

16             (Proceedings concluded at 9:36 a.m.)

17

18

19

20

21

22

23

24

25
```

78

1

2

REPORTER'S CERTIFICATION

3

4

5          I hereby certify that the foregoing is a true and accurate

6     transcript of the proceedings recorded by me and reduced to

7     typewriting at my direction.

8

9

10                              Court Reporter

11                              Robert Ryckoff

12

13

14

15                         Date:

16

17

18

19

20

21

22

23

24

25

```
                    UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF FLORIDA
                     FORT LAUDERDALE DIVISION

UNITED STATES OF AMERICA,    )   CASE NO. 00-6309-CR-WPD
                             )
              Plaintiff,     )
                             )
                             )
         -v-                 )
                             )
FRED MORGENSTERN,            )
DAVID MORGENSTERN,           )
                             )   Fort Lauderdale, Florida
              Defendants.    )   January 31, 2003
_____)   10:20 a.m.


              TRANSCRIPT OF STATUS CONFERENCE

     BEFORE THE HONORABLE WILLIAM P. DIMITROULEAS

                 U.S. DISTRICT JUDGE


APPEARANCES:
                        J. BRIAN MCCORMICK, ESQ.
                        JAMES R. PAVLOCK, ESQ.
                        Assistant U.S. Attorneys
                        Appearing on behalf of the Plaintiff

                        WILLIAM NORRIS, ESQ.
                        Appearing on behalf of Defendant
                        Fred Morgenstern

                        SCOTT SAKIN, ESQ.
                        Appearing on behalf of Defendant
                        David Morgenstern



Reporter                ROBERT A. RYCKOFF
                        Official Court Reporter
                        299 East Broward Boulevard
                        Fort Lauderdale, Florida 33301
                        954-769-5657
```

2

```
        (Call to order of the Court.)

 1          THE COURT:  United States versus Fred Morgenstern and

 2   David Morgenstern.  If counsel would announce their appearances

 3   for the record.

 4          MR. MCCORMICK:  Yes, Your Honor.  Brian McCormick and

 5   James Pavlock for the United States.

 6          MR. SAKIN:  Judge, good morning.

 7   Scott Sakin on behalf of David Morgenstern.

 8          MR. NORRIS:  William Norris with Fred Morgenstern.

 9          THE COURT:  All right.

10          And David Morgenstern is present, is that correct?

11          DEFENDANT DAVID MORGENSTERN:  Yes, sir.

12          THE COURT:  And Fred Morgenstern is present, is that

13   correct?

14          MR. NORRIS:  Yes, he is, Your Honor.

15          THE COURT:  Okay.  We are here on a status conference

16   on Judge Anderson's order transferring the case back to the

17   Southern District of Florida.

18          What's the Government's position on the status of

19   this case?

20          MR. MCCORMICK:  Your Honor, we are ready for

21   sentencing.  We would ask that a sentencing date be imposed as

22   soon as possible.

23          THE COURT:  Mr. Sakin, your position.

24          MR. SAKIN:  Judge, with respect to David
```

3

1  Morgenstern -- as the Court knows -- I have had no contact with

2  Mr. Morgenstern up until this week. I don't think

3  Mr. Morgenstern desires for me to continue as his counsel in

4  this case.

5          I was discharged, of course, when the case was sent

6  to South Carolina pursuant to Rule 20.

7          I don't know if it's the Court's pleasure to

8  reappoint me to these matters or to appoint new counsel on

9  behalf of Mr. Morgenstern. I kind of leave it up to the Court

10 and Mr. Morgenstern --

11         THE COURT: Let me hear from David Morgenstern.

12         DEFENDANT DAVID MORGENSTERN: Certainly these are --

13 the circumstances under which this case finds its way back here

14 is very inordinate, confusing to me --

15         THE COURT: It's confusing to me, too. I have never

16 had one come back.

17         DEFENDANT DAVID MORGENSTERN: I, therefore, request

18 time to even respond on the subject by having counsel to

19 represent me in this matter.

20         THE COURT: You can represent yourself,

21 Mr. Morgenstern. You can ask me to reappoint Mr. Sakin to

22 represent you. You can hire somebody. You can tell me why you

23 don't want Mr. Sakin and you want some other CJA lawyer.

24         DEFENDANT DAVID MORGENSTERN: With all due respect,

25 sir, I am not prepared to make a statement today on this

1    matter.   I would ask for a reasonable period of time to seek a

2    resolute solution to the counsel that I --

3            THE COURT:  All right.  I am going to deny that

4    request.

5            I will put the case on recall.  You can discuss with

6    Mr. Sakin and see what you want to do.  We will put your case

7    on recall.

8            Let me ask Mr. Norris what his position is at this

9    time.

10           MR. NORRIS:  Your Honor, I was out of town for much

11   of the time since this hearing was noticed.

12           I have spoken with Fred Morgenstern.

13           As with Mr. Sakin, I am subject, of course, to the

14   Court's directive.

15           I have a concern as I look downstream with this case

16   that my role as a participant in past actions may conflict with

17   my ability to represent Fred Morgenstern in the future.  I have

18   spoken with Fred Morgenstern about that and he concurs with my

19   assessment.

20           To put that another way, Judge, right now I am

21   prepared to go forward with representing Fred Morgenstern, but

22   I am tremendously concerned that I may find myself in a

23   conflict position and would rather that be addressed now rather

24   than later.  I think it's fair to the Court and to Fred

25   Morgenstern.

1      THE COURT:  Let me hear from Fred Morgenstern as to

2  his position on counsel.

3      And let me just preface my remarks or my question to

4  you, Mr. Morgenstern, the same thing I said to David

5  Morgenstern and that is you can stay with Mr. Norris, you can

6  represent yourself, you can hire your own attorney.  If you

7  can't afford an attorney, and for some reason you are not happy

8  with Mr. Norris, you can ask me to appoint another CJA lawyer

9  for your case.

10      DEFENDANT FRED MORGENSTERN:  Yes, Your Honor.

11      I don't want to represent myself.  I can't hire an

12  attorney.  I have not found anybody that wants to do it for

13  funds that I can have available.  I think that Mr. Norris and I

14  traveled well together, and I respect him, but I believe that I

15  would be best served with a fresh start, with a lawyer that

16  could look at the sentencing circumstances, what it is that I

17  may be able to appeal to the Court under those circumstances,

18  and I believe I would be better represented in that matter by a

19  new counsel.

20      THE COURT:  You understand if I appoint new counsel,

21  he is going to be at somewhat of a disadvantage in that he is

22  going to have to try to go back and familiarize himself with

23  everything that Mr. Norris has been through?  Do you understand

24  that?

25      DEFENDANT FRED MORGENSTERN:  I do understand that.

1    THE COURT:  And understanding all that, you still

2    want me to put somebody on this case brand new and they are

3    going to have to try to get up to speed and catch up on

4    everything Mr. Norris knows about the case?

5    DEFENDANT FRED MORGENSTERN:  Yes.  I would like

6    someone that focuses on sentencing without the actual -- the

7    history may help, sir -- Your Honor.

8    THE COURT:  I don't know how you can focus on

9    sentencing without knowing about the underlying facts of the

10   case.

11   DEFENDANT FRED MORGENSTERN:  Well, I agree, but -- I

12   don't disagree is the right way to say it, but I think that --

13   as I said -- Mr. Norris and I traveled together a certain

14   distance, and I believe that someone could get up to speed in a

15   reasonable period of time and approach this sentencing fairly.

16   THE COURT:  You understand what you think is a

17   reasonable period of time might be different from what the

18   Government thinks is reasonable and it might be different from

19   what I think is reasonable also?

20   DEFENDANT FRED MORGENSTERN:  Of course.

21   THE COURT:  Let me hear what the Government's

22   position is.

23   MR. MCCORMICK:  Your Honor, both the Morgenstern

24   brothers have both had -- they have each had three different

25   attorneys in this particular case, two CJA attorneys apiece.

1    We are going on the third CJA attorney.

2              Your Honor, we object to another appointment of

3    counsel.  We think the case should proceed as it is presently

4    situated.

5              THE COURT:  All right.  Let me put the case on recall

6    for a few minutes so that Mr. Sakin and David Morgenstern can

7    discuss their position and then I will recall the case in a few

8    minutes.

9              (Recess taken at 10:27 a.m. until 10:40 a.m.)

10             THE COURT:  Okay.  We are back on the record.

11   Counsel are present.  Fred and David Morgenstern are present.

12             Mr. Sakin, what's the situation as to David

13   Morgenstern?

14             MR. SAKIN:  Judge, I spoke with David Morgenstern and

15   he like his brother would request that the Court appoint new

16   CJA counsel.  We did have an opportunity to discuss it this

17   morning and discuss it more in the last few minutes and that is

18   Mr. David Morgenstern's request to this Court.

19             THE COURT:  And the Government is opposed to that?

20             MR. MCCORMICK:  Yes, Your Honor.

21             THE COURT:  I think I need more than just a possible

22   or a hypothetical conflict occurring in the future before we

23   shift gears and go to the expense of bringing new counsel in

24   and bringing them up to speed, which obviously is going to be

25   duplicative of efforts that have already been done by

8

1  Mr. Norris and Mr. Sakin.  So I think I need to hear more than

2  just the defendants would like different counsel.

3        (Pause.)

4        MR. SAKIN:  Your Honor, what I think is going to --

5  what I think may occur is that there is going to be allegations

6  that -- I mean this puts me in an unusual position here -- that

7  there were things that I didn't do or that the Court didn't do

8  on behalf of Mr. Morgenstern that he wanted done, and that I

9  think there is going to be allegations -- I don't know to

10  withdraw his plea, but to -- I guess, in effect make

11  allegations concerning counsel -- myself in this matter -- as

12  we go down the road here closer to the sentencing at the time

13  of sentencing.  I am not informed what those specifies are.  I

14  think they might be coming.  And instead of me having to come

15  back here in a few weeks or in a few days saying there is a

16  problem or that there is a conflict between Mr. Morgenstern and

17  I, Mr. Morgenstern would rather have new counsel now so that

18  person would have time to do the necessary preparation for the

19  sentencing.

20        THE COURT:  I guess I need to know what the conflicts

21  are.

22        MR. SAKIN:  I don't know what they are either.  I

23  thought of (phonetic) everything I could possibly do for

24  Mr. Morgenstern prior to the plea, but there are things that --

25  you know, Mr. Morgenstern is very involved in this case as the

1    Court knows, has been very involved in terms of the input into

2    the representation here.

3              So I just don't know at this point any specifics.

4    Otherwise I would tell the Court.  I am not holding back.  I

5    just don't know anything additional than what I am advising the

6    Court right now.

7              And personally if the Court wanted me to stay in, I

8    would stay in, but if Mr. Morgenstern feels that I have been

9    deficient in any way and there is going to be any allegations

10   of those deficiencies, I rather that come up now so that he has

11   new counsel now instead of this becoming a -- like a career

12   case for me, which I am concerned could happen if there are

13   allegations by David Morgenstern.

14             THE COURT:  Mr. McCormick.

15             MR. MCCORMICK:  Yes, Your Honor.

16             Just recalling the plea colloquy that the Court had

17   with both defendants, both defendants at that time indicated to

18   the Court that they were pleased with the performance of their

19   attorneys.

20             THE COURT:  Things can happen after that that can

21   change that and things can happen that cause there to be a

22   conflict of interest in Mr. Sakin or Mr. Norris continuing to

23   represent Fred and/or David Morgenstern, but I think I have to

24   hear specifically what the conflict is to decide if there is a

25   conflict.  If there is a conflict, then I think I appoint new

 1    counsel.  If there is no conflict and it's just dissatisfaction

 2    or a decision that we are second guessing other decisions, then

 3    I don't know that I go to the expense of appointing new

 4    counsel.  So I think I am going to need to hear more than just

 5    there may be a motion to withdraw a plea or there may be

 6    allegations that counsel should have done something or didn't

 7    do something to the point where I can decide that there is a

 8    conflict or that there was ineffective assistance of counsel or

 9    some other reason to change counsel.  Absent there being a good

10    reason to change counsel, then I think the options are to stay

11    with the same counsel or represent oneself.  So I will listen

12    to specific complaints about Mr. Sakin and/or Mr. Norris at

13    this time.

14          DEFENDANT DAVID MORGENSTERN:  Judge, this event has

15    occurred very quickly.  It is an event that is precipitated by

16    activities that have occurred outside the realm of my defense

17    attorney in South Carolina who had petitioned the Judge for ex

18    parte information not to be used in deference to her request.

19          I have prepared and I am not finished yet preparing a

20    25 to 30 page commentary associated with why the issue with Mr.

21    Sakin, et cetera, may create a severe conflict of interest.  I

22    have worked on that diligently since being made aware of this

23    change -- drastic change -- of events.  I would ask the Court

24    to give me just a reasonable period of time to put it on the

25    record appropriately.  I would even come so far as to say that

1    I would be glad to read it to the Court to say it properly for

2    the record because of the fact that I think there are appellate

3    issues here as Mr. David Stevens has put in -- even in his

4    letter to get the case moved down here from Judge Anderson.    I

5    would, you know, plead with the Court to give me --

6         THE COURT:  You can read whatever you want to read

7    into the record.

8         DEFENDANT DAVID MORGENSTERN:  I don't have it

9    finished.  I would like the few days that it takes to complete

10    it.  I obviously do not have counsel to review it, which puts

11    me at risk potentially, but I would be willing to read it to

12    the Court on the basis that the -- that it may put me at risk

13    because at least it is the truth.  I do not have it finished.

14    I have endeavored each day to complete it.

15         I am still for the Court's edification a sepsis

16    patient.  I have to rest every day because of my septicemia

17    (phonetic) blood disease.  I am endeavoring as rapidly as I can

18    to complete it.

19         I would ask the Court for merely a reasonable period

20    of time to finish it.  I will either file it at your

21    instruction, I will read it to the Court at your instruction,

22    but I beg the Court to give me a reasonable period of time to

23    finish it so I am not meandering up here in front of you.

24         THE COURT:  I don't have any problem resetting this

25    hearing until Tuesday at 9:00 o'clock.

1          Does the Government have any problem with that?

2          MR. MCCORMICK:  Not till Tuesday at 9:00 o'clock,

3   Your Honor.

4          I would remind the Court, though, when Ms. Anna

5   Jhones represented David Morgenstern, the basis for her

6   withdrawal and appointment of new counsel was a conflict.

7          THE COURT:  I am only continuing the hearing to give

8   Mr. Morgenstern an opportunity to collect his thoughts to tell

9   me why Scott Sakin should not continue to represent him in the

10  case.

11         MR. MCCORMICK:  I wouldn't object to that, Your

12  Honor

13         THE COURT:  Mr. Sakin, can you come back Tuesday at

14  9:00?

15         MR. SAKIN:  Yes, I can be here.

16         THE COURT:  All right.  So I will reset

17  Mr. Morgenstern's status conference for Tuesday, February 4th,

18  at 9:00 o'clock, and we will see everybody back at that time.

19         MR. MCCORMICK:  Your Honor, one other matter.

20         The Government at the appropriate time would want to

21  revisit the issue of bond and special conditions of bond.

22         THE COURT:  File whatever motions you want to file.

23         MR. MCCORMICK:  We would probably want to do that on

24  Tuesday.

25         Also I would ask the Court to order an update of the

1    Presentence Report on both defendants because it's been

2    approximately eight months since the Court took a plea from

3    these defendants.

4         DEFENDANT DAVID MORGENSTERN:  I think that that shows

5    prejudice from the Government to try to accelerate my request,

6    sir.  If those things are to be done in a reasonable period --

7    I have responded without counsel -- for the request to be heard

8    without counsel --

9         THE COURT:  I think you have counsel today.  Mr.

10   Sakin can represent you.

11        DEFENDANT DAVID MORGENSTERN:  I think that for the

12   Government to just once again snow right over the top of my

13   reasonable request with one more and still another request that

14   is why this case has accelerated to the place that it has, sir.

15        I would ask that Tuesday -- that there be a stay

16   given for these kinds of slinging going on by the Government --

17        THE COURT:  That's why you need a lawyer,

18   Mr. Morgenstern, because slinging is what the lawyers do best.

19        DEFENDANT DAVID MORGENSTERN:  Well, I understand

20   that, sir, and I am asking till Tuesday for you to stay this

21   kind of abuse by the renegade (phonetic) Government here.

22        THE COURT:  He can file whatever motions he wants to

23   file.

24        When I set a sentencing hearing, at that point I

25   think is the point for me to consider ordering an updated

1   presentence investigation.  So make the request when and if I

2   set a sentencing hearing, Mr. McCormick.

3        MR. MCCORMICK:  Yes, Your Honor.

4        DEFENDANT DAVID MORGENSTERN:  Thank you for hearing

5   that, sir.  Thank you very much.

6        THE COURT:  All right.

7        So we will reset Mr. David Morgenstern's status

8   conference for Tuesday, February 4th, at 9:00 o'clock, and we

9   will see everybody back at that time.

10        How about Fred Morgenstern's situation?

11        DEFENDANT FRED MORGENSTERN:  Thank you, Your Honor.

12        I am not entirely articulate on all of the issues of

13   conflict, so I am going to do the best I can.  The -- nor do I

14   wish to in front of the Court embarrass Mr. Norris in any way.

15   As I said, I respect him.

16        THE COURT:  If you want a different lawyer, then you

17   can't hold back --

18        DEFENDANT FRED MORGENSTERN:  Well, I just would

19   like -- I agree.

20        So, first of all, the Government's position that I

21   am, shall we say, CJA counsel long.

22        It was Mr. Howes that was removed at their work that

23   caused me to lose my first counsel. Yes, I agreed once

24   understanding what Sixth Amendment conflict means.  So it was

25   not me that initiated the so-called firing of Mr. Howes.

1            Mr. Norris was appointed, and in the course of his

2    and my relationship -- which we had very limited

3    communication -- I found him to be professorial and able, but

4    at the same time the communication that I had with him was

5    inadequate, sometimes confusing, and in the end there were

6    things that he did not do that perhaps out of the reasoning

7    that the case was moved that I really feel I have issues to say

8    that he ought to have done.  Those are objections to the PSI.

9    Those may well have been motions to consider some factors that

10   I am not aware.

11           I feel that even the fact that I was given 15 minutes

12   to plea is -- was kind of aggressive considering that, number

13   one, I was incarcerated, and that everyone else got a

14   continuance.  I have never had a continuance in this case from

15   its inception.  I have never asked for any delaying tactics.

16   You know, I have asked for discovery.  I have chased (phonetic)

17   the thing with these attorneys.

18           I just think that there is things that Mr. Norris and

19   I have issues with that may well be legitimate and that I don't

20   know exactly what a conflict may mean.

21           I think a man that tries, but doesn't perform, and

22   then says humbly in front of the Court, you know, I just didn't

23   perform -- I mean I was given this exact choice sitting right

24   over there in the chair, you know, we -- let's go to trial.  I

25   am not ready.  You are going to lose on all counts.  Then your

1    only choice is incarceration, 2255 motion, or you have got 15

2    minutes to plea.

3         I don't think -- I think he should have at least

4    asked you as you were granting those days -- Mr. Silvestri's

5    attorney you gave two weeks to get ready for something. David

6    got time for certain things. My lawyer didn't even stand up

7    and say I think I need to talk to my person about what it is

8    his choices are.

9         I don't know whether any of that's valid, Your Honor,

10   but what I would like -- and further both in the case of Mr.

11   Howes that refers to the -- to Brian McCormick as the drunken

12   Irishman, and Mr. Norris who has conflicts with him, too,

13   personally, I want a friend of mine as an attorney to work with

14   the Government on this sentence. This is my life that we are

15   working with now, not about posturing. I want a reasonable man

16   to meet with what I consider to be another reasonable man,

17   Brian McCormick, having met him really the first time in jail

18   here and had a very open and competent conversation with him,

19   and I found great respect for him -- something that was not

20   represented to me by my attorneys -- as he is a man of attitude

21   and willingness.

22        So it's just simply that I don't want to fight

23   anybody. I want a lawyer to look at the law, look at what's

24   available to me, see what I can do to possibly help my

25   sentence, and work diligently in partnership with the

1   Government with that.  That's my perception of it.

2          And so I request respectfully that I be given a new

3   attorney.

4          THE COURT:  Let's go over a couple of your

5   objections.

6          First, you are concerned about there not being

7   objections to the Presentence Investigation Report.

8          As I indicated previously, I would set a sentencing

9   hearing and was thinking I was going to do that today, and

10  certainly if I ordered an updated Presentence Investigation,

11  then that would restart all the time periods and whoever

12  represents you can make whatever objections they want to make

13  to the updated Presentence Investigation Report.  If I didn't

14  order an updated Presentence Investigation, whatever

15  presentence has been done in the time between now and whenever

16  the sentencing is, Mr. Norris or whoever is representing you

17  can make objections.  So this transfer back from South Carolina

18  is not going to prejudice you or David Morgenstern's ability to

19  object to the Presentence Investigation Report or have input in

20  your sentencing.

21         I am more concerned about the allegations that you

22  are making about your plea not being a voluntary plea and let

23  me ask Mr. Norris what his response to that is.

24         MR. NORRIS:  Your Honor, my initial response is is

25  that this is exactly the concern that I had in that I become --

1    as a participant in past events, the future may place me in a

2    position where I -- where my role becomes -- if not adversarial

3    to, at least inconsistent with my role as representing --

4         THE COURT:  I mean you represent clients in state

5    court.  I am sure you have seen a Nelson hearing take place in

6    state court where -- that's what the state Judges have to do.

7    They have to, you know, listen to the client's complaint, see

8    what the lawyer's response to it is, and decide whether or not

9    there is a basis to substitute or change counsel.  I mean it's

10   not unusual for that to happen, is it?

11        MR. NORRIS:  Well, it's not.

12        But part of my concern -- and I have told Fred

13   Morgenstern about how a lawyer has obligations as an officer of

14   the court to the system, and that some of those obligations are

15   efficiency obligations, which is what you addressed earlier,

16   and that sometimes those obligations are in tension with the

17   obligations to the client, and what the lawyer does, of course,

18   is he recognizes the zone of what is possible and tailors his

19   request to that zone, and, in other words, asks for something

20   at the bottom end of the zone, which is in that lawyer's

21   judgment likely to be obtained from the particular Judge.

22        THE COURT:  Let me ask you based on what Fred

23   Morgenstern has told you and what you have heard him say here

24   in open court, if he wanted you to file a motion to withdraw

25   the plea, could you do that?

1          MR. NORRIS:  Yes, I could.

2          Well -- okay.  Could -- see, that's the tension,

3     Judge.  I understand what it is that Fred Morgenstern is saying

4     about his position, and to a large extent in terms of what

5     brought him to the difficulty that he had -- let me start again

6     if I may, Your Honor?

7          This case got indicted as a certain type of case, and

8     John Howes defended it as it was indicted, and in the course of

9     developing his defense, he discovered a great volume of

10    information that the Government was saying was irrelevant, but

11    was tremendous -- and it may have been from their prosecutorial

12    point of view.  From the defense point of view, that was the

13    defense.  And he may have made an error in judgment about how

14    he went about obtaining that information, but consistent with

15    his obligation to Fred Morgenstern that's what he did.  Out of

16    that it was the Government -- for whatever reason -- who filed

17    the motion to disqualify him because of the fact that he might

18    end up getting sued or might have some personal financial

19    liability.

20         That's how I came into the case, and I came into the

21    case with an instruction from the Magistrate Judge who called

22    me saying you will not ask for a continuance.

23         I had a profound problem with that.  I didn't believe

24    it for an instant.  I didn't believe that case was going to go

25    to trial, and that's why I took it, and it didn't go to trial.

1    But unfortunately what happened was then Fred Morgenstern got

2    caught -- he got snookered by a -- you know, the old perjury

3    trap.  Well, he was called upon to make a judgment where I was

4    not competent to advise him about the relative structure of

5    what was going on in South Carolina and what was going on in

6    the Southern District of Florida that was -- I didn't know.  I

7    didn't have the information.  And my ability to advise him was

8    very, very severely impacted by my own lack of knowledge.

9         He made a judgment -- he made what he saw to be the

10   best judgment at the time -- and ended up spending six months

11   in jail because of it, and those six months in jail, Judge, in

12   a case like this to have him in jail and to have him out of the

13   district where it's costing me my -- you know, I vouchered a

14   couple of them on my CJA voucher.  The cost of his calling me

15   collect from the South Carolina jail was prohibitive, aside

16   from the fact that there could be no reasonable dialogue going

17   on there.

18        So he is off in South Carolina in jail, and then he

19   comes back here, and he is caught in the fact that, you know,

20   this case has been around for a long time, it's got to be

21   tried -- if I were in Fred Morgenstern's shoes, Judge, I don't

22   think that I could summon the courtesy and the respect that he

23   has for the system.  I think I would be shouting.  But then I

24   would be sitting over there, too, so maybe I wouldn't do that.

25        But that's the backdrop, Judge.

1    So do -- if you are asking me for my professional

2  judgment if I were the Judge in this case, would I grant the

3  motion to withdraw the plea, the answer is no.

4        Are there very serious things here that trouble me

5  personally and trouble me professionally about what's happened

6  with the case?  There are.

7        And can I put those all at the door of Fred

8  Morgenstern?  Absolutely not.

9        I mean he did the things that he did that led to the

10  Indictment and that's why he is before the Court, but I don't

11  know that he is entirely responsible for the situation that he

12  has now and that his -- in a situation like that, my experience

13  has been that defendants often look to the person that's

14  closest to them, and that's their lawyer, and I don't want to

15  come back to this Court in 30 or 45 days and say, Judge, this

16  is what has developed, this is what he is saying to me, and I

17  can't go forward with it.

18        THE COURT:  Mr. Morgenstern, you have heard what

19  Mr. Norris has to say.  He has spoken pretty eloquently.  Are

20  you sure you want a different lawyer?

21        DEFENDANT FRED MORGENSTERN:  Often I am prone to

22  humor, and I apologize, but can I just say I have no idea what

23  to do?  I would like some lawyer to coach me on what to do.

24        I respect the man.  I said that in advance.  I said I

25  didn't want to harm him in front of the Court.

1          THE COURT:  Let's do this.  Let's reset --

2          DEFENDANT FRED MORGENSTERN:  On the other hand, I

3    think I should have -- how big of a deal is it for me to have a

4    new attorney?

5          THE COURT:  It's a big deal.  It costs the Government

6    of the United States money to put another lawyer on the case,

7    and he is going to have to review the records, and it's going

8    to take time to do that, and that's expensive.

9          DEFENDANT FRED MORGENSTERN:  All right.

10         THE COURT:  I mean it's not a big deal to you because

11   it's no money out of your pocket.

12         It may be a big deal to you because the lawyer that

13   you get on the case may not be as good as Mr. Norris.  I don't

14   know.

15         DEFENDANT FRED MORGENSTERN:  That's what I mean, Your

16   Honor.  I don't know what to do.  I even said that in the

17   beginning.  I am not a lawyer, and I don't even have the --

18   shall we say -- the arrogance to wish to be considered one.

19         THE COURT:  Mr. Norris, can you come back Tuesday at

20   9:00?

21         MR. NORRIS:  Absolutely.

22         THE COURT:  Why don't we do that?  Why don't we reset

23   this also for Tuesday at 9:00?  That will give you more time to

24   think about it, more time to talk to Mr. Norris if you want to

25   between now and then and really think about whether you want to

```
 1   shift gears at this point and get somebody brand new on the

 2   case and try to get them up to speed, and we will revisit it

 3   Tuesday at 9:00 o'clock.

 4           DEFENDANT FRED MORGENSTERN:  Thank you, Your Honor.

 5           (Proceedings concluded at 11:05 a.m.)

 6

 7

 8

 9

10                    REPORTER'S CERTIFICATION

11

12      I hereby certify that the foregoing is a true and accurate

13   transcript of the proceedings recorded by me and reduced to

14   typewriting at my direction.

15

16

17                              Court Reporter

18                              Robert Ryckoff

19

20

21

22                              Date:

23

24

25
```

```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
                      FORT LAUDERDALE DIVISION

UNITED STATES OF AMERICA,      )   CASE NO. 00-6309-CR-WPD
                               )
              Plaintiff,        )
                               )
                               )
        -v-                     )
                               )
FRED MORGENSTERN,               )
DAVID MORGENSTERN,              )
                               )   Fort Lauderdale, Florida
              Defendants.       )   February 4, 2003
_____)   9:07 a.m.


                  TRANSCRIPT OF STATUS CONFERENCE

           BEFORE THE HONORABLE WILLIAM P. DIMITROULEAS

                      U.S. DISTRICT JUDGE


APPEARANCES:
                          DIANA FERNANDEZ, ESQ.
                          Assistant U.S. Attorney
                          Appearing on behalf of the Plaintiff

                          WILLIAM NORRIS, ESQ.
                          Appearing on behalf of Defendant
                          Fred Morgenstern

                          SCOTT SAKIN, ESQ.
                          Appearing on behalf of Defendant
                          David Morgenstern




Reporter                  ROBERT A. RYCKOFF
                          Official Court Reporter
                          299 East Broward Boulevard
                          Fort Lauderdale, Florida 33301
                          954-769-5657
```

(Call to order of the Court.)

THE COURT:  United States versus Fred Morgenstern and David Morgenstern.  If counsel would announce their appearances for the record.

MS. FERNANDEZ:  AUSA Diana Fernandez on behalf of the Government.

MR. SAKIN:  And, Judge, good morning.

Scott Sakin on behalf of David Morgenstern.

MR. NORRIS:  William Norris for Fred Morgenstern. Mr. Morgenstern is present.

MR. SAKIN:  Along with David Morgenstern.

THE COURT:  So both Morgensterns are present.

We are here on a status conference -- a continuation of a status conference -- that we started last week.  I think on January 31st.

What's David Morgenstern's position on counsel?

DEFENDANT DAVID MORGENSTERN:  My position is still the same.  I filed a motion in this court asking for the appointment of new CJA counsel.

THE COURT:  All right.  Let me ask what Fred Morgenstern's position is?

DEFENDANT FRED MORGENSTERN:  It is the same.  I request.

THE COURT:  All right.

Does the Government have anything further on the

1   request?

2          MS. FERNANDEZ:  Your Honor, if Mr. David Morgenstern

3   has filed a motion, we have not seen it yet.

4          THE COURT:  I think they filed a joint motion.

5          MS. FERNANDEZ:  If we are talking about the original

6   one that was filed last week.

7          THE COURT:  That's what I am assuming that they are

8   talking about.

9          MS. FERNANDEZ:  I gathered from the hearing or at

10  least what was described to me from the hearing last week,

11  there was some indication -- at least by David Morgenstern --

12  that he wished to file a large and lengthy motion concerning

13  this matter.  I just want to make sure we are not talking about

14  a new motion.

15         But obviously our position as to both requests is

16  still the same.  We do object to the change.  We have had -- I

17  believe as to each defendant -- three attorneys through the

18  course of this matter, along with obviously the one appointed

19  up in South Carolina as an additional one, and they have shown

20  no basis, no reasons, for having another change of attorneys at

21  this point in time.

22         THE COURT:  Both defendants have alluded to the

23  possibility of thinking about moving to withdraw their plea and

24  obviously there are strategic considerations for doing that.

25         One of the factors that the Court always considers in

1    a sentencing is acceptance of responsibility, and someone who

2    moves to withdraw their plea may make allegations that causes

3    the Government to oppose acceptance of responsibility, and

4    there may be other strategic factors in deciding whether you

5    want to file that type of a motion, and I think it puts

6    Mr. Norris and Mr. Sakin in a difficult situation to advise the

7    Morgensterns about whether to file a motion to withdraw a plea

8    when part of the motion to withdraw the plea may genuinely or

9    not meritoriously allege imperfections in Mr. Norris and

10   Mr. Sakin's representations.  So I think it's a difficult

11   situation for them to be in to advise the Morgensterns as to

12   whether or not to move to withdraw the plea when some of the

13   allegations may involve their representation.  So given the

14   possibility or maybe even likelihood of a motion to withdraw

15   the plea being filed in this, case I think the more prudent

16   course of action is to appoint separate counsel.

17         I tried to mention to the Morgensterns last week the

18   disadvantages of having separate counsel, and reset the hearing

19   until today to give them more time to think about it, and if

20   they wanted to talk with Mr. Norris and Mr. Sakin about the

21   disadvantages of getting someone brand new on the case having

22   to reinvent the wheel, and whether they have done that or not,

23   I don't know.  They have had enough time to do that and they

24   have decided that they still want separate counsel.  So I am

25   going to grant their joint motion for appointment of new

5

```
1   counsel.

2           Let me ask the Government or Mr. Norris and Mr. Sakin

3   whether or not these two lawyers to your knowledge have any

4   conflict in representing the Morgensterns.  One is William Clay

5   from Miami and the other is Brian McComb from Stuart.

6           Is anybody aware of their having a conflict of

7   interest in this case having represented a witness or a

8   defendant or anything like that?

9           MR. SAKIN:  Your Honor, I know Mr. Clay.  I don't

10  know Mr. McComb.  I am unaware of Mr. Clay's name ever being

11  mentioned with respect to any witness or co-defendant or anyone

12  in this case.  I can't speak on behalf -- Mr. McComb's name

13  doesn't sound familiar to me either --

14          THE COURT:  He is from Stuart.

15          MR. SAKIN:  -- with respect to any aspects of this

16  case.

17          MR. NORRIS:  I know Mr. Clay.  I do not know Mr.

18  McComb.  But neither name has any association to this case to

19  my knowledge.

20          THE COURT:  Ms. Fernandez.

21          MS. FERNANDEZ:  No, no association with this case,

22  Your Honor.

23          I will say that on one particular matter, the

24  Government is dealing with Mr. Clay, but it has no relationship

25  to this case at all.
```

1        THE COURT:  I mean that's not an unusual for a

2  criminal defense attorney to be dealing with the Government on

3  a matter, is it?

4        MS. FERNANDEZ:  No, Your Honor.  It's just closed

5  (phonetic) discussions we are having with him on a different

6  matter.  I just want the defendants to be aware of that.  But

7  it doesn't affect this case, these witnesses, or anything --

8        THE COURT:  Is there any reason I should have concern

9  about appointing him as opposed to somebody else?

10        MS. FERNANDEZ:  I don't believe so, Your Honor.

11        THE COURT:  Okay.

12        DEFENDANT DAVID MORGENSTERN:  Judge, may I speak?

13        THE COURT:  Yes, if you know either of these two guys

14  and there is something about them.

15        DEFENDANT DAVID MORGENSTERN:  I seem to remember

16  William Clay in the early part of the first Indictment of this

17  case being the attorney of one of the original co-defendants.

18        MS. FERNANDEZ:  Your Honor, there was a co-defendant

19  who was charged in this on the original Indictment whose last

20  name is Clay.  That may be who the defendant is thinking of.

21        THE COURT:  I went through Windoc, all the different

22  defendants this morning on the computer, and I didn't see

23  Mr. Clay's mentioned.

24        MS. FERNANDEZ:  There was a Charles Clay who was a

25  co-defendant.

THE COURT:  Do you think that might be it, Mr. Morgenstern?

DEFENDANT DAVID MORGENSTERN:  That may very well be, sir.

I apologize.

THE COURT:  No problem.

Anybody else have any information that Mr. Clay or Mr. McComb might have a conflict in this case?

Not hearing anything, I will appoint Mr. McComb to represent David Morgenstern and Mr. Clay to represent Fred Morgenstern.

Let me give you their phone numbers so that you can get a hold of them.

I am also going to ask Ms. Fernandez and Mr. Norris and Mr. Sakin if they would be kind enough to also give them a courtesy call.  Obviously, Mr. Norris doesn't need to call Mr. McComb and Mr. Sakin doesn't need to call Mr. Clay.  But Mr. Clay's phone number -- and I guess maybe Mr. Fred Morgenstern ought to be writing this down.

(Pause.)

THE COURT:  Okay.

305-595-0866.

And Mr. McComb's phone number, 772-781-0069.

I am going to set sentencing for April 18th at 8:45 a.m. on Mr. Fred Morgenstern's case in this courtroom.  I will

1    set sentencing for David Morgenstern the same, April 18th, at

2    9:15 a.m. in this courtroom.

3        Any motions to withdraw a plea should be filed

4    forthwith.  And I just mention it to the Morgensterns that one

5    of the factors that the Court typically takes into account in

6    deciding whether to grant a motion to withdraw the plea is the

7    delay between the plea and the motion.  So I suggest to you

8    that if you are going to file that motion, that you get with

9    your new lawyers and file it forthwith.  In no event should it

10   be filed later than March 14th.

11       The Government has filed this morning motions to set

12   conditions of bond on Fred Morgenstern's case and motions to

13   reinstate conditions of bond on David Morgenstern's case.  I am

14   going to defer ruling on those until February 14th, and if the

15   defense is going to object or have any position in those

16   motions, then the objections should be filed on or before

17   February 14th.

18       Are there any other matters that we need to discuss?

19       I am going to release Mr. Sakin and Mr. Norris from

20   their representation.  I appreciate their coming up here these

21   last two times.

22       DEFENDANT DAVID MORGENSTERN:  Judge.

23       THE COURT:  Yes.

24       DEFENDANT DAVID MORGENSTERN:  There is a substantial

25   addition to this proceeding that I had requested, and, in fact,

1    a motion that I did intend to file.

2         THE COURT:  You have a lawyer now.  So talk to your

3    lawyer about filing motions.

4         DEFENDANT DAVID MORGENSTERN:  I know.

5         I just wanted to say in answer to Ms. Fernandez's

6    comment that was, in fact, the case.  I do have the motion in

7    my briefcase and I will file it to the extent --

8         THE COURT:  No, you won't file it because you have a

9    lawyer now.

10        DEFENDANT DAVID MORGENSTERN:  Okay.

11        THE COURT:  Get with the lawyer and if he wants to

12   file it, fine.  If he won't file it, and you want to represent

13   yourself, then file a motion to fire him and represent

14   yourself.  But you have a lawyer now.  So give him that

15   material, and tell him what you want to do, listen to what he

16   has to say, consider his advice, and go from there.

17        DEFENDANT DAVID MORGENSTERN:  I appreciate the

18   clarity, sir.  I am not trying to be a bother at all.

19        THE COURT:  Okay.

20        Anything else we need to discuss?

21        MR. SAKIN:  Judge, as far as the bond motion, I will

22   give it to Mr. Morgenstern so he can give it to Mr. McComb.

23   Obviously he will be meeting with him shortly.  And anything

24   else that Mr. McComb needs, I will be happy to provide.

25        THE COURT:  Okay.

1          MR. SAKIN:  Okay.

2      Thank you very much, Your Honor.

3      THE COURT:  Thanks for coming in.

4      (Proceedings concluded at 9:18 a.m.)

5

6

7

8

9

10                  REPORTER'S CERTIFICATION

11

12      I hereby certify that the foregoing is a true and accurate

13  transcript of the proceedings recorded by me and reduced to

14  typewriting at my direction.

15

16

17                          Court Reporter

18                          Robert Ryckoff

19

20

21

22                          Date:

23

24

25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

UNITED STATES OF AMERICA,    )    CASE NO. 00-6309-CR-WPD
                              )    CASE NO. 02-60101-CR-WPD
            Plaintiff,    )
                              )
        -v-               )
                              )
FRED MORGENSTERN,           )
                              )    Fort Lauderdale, Florida
            Defendant.   )    April 18, 2003
_____)    8:50 a.m.

TRANSCRIPT OF SENTENCE

BEFORE THE HONORABLE WILLIAM P. DIMITROULEAS

U.S. DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:       BRIAN MCCORMICK, ESQ.
                         DIANA FERNANDEZ, ESQ.
                         JAMES PAVLOCK, ESQ.
                         Assistant U.S. Attorneys


For the Defendant:       MICHAEL J. ROSEN, ESQ.



Reporter:                ROBERT A. RYCKOFF
                         Official Court Reporter
                         299 East Broward Boulevard
                         Fort Lauderdale, Florida 33301
                         954-769-5657

1              (Call to order of the Court.)

2         THE COURT:  Okay.  United States versus Fred

3    Morgenstern.  If counsel would announce appearances for the

4    record.

5         MR. MCCORMICK:  Good morning, Your Honor.

6         Brian McCormick, Diana Fernandez and James Pavlock

7    for the United States.

8         MR. ROSEN:  Good morning, Your Honor.

9         Michael Rosen and Mr. Fred Morgenstern is in court.

10        THE COURT:  We are here today for a sentencing, but

11   before we get to that, I guess at 2:39 yesterday afternoon, Mr.

12   Morgenstern filed a motion for recusal.

13        Has the Government seen the motion?

14        MR. MCCORMICK:  Yes, Your Honor.  We have it.

15        THE COURT:  And what's the Government's position?

16        MR. MCCORMICK:  Your Honor, we oppose it.  We don't

17   think there is a sufficient showing for the Court to recuse

18   itself based upon the papers presented for several reasons.

19        THE COURT:  Go ahead.

20        MR. MCCORMICK:  Your Honor, I don't believe that

21   there has been an adequate affidavit filed with it in the first

22   place to justify a hearing on the matter.  I think it's

23   insufficient on that basis.

24        And given that, though, Your Honor, the case law --

25   the limited time we had to research the case law -- seems to

1    show that this is inadequate on its face anyhow.

2            I would cite to the case United States -- excuse

3    me -- Corrugated Container Antitrust Litigation, Steering

4    Committee versus Mead Corporation.  That's located at 614 F.2d

5    958.  It isn't exactly on point, Your Honor, but it has several

6    instances where a Judge who was hearing that particular matter

7    made a comment about the case, about the evidence, apparently

8    on a golf course to some lawyers and that ends up in an

9    affidavit, and the Judge's law clerk made a statement in an

10   interview about the case that presumably showed some sort of

11   bias, and that was litigated, and I have a copy of the case for

12   the Court if the Court wishes, and that's woefully inadequate

13   to justify the Court recusing itself based upon either of those

14   instances, and it's very specific, the personal bias that has

15   to be shown, and the type of statement -- and I know the Court

16   has to assume that's true for purposes of assessing it, and

17   when the Court makes that assumption, it still falls short.

18           If the Court -- I have other cases that back up that

19   proposition.  It's a general proposition.  If the Court would

20   indulge me, I can give it to the clerk.

21           THE COURT:  Okay.

22           MR. MCCORMICK:  (Handing to the Court.)

23           THE COURT:  Mr. Rosen.

24           MR. ROSEN:  Yes, sir, Your Honor.

25           If it please the Court, one does not take lightly the

1    filing of a motion for recusal, and one does not take lightly

2    the filing of a motion for recusal certainly on the eve of your

3    client being sentenced.

4                And I want to state initially that this was a

5    decision made by myself, not by my secretary and not by Fred

6    Morgenstern, who was consulted with it.

7                THE COURT:  I assume Mr. Morgenstern agrees with the

8    motion.

9                MR. ROSEN:  He does.

10               But I want the Court to know that I am the driving

11   force behind it.

12               Your Honor, it's -- obviously -- well, it occurred at

13   the last minute because the event occurred at the last minute,

14   and as attached to the affidavit or as part of the affidavit,

15   in a telephone conversation, your court clerk -- who I don't

16   know -- was returning a phone call placed by my secretary at my

17   direction --

18               THE COURT:  She is sitting out in the audience right

19   now.

20               MR. ROSEN:  The clerk?

21               That's fine.

22               I believe my secretary is, too, Your Honor.

23               THE COURT:  Okay.

24               MR. ROSEN:  -- and made a comment to my secretary

25   that this is not one of our favorite cases, not to mention the

1    Court's dislike of this case.

2           Lyda came and discussed it with myself.  I asked her

3    very clearly to set out precisely what was said, and the tone,

4    and she was a bit in shock over the tone.

5           The tone is not the issue.

6           I take at face value what Ms. Aparicio said to me.

7    She has been a secretary for a long time.

8           The troubling part, Judge, is this:  Why would a

9    statement like that be made if it wasn't a true statement?  Why

10   would she say or be of the impression that the Court did not

11   like this case?  And if it is a true statement, what is it

12   about the case or what is it about Mr. Morgenstern -- who was

13   not mentioned specifically -- that the Court dislikes?

14          And here is the troubling factor of this whole thing:

15   At the end of the day today, I am going home, the Government is

16   going home, the Court is going home, and only Mr. Morgenstern

17   is not going home.

18          And what we are going to present today is in my

19   respectful and humble opinion an extraordinary and compelling

20   5K2.0, which -- as the Court knows -- means that it all rests

21   on this Court's shoulders.  It's really not an appellate

22   issue.  It's a judgment and discretion call by Your Honor.

23          And when confronted with a statement like that, I am

24   put in a position of saying, well, I have prepared.  I have

25   litigated.  The Court has granted some motions.  The Court has

```
 1              THE COURT:  I haven't talked to her.  I don't know.
 2              MR. ROSEN:  Okay.
 3              -- then that's an issue.  And I have no doubt that it
 4   was said.  I have no doubt that it was said in the tone that it
 5   was said.
 6              And, quite frankly, my impression from this reading
 7   and hearing of it was we just caught Ms. Carlton at a bad time.
 8   You know, that happens to all of us.  You know, we all have
 9   that moment.  And I think she was aggravated with my secretary
10   for disregarding a request or an order of hers, however it
11   appears, but she said what she said.
12              And it becomes an issue of the law and the Court
13   making its own judgment if it's true.  If there is something
14   about the case that the Court is unsettled with, and I am here
15   today on a 5K2.0, and she is simply --
16              THE COURT:  If I thought I couldn't be fair, Mr.
17   Rosen, I would have disqualified myself already on the case.
18              MR. ROSEN:  Well, then, Your Honor, it becomes a
19   matter of -- and I appreciate that -- I mean I do appreciate
20   that -- it becomes a matter of is the statement legally --
21              THE COURT:  Let me just say on Mr. Silvestri's case,
22   I thought I could be fair.  I didn't disqualify myself on Mr.
23   Silvestri's case.  They presented me with authority that I
24   thought was compelling that a disinterested person would feel
25   that they weren't getting a fair shake based on those
```

1  circumstances. So I reluctantly disqualified myself realizing

2  the amount of work it was going to create for Judge Seitz.

3       But if I think I am not fair on a case, I disqualify

4  myself sua sponte. If I think that the law requires me to

5  disqualify myself, then I have and I continue to believe that I

6  will.

7       So I guess the question is do you want me to rule

8  based on your affidavit? You have got your secretary here. My

9  courtroom deputy is in the courtroom. How do you want --

10       MR. ROSEN: I would like the Court to rule on the

11  affidavit. I think it says the entire scenario as I understand

12  it.

13       THE COURT: All right.

14       So you don't want to have any testimony from anybody

15  because my courtroom deputy came in on her vacation day today?

16  So I can release her?

17       MR. ROSEN: Believe me. So did mine.

18       Yes.

19       THE COURT: All right.

20       The Government agrees I am going to rule on the

21  sufficiency of the affidavit without hearing testimony?

22       MR. MCCORMICK: Yes, Your Honor.

23       THE COURT: Mr. Morgenstern, do you agree with that

24  strategy?

25       THE DEFENDANT: Yes, Your Honor.

1          THE COURT:  Okay.  I appreciate you coming in today,

2     Karen.

3          Anything further on the motion to disqualify?

4          MR. ROSEN:  No, Your Honor.  We have set out the

5     facts and the law as we understand it.

6          THE COURT:  I agree with you that the standard is

7     whether the average person on the street would question the

8     impartiality of the Judge under the circumstances.

9          And I cite Pope versus Federal Express Corporation,

10    an Eighth Circuit opinion from -- at 974 F.2d 982 -- an Eighth

11    Circuit opinion from '92, and in that opinion the Eighth

12    Circuit says that a party introducing a motion to recuse

13    carries a heavy burden of proof.  A Judge is presumed to be

14    impartial and the party seeking disqualification bears a

15    substantial burden of proving otherwise.

16          I think the leading case on disqualification and

17    recusal is the U.S. Supreme Court case Liteky versus United

18    States at 114 Supreme Court 1147.  It's a 1994 opinion.  And,

19    again, the law of the land is recusal is required whenever

20    impartiality might reasonably be questioned.

21          And in that case they said that the fact that a Judge

22    who presided at a trial -- this wasn't a trial, but obviously

23    at this particular point, I presided over Mr. Silvestri's

24    trial, and I have had the benefit of the Presentence

25    Investigation Report.  So I have almost as much information as

1   a person who -- as a Judge who presided at a trial may have --

2   that a Judge who presides at a trial may, upon the completion

3   of the evidence, be exceedingly ill disposed towards the

4   defendant, who has been shown to be a thoroughly reprehensible

5   person.  But that doesn't make the Judge recusable for bias or

6   prejudice as his knowledge and opinion came from the course of

7   the proceedings and is necessary to complete the Judge's task.

8           Now, I am not saying that Mr. Morgenstern is a

9   thoroughly reprehensible person, but I think that stands for

10  the proposition that Judge's are human beings, and given the

11  fact that I have to accept this affidavit as true, the fact --

12  I have to accept the fact that my courtroom deputy said this is

13  true based on the lawyers' positions here today -- then the

14  question is the fact that she would have said that, does it

15  necessarily mean that I formed an opinion on the facts of this

16  particular case, and if it does come to -- a reasonable person

17  would come to the conclusion that I formed some type of an

18  opinion, is that opinion a display of deep-seated favoritism or

19  antagonism that would make a fair judgment impossible?

20          And the Supreme Court in that Liteky opinion talks

21  about whether or not the opinion derives from an extrajudicial

22  source, and I think the Supreme Court says that generally

23  speaking recusal should be limited to opinions that derive from

24  extrajudicial sources, but there are some situations where

25  something can happen actually from the trial itself or the

1    Court rulings itself that in a rare situation can result in a

2    recusal, but I think they say at page 554 of the Supreme Court

3    cite, which is page 1157 of the -- no, it's 554 of the U.S.

4    Cite, 1157 of the Supreme Court cite -- that predispositions

5    developed during the course of a trial will sometimes, albeit

6    rarely, suffice.

7             And to me it seems that the comment by the courtroom

8    deputy refers to a dislike of a case, not Mr. Morgenstern, and

9    this case involves more than just Fred Morgenstern.  It

10   involves more than just David Morgenstern.  And there is no

11   indication that even if there was a dislike of Fred

12   Morgenstern, that that dislike came from anything other than

13   information that the Court has gleaned from the Presentence

14   Investigation Report.

15            So consequently I deny the motion to recuse.

16            Now, you also had a motion to continue in your

17   sentencing memorandum.

18            MR. ROSEN:  Yes, sir.

19            THE COURT:  What I was thinking about doing was --

20   right now the way the Court -- because scheduling wise, I had

21   Fred Morgenstern scheduled to be sentenced first and David

22   second.  I have no problem with switching the order and just

23   scheduling Fred Morgenstern's sentencing for after David

24   Morgenstern's if that will help accomplish some of the -- or

25   reduce some of the concerns that Fred Morgenstern has.

1    MR. ROSEN:  Thank you, Judge.  I appreciate the

2  Court's attention to the request.

3    We had filed a motion for a continuance.  It's a

4  two -- sort of a two-part request.  Let me, if I may, enlarge

5  on it for one second.

6    One was that we do go after David Morgenstern.

7    And I think in all candor, Your Honor, the things

8  that I have to say on Fred's behalf are going to impact on

9  David as a person and I don't want that impact to cause any

10  damage to a sentence this Court is going to impose.

11    THE COURT:  That assumes that I can't separate the

12  two things.

13    MR. ROSEN:  Well, that's true.  That's very true.

14    The other part to the continuance was this:  We have

15  unearthed and are relying in large measure on the psychological

16  issue and Dr. Bourg Carter is in court today.

17    We had submitted a letter to Your Honor and to the

18  Government indicating a fundamental part of her discovery and

19  her findings with regard to Fred Morgenstern.  We are

20  requesting an opportunity to have -- because we just discovered

21  this -- and because it goes to the heart of Fred's sentencing,

22  I believe -- an opportunity to be in a position to present to

23  the Court a greater degree of depth, and should the Court have

24  any doubt about the testimony, a greater ability to present

25  evidence and testimony to support it.  It will go to the heart

1    of our 5K2.0 request.

2          The other aspect -- I guess there is a third aspect

3    to it, Judge, and that's this -- although I -- I mean this

4    particular request goes a little bit -- well, it is what it is.

5    Mr. Morgenstern's wife -- as the Court is aware -- has had some

6    serious alcohol issues and is supposed to be in residential

7    treatment. She has not yet been admitted, but she expects to

8    be. One of the requests I am going to make is that Mr.

9    Morgenstern have an opportunity to remain on house arrest after

10   sentence is imposed to take care of his children --

11         THE COURT: I usually don't do that.

12         MR. ROSEN: I know that.

13         And he is prepared to surrender today. We are well

14   aware of the Court's policy.

15         I don't know how that factors into our request for a

16   continuance.

17         But, yes, we would like to go after David.

18         Yes, we would like more time to complete our -- and I

19   am happy to make a showing to the Court as to where it's going

20   and why we believe it's necessary.

21         And I just want to make the Court aware as well that

22   a last ground is the welfare of Fred's children.

23         THE COURT: What's the Government's position on the

24   motion to continue?

25         MR. MCCORMICK: Your Honor, we oppose the motion to

1    continue.

2            THE COURT:  What's your position on my having Fred

3    Morgenstern's sentencing after David Morgenstern's if I deny

4    the continuance today?

5            MR. MCCORMICK:  Your Honor, it's at the Court's

6    discretion.  We have no position.

7            THE COURT:  Anything else, Mr. Rosen?

8            MR. ROSEN:  No, Your Honor.

9            THE COURT:  When would the Government estimate that

10   David Morgenstern's sentencing would be done so I can have

11   everybody come back on Fred's?

12           MR. MCCORMICK:  Your Honor, the Court allotted 30

13   minutes and --

14           THE COURT:  I think I have erred in my judgment as to

15   how long these sentencing are going to take.

16           MR. MCCORMICK:  Your Honor, in terms of the

17   Government's presentation, it's not much longer than that.  I

18   have no idea how long David Morgenstern's presentation --

19           THE COURT:  How about your witnesses, Mr. Rosen?

20   What's that situation?

21           MR. ROSEN:  That's an issue.  I have three of them.

22   Of them one is a attorney.  One is a --

23           THE COURT:  Are they here now?

24           MR. ROSEN:  Yes, they are.

25           THE COURT:  Why don't we do this:  I have got some

1    9:00 o'clock hearings.  Let me take the 9:00 o'clock hearings.

2    And then I will hear the witnesses that you have here on Fred

3    Morgenstern.

4              MR. ROSEN:  Thank you.

5              THE COURT:  And then I will recess Fred Morgenstern's

6    sentencing and we will do David Morgenstern's sentencing and

7    then come back to Fred.

8              Okay?

9              MR. ROSEN:  Yes.

10              (Recess taken at 9:10 a.m. until 9:52 a.m.)

11              THE COURT:  United States versus Fred Morgenstern.

12    If counsel would announce their appearances for the record.

13              MR. MCCORMICK:  Brian McCormick, Diana Fernandez and

14    James Pavlock for the United States, Your Honor.

15              MR. ROSEN:  Michael Rosen on behalf of Fred

16    Morgenstern, Your Honor, who is present before the Court.

17              Your Honor, may I have leave to approach the bench

18    for a moment?

19              THE COURT:  Why can't you say it in open court?

20              MR. ROSEN:  I am going to request an in camera matter

21    and I would like to present to the Court a request for it.

22              THE COURT:  All right.

23              (Sidebar conference on the record.)

24              MR. ROSEN:  If it please the Court.

25              I have three witnesses.  One is Bill Norris.  That

1    matter need not be taken in camera.

2            The other is a fact witness as to a relationship that

3    he observed between Fred and David Morgenstern for seven years.

4    He is a fact witness that supports Dr. Bourg Carter.

5            I believe the Court knows Dr. Bourg Carter. She has

6    appeared before Your Honor before.

7            Judge, she is going to disclose physical,

8    psychological and sexual abuse imposed on Fred by David that

9    has never been revealed anywhere that I indicated to Your Honor

10   had just surfaced this weekend. As she said to me, this is raw

11   stuff. It's part of the aspect of -- or impact on David's

12   sentence -- but that's not my point. My point is we have

13   reporters here from the press. This may not be made public and

14   it is --

15           THE COURT: What's the basis for me closing the

16   courtroom?

17           MR. ROSEN: The level of personal embarrassment, the

18   level of exposure of the relationship between the parties that

19   I would prefer not be made a part of the record -- I am

20   sorry -- not be made public.

21           THE COURT: What's the Government's position?

22           MR. MCCORMICK: Your Honor, the U.S. -- the

23   Department Of Justice's policy is to oppose any closure without

24   the prior approval of a Deputy Attorney General. We don't have

25   that, nor would we seek it.

1      THE COURT:  I don't think I can close the courtroom.

2  I don't know what to suggest to you.

3      MR. ROSEN:  I can't go backwards.  I mean it's going

4  to be what it is.  It simply is -- it's pretty incredible

5  testimony, Judge.

6      And I just -- you know, I know that going in camera

7  is an unusual process and just the nature of it compels me to

8  ask the Court for leave to consider it.

9      THE COURT:  I don't think there is any way I can do

10  it at this late stage.  So the request is denied.

11      MR. ROSEN:  All right, sir.

12      MS. FERNANDEZ:  Your Honor, while we are here, if we

13  could also discuss Mr. Norris testifying.  It is the

14  Government's position -- at least talking to Mr. Rosen as far

15  as the potential testimony -- that his testimony would be

16  irrelevant.

17      THE COURT:  Then object to it when he testifies.

18      MS. FERNANDEZ:  Fine, Your Honor.

19      (End of sidebar conference.)

20      MR. ROSEN:  If it please the Court, Your Honor, at

21  this time we would call William Norris to the stand.

22      THE COURT:  Well, before we do that, there were a

23  couple of things I needed to go over.

24      One, given my ruling at sidebar, there is no reason

25  to seal that, is that correct?

```
 1              MR. ROSEN:  If that is your ruling, yes.

 2              THE COURT:  All right.  So there is no reason for my

 3    court reporter to seal that given my ruling, is that right?

 4              MR. ROSEN:  No, sir.

 5              THE COURT:  Okay.

 6              All right.  We are here today for Mr. Morgenstern's

 7    sentencing him having pled guilty to two counts, one in Case

 8    Number OO-6309 and one in 02-60101.  I adjudicated him guilty,

 9    deferred sentencing, ordered a Presentence Investigation Report

10    that I have received and reviewed.

11              Have counsel had an opportunity to review the

12    Presentence Investigation Report?

13              Mr. McCormick.

14              MR. MCCORMICK:  Yes, Your Honor, we have.

15              THE COURT:  Ms. Fernandez.

16             .MS. FERNANDEZ:  Yes, Your Honor, we have.

17              THE COURT:  Mr. Pavlock.

18              MR. PAVLOCK:  Yes, Your Honor.

19              THE COURT:  Mr. Rosen.

20              MR. ROSEN:  Yes, sir.

21              THE COURT:  Mr. Fred Morgenstern, have you read the

22    Presentence Investigation Report and discussed it with your

23    lawyer?

24              THE DEFENDANT:  Yes, I have.

25              THE COURT:  Okay.
```

1          All right.  We will go ahead and take the witnesses

2  that aren't available later on today and then we will recess

3  this hearing and do the other sentencing and then come back to

4  it.

5          MR. ROSEN:  Your Honor, there was one matter I think

6  I needed to do just to preserve the record.

7          I am concerned that the Court has employed an

8  incorrect standard on the recusal motion and I just wanted to

9  note an objection to that.

10          THE COURT:  Okay.

11          MR. ROSEN:  Thank you, sir.

12          And we appreciate your accommodating our witnesses.

13          MS. FERNANDEZ:  Your Honor, as I indicated, the

14  Government is objecting to the testimony of this witness.

15          THE COURT:  I don't even know what he is going to

16  say.

17          When he asks questions and if you think they are

18  objectionable, then object.

19          WILLIAM M. NORRIS, DEFENDANT'S WITNESS, SWORN.

20          THE CLERK:  Please state your name and spell it for

21  the record.

22          THE WITNESS:  My name is William M. Norris,

23  N-o-r-r-i-s.

24                      DIRECT EXAMINATION

25  BY MR. ROSEN:

1    Q.    Good morning, Mr. Norris.

2    A.    Good morning.

3    Q.    Thank you for being here, sir.

4          Would you state your occupation?

5    A.    I am an attorney.

6    Q.    Have you represented Fred Morgenstern in this matter?

7    A.    I have.

8    Q.    Were you court appointed to do so?

9    A.    I was.

10   Q.    Did there come a time that Mr. Morgenstern was returned to

11   South Florida to enter a -- to appear before Judge Dimitrouleas

12   on an Information and an outstanding Indictment?

13   A.    There was a time we were present in court to enter a plea

14   pursuant to a negotiated Plea Agreement.

15   Q.    What were the terms of the negotiated Plea Agreement at

16   this point in time?

17   A.    It was a complicated Indictment, and the essential outline

18   of the Plea Agreement was that Fred Morgenstern and David

19   Morgenstern would be permitted to go to South Carolina to

20   tender substantial assistance to the Government in exchange for

21   a plea to a part of the Indictment that the Grand Jury had

22   returned and a Superseding Information.

23   Q.    Are you aware of what happened in those -- in South

24   Carolina?

25         MS. FERNANDEZ:  Objection, Your Honor.  It's

1    irrelevant.

2              THE COURT:  What's the relevance, Mr. Rosen?

3              MR. ROSEN:  It's just a matter of point in time,

4    Judge.

5              THE COURT:  I sustain the objection.

6              MR. ROSEN:  I can move on.

7    Q.    Did there come a point in time that Fred Morgenstern came

8    back to South Florida?

9    A.    There did.

10   Q.    And were you still his counsel?

11   A.    Technically, no.  I had been court appointed and the

12   appointment had terminated, but I continued to act in an

13   advisory attorney capacity.

14   Q.    Did you actually appear with Mr. Morgenstern as his

15   counsel to enter a change of plea?

16   A.    That was before.

17   Q.    Back in (unintelligible)?

18   A.    Yes, I did.

19   Q.    Okay.

20             At the time that you were his counsel where there was

21   a change of plea, was that a plea to an Indictment or an

22   Information and an Indictment?

23   A.    Both.

24   Q.    On that day -- the day of the change of plea -- was Mr.

25   Morgenstern in custody?

1   A.   He was.

2   Q.   When had been the last time that you had spoken to Mr.

3   Morgenstern before that day?

4            MS. FERNANDEZ:   Your Honor, objection as to

5   relevance.

6            THE COURT:   What's the relevance, Mr. Rosen?

7            MR. ROSEN:   The relevance is to establish a lack of

8   communication between Mr. Norris and Mr. Morgenstern --

9            THE COURT:   What's the relevance of that for

10  sentencing?

11           MR. ROSEN:   Well, the relevance of his testimony is

12  it goes to the issue of the -- part of the omnibus motion where

13  we are seeking the Court to depart under 5K2.0 for the failure

14  of Mr. Norris to discuss with Mr. Morgenstern the Sentencing

15  Guidelines on the Information that he pled to.

16           THE COURT:   It sounds to me like ineffective

17  assistance of counsel, not a reason to depart downward.

18           MR. ROSEN:   Well, it's a -- it is an ineffective

19  assistance of counsel --

20           THE COURT:   You haven't filed any motion to withdraw

21  the plea, have you?

22           MR. ROSEN:   No, we have not.

23           But we believe that the Court can entertain this as

24  an analysis of whether or not the Sentencing Guidelines and the

25  plea to the Information and the impact of that on today's

1    sentence is a 5K2.0 basis to depart.

2          THE COURT:  Ms. Fernandez.

3          MS. FERNANDEZ:  Yes, Your Honor.

4          It's the Government's position that this would be no

5    basis under 5K2 whatsoever and, therefore, the testimony is

6    totally irrelevant.

7          As the Court pointed out, it might be the basis if it

8    were going to be anything for a motion to withdraw the plea or

9    some claim of ineffective assistance, but that's not a basis

10   for a departure of any sort, and that's why we ask that the

11   witness' testimony be rejected.  There is nothing relevant that

12   this witness can say on the issue of sentencing.

13         MR. ROSEN:  I think, Your Honor, under the Koon

14   analysis there is nothing prohibited by this testimony and the

15   Court may choose to reject it or find that it is insufficient,

16   but certainly it is a factor that is not in any way rejected.

17         THE COURT:  This isn't like the death penalty where

18   you have to consider all mitigation.  It has to be something

19   that's relevant to mitigation.  And I am having a tough time

20   understanding how the question about whether he understood the

21   guidelines is relevant to mitigation.

22         MR. ROSEN:  It goes to the following issue, Your

23   Honor:  It's not whether Mr. Morgenstern understood the

24   guidelines.

25         The proffered testimony of Mr. Norris is that Mr.

1  Norris in negotiating a plea for Mr. Morgenstern failed to look

2  at the Sentencing Guidelines, failed to discuss it with his

3  client, on the belief that the money side of this case was

4  going to drive the punishment beyond the statutory maximum.

5  That turns out not to be the case.

6         And that as we postured in our pleading, the result

7  of this is a three-level difference in the offense -- base

8  offense level for Fred Morgenstern.

9         If, in fact, the Court takes into consideration that

10  this was essentially either an uncounseled plea or a plea by

11  which Mr. Morgenstern did not have full information, we

12  respectfully submit that the guidelines would permit the Court

13  to take that into consideration in determining whether or not

14  the base offense level ought to be departed downward.

15         THE COURT:  I think that's a motion to withdraw a

16  plea in sheep's clothing and I sustain the objection.

17         MR. ROSEN:  May we -- since Mr. Norris is here --

18  make a proffer or complete the testimony to this issue so --

19         THE COURT:  You can proffer the testimony.

20         MR. ROSEN:  All right.

21         Your Honor, it's our proffered testimony that when

22  Fred Morgenstern entered a plea of guilty to the Information,

23  that Mr. Norris had not studied or reviewed the Sentencing

24  Guidelines as to the Information.  The result of that is that

25  Mr. Morgenstern has ended up pleading to a base offense level

1    of 20, rather than 17; that had there been a time studied

2    phonetic) that the end result of it -- of the plea would have

3    been this:  That the Information contains an underlying

4    criminal act of a violation of 1956 money laundering.

5              As the Court may recall, the Information was a 1952

6    travel in aid of racketeering, and it was a plea specifically

7    oriented toward the underlying criminal activity and not the

8    racketeering aspect of it.

9              The Government requested a 1956 underlying act.

10             The Indictment was agreed to by the parties to be a

11   1957 violation.  The consequence of that, of course, was you

12   have a ten-year cap on 1957 and the racketeering statute gave a

13   five-year cap.  That's what everyone was looking at.  But no

14   one looked at the guidelines -- at least nobody on behalf of

15   Fred.  The guidelines become a 1956 guideline.  And that's why

16   the base offense level today is 20, rather than 17.

17             If Mr. Norris were to testify, he would testify that

18   he did not look at the Sentencing Guidelines; that the

19   assumption was that the money was going to drive this beyond 15

20   years; that, in fact, it does not drive it beyond 15 years.

21             And, therefore, Fred Morgenstern has been prejudiced

22   by a failure of his counsel to review the Sentencing

23   Guidelines.

24             And what we are asking the Court to do based upon

25   that proffered testimony would be to consider reducing the base

1    offense level by three points.

2              THE COURT:  Okay.

3              And do we need Mr. Norris for anything else?

4              MR. ROSEN:  No.  That would be his testimony, Your

5    Honor.

6              THE COURT:  I appreciate you coming in today, Mr.

7    Norris.

8              THE WITNESS:  May I be excused, Your Honor?

9              THE COURT:  Yes.

10             Next witness.

11             MR. ROSEN:  Ormando Gomez.

12             ORMANDO GOMEZ, DEFENDANT'S WITNESS, SWORN.

13             THE CLERK:  Please state your name and spell it for

14   the record.

15             THE WITNESS:  Ormando Gomez, O-r-m-a-n-d-o G-o-m-e-z.

16                         DIRECT EXAMINATION

17   BY MR. ROSEN:

18   Q.   Mr. Gomez, do you know Fred Morgenstern?

19   A.   Yes.

20   Q.   Do you know David Morgenstern?

21   A.   Yes.

22   Q.   Do you see both of them in court?

23   A.   Yes.

24   Q.   Where did you meet Fred Morgenstern?

25   A.   I met him at Eglin federal prison camp.

1   Q.   And where did you meet David Morgenstern?

2   A.   At Eglin federal prison camp.

3   Q.   How long were you in jail together with Fred and David

4   Morgenstern?

5   A.   Together with both of them?

6        About eight months -- six, eight months, I believe.

7   Q.   Okay.

8        And how long -- were you in jail longer with one or

9   the other of them?

10  A.   Yes.

11  Q.   Which one?

12  A.   Fred.

13  Q.   How much longer?

14  A.   I was in jail with Fred maybe a year-and-a-half, two years

15  total.

16  Q.   After you got out of jail, did you see Fred and/or David?

17  A.   Yes.

18  Q.   When and where?

19  A.   I don't recall where specifically, but it was in the state

20  of Florida.

21  Q.   Okay.

22       What were the circumstances?

23  A.   While we were in prison, me and Fred, we had been working

24  on some things together, some writings, and we met again to

25  talk and discuss those things.

```
 1   Q.    Okay.
 2              Did there ever come a point in time that you saw Fred
 3   after you got out of prison?
 4   A.    That I saw Fred after I got out of prison?
 5   Q.    Yes.
 6   A.    Yes.
 7   Q.    Did you ever work with Fred?
 8   A.    Yes.
 9   Q.    When did you go to work with Fred?
10   A.    I believe it was sometime in 1996, '97.
11   Q.    And would you tell the Court what you were doing?
12   A.    We were -- when we first went to work with him, they were
13   providing consulting services to companies.  They were doing --
14   raising capital for companies.
15   Q.    Are you saying them?
16   A.    David and Fred.
17   Q.    Okay.
18              So when you saw Fred, your point is that you saw both
19   Fred and David?
20   A.    Not the first time I saw him (phonetic), no.
21   Q.    Okay.
22              But as you worked with them in 1996 and '97, you
23   worked with both Fred and David?
24   A.    Yes.
25   Q.    Okay.
```

1       And how long did you work with Fred and David?

2   A.   I believe I worked with Fred and David up to -- I guess

3   maybe '98, '99.  I am bad with the time.

4   Q.   Okay.

5       So just to put a time parameter on this, you spent

6   approximately eight months at Eglin with both Fred and David?

7   A.   Yes.

8   Q.   And you spent two to three years with Fred and David after

9   that in '96, '97, '98 and '99?

10  A.   Yes.

11  Q.   So anywhere -- around that time period?

12  A.   To the best of my recollection, yes.

13  Q.   How often -- let's talk about the '96 to '99 time

14  period -- how often were you in the company of both Fred and

15  David?

16  A.   Frequently.

17  Q.   I need better.  What does "frequently" mean?

18       Everyday?

19  A.   Almost every day.

20  Q.   Almost every day?

21  A.   Yes.

22  Q.   For that entire --

23  A.   Weekdays.

24  Q.   For that entire time period?

25  A.   Yes.

30

1   Q.   Was the work that you did and any part of that work become

2   a part of this case?

3   A.   No, I don't believe so.

4   Q.   Okay.

5        Did you ever meet with anybody from the Government's

6   table here to provide information to the Government?

7   A.   I met with the Government, yes.

8   Q.   Do you remember who you met with?

9   A.   I met with, I believe, everyone that's here today --

10  Q.   Okay.

11  A.   -- at the table.

12  Q.   Okay.

13       Did you provide information to them?

14  A.   I answered their questions truthfully.

15  Q.   Okay.

16       I would like you, Mr. Gomez, to tell the Court what

17  you observed in your own words -- and I would like you to take

18  your time in doing it -- but I would like you to tell the Court

19  what you observed about the relationship of Fred and David

20  Morgenstern?

21  A.   Okay.

22  Q.   And you have to speak into the microphone, sir.

23  A.   From the beginning of seeing them together, the

24  relationship was what I would characterize as sort of -- while

25  they are twins -- I would categorize them as sort of mirror

1    twins.  Where one is very strong and dominant, Fred is -- in

2    that relationship -- when it relates to his brother was very

3    weak and submissive.  David always was the initiator or the

4    creator of the ideas, the leader of the ideas, and Fred always

5    was the man that would do whatever he was told by David.

6            I knew Fred well enough to know that he had the

7    capacity for judgment, but when it came to his brother, there

8    was never any judgment.  It was a blind faith.

9            And I have been thinking about how to say this and I

10   think a good way of saying it is that if David asked Fred to

11   jump off a mountain, Fred would not think that he was jumping

12   off the mountain to sacrifice himself for David, but he would

13   just simply think that David had done everything possible to

14   make sure that that landing was padded and safe.  And that type

15   of blind faith was so obvious in my dealings with them in

16   everything that related to them two together.

17           Fred outside the arena of David was totally

18   different.  He was strong.  He was forward.  But with David, he

19   was just very submissive, very -- whatever it was that David

20   wanted, Fred would do.

21   Q.   Let me direct your attention to the time that the three of

22   you were in jail together.  Can you give me examples of events

23   that you witnessed that caused you to come to this opinion or

24   this belief?

25   A.   In prison it was sort of a different observation.  In

```
 1    prison there was David basically (phonetic) isolated himself
 2    from Fred.  He didn't really have much of a relationship with
 3    Fred in prison.  He -- from my conversation with Fred, you
 4    know, Fred had to bear the responsibility and the blame from
 5    David of them both being in there.  So during that period of
 6    time there wasn't much that David -- I can't really recall --
 7    eventually David was asking Fred to do things and he was doing
 8    this.  It was just more of, you know, Fred's feelings about the
 9    way his brother was treating him.
10             MR. MCCORMICK:  Your Honor, at this point we are
11    going to object.  This witness is testifying as to what -- he
12    is speculating about things he knows nothing about, what Fred
13    is doing and thinking, and things like that.  There is no
14    relevance and it's inappropriate.
15             THE COURT:  I allow some latitude.
16    Q.   You had -- in discussing with me on the phone about their
17    time in jail, you had used an example with me of a battered
18    spouse.  You used that term.  A battered wife, I think you
19    said.  Can you repeat to the Court what your comment was and
20    why you came to that conclusion?
21             MR. MCCORMICK:  Your Honor, this witness isn't
22    qualified as an expert to come up with these conclusions.  We
23    object to the whole line --
24             THE COURT:  I think it goes to the weight.
25    Overruled.
```

```
 1   A.    It just was so -- there were so many times where I would
 2   see that David's relationship with Fred would be in a way that
 3   it would affect Fred negatively and he just kept going back.
 4   It didn't matter, you know, whatever David -- whatever the
 5   consequences were of his relationship with his brother, he
 6   would just go back.  He would just, you know, sort of that's
 7   why I characterized it like a (unintelligible).  There is some
 8   bond there that regardless of how you are being treated, you
 9   are going to continue to put up with it.  You are going to
10   continue to be in the relationship.
11   Q.    Do you have any idea what the bond is other than the fact
12   that they are mirror twins?
13   A.    (No response.)
14   Q.    Okay.
15         What about when you were out?  What events did you
16   see that you can relate to the Court about their relationship?
17   A.    Well, just in general.  Just in daily interactivity, David
18   would request something from Fred, and if there was anybody who
19   would try to create some rationale for it not being, you know,
20   rational what he is asking, Fred would reject it.  He would
21   just -- he was total blind faith of whatever David said to do,
22   Fred would do.
23   Q.    Did you ever see Fred question David?
24   A.    Never.
25   Q.    Did you see other people question David?
```

1    A.    Yes.

2    Q.    And what would happen when someone else would question

3    David?

4    A.    David is very intelligent.  He would bring forth a very

5    compelling argument and a very aggressive argument many times

6    and most times would have his way.

7    Q.    But in the five or so years that you were with the two of

8    them, you never saw Fred challenge David on any judgment that

9    David was asking Fred to do?

10    A.    Not that I could recall at the moment, no.

11    Q.    You testified a few minutes ago that all the ideas that

12    you observed were ideas that came from David and that Fred

13    would carry out those ideas?

14    A.    I said that where David is the initiator or the creator of

15    ideas, David -- Fred is the one who does whatever he is told.

16    Q.    All right.

17          Can you --

18    A.    I am not saying that all the ideas were created by David.

19    Q.    I understand.

20          Can you give us examples of what you are talking

21    about when you say that -- something that you saw?

22    A.    Well, in specific there was a company called Land Quest

23    (phonetic) that they were working on, and David had some ideas

24    of how the company should grow, and what elements were valid in

25    a balance sheet, and, you know, while those ideas may have been

```
 1    very irrational, Fred never -- even though he had the capacity

 2    to be able to judge it as irrational -- never questioned it.

 3    Q.    Did you observe whether or not in your opinion David

 4    Morgenstern exercised complete control over Fred Morgenstern?

 5    A.    He -- in my opinion --

 6              MR. MCCORMICK:  Your Honor, I object to this.

 7              THE COURT:  Sustained.

 8    Q.    What did you observe in terms of David controlling Fred?

 9    What did you see?  What did you hear?

10    A.    David would tell Fred --

11              MR. MCCORMICK:  Asked and answered, Your Honor.  This

12    has been asked and answered.

13              THE COURT:  I allow some latitude.

14              MR. ROSEN:  Thank you, Your Honor.

15    Q.    Go ahead, sir.

16    A.    David would ask Fred to do something and Fred would do

17    it.

18    Q.    Something, for example?

19    A.    For example, whatever was necessary on a balance sheet to

20    have been done, David would say get me an accountant, get

21    whatever.  Whatever he asked, Fred would do.

22    Q.    Did you ever see David blame Fred for situations they were

23    in?

24    A.    Yes.

25    Q.    Can you give us examples of what was said?
```

36

1    A.    I can't recall any specific example, but David would often

2    blame Fred for things that went wrong.

3    Q.    Did you see Fred ever battle back, disagree?

4          MR. MCCORMICK:  Your Honor, how this pertains to the

5    case (phonetic) -- I would object on relevance.

6          THE COURT:  My understanding is that they may call

7    another witness and this may be relevant to the other witness'

8    testimony.  So subject to it being tied up, you may continue.

9          MR. ROSEN:  Thank you, Your Honor.

10         And we don't have much more.

11   Q.    Did you ever see Fred challenge David -- I am trying to

12   recall my last question -- did you ever see Fred challenge

13   David in terms of any directions that David gave to Fred?

14   A.    I never saw Fred challenge him aggressively where he would

15   try to make his point over David's.  Not that I could recall at

16   least.

17   Q.    What you are describing, Mr. Gomez, was this a -- this

18   pattern that you are describing -- was this a usual pattern, a

19   constant pattern or an infrequent pattern?

20   A.    I think it's a pattern.

21   Q.    A pattern that occurred regularly?

22   A.    A pattern that occurred from the beginning to the end.

23         MR. ROSEN:  Thank you, sir.

24         THE COURT:  Cross examination.

25         MR. MCCORMICK:  I have just a few questions Your

Honor.

CROSS EXAMINATION

BY MR. MCCORMICK:

Q.    Good morning, Mr. Gomez.

A.    Good morning.

Q.    You cooperated with the Government because you were given direct use immunity, isn't that correct?

A.    That's correct.

Q.    And you were one of the individuals who was working at Merit Advisors or in the building during the period of time that the FBI was investigating Mr. Morgenstern, correct?

A.    Correct.

Q.    And you were present when the -- you were aware of the fact that on January 7th the FBI searched Merit Advisors and searched the cash checking store, which you are familiar with too?

A.    Correct.

Q.    And during that period of time, you had several conversations with Fred Morgenstern concerning the search -- searches -- did you not?

A.    Yes, sir.

Q.    You were pretty heated and upset with Fred Morgenstern because he had upset what you perceived to be your side of the business and nothing to do with Chemical Trust, correct?

A.    That's correct.

1  Q.   And you were quite angry and you exhibited that anger in

2  telephone conversations with Fred Morgenstern?

3  A.   Correct.

4  Q.   And were you blaming David Morgenstern during those

5  telephone conversations that caused disruption of your

6  business?

7  A.   No, I was not.

8  Q.   You were blaming Fred Morgenstern, weren't you?

9  A.   That's correct.

10  Q.   You were having direct conversations with Fred

11  Morgenstern?

12  A.   That's correct.

13  Q.   In fact, you finally got so exasperated on the telephone

14  that you said to Fred Morgenstern why could he be -- how can he

15  be so stupid as to get involved with these fraudsters

16  (phonetic) from South Carolina, didn't you?

17  A.   That's correct.

18  Q.   And you said that several times during a couple of

19  conversations, didn't you?

20  A.   I believe so, yes.

21  Q.   And finally Fred Morgenstern said to you -- well, first of

22  all, you said why didn't you stop at a million dollars.  And

23  what did Fred Morgenstern say to you when you said that to him?

24  A.   As I recall, something about because he needed to.

25  Q.   He said he needed the money, didn't he?

1    A.    Correct.

2    Q.    He said if you had the American Express bills I had,

3    $50,000 a month, that's why he was doing it.  Didn't he explain

4    that to you?

5    A.    Around that kind of conversation --

6    Q.    He said that to you?  He didn't say David made him do it?

7              MR. ROSEN:  Objection, Your Honor.  Give him a chance

8    to answer.

9              THE COURT:  Let's talk one at a time please.

10              MR. MCCORMICK:  I am sorry.

11   Q.    Go ahead.

12   A.    He did mention about credit card bills, yes.

13   Q.    And he didn't say that David made him charge those charges

14   and take the money to pay off those charges, did he?

15   A.    I don't recall he said that, no.

16   Q.    You don't recall or he didn't say it?

17   A.    I don't believe he said that, no.

18   Q.    You weren't with Fred and David all the time, were you?

19   You were just there in the office when they had interplay

20   between themselves after you both got out of prison -- all

21   three of you got out of prison, isn't that right?

22   A.    That's correct.

23   Q.    You don't know what they talked about or who controlled

24   who over the course of this conspiracy that they are charged in

25   this case, right?

1    A.    That's correct.

2    Q.    You don't have any real personal knowledge about how any

3    of the plans or implementations of the money laundering took

4    place between David and Fred, do you?

5    A.    I do not.

6    Q.    No idea whatsoever?

7    A.    Not whatsoever.

8              MR. MCCORMICK:    Excuse me one second.

9              (Pause.)

10   Q.    Just a couple more questions, Mr. Gomez.

11             There came a time that David Morgenstern even left

12   Merit Advisors and went to the Bahamas and Europe, isn't that

13   correct?

14   A.    Yes.

15   Q.    When was that?

16   A.    I don't recall the exact time.

17   Q.    Would you think it would be the late nineties, '97, '98?

18   A.    Late nineties, I believe.

19   Q.    So you saw him only infrequently after that, right?

20   A.    That's correct.

21   Q.    So when you were saying -- testifying with Mr. Rosen, you

22   weren't meaning to say you saw them everyday for a period of

23   two or three or four years?  That's not correct, is it?

24   A.    During the earlier years, I saw them.

25   Q.    For a couple of years?

1  A.    A couple of years, yes.

2  Q.    But when -- the time period covered in this Indictment

3  was, I believe -- in terms of this specific money laundering

4  charge -- was '99 --

5  A.    I wasn't around them at that time.

6  Q.    You weren't around at all?

7  A.    No.

8  Q.    So you have no feeling as to who was directing who or what

9  was being done?  Is that a fair statement?

10  A.    That's a fair statement.

11          MR. MCCORMICK:  Thank you.

12          THE COURT:  Redirect.

13          MR. ROSEN:  Just briefly.

14                    REDIRECT EXAMINATION

15  BY MR. ROSEN:

16  Q.    You saw them in prison for eight months?  Correct?

17  A.    I saw them in prison for eight months?

18  Q.    The two of them with you?

19  A.    I was in prison -- in that prison -- for approximately

20  eight months, I believe.

21  Q.    Okay.

22          But you saw both Fred and David for that period

23  together?

24  A.    Yes.

25  Q.    And you saw them at least a couple of years together on a

1    regular basis?

2    A.    Yes.

3    Q.    Daily, except for weekends?

4    A.    Yes.

5    Q.    Notwithstanding Mr. McCormick's questions to you, is there

6    anything about your observations or opinions that you developed

7    that you have testified to?  Does that change anything because

8    of what he has asked you?  Because of the questions Mr.

9    McCormick has asked you today, is there anything about your

10   testimony that you would change about what you observed?

11   A.    My testimony is to what I observed during the period of

12   time that I am mentioning.

13   Q.    Okay.

14   A.    But I did not observe anything during the period of time

15   of this incident.  So I can't -- so I am speaking as to my

16   observations prior to this incident.

17   Q.    Correct.

18           '96, '97, '98?

19   A.    That's correct.

20   Q.    When you and Fred had this conversation on the telephone

21   that Mr. McCormick was talking about, who was lashing out at

22   who?

23   A.    I think we were both lashing out at each other.

24   Q.    Okay.

25           Did you accuse Fred of doing something wrong?

43

1   A.   I don't know if the word is "accused," but I certainly

2   brought up that he has done something wrong.

3   Q.   And his response was something to the effect of, you know,

4   if you had the $50,000 American Express bills that I had, some

5   comment to that regard?

6   A.   That's correct.

7   Q.   Do you know whose $50,000 American Express bills those

8   were?

9   A.   No, I do not.

10           MR. ROSEN:   Thank you, Mr. Gomez.

11           THE COURT:   Thank you, sir.  You may step down and

12   you are excused.

13           Mr. Rosen, you may call your next witness.

14           MR. ROSEN:   Thank you, Your Honor.

15           Either for the record or for the Court's

16   reconsideration, I would renew my request to go in chambers.

17           THE COURT:   I don't think there is a legal basis for

18   it.

19           SHERRIE BOURG CARTER, DEFENDANT'S WITNESS, SWORN.

20           THE CLERK:   Please state your name for the record and

21   spell it, please.

22           THE WITNESS:   Sherrie Bourg Carter, B-o-u-r-g

23   C-a-r-t-e-r.

24                    DIRECT EXAMINATION

25   BY MR. ROSEN:

1    Q.    Good morning, Dr. Bourg Carter.

2    A.    Good morning.

3    Q.    I had handed the Government earlier today and just handed

4    the Court a ten page Curriculum Vitae.

5            If you will briefly go into your background and we

6    will see if the Government has any objection to your testifying

7    as an expert today?

8            MR. MCCORMICK:  We are not going to object to this.

9            THE COURT:  The Court is familiar with Dr. Bourg

10   Carter's qualifications.  I will accept her as an expert.

11           MR. ROSEN:  Thank you, Your Honor.  And thank you,

12   Mr. McCormick.

13   Q.    Did there come a time recently, Doctor, that I requested

14   that you test Fred Morgenstern?

15   A.    Yes.

16   Q.    Do you recall the date when you actually did that?

17   A.    3/27 of 2003.

18   Q.    Did there come a time that I requested a follow-up

19   interview of Fred Morgenstern?

20   A.    Yes.

21   Q.    Do you have the date for that?

22   A.    4/11 of 2003.

23   Q.    Can you discuss the procedures that you employed to

24   conduct your evaluation of Mr. Morgenstern?

25   A.    Sure.

1    Initially on 3/27/03 I administered some

2  psychological testing of Mr. Morgenstern.  Specifically I gave

3  him what's known as the Millon Clinical Multi-Axial Inventory

4  3, which I will refer to as the MCMI-3.

5    I also had my colleague, Dr. Michael Brannon,

6  administer the Gudjonsson Suggestibility Scales and the

7  Gudjonsson Compliance Scales.

8  Q.   Having conducted those procedures, did you come to a

9  diagnostic conclusion as to Mr. Morgenstern's mental condition?

10  A.   No, not at that time.  I had not -- I had briefly met with

11  him in my office, but I -- as I had explained to you when I

12  initially took the case -- I needed to see what the

13  psychological testing results came back as in order to see if I

14  would be of any help at all.

15  Q.   Thank you.

16    MR. ROSEN:  Your Honor, may we have the C.V. admitted

17  as Defendant's Exhibit 1 for the sentencing hearing?

18    THE COURT:  Okay.  That will be Defendant's Exhibit

19  1.  You will need to mark it.

20    MR. ROSEN:  Thank you, Your Honor.

21    (Defendant's Exhibit 1 was marked in evidence.)

22  Q.   What happened next in terms of your analysis of Fred

23  Morgenstern?

24  A.   I scored and interpreted the psychological test resu

25  and then contacted you to discuss the results and deter

1   there -- if you wanted to go any further with the evaluation.

2   Q.   Did you reach any conclusions at that time?

3   A.   Only that you wanted to pursue additional work on the

4   case, but I didn't come to any diagnostic conclusions.

5   Q.   What happened next then?

6   A.   Then Mr. Morgenstern came into my office on 4/11 of 2003

7   for the interview work.

8   Q.   How long was he there for, Doctor?

9   A.   An hour-and-a-half.

10  Q.   Can you relate to the Court the nature of your

11  conversations with Fred Morgenstern?

12  A.   Sure.

13          It was a clinical interview where I obtained

14  information about his background, his family history,

15  educational history, general background information, and then

16  spoke to him specifically about his relationship with his

17  brother David.

18  Q.   And why did you do that?

19  A.   Because that was the issue that you felt was relevant to

20  the case you were presenting in front of the court.

21  Q.   Okay.

22          And can you tell us about those conversations?

23  A.   Sure.

24          Mr. Morgenstern described himself as David's mirror

25  twin and he explained that as being that whatever David is, he

1    feels like he is the opposite of that; that he is very passive

2    in his view of himself and --

3    Q.   "He" being?

4    A.   Mr. Morgenstern -- Fred.

5         I am going to say Fred and David.  It can be

6    confusing if I don't.

7         Fred is very passive.  He finds his brother to be

8    very dominant and domineering and controlling.  He said that it

9    has been that way since his earliest memory of their

10   relationship; that Fred -- that David was a very popular

11   person, and he, Fred, was not a very popular person.  David had

12   all the dates, had all his friends all around him, and he

13   seemed to have everything, whereas Fred like he was inadequate

14   and didn't -- wasn't as popular certainly (phonetic).  He said

15   that continued throughout childhood and then it continued into

16   adulthood.

17        He said that he feels like the many things that

18   happened in his life with David, he was always the one doing

19   the bidding (phonetic) of David, but David was the one who

20   would come up with the great ideas and the creative ideas and

21   he would implement them.  He, Fred, would implement them.

22   Q.   Did the conversation reach into any areas of abuse between

23   Fred and David?

24   A.   Yes.

25   Q.   Okay.

48

1          Can you tell us about that, please?

2    A.    Initially Fred indicated that his brother was verbally

3    abusive and demeaning to him throughout their relationship, and

4    that there were also periods in time where David would hit him,

5    push him, shove him, things like that.

6          At the very end of the interview, he described a

7    period in his childhood where David also sexually abused him.

8    Q.    Can you describe to us, please, what it was that Fred told

9    you?

10   A.    He said that it started when they were about eleven years

11   old and that his brother would sexually molest him, convince

12   him to engage in sexual activity between the two of them.    It

13   did involve intercourse and that --

14   Q.    Did or do not?

15   A.    It did, he said, involve intercourse.

16   Q.    Okay.

17   A.    And that there were two or three other boys that David

18   brought into that where they were all having sex at the age of

19   eleven.

20   Q.    Did you pursue the conversation with him?

21   A.    I tried to pursue the conversation with him.    He said it

22   right at the end of the interview.    And he was very

23   uncomfortable with it.    And then when I tried to get more

24   information about it, he said I don't want -- I have never said

25   anything like that before to anybody.    I have alluded to it to

1    my therapist -- who was a Dr. Dianne Abdo, he said -- but I

2    have never said anything about it and I don't want to talk

3    about it.  I don't want it to be brought up with anybody

4    else -- including used in the courtroom today.

5    Q.    Including being used in the courtroom today?

6    A.    Correct.

7    Q.    Including sharing it with me?

8    A.    Correct.

9          But I explained to him that I had to share it with

10   you; that you and he could make the decision whether it would

11   be testified to in court, but that I couldn't keep it from you.

12   Q.    His request was that it not be shared with me?

13   A.    Correct.

14   Q.    How long have you been practicing your art or your

15   science, if you will?

16   A.    Thank you.

17   Q.    You are welcome.

18   A.    1994 is when I was licensed.  I have been practicing in

19   the field of psychology before 1994, but as a licensed

20   psychologist, as a doctor, since 1994.

21   Q.    Are you experienced in the area of what I would

22   call "malingering"?

23   A.    Yes.

24   Q.    In English, faking?

25   A.    Yes.

1    Q.    Have you even testified in front of this Court on those

2    issues before?

3    A.    Yes.

4    Q.    Do you recall an incident where you were appointed by

5    Judge Dimitrouleas and you came back with a finding that the

6    defendant was malingering?

7    A.    Yes.

8    Q.    Do you hesitate where you find it and believe it to be so

9    to call it "malingering"?

10   A.    Not at all.

11   Q.    Okay.

12         Do you believe Fred was malingering or faking with

13   you?

14   A.    There was no evidence in the way he disclosed the

15   information, nor in the way he wanted to conceal it, that would

16   suggest malingering.  Malingerers tend to want to exploit their

17   lives and their faking.  They want everybody to know about it

18   because they think it can help them in some kind of way, such

19   as in a criminal case where they may be sentenced, where there

20   may be consequences.

21         That wasn't the case in this situation.

22         And in addition do that, when I spoke to other

23   sources of information -- because I initially met with Fred and

24   then spoke with collateral sources -- when I broached the issue

25   of sexual abuse, they were not surprised.  They suspected that

1    something strange was going on in their relationship.

2    Q.    In our conversations, we discussed whether or not it was

3    psychologically necessary to bring out the sexual abuse and

4    whether we could limit your testimony to physical or emotional

5    abuse, did we not?

6    A.    Yes.

7    Q.    And you indicated to me your opinion about why the sexual

8    abuse is a fundamentally different situation than physical and

9    emotional abuse?

10   A.    Yes.

11   Q.    Can you tell the Court what that conversation is and what

12   your opinion is in that regard?

13   A.    Because typically victims of sexual abuse tend to be more

14   scarred by it, tend to be more effected by that in their

15   relationship with others, and based on the test data and the

16   collateral interview information I was obtaining, it seemed

17   central to the development of the disorder that I eventually

18   diagnosed Fred with.

19   Q.    Okay.

20         Tell us about your other interviews with other

21   people?

22   A.    I interviewed two work related collateral courses, Jason

23   Crossen and Ormando Gomez.  I then interviewed Mr.

24   Morgenstern's father, Harold.  And I was able to track down

25   Dianne Abdo and interviewed her as well.

1   Q.   That is Fred's therapist in the nineties?

2   A.   It was his therapist in the late nineties.

3   Q.   All right.

4           Would you tell us about your discussions with Mr.

5   Crossen and Mr. Gomez.

6   A.   Mr. Crossen and Mr. Gomez provided information based on

7   their experiences with the twins work related.  They both knew

8   them in the context of work.  They both described the same

9   exact thing, but independently --

10          MR. MCCORMICK:  Excuse me.

11          I would object to the testimony or opinions of Mr.

12  Crossen because it's too attenuated and there has to be some

13  modicum of credibility or --

14          THE COURT:  I assume that these are matters that an

15  expert regularly relies on in formulating an opinion.  So I

16  will allow it.

17  Q.   Go ahead, ma'am.

18  A.   They both described the relationship between the twins as

19  being one in which David was very domineering, very

20  controlling, and Fred was very passive, submissive and

21  compliant.  Basically they described a situation where David

22  would demand something or request something and that Fred would

23  get it done.

24          Ormando was more detailed about the situation,

25  explaining that he saw that pattern over and over again as you

1  heard him testify in court today; that Fred seemed completely

2  controlled by David and seemed -- he had witnessed also -- he

3  told me -- verbal abuse on the part of David toward Fred and

4  some physical abuse where he observed Fred being pushed by

5  David.

6  Q.   These are as grown men now?

7  A.   As grown men, yes.

8  Q.   Okay.

9        Before I go on to the father and the doctor, is there

10  anything else about your interviews with them that you --

11  A.   Just some -- you know -- some interesting words Ormando

12  chose to use -- Mr. Gomez chose to use.  He described David as

13  the commander, the general, the dictator or master manipulator,

14  and Fred as the soldier who did what David wanted, and said

15  that he was astounded by what he believed to be Fred's

16  intelligence, yet his complete lack of judgment when it came to

17  making a decision about something David wanted him to do.  He

18  said he trusted his brother implicitly, and that no one ever

19  questioned David, and particularly Fred never questioned

20  David.  He said it just appeared that he dispensed of all

21  common sense with his brother and he never said no to David.

22  That's the way they described -- again, Mr. Gomez more

23  specifically, but they both described that type of relationship

24  between Fred and David.

25  Q.   You had heard me ask Mr. Gomez in court whether -- about

54

1   the phrase "battered wife syndrome," language that he had used

2   with me on the telephone because you were in court, correct?

3   A.   Yes.

4   Q.   Does that description fit into the pattern that you were

5   developing in terms of observing Fred's personality?  I may not

6   be asking that artfully or properly, but --

7   A.   I didn't assess for battered spouse syndrome.  Obviously I

8   didn't assess for that.  But the dynamics between the two are

9   consistent with the dynamics that are often seen between a

10  battered spouse and their abusive partner.  I do a lot of work

11  with domestic violence and battered spouse syndrome, so I am

12  familiar with the dynamics.  And although I wouldn't call him a

13  battered spouse, it's not appropriate, it wouldn't apply in

14  this case, the dynamics between the relationship are similar.

15  Q.   Okay.

16           You spoke to Harold Morgenstern, the father?

17  A.   Yes, I did.

18  Q.   Did he add anything to your input and information?

19  A.   Again, very consistent information that I was finding out

20  from psychological testing, my interview with Mr. Morgenstern

21  and the other two collateral sources that I had then had the

22  opportunity to speak to.  He described his son David as very

23  popular, very good in almost everything he undertook.  He was

24  very well respected on the football team, for example, when

25  they were growing up.  He described David as a more aggressive

55

1   type, going after things that he wanted, and Fred as more

2   passive.  He described David as dominant and Fred as not being

3   as dominant.

4          And he said that David tended to be the one who had

5   all the original ideas, who would come up with all the

6   creativity.  He was extraordinarily adept at speaking -- David

7   was according to their father -- and much more demanding and

8   controlling in relationships than Fred was.

9   Q.   And what about Dr. Abdo?

10  A.   She was the last source that I had the opportunity to

11  speak to   She explained that it had been a while since she had

12  seen Mr. Morgenstern and that her records because of the time

13  frame involved were in storage, but she did remember him and

14  she did remember the gist of their therapeutic relationship and

15  what the primary concerns were that Mr. Morgenstern went in to

16  see her about.  She said that the therapy was, to the best of

17  her recollection, in the late 1990's and lasted for at least a

18  year.

19  Q.   And tell us what her recollection was of Fred and if she

20  got into a discussion of Fred and David and their relationship?

21  A.   She said that the bulk of the time spent in the therapy

22  was discussing Mr. Fred Morgenstern, her client's difficulty

23  and concerns and depression and despondency over the problems

24  he felt were present in his relationship with David.  She said

25  that he, Fred, is -- has some very strong dependency issues,

1    not just in his relationship with David, but also in his

2    relationship with everybody else that she could -- that they

3    addressed in the therapy, and that he came into treatment

4    because of the relationship issues.

5         When you see someone with this type of dependent

6    personality -- which I am sure we will get into in a moment --

7    they aren't comfortable in the relationships that they have

8    with others.  They don't like their dependency, but they don't

9    feel like they can do anything about it.  That's just the way

10   they relate to others.

11        And so it's not surprising to see that he went into

12   therapy because he was distressed over how his relationship

13   seemed to be turning out again and again.

14        But she described him as a person who trusted when he

15   should not have trusted in a blind faith type of way.  She said

16   that he has strong needs to be valued, and particularly to be

17   valued by his brother David, and that because he wanted to be

18   valued so much and loved so much by his brother, that she would

19   find that he would oftentimes put himself in very vulnerable

20   situations because he wanted his brother just to love him and

21   to value him, and that she felt that he lived in the shadow --

22   these are her words -- lived in the shadow of his brother.

23        She said that he recounted many experiences to her

24   knowledge of emotional abuse where he felt he was being

25   emotionally and verbally abused by his brother and would go

1    back well into their early childhood and describe times where

2    he felt that David was abusive towards him, and she felt that

3    the emotional wounds that he suffered early in life and in

4    those relationships led him into other relationships where he

5    had very low self-esteem, was very passive, very easily

6    dominated by other people. She said his self-perceptions in

7    her treatment of him were very much damaged.

8    Q.    Let me digress for one moment.

9         One of the things that we had asked for in our

10   pleading before the Court was some additional time for you to

11   do some additional work.

12        What do you feel would be beneficial to you adding to

13   what you have already have concluded in this matter?

14   A.    The issue of getting the years worth of therapy records

15   could potentially be beneficial because there -- as Dr. Abdo --

16        MR. MCCORMICK:  I object to this line of questioning.

17   It's irrelevant to the purposes of this witness' testimony.

18   The Court has denied the continuance --

19        THE COURT:  I agree.  Sustained.

20        MR. ROSEN:  Your Honor, I think --

21        THE COURT:  You can proffer what her answer would be.

22        MR. ROSEN:  All right.

23        My understanding is that Dr. Bourg Carter would like

24   access to the written therapy records of Dr. Abdo to look for

25   additional information beyond that which has already been

1   provided to her to perhaps find beyond what conclusions she is

2   going to reach today other psychological matters that may aid

3   this Court in sentencing.

4           THE COURT:   Okay.

5   Q.   Is that a fair assessment of --

6   A.   Yes.

7   Q.   Okay.

8           As a result of all of the input that you have

9   testified to, Dr. Bourg Carter, did you reach a conclusion as

10  to whether or not Fred has psychological issues?  And I

11  apologize.  I don't how to say it better.

12  A.   He has a diagnosis.

13  Q.   What would the diagnosis be?

14  A.   In my opinion he suffers from what is known as a dependent

15  personality disorder.

16  Q.   And would you tell us what a "dependent personality

17  disorder" is?

18  A.   It's a maladaptive, pervasive pattern of relating to

19  others in relationships -- close relationships --

20  Q.   I am sorry.

21          Maladaptive --

22  A.   Pervasive pattern of relating to other people, close

23  relationships, where these personality types tend to follow the

24  lead of others in forming most of their opinions and beliefs,

25  not only about the world, but about themselves, and although

1    they are not comfortable typically with their relationship with

2    others and tend to become depressed and unhappy over it, they

3    don't really confront other people.  They just tend to be

4    submissive and dependent in those relationships, and they are

5    not happy about it, but they live with it because they are

6    scared that if they don't, they are going to lose that person

7    completely.

8    Q.    So that this dependent personality disorder is one across

9    the board in a person's relationship with other people?

10   A.    With people that they -- not with associates, for the most

11   part, but with people that they have some connection to.  When

12   they establish a close relationship with someone, they are

13   going to be dependent in that relationship.

14   Q.    Would that include Fred's wife, Fred's children, Fred's

15   family?

16   A.    Yes.

17   Q.    Did you find any evidence that Fred's relationship with

18   his brother David has been affected by this dependent

19   personality?

20   A.    Certainly every single source of information that I was

21   able to obtain prior to coming here to court would be

22   consistent with a dependent personality disorder.  In fact, Dr.

23   Abdo had diagnosed him with that dependent personality disorder

24   when she was treating him back in the late 1990's.  And every

25   source of information certainly provided information suggesting

60

that his dependency did substantially impact his relationship

with David.

Q.    What impact would the sexual abuse have on this situation

as a grown man today?

A.    Well, it's --

Q.    Speaking specifically of the relationship between Fred and

David.

A.    It's a very -- sexual abuse is hard to explain in a few

minutes of testimony, but it -- when children are sexually

abused, they tend to interact in the remainder of their

relationships in ways that -- it's hard to explain in just a

few sentences.  I am trying to do it in just a few sentences.

Q.    You don't need to do it -- I mean this is -- Fred is

looking at 15 years, and the Judge is being kind with his time,

but take your time to do it the way it ought to be done,

please.

A.    Okay.

        Sexually abused children often have damaged

self-percepts.  They don't feel that they are worthy of

relationships.  They don't feel valued in relationships.  They

want to be very valued in relationships, but they feel like

they are damaged goods.

        With that overlay of childhood when he reports being

sexually abused, and all the other dynamics that were going on

between the two twins -- it wasn't just the sexual abuse, but

1  that and the popularity contest that seemed to be going on, and

2  Fred was definitely losing that -- all of that I think

3  overshadows how he developed his personality, and he then

4  became more submissive in relationships, more dependent in

5  relationships, and very much wanted to get the love of David

6  for who he was and not necessarily what Fred could provide to

7  him.  Not just a physical object or a sexual object.  He wanted

8  to be valued for himself -- for Fred -- and I don't think that

9  ever happened.  Doctor Abdo commented upon that several times

10 in our conversation that he always seems to want David's love

11 and wanted to be valued by David, but he never felt that he was

12 ever loved or valued by David, but he was striving to

13 achievement that over and over again, making some very bad

14 judgments in her opinion and some very bad decisions because he

15 continually wanted the approval of his brother.

16         And she too interestingly independently of the other

17 witnesses I spoke to described Fred as the soldier and the way

18 he described David in his work with her because Dr. Abdo -- let

19 me make it clear -- never met David, but she said that Fred

20 described his role in his life as the general and David as --

21 and Fred as the soldier, and that he -- in her work with him,

22 she never saw Fred as being a leader, more of a follower, and

23 that he could be manipulative, she said, but he could not be a

24 general.  It's not his personality she said.

25 Q.   Fred is a 54 year old bright man?

1   A.   I didn't do intelligence testing with him, but he -- just

2   based on his vocabulary and his English -- the structure of his

3   language -- he seems to be at least above average in

4   intelligence.

5   Q.   And this dependent personality disorder, would that

6   prevent Fred from conducting himself in a business fashion or

7   in a social setting or in society in a regular functioning

8   fashion outside the world of David Morgenstern?

9   A.   No.  People with personality disorders don't -- they are

10   not psychotic.  It's not like you would notice just from

11   talking to them that they have a mental disorder.

12   Q.   So they could function and operate like a regular person?

13   A.   Yes.

14   Q.   When Mr. Gomez was --

15   A.   Not like a regular person in their relationships, but like

16   a regular person in business matters and in conversations.

17   Q.   When Mr. Gomez was testifying, he used a phrase that I

18   thought was interesting and you were in court.  I would ask

19   your opinion of it.  He said if David told Fred to jump off a

20   mountain, it's not that Fred would do it blindly, but Fred

21   would trust the fact that David had taken care of the landing.

22   Can you comment on that testimony?

23   A.   That's exactly what every collateral source I spoke to

24   described the relationship as.  They didn't use that analogy,

25   but they did say that they have seen a very intelligent person,

1   Fred Morgenstern, do things that were beyond what they -- like

2   why would you do that just because David said it, and they all

3   described the relationship as Fred completely trusted that

4   David would take care of him.

5   Q.   And in concluding my questions, can you comment, please,

6   on the impact of that observation as it relates to the

7   personality disorder and the relationship with David

8   Morgenstern?

9   A.   It would be completely consistent.  There is not one shred

10  of information I obtained from this case that isn't consistent

11  with a dependent personality and that certainly seems to be

12  playing in the relationship between David and Fred.

13  Q.   Is there anything, Dr. Bourg Carter, that I have not asked

14  you that you think is relevant or important for the Court to

15  know that we have not covered?

16  A.   There was one thing that Dr. Abdo said that I failed to

17  mention, but as always in forensic cases, I am concerned when

18  someone tells me something and then says but I never told

19  anybody else.  You are the very first person.  My role is to be

20  skeptical.  And I did ask Dr. Abdo about her -- if he ever told

21  her anything about being sexually abused and she said, no,

22  nothing explicitly, but she does remember a comment he made as

23  he was leaving one of the sessions about -- something about

24  homosexuality and his relationship with his brother, and she

25  said found that odd that he would just bring that up right at

1   the end of the session and then kind of run out because it was

2   the end of the session, and she never got back to it in

3   subsequent sessions, but when I asked her if she thought that

4   there was a possibility that Fred had been sexually abused by

5   his brother David, she said that she wouldn't be surprised by

6   that at all based on her work with him and his comment in

7   passing about David and homosexuality.

8   Q.   Isn't basically how that happened with you as well as he

9   was leaving?

10  A.   That's exactly how it happened with me.   As he was

11  leaving.

12           MR. ROSEN:   Thank you very much, Doctor.

13           THE COURT:   Cross examination.

14                       CROSS EXAMINATION

15  BY MR. MCCORMICK:

16  Q.   Good morning, Doctor.

17  A.   Good morning.

18  Q.   You are not suggesting to the Court that somehow Mr.

19  Morgenstern is not guilty of this crime that he has pled guilty

20  to, are you?

21  A.   Not at all.   I don't have any information about the crime.

22  Q.   Okay.

23           We are going to get into that a little bit more.

24           But when you first interviewed or second interviewed

25  Mr. Morgenstern, did he tell you that he was guilty of the

crime that he being sentenced for?

A.   I didn't speak to him about the crime.

Q.   He didn't -- that didn't come into the conversation at all, his motivations for committing the crimes that he pled guilty to?

A.   No, it did not.

Q.   So he definitely didn't say to you David made me do it or anything like that?

A.   In general he said that David has played a primary role in all the trouble he, Fred, has got into in his life --

Q.   So indirectly he did discuss it with you --

MR. ROSEN:   I don't think she was finished.

Q.   I am sorry.

Weren't you finished?

A.   No.

Q.   Go ahead.

A.   But he didn't relate it to this particular case and it wasn't my role in this particular case to get into the facts of the case.  So he just made a general comment that all the trouble I have been in involves my brother.  My brother gets me into all this difficulty, and I become a part of it, and then I get stuck.

Q.   All right.

But you did know, did you not, Doctor, that your testimony -- Mr. Rosen is arguing that your testimony should be

66

1    considered by the Court for lowering the sentence on the

2    defendant in this case?

3    A.    Yes, I did know that.

4    Q.    And may impact on this case?

5    A.    Yes, I did know that.

6            However -- and, again, I didn't get into the facts of

7    the case, and it wasn't -- this wasn't a case where it was

8    involving his mental state at the time of the incident.    That's

9    not the way the case came into my office as.    It was more that

10   does he have any kind of mental conditions or emotional

11   conditions that might have affected his thinking and judgment

12   and his decision making?

13   Q.    Okay.

14           But you would agree, though, if it had -- if he acted

15   independently on this case, the acts that he committed, your

16   testimony would be irrelevant then, wouldn't it?

17   A.    If there --

18           MR. ROSEN:   Objection, Your Honor.   It's calling for

19   a legal conclusion.

20           THE COURT:   Sustained.

21   Q.   Your testimony wouldn't have any bearing on that if we are

22   talking about the effect of a 5K2 motion to reduce, is that

23   right?

24           MR. ROSEN:   The same objection.

25           THE COURT:   The same ruling.   Sustained.

1  Q.    You didn't get into any of the facts of this case.

2        Did you talk about Mr. Morgenstern's failure to

3  appear in South Carolina on -- and where he was found guilty of

4  criminal contempt?

5  A.    I asked him about his criminal history as a part of the

6  clinical interview, but we didn't get into anything specific

7  about South Carolina and nor did I know anything about it to

8  ask.

9  Q.    Okay.

10       So you don't know if that had any bearing on David

11 Morgenstern or not then, is that true?

12 A.    I have no idea.  I didn't get into the facts of this case

13 or anything surrounding it.

14 Q.    Before this case, did you talk to David -- or to Fred

15 Morgenstern about the Amquest matter where he was the subject

16 of an SEC investigation and subsequent court rulings?

17 A.    I can only tell you that I discussed with him his criminal

18 history, but --

19 Q.    This is a civil fraud case I am referring to that occurred

20 before this case.

21       Did you discuss that at all with him?

22 A.    He spoke to me about a '76 case, an '89 case and some

23 juvenile problems he had.

24 Q.    All right.

25       Do you know what "pump and dump" means?

68

1   A.    No.

2   Q.    Doctor, in terms of the -- not having a full preview or --

3   if you will -- a full recitation of Mr. Morgenstern's

4   involvement with the various witnesses, Jason Crossen and

5   Ormando Gomez, did you attempt to listen any of the wires --

6   the volumes of wiretap recordings that were taken between Fred

7   Morgenstern, Ormando Gomez and Jason Crossen during the

8   investigation that you are here for?

9   A.    No.

10  Q.    Did Mr. Rosen offer those to you in terms of evaluating

11  the individuals that were giving you this information that you

12  formed your opinion on?

13  A.    No.

14  Q.    Did you review any of the discovery in the case at all,

15  the search warrant material that was taken, or anything like

16  that?

17  A.    Not a word.

18  Q.    So you don't have any information at all that would relate

19  to how Mr. Fred Morgenstern conducted himself during the time

20  period that he is charged in the Indictment, correct?

21  A.    Correct.

22  Q.    Do you charge a fee for this, what you are doing here,

23  your testifying here today?

24  A.    I charge a fee for my time.

25  Q.    Okay.

1              What is your fee for testifying and for your time?

2    A.   Well, it's a fee for my time.   It's not for testifying.

3    And it's $250 an hour.

4    Q.   And what does it come to so far, Doctor, if you wouldn't

5    mind telling us?

6    A.   So far they have sent me a $500 retainer, but the

7    total time, I haven't been able to calculate yet.

8    Q.   Okay.

9    A.   I am still here.

10   Q.   The bill is to come then?   You are still calculating

11   depending upon how long you stay on the stand, is that a fair

12   statement?

13   A.   Of course.   Yes.

14   Q.   Okay.

15   A.   It's my time.

16   Q.   I will try and minimize your time.

17              Let me ask you something.   You indicated that his

18   ability to function in our society given the diagnosis that you

19   have made is somewhat limited, but not completely limited?   He

20   could can out and make friends, he can go out and do business

21   deals, and things like that?

22   A.   Yes.

23   Q.   He can organize and lead people into various business

24   opportunities, if you will, and still have this disorder?

25   A.   Yes.

Q.   And it's not detectable?

A.   Well, it's detectable if you ask about his relationships. It's detectable by mental health professionals who are familiar with the disorder.  For example, Dr. Abdo gave him that diagnosis.

Q.   Now, Fred Morgenstern wasn't attempting to tell you that the reason for all of his woes was strictly David Morgenstern, was he?

A.   No, no.

Q.   He was saying that may be an explanation, but there is other explanations why he chose the criminal path in many things that he has done throughout his life, is that a fair statement?

A.   That is correct.

          MR. MCCORMICK:  May I have one minute, Your Honor?

          THE COURT:  Okay.

          (Pause.)

          MR. MCCORMICK:  I have nothing further.

          Thank you, Doctor.

          THE COURT:  Redirect.

          MR. ROSEN:  No.

          THE COURT:  Thank you, Doctor.  You may step down and you are excused.

          Was there anything else you wanted to present or is this when you wanted to break, Mr. Rosen.

1    MR. ROSEN:  This is the end of our testimony, Your

2  Honor.

3    THE COURT:  Are you planning on sticking around and

4  watching David Morgenstern's sentencing or do you want a

5  specific time to come back?

6    MR. ROSEN:  I am going to stay and watch.

7    THE COURT:  All right.

8    So if everybody is going to stay and watch, then we

9  will just put this in recess until we finish David Morgenstern.

10    MR. ROSEN:  Yes, sir.

11    THE COURT:  All right.

12    But before we do that, let's take a ten-minute recess

13  for the court reporter and then we will call up the David

14  Morgenstern case.

15    (Recess taken at 11:07 a.m. until 2:47 p.m.)

16    THE COURT:  Okay.  We are back on the record.  Both

17  counsel are present.  Fred Morgenstern is present.

18    Any objections to the Presentence Investigation

19  Report from the Government?

20    MS. FERNANDEZ:  Your Honor, again, only to the extent

21  that the Government has agreed to some of these corrections to

22  be made in our response to the defendant's objections.

23    THE COURT:  Is the easiest way to handle this is just

24  go through the way we did it with --

25    MS. FERNANDEZ:  That's fine with the Government, Your

1    Honor.

2            THE COURT:  -- with David Morgenstern?

3            Mr. Rosen, what's your position?

4            What I did with him is I just went through the

5    guidelines, and we scored up the guidelines, and then if there

6    were any objections that we hadn't handled, then we cleaned

7    them up at the end.

8            MR. ROSEN:  If the Court is asking my input, I would

9    prefer to announce our objections at the time at the beginning

10   of the proceedings.

11           THE COURT:  Why don't you go ahead and do that now

12   then.

13           MR. ROSEN:  All right, Your Honor.  Thank you.

14           And I need to apologize to the Court.  In going

15   through a multitude of files, I came across a pleading that was

16   in its final draft form, but didn't make it from the file to

17   the Court and it's simply a motion to adopt the objections of

18   the Presentence Investigation Report of David Morgenstern.

19   There are several areas that he had objected to that I think he

20   had some unique knowledge of.  In addition -- and they would

21   be -- just for the record -- our paragraph 26, David

22   Morgenstern's paragraph 27, our paragraph 30, his paragraph 31,

23   our paragraph 31, his paragraph 32, and our paragraph 75, his

24   paragraph 76.

25           And I would also ore tenus move to adopt any

73

1   objections that were raised during his sentencing proceeding

2   today.

3           THE COURT:  I take it by that that you and Fred

4   Morgenstern were present during the whole sentencing

5   proceeding?

6           MR. ROSEN:  Yes, sir.

7           THE COURT:  Fred Morgenstern, is that correct?

8           THE DEFENDANT:  That's correct.

9           THE COURT:  What's your position on that, Ms.

10  Fernandez?

11          MS. FERNANDEZ:  Well, Your Honor, some of the

12  specific objections that he is trying to adopt of David

13  Morgenstern simply are inapplicable to Fred Morgenstern.  So we

14  certainly object in that regard.

15          In addition, Your Honor, the motions now being stated

16  by the -- or the objections now being stated by the defendant

17  are far too late.  Obviously the Government has had no

18  opportunity to address them, and certainly can't really address

19  them at this point, but they really are too late to raise them

20  on the --

21          THE COURT:  Let's do this:  Let's just go through the

22  guidelines, and we will score up the guidelines, and then any

23  additional objections that Mr. Rosen wants to make, I will

24  listen to those objections at that time.

25          MR. ROSEN:  Your Honor, as to the David Morgenstern

74

1    objections -- I mean the Court is certainly free to do that --

2    I just want to let the Court know that the Government and I

3    have made some meaningful effort to resolve our motions -- our

4    objections -- and I guess the bottom line is if the Court is

5    not going to take into consideration the matters that we had

6    objected to, then it won't matter, and if the Court is --

7        THE COURT:  I am not going to prevent Fred

8    Morgenstern from objecting today.  If he wants to object to

9    something, I am going to listen to it.

10        MR. ROSEN:  No, no, it's not that.

11        It's how the Court is going to -- if the Court is

12    going to use any of the matters that we have objected to in

13    reaching a sentence, then it becomes something we need to

14    resolve, and if the Court isn't, then we don't.

15        THE COURT:  Right.

16        And what I propose doing is just going through the

17    guidelines, resolving all those objections that have to do with

18    the guidelines --

19        MR. ROSEN:  All right.

20        THE COURT:  -- listen to your motion for downward

21    departure, and then if there are other objections that you

22    have, if they are not going to affect the way I am going to

23    sentence, then I will just indicate that they don't have an

24    affect on the sentence.

25        MR. ROSEN:  Fair enough.

1            THE COURT:  So the base level offense that Probation

2    comes up with is a level 20.  You wanted 17.  Is that right,

3    Mr. Rosen?

4            MR. ROSEN:  Yes, sir.

5            THE COURT:  Any further argument on that?

6            MR. ROSEN:  If I have may have a moment?

7            (Pause.)

8            MR. ROSEN:  If I understood -- initially if I

9    understood the Court's ruling on behalf of David Morgenstern,

10   the Court had found the underlying criminal activity to be a

11   violation of 1957.

12           That being the case, under the appropriate guideline,

13   a 1957 violation scores out under 2S1.2 and not 2S1.1 and that

14   is a base offense level of 17.

15           THE COURT:  What's the Government's position on that?

16           MS. FERNANDEZ:  Your Honor, the Government's position

17   is that as to the -- Mr. Rosen is correct as far as count 14 of

18   the conspiracy, which we have agreed to.  The object of that

19   conspiracy is a 1957.

20           However, as far as the one-count Information to which

21   the defendant also pled guilty, the object of that conspiracy

22   is 1956.

23           And, therefore, in grouping the counts and the

24   calculations done in the PSI, under 2S -- the appropriate

25   guideline would be under 2S1.1 with a base offense level of 20.

1    MR. ROSEN:  If I heard the Court's ruling

2  correctly -- and I was listening pretty carefully -- there was

3  no distinction made between the two and the Court found a

4  violation only of 1957.

5    THE COURT:  I think that was just as to count --

6  well, to the 00-6309.  I don't think that was as to 02-60101.

7  But why don't you refresh my recollection, Ms. Fernandez.

8    MS. FERNANDEZ:  That's correct, Your Honor.

9    As to the -- 6309 is the Second Superseding

10  indictment.  That's where both defendants -- this defendant

11  included -- pled guilty to count 14, which was a conspiracy to

12  commit -- to engage in monetary transactions.

13    THE COURT:  And you agree that under 1957 that would

14  be scored at a level 17?

15    MS. FERNANDEZ:  That's correct, Your Honor.

16    But as to the one-count Information, the defendant

17  pled to a single count, 1952, the object of which was a

18  violation of 1956.  That scores at a level 20.

19    THE COURT:  That's my understanding of the

20  Information.

21    I am looking at 60101 and its proceeds derived from a

22  violation of Title 18, United States Code, Section 1956.  Over

23  a million dollar -- well, a million dollar wire transfer.

24    MR. ROSEN:  Let me just make one additional point for

25  the Court.

1    THE COURT:  Okay.

2    MR. ROSEN:  So my first objection would be if the

3  Court had ruled earlier, then we would ask the Court to adopt

4  that same ruling for Fred Morgenstern.

5    THE COURT:  If I made a mistake earlier, I don't know

6  that Fred gets a windfall on that.

7    MR. ROSEN:  Well, if you did, he should, and if this

8  Court -- if the Court did make a mistake, but that was the

9  Court's finding, then he certainly should get the benefit of

10  it.

11    THE COURT:  I don't think I agree with you on that.

12    MR. ROSEN:  All right.

13    THE COURT:  If it was a mistaken finding before, I

14  don't think that Fred gets a windfall on it.

15    MR. ROSEN:  It's not a mistake, Your Honor.  I just

16  think that was the Court's finding.

17    THE COURT:  Okay.

18    MR. ROSEN:  Second, I want to simply renew that which

19  I had argued earlier, which is in my omnibus motion.  The Court

20  has ruled on it.  And that is that the ineffective assistance

21  of counsel argument led to this Plea Agreement -- to this level

22  20 instead of level 17.  Your Honor has ruled on it.  I am only

23  renewing it at this point.

24    THE COURT:  I think I sustained objections to it, but

25  go ahead.

1              MR. ROSEN:  Well, then, I am certainly happy -- well,

2    you did.  You sustained objections to Mr. Norris' testimony.

3              I will make a brief argument on it.

4              And I also want to make one other point that I don't

5    want to forget.

6              THE COURT:  Okay.

7              MR. ROSEN:  And that is the Indictment was a plea to

8    the 1956(h) violation of 1957.

9              The specific language in the plea colloquy talks in

10   terms of the information being a part of the aforementioned

11   conspiracy, the conspiracy in the Indictment.

12             I recognize that the Indictment had two parts to it.

13             Because of the negotiations and because of the plea,

14   if this substantive wire transaction -- which is the

15   information -- was a part of the 1956(h) violation of 1957,

16   then Fred Morgenstern should be sentenced under the substantive

17   part of the conspiracy, which was a violation of 1956 -- I am

18   sorry -- 1957.

19             I agree.  The Plea Agreement -- the Information talks

20   in terms of 1956.  And to be candid with the Court, if you go

21   back and look at the plea colloquy, it talks in terms of 1956.

22             I just think that there was a missed opportunity that

23   comes out of pure negligence of Mr. Norris, and I don't think

24   Fred Morgenstern ought to be deprived of a three-point

25   departure because of his lawyer's ineffectiveness.  And that is

1    set forth in my omnibus motion.

2         I am happy to make any further argument the Court

3    wishes.

4         THE COURT:  I will be consistent with the way I ruled

5    previously that the 02-60101 case warrants an offense level of

6    20 because of the 1956 violation that's alleged in there and I

7    will score the base offense level at 20.

8         MR. ROSEN:  Your Honor, just one observation.

9         THE COURT:  All right.

10        MR. ROSEN:  It's 3:00 o'clock.  We have been at it

11   since 9:00 o'clock.  If the Court looks around, everybody is

12   tired.

13        THE COURT:  I am not tired.

14        MR. ROSEN:  The Court is okay?

15        THE COURT:  I am fine.

16        MR. ROSEN:  Okay.

17        THE COURT:  I appreciate your concern, but I am fine.

18        MR. ROSEN:  You are the important party here.

19        THE COURT:  I think everybody is important.

20        Let's move on to specific offense characteristics.

21        You wanted a level 9 instead of 10, is that correct?

22        MR. ROSEN:  Yes, sir.

23        THE COURT:  And I ruled this morning that the

24   relevant amount is the amount that was laundered, the

25   $31,000,000, not reducing it by an amount that was recovered.

1          Any further argument on that?

2          MR. ROSEN:  No.  We will stand on our pleading that

3    we filed, Your Honor.

4          THE COURT:  All right.

5          So I am going to overrule that objection.  I will

6    score a ten-level enhancement.

7          The next objection is to role in the offense.

8          Let me hear the Government's argument as to Mr.

9    Morgenstern's role in the offense.

10          I recognize -- I think that Peggy Preston worked for

11    him and he supervised Peggy Preston, but tell me what else I

12    should be considering?

13          MS. FERNANDEZ:  Well, that's correct, Your Honor.

14          As you may recall, Fred Morgenstern had taken over

15    Gold Coast Check Cashing store down here in South Florida, and

16    in that regard he ended up receiving through daily DHL mailing

17    the Chemical Trust -- Alliance Trust and Chemical Trust checks

18    that were then laundered on his direction through Gold Coast

19    Check Cashing, through a number of other accounts down here in

20    South Florida, as well as being wired and forwarded over to his

21    brother in the Bahamas.

22          The additional people involved specifically just even

23    here at the check cashing store, you had Peggy Preston, Mike

24    Buccina, his wife, Debby Buccina, a Mark Weiss, Jason

25    Crossen, all people who were taking these checks, depositing,

1    negotiating, bringing the cash back to -- on Fred Morgenstern's

2    specific direction.

3           Those would be the main areas.

4           And then, of course, as the money was laundered and

5    forwarded to his brother, it was laundered again.  Although

6    that's not specifically part of what we are doing.

7           He had contact as well directly with Gary Christie in

8    the Bahamas, who is the bank president or was the bank

9    president of AIBC where two of the main accounts were held and

10   the majority of the monies were forwarded to his brother.

11          There are and were a number of documents that we

12   had entered into evidence, but just in general I would point

13   out, Your Honor, that it was not just David Morgenstern who was

14   directing Gary Christie as far as transferring monies, debiting

15   monies, paying Amex accounts; that were as well a number of

16   memos, and so on, that were signed by Fred Morgenstern on his

17   direction to take what, in fact, were Chemical Trust funds and

18   utilize them to pay off American Express bills.

19          So in sum, Your Honor, that would be it.

20          THE COURT:  Mr. Rosen, your position on the

21   four-level enhancement.

22          MR. ROSEN:  Your Honor, the law talks in terms of the

23   person's conduct in relation to others.

24          And I am citing U.S. versus Rodriguez De Varon, which

25   is an en banc Eleventh Circuit opinion, 175 F.3d 930.

1          To measure the defendant's role against his relevant

2    conduct is one criteria.

3          Second, to measure the defendant's against that of

4    other participants in the criminal scheme.

5          It is an -- to say the least -- an unusual case.

6          Brian McCormick on behalf of the Government

7    acknowledged and recognized the truth, which is that David gave

8    instructions to Fred.

9          I don't discount that Fred had Peggy Preston working

10   in the store and Jason Crossen working in the store.  Yet Fred

11   truly exercised -- he was between two places.  Maybe it was a

12   rock and a hard place.  I don't know.  But he had Mr. Womack

13   sending funds to him and he had his brother telling him where

14   the funds are to go.

15         I have used the term throughout my pleadings that

16   Fred was a processor of checks, and I know that the Government

17   doesn't agree with that, and I think it intentionally

18   overstates -- I am sorry -- understates his conduct, but it

19   puts into perspective what his conduct was, and when money

20   would come in and people would tell him where to send money out

21   to, what is a role adjustment becomes, I think, a feature of

22   the reality of the case.

23         I want to bring to the Court's attention certain

24   testimony that Fred gave in South Carolina and I believe that

25   at least Mr. Pavlock was there.

83

1          When the Government asked Fred on the witness stand

2   whether he was the signatory on a foreign bank account, he said

3   no, I am not.

4          Do you have any trustee or fiduciary powers over that

5   bank account?

6          No, I do not.

7          Have you ever been to Europe?

8          Well, 30 years ago.

9          When asked by Mr. Morgenstern's attorney -- and I

10  believe this is Mr. Jacobs was asked by Mr. Morgenstern's

11  attorney -- who is, I believe, a Government agent -- do you

12  have any information or documents, material, or otherwise, that

13  demonstrate that Fred Morgenstern had signatory power over any

14  of the funds that may have been derived from the Chemical

15  Womack accounts, the answer was no.

16         MS. FERNANDEZ:  Your Honor, for the record, could we

17  just have Mr. Rosen identify the transcripts that he is reading

18  from?

19         MR. ROSEN:  Sure.

20         I am sorry.  Of course.  I apologize.

21         The February 14th -- I am sorry -- February 28,

22  2002.

23         Let me make sure I am giving you the right --

24         (Pause.)

25         MR. ROSEN:  February 28, 2002, is the date, page 47,

1    the question to Mr. Jacobs by Mr. Wilson.

2            The previous testimony was page 14 through -- it is

3    14 and 15.

4            And I have the date in my briefcase.  So I will give

5    that to you in just one moment.

6            The last that I want to read to the Court is March 5,

7    2002, page 45.

8            What kind of conversations did you have with David

9    around 1999?

10           Relatively narrow conversations.  He said he was

11   involved in international business, some kind of international

12   finance.  He said he was licensed to do certain things.  I

13   never really could understand really all of his speaking.  It

14   was somewhat elaborate, you know, and he just represented that

15   he had abilities to invest money overseas.  That was my

16   brother.  He never really gave me much information.

17           You sent $15,000,000 and you don't know what happened

18   to it?

19           This is the Court's question.

20           Answer:  I was an intermediary.  I mean I had nothing

21   to do with that.

22           Page 54.

23           The Court:  David was in charge of everything?

24           Answer:  That's correct.

25           So, Your Honor, you have a major fraud happening in

1    South Carolina, which Fred Morgenstern had no involvement or

2    responsibility as to the fraud activities.

3           You had David Morgenstern in Europe taking the money

4    that Fred sent to him at the direction of Womack.

5           Is this entitled to some role enhancement?

6           Perhaps.

7           Was it extensive?

8           Perhaps.

9           But I would ask the Court to find that either under

10   the Rodriguez De Varon case that his responsibility -- role

11   responsibility -- was either zero or two, and two would

12   apply --

13          THE COURT:  If I didn't think that the criminal

14   activity was otherwise extensive.  If I thought it was

15   otherwise extensive, then it would be three, would it not?

16          MR. ROSEN:  It would be three.

17          THE COURT:  I have already ruled as relates to David

18   Morgenstern that it was $31,000,000 worth of money laundering

19   and that I felt that it was otherwise extensive.

20          MR. ROSEN:  This is true, Judge.

21          And my distinction would be that David Morgenstern's

22   involvement was extensive.  Fred Morgenstern's involvement was

23   less extensive.

24          THE COURT:  I don't know that it's a person's

25   involvement that's extensive as opposed to the criminal

1   activity that he is involved in.

2          Anything further on the role adjustment because I am

3   inclined to agree with you that a three-level role and not a

4   four-level role is appropriate?

5          I am inclined to agree that Fred Morgenstern was a

6   manager and supervisor of others in an otherwise extensive

7   criminal activity.

8          MR. ROSEN:  I have nothing further, Your Honor.

9          THE COURT:  Anything you want to say on that, Fred

10  Morgenstern?

11         THE DEFENDANT:  I had some difficulty following that.

12         Can I ask him?

13         THE COURT:  Sure.

14         (Pause.)

15         MR. ROSEN:  One of the distinctions the Court is

16  going to find between David and Fred is that Fred has entrusted

17  his case to me and I don't think is prepared or inclined to

18  engage the Court --

19         THE COURT:  I don't expect him to argue his case.

20  That's what he has you for.  But normally what I do is I wait

21  till the end to make all my rulings and before I do that, I

22  give the defendant an opportunity to say something.

23         MR. ROSEN:  All right.

24         THE COURT:  And I didn't want to make a factual

25  ruling on his role in the offense without giving him a chance

1    to say anything.

2          I mean I could wait till the end and make all my

3    rulings.  I just have to remember them all.  Or we can go to

4    Fred Morgenstern each time and ask him if he has anything

5    factually he wants to add in the way of allocution as to that

6    particular area.

7          MR. ROSEN:  All right, Your Honor.  I think that

8    helps our understanding of the process.

9          (Pause.)

10          THE DEFENDANT:  I wouldn't know -- excuse me -- I

11    don't have anything to add factually to that.

12          I appreciate it, though.

13          THE COURT:  Okay.

14          Ms. Fernandez, anything further on the role?

15          MS. FERNANDEZ:  Yes, Your Honor, we do.  We have just

16    a couple of matters in response to Mr. Rosen.

17          Your Honor, specifically I understand the Court

18    attempting to make the distinction between Fred and his brother

19    David as far as control, and I would just like to remind the

20    Court concerning some items that we produced at trial, but

21    specifically -- which demonstrated -- and the documents

22    demonstrated -- that this defendant -- not David Morgenstern --

23    was the one authorizing specific expenditures, and this was out

24    of both the Bahamas and the Switzerland account.

25          We have hear three memos, Your Honor, which are

88

1    directed.

2            This first one is from -- directing AIBC -- signed by

3    Fred Morgenstern.  At the trial it was Government's Exhibit

4    9G.  And this is directing him to make two specific transfers

5    of $95,000 and $15,000, specifically signed by Fred

6    Morgenstern.

7            And I will produce them if the Court wants to see

8    them again.

9            This one is dated August 20th of 1999.

10           Government's Exhibit 9FF from the trial, Your Honor,

11   was a memo with accompanying -- copy of a check, dated 20th of

12   December of 1999, from Fred Morgenstern to Gary Christie, who

13   is the AIBC president, directing him to make specific payments

14   on both Fred Morgenstern's American Express account, as well as

15   David Morgenstern's.

16           And this -- just to remind the Court this would be

17   coming out of accounts where the Chemical Trust funds were

18   being held.

19           Finally, Your Honor, there was Government's Exhibit

20   9EE, which is again a direction by Fred to Gary Christie at

21   AIBC again to make an American Express payment -- this one to

22   cover David Morgenstern's Amex card -- in the amount of over

23   $44,000.

24           And then finally, Your Honor -- I don't happen to

25   have the transcript with me.  Although I guess Mr. Rosen loaned

1   me part of it.  But let me just point out the transcript that
2   Mr. Rosen was reading to the Court from is the hearing on the
3   defendant's civil and criminal contempt up in South Carolina
4   and without looking at it -- well, I gather the entire
5   transcript isn't here -- but from my recollection, Your
6   Honor -- and it's obvious from the Court's ruling -- at the end
7   of that two-day hearing, Judge Anderson found -- basically
8   found the defendant not to be credible in his testimony, and
9   held him in both civil contempt and criminal contempt, and
10  that's what I would point out in consideration of the passages
11  that Mr. Rosen was reading.
12          Your Honor, that would be all I would have in
13  addition.
14          THE COURT:  All right.  I recognize that under the
15  guidelines you can have more than one organizer or leader in an
16  organization, but I also have had the benefit of Dr. Bourg
17  Carter's testimony today, and weighing everything I know about
18  this case, I find that Fred Morgenstern was a manager or
19  supervisor of others in an otherwise extensive criminal
20  activity, and I only approve a three level, not a four level,
21  adjustment for role in the offense.
22          So that puts us up to a level -- adjusted level 33
23  and that moves us to acceptance of responsibility.
24          Let me ask the Government.  At the time that this
25  plea was entered, the Government agreed to recommend acceptance

1    of responsibility, except for three situations.

2         The one situation that the Probation Office is using

3    to disqualify Fred Morgenstern from acceptance of

4    responsibility predated the Plea Agreement.

5         So am I assuming that the Government is agreeing with

6    the defense that there should be acceptance of responsibility

7    in this case?

8         MS. FERNANDEZ:  Yes, Your Honor.

9         As I think we pointed out in our response, as it

10   finally ended up, the only ground that we felt the defendant

11   had yet to comply with was acceptance -- basically a statement

12   of acceptance of responsibility.  That has been provided just

13   within the last day or two.  And that was really the only

14   ground that the Government still stood by denying the defendant

15   acceptance.  That having been completed, we are recommending --

16   standing by our recommendation of a three level acceptance for

17   the defense.

18        THE COURT:  All right.

19        My having said that, let me interject a thought.

20        David Morgenstern exercised his right to file a

21   motion to withdraw a plea, and he did that, and it was at least

22   one of the bases for me denying him acceptance of

23   responsibility.

24        Fred Morgenstern has not done that.  In fact, he

25   asked me for additional time up to sentencing to file a motion

1    to withdraw a plea and I granted that motion.

2         But what's to stop Fred Morgenstern from filing a

3    2255 after sentencing asking to withdraw his plea for

4    ineffective assistance of counsel, which has been alluded to

5    already today in the sentencing hearing?  How does that impact

6    the Court's situation?  Am I rewarding somebody who has the

7    foresight not to move to withdraw their plea before sentencing

8    and not giving the same benefit to someone who exercises that

9    right, Ms. Fernandez?

10        MS. FERNANDEZ:  No, Your Honor, I don't believe so.

11        The standard once sentence has been imposed for

12   withdrawal of a plea under 2255 is a much higher standard then

13   the Court would face should this defendant present that issue

14   to the Court at this time.

15        But really the Government's belief as far as this

16   defendant's acceptance, I think is for a number of matters.

17        THE COURT:  You have given me a distinction.  That

18   satisfies my quandary about this.

19        So I will grant the acceptance of responsibility,

20   which puts us to a level 30.

21        And we have a criminal history category of three, is

22   that correct?

23        MR. ROSEN:  That's in dispute, Your Honor.

24        THE COURT:  Okay.  Do you want to go ahead and argue

25   that?

92

1    MR. ROSEN:  Yes, I do.

2    (Pause.)

3    MR. ROSEN:  I apologize for the delay, Your Honor.

4    I wanted to present -- I would like to present to the

5 Court and to the Government two affidavits, one from John Howes

6 and one from Robert Wilson, Jr.  We have marked them

7 respectively Fred Morgenstern number 2 and 3 (handing to the

8 Court).

9    THE COURT:  Let me read these.

10    MR. ROSEN:  All right, sir.

11    (Pause.)

12    THE COURT:  Are you arguing that the contempt was a

13 civil contempt for not paying as opposed to a criminal contempt

14 for not showing up?

15    MR. ROSEN:  No, Your Honor.

16    THE COURT:  What's the difference if he had a good

17 reason for not showing up if Judge Anderson didn't buy it and

18 Judge Anderson found him in contempt of court?

19    MR. ROSEN:  That's a very appropriate question, Your

20 Honor.

21    I am not contesting the criminal contempt citation.

22    What I am arguing -- and it's contained in our

23 omnibus sentencing motion -- let me see if I can direct the

24 Court's attention to the proper page.

25    Page 16 through page 19.

1          As I start there, Your Honor, Mr. Morgenstern does

2    not today seek to defend his failure to appear before Judge

3    Anderson.

4          What this issue boils down to is not whether Mr.

5    Morgenstern committed criminal contempt, but whether the result

6    of that, which moves him from a category two to a category

7    three, overrepresents the defendant's criminal history?

8          What happened -- as attested to in these

9    affidavits -- is that his attorney --

10         THE COURT:  I think I understand what you are saying.

11   Let me cut you off.

12         You are agreeing that the scoring should be criminal

13   history category three, but you are saying that I should depart

14   downward along the criminal axis because it overrepresents his

15   criminal record.

16         MR. ROSEN:  Yes, sir.

17         THE COURT:  All right.

18         All I was doing at this point was trying to get our

19   scoring agreed to, and then you can, you know, argue your

20   motions for downward departure that you have -- at least one

21   other one besides this, right?

22         MR. ROSEN:  Yes, sir, I do.

23         And I apologize --

24         THE COURT:  All right.

25         So we are agreed that the scoring is a level 30,

1  criminal history category 3, for a range of 121 to 151 months?

2  MS. FERNANDEZ: Yes, Your Honor.

3  THE COURT: All right.

4  Now, we have got at least two arguments for downward

5  departure.

6  Mr. Rosen.

7  MR. ROSEN: Thank you, Judge.

8  Let me start where I was on the criminal history.

9  Fred Morgenstern has --

10  THE COURT: Let me interrupt you for a second.

11  I mean --

12  MR. ROSEN: All right.

13  THE COURT: Let me ask the Government why I shouldn't

14  depart down to level two on this?

15  MS. FERNANDEZ: Your Honor, I would suggest that in

16  the defense motion as much as you can say it overrepresents his

17  criminal history, the defendant has yet to offer any good

18  statement or reason as to why it's overrepresented.

19  When you take a look at the defendant's criminal

20  history -- putting aside the criminal conviction -- because

21  that's what the Courts end up doing -- when a downward

22  departure for overrepresentation is raised, the Court should

23  look at the entire history of the defendant.

24  And in this case basically what you have is a

25  defendant from age 27 involved at least in a minor event, but

1    then in '86 a major event, another fraud, the contempt, and

2    then passing bad checks.  You have a number of -- I guess -- I

3    don't know if they are misdemeanors or felonies.  I think four

4    of them listed with no disposition.

5          And I would suggest to the Court what that indicates

6    is an individual who has not been on the right side of the law,

7    has consistently stepped over the line, and has had a couple of

8    major convictions because of it.  This last one -- the one that

9    the Court is now sentencing on -- obviously being the last.

10         So basically in sum, Your Honor, the Government's

11   position is that a criminal history three properly represents a

12   defendant in his position with the type of overall criminal

13   history that's represented in the PSI.

14         THE COURT:  Let me go back to Mr. Rosen.

15         I have someone here that did federal time for a check

16   kiting scheme involving over $7,000,000, gets out, gets

17   involved in a money laundering scheme over $30,000,000.

18         Why isn't a category three criminal history

19   appropriate in this case?

20         Also ignoring the fact that in, you know, 1976 he got

21   a suspended sentence for a check kiting scheme involving

22   $68,000 that he didn't get any points for because it was

23   stale.

24         MR. ROSEN:  Well, I think the simple answer, the

25   direct answer, is the Government's objections and the Court's

1    inquiry is addressed by the guideline.  Everything the Court

2    has just asked me is contemplated by the guideline.  And that's

3    why we are all stuck or live or have the guideline.

4             THE COURT:  Isn't it an appropriate consideration

5    when someone is arguing that a criminal history category

6    overrepresents his history the fact that there were unscored

7    convictions that had they been scored, the criminal history

8    would have been even higher?

9             I mean is the Court supposed to give the defendant

10   the benefit of the doubt all the way around, not consider stale

11   convictions, and then when you ignore the scale convictions say

12   what's left overrepresents his criminal history?

13            MR. ROSEN:  Judge, the conviction the Court is

14   talking about is 27 years ago and it was for theft of over

15   $150.

16            THE COURT:  Yes.  $68,450 over $150.

17            MR. ROSEN:  Restitution was paid.

18            Yes, sir, I see that.

19            THE COURT:  He paid $14,000 restitution.

20            MR. ROSEN:  Well, you will find out that David

21   Morgenstern is the one responsible behind that, but we will get

22   to that.

23            As I said, the direct answer is we would be at the

24   high end of level two taking into consideration everything the

25   Court has said and taking into consideration what the

97

1    Government has said.

2          The only reason we are having this discussion -- and

3    I recognize the Court's inquiry -- and it's a fair one -- why

4    should the Court come down when you have these priors?

5          Judge, you have a 27 year old offense, which, with

6    all due respect, I think it's not unreasonable to put

7    behind.

8          You have the 1986 offense, which I recognize is, in

9    my mind, an issue -- a major issue.

10          I think the answer is -- and what I am asking the

11    Court to do is look at the reason why we are even having this

12    conversation.  If we having this conversation because Fred

13    Morgenstern was involved in a fraud, if we were having this

14    conversation because Fred Morgenstern had robbed a bank, if we

15    had had this conversation because Fred had done something overt

16    to someone, I don't think I would be here in good faith at all,

17    but the only reason we are having the conversation is because

18    Fred didn't appear, and stood at an airport with two lawyers

19    telling him the opposite things, and then went home and waited

20    to get arrested the next day.

21          And I want to address one comment by Ms. Fernandez.

22          Yes, Fred Morgenstern went to South Carolina.  He had

23    two hearings, a criminal and a civil contempt.  And there is a

24    little confusion to get -- to figure all this out, but at the

25    end of day, Judge Anderson imposed a 35-day sentence, time

98

1    served, on the criminal contempt.

2          And when Ms. Fernandez says Judge Anderson didn't buy

3    the defendant's story about the civil side, and imposed a civil

4    contempt, and waited for him to repay $2,000,000 or almost

5    $3,000,000, six months later -- six months later -- Judge

6    Anderson accepted a $16,000 payment because he learned that's

7    all Fred Morgenstern either was capable of doing or was

8    responsible for.

9          And it typifies, Judge, this man's whole situation in

10   this case.  It looks terrible what he has done, but if the

11   Court -- if this Court allows itself to get underneath that as

12   Judge Anderson did six months later when he found him in

13   contempt for not turning over millions of dollars, he realized

14   and agreed and ordered not only a payment of $16,000 and a

15   purging of contempt, but he released him on a $25,000 personal

16   surety.

17         So there has to be more to this case than what is

18   just -- what it looks like, which is a terrible thing, and

19   that's why I am trying to get the Court -- and I am asking the

20   Court to today not just look at a little piece of the puzzle,

21   but the whole thing.

22         When Judge Anderson did that -- I mean, Judge

23   Anderson is no slouch up there.  He is a tough Judge.  And it's

24   known.  And yet not only did he order him purged with a $16,000

25   payment, but he ordered him released on a $25,000 personal

1    surety.  Something has to be happening.  And today we have our

2    day.

3              And so the affidavit, Your Honor, account for the

4    fact that Fred was at the airport.  We have the plane tickets

5    attached to Mr. Wilson's affidavit that were purchased on the

6    day before, ready to go.

7              John Howes is at the -- he is calling him from the

8    airport and John says don't go.

9              Now, look, I am not saying Fred shouldn't have done

10   something.  I mean he should have.  And Bill Norris was his

11   lawyer and Bill Norris didn't.

12             And all I am saying is this difference between a

13   criminal level three and two is at a minimum, as I recall,

14   almost two years.  There is a two year difference in the

15   guideline.  That was at a level 34.  So it may change a little

16   bit because we are at a level 30.  It is not a small amount.

17   And the only reason we are having the conversation is because

18   he was ready to go and all he had to do was go.  And he -- you

19   know -- he just got terrible advice.  He had two lawyers

20   telling him different things.

21             I think the Court is entitled to go behind a criminal

22   contempt.

23             The other point I want to make is this:  These

24   things -- these guidelines and the adequacy of criminal history

25   categories just don't take into account this situation.  They

1    really speak in terms of repeated criminal conduct.  He is a

2    threat to do it again.  But look at what it was he did again.

3    He just didn't appear when his lawyer said you are going to get

4    a continuance.  Don't come up here.  And then he calls him at

5    the last minute and says get up here.  And John Howes says

6    don't go.

7             There is a big jump, Judge, between a two and three

8    here, and I think the mitigating factors and the particular

9    crime that he committed justifies this notwithstanding a

10   27-year-old conviction and the one in 1986, which the

11   guidelines do take into consideration by giving him the high

12   end of criminal history two.

13            THE COURT:  Anything you want to add on that, Fred

14   Morgenstern, factually?

15            THE DEFENDANT:  I would just like to say that that's

16   a true characterization of what happened.  I intended to go and

17   I wanted to go.  I was through security.  I had the boarding

18   pass.  I surely should have gone, but I listened and did not.

19   But nobody else would have wanted to go anymore than me.  I was

20   afraid of Judge Anderson; read transcripts of his rulings.  I

21   did not want to make him mad.  But I made the wrong decision.

22   But I did not intend to not go and I didn't intend to commit a

23   crime that day.

24            THE COURT:  Well, you know, I think if you zero in

25   and focus on the criminal contempt, I think there are certainly

1    mitigating factors regarding that particular one point, but I

2    don't think when you decide whether someone's criminal history

3    is overrepresented, you are to just look at the last point and

4    see whether or not that particular point is an aggravating

5    point or not.  I think you have to look at the overall criminal

6    history.  And just the way the one point that gets him from

7    three to four points is not particularly aggravating, the

8    situation that got him the three points is particularly

9    aggravating.

10          So, you know, you may have a situation that David

11   Morgenstern's criminal history really was underrepresented in a

12   category two, but there were there were no objections regarding

13   that.  There were no requests for me to do an upward departure

14   along the criminal history axis.  So I didn't.

15          But I think when you look at Fred Morgenstern's

16   overall criminal history, the unscored $68,000 fraud in Ohio,

17   the 7.1 million dollar fraud in Tennessee, I think that by

18   itself is equivalent to at least a category three or higher

19   criminal history without even getting into the one point.

20          The one point for the criminal contempt slips him

21   over the territory into category three, and I can't say that --

22   and don't think -- that category three overrepresents Fred

23   Morgenstern's criminal history.  So the objection is

24   overruled.

25          Do you want to do your 5K2.0 motion for a downward

1    departure?

2             MR. ROSEN:  Yes, sir.

3             And I think, Your Honor, that I ought to start at the

4    heart of the matter.

5             As a matter of law, Section 5K2.0 -- perhaps the last

6    card in the deck -- is there for a reason.

7             Koon versus United States, 518 U.S. 81, 1996,

8    recognizes that.  Koon versus United States gave four reasons

9    why 5K2.0 could or could not apply.  These are as follows:

10   What features of this case potentially take it outside the

11   guidelines heartland and make it a special or unusual case?

12   Has the Commission forbidden departures based upon those

13   features?  If not, has the Commission encouraged departures

14   based on those features?  And if not, has the Commission

15   discouraged departures on those features?

16            Section 5H1.3 states:  Mental and emotional

17   conditions are not ordinarily relevant in determining whether a

18   sentence should be outside the applicable guideline range,

19   except as provided in Chapter 5, part (k), sub-part (2).

20            And the law behind it speaks in terms of

21   extraordinary cases.

22            I would respectfully submit, Judge, that what the

23   Court has before it is the epitome of the extraordinary case.

24            And as reluctant as I was to do it to Fred and as

25   reluctant as Fred was for me to do it, it was painfully

1    apparent that this situation needed to be brought out and that

2    is the Fred and David link as I call it.

3        If, as a matter of law, this Court determines that it

4    has the authority to downward depart because of the testimony

5    of Dr. Bourg Carter and all of the evidence and information she

6    brought to it, as well as the testimony of Ormando Gomez, who

7    perhaps was gun shy on the stand, and I understand that, but

8    still was able to attest to facts that he saw, and I think was

9    a little easier in his communications with Dr. Bourg Carter,

10   Judge, you have a -- the reason this works in this case is

11   because of the relationship between Fred and David on the facts

12   much this case and historically.

13       I made mention to you before of the fact that -- when

14   Your Honor talked in terms of the $68,000 restitution -- David

15   Morgenstern convinced Fred Morgenstern to take that guilty plea

16   and David Morgenstern would pay the fine.

17       Go to 1986.  David Morgenstern and Fred Morgenstern

18   are in jail together.

19       Go to 2003.  David Morgenstern and Fred Morgenstern

20   are in jail together.

21       And my presentation in my written presentation,

22   Judge, was this:  If the Court -- let me start over --

23   understandably the Government looked at this and has seen this

24   chain, the Fred and David chain, and it's just travel through

25   time.

1        Nobody has taken the energy, had the will, had

2    whatever it took to go behind that until today.

3        And I am not arguing that Fred Morgenstern isn't

4    responsible for his actions.  I am not arguing that Fred

5    Morgenstern (unintelligible) should be put on probation today.

6        And I know the Government is going to come up here

7    and pound on the table as hard as Ms. Fernandez can do and say

8    look at all the crimes he committed, look at all the wrongs

9    that he did in this case.  And, Judge, I recognize that that's

10   an acceptable thing for the Court to say.  But there is an

11   overwhelming mitigation that the guidelines give this Court an

12   opportunity to put into place.

13       If the Court finds that the sexual abuse, the mirror

14   twins, the overwhelming fact that David Morgenstern -- look

15   what he did today.

16       Now, this Court entertained his objections

17   extraordinarily well in my opinion.  But look at the

18   surroundings we are in and he still made an intensive effort to

19   gain control of a situation.  And that's here.  And that's not

20   to a man, his brother, that for whatever the psychological

21   makeup was, has spent 54 years being put into a submissive

22   position that Dr. Bourg Carter said she can't even explain to

23   us the intensity of that.

24       And the guidelines, Judge, just say to this Court if

25   there is an extraordinary case for emotional and mental

1    condition, you can depart.

2            All I am asking this Court to do is to find that this

3    case meets that extraordinary and unusual situation, and it's

4    tied to the facts, and if we get to that hurdle, then I have

5    some recommendations to the Court about, okay, what's a fair

6    sentence?

7            This is my humble recommendation:  I would venture a

8    guess that there will never be a case more adroitly on point,

9    more accurate to this particular finding, than this case.

10   Where is the Court going to find mirror twin brothers who

11   adopted a battered spouse relationship?  And I think it's

12   apparent.

13           And I was astounded at Mr. Gomez's comment because it

14   really -- I thought he was going to say if David told him to

15   jump off a bridge, Fred would have.  And that wouldn't be

16   right.  But what he said was Fred would have blindly believed

17   that the landing would be safe.

18           Listen to what David said to this Court.  I am an

19   investment manager.  These were legitimate funds.  All I did

20   was invest.  Why don't you believe that, Judge?  I am telling

21   it to you.

22           I want you to look at if -- excuse me -- if you look

23   at the posture of Fred, it speaks to everything.  He is a

24   completely submissive and beaten person.  And David was here

25   kicking and screaming with all he had.  And that's what their

```
 1   life has been.  And I don't know how in a sterile environment
 2   to make it more real.  But the guidelines give this Court that
 3   opportunity.
 4            There are other grounds, Your Honor, that support my
 5   5K2.0.  I can argue them now.  But this is the heart of it.
 6            And as I said to this Court this morning, this is a
 7   one stop deal.  I mean there is no appeal.
 8            If this Court -- I haven't been before this Court
 9   very often, but I know what this Court says.  You are looking
10   to me for mercy.
11            And if the Court should recall what Fred Morgenstern
12   said to this Court in response to this, are you asking this
13   Court for mercy in pleading guilty, his response was not, yes,
14   Judge.  His response was most mercifully.
15            It's just one of those cases, Judge, and they don't
16   come by very often.
17            So I would ask the Court to find a 5K2.0 basis under
18   the extraordinary circumstances of this testimony, unrebutted,
19   unrefuted, and then address the other issues that support
20   additional grounds for a 5K2.0, and I would the Court to
21   entertain some argument on mitigation.
22            THE COURT:  Anything you want to say, Fred
23   Morgenstern, before I impose sentence?
24            MR. ROSEN:  Judge, there are other grounds that I
25   need to raise.
```

1          THE COURT:  Go ahead.

2          MR. ROSEN:  All right, sir.

3          Another ground for my argument for a 5K2.0 is the

4    disproportionate conduct versus the dollars that were

5    received.

6          While the Government and I have a reasonable dispute

7    as to the extent of Fred's conduct, I think two things are not

8    in dispute.

9          One of them is that Fred had nothing to do with the

10   creation of the fraud and the generating of those monies.

11         The other dispute is Fred was not living the high

12   life in Europe as his brother David did and has always.

13         I cited to the Court two cases, one U.S. versus

14   Dorville (phonetic), and one U.S. Versus Restrepo.  One is a

15   drug case.  One is a money laundering case.  In both instances

16   the Courts found to be a 5K2.0 departure because the conduct in

17   relation to the amount of the money or drugs drove the

18   guidelines so high as to make the punishment disproportionate

19   to the conduct.

20         The guidelines here drive the conduct to a level 10,

21   plus 20, because of Fred's particular role -- which was an

22   integral part of this, and I don't deny that, and I am not

23   asking the Court to find that it wasn't.  I am asking the Court

24   to find that his role was disproportionate to the $30,000,000

25   fraud and to adjust the guidelines down as a result.

1          Also, Your Honor, I have -- in case the Court wants

2     it -- a Pacer download of Virgil Womack's sentence.  I know

3     it's been referred to.  And this is all I could get my hands

4     on.  But I wanted the Court to be aware -- and if the Court had

5     any concern or doubt about it -- that Mr. Womack got a 60-month

6     sentence.  That's the man that put the money in Fred's hands.

7          I want the Court also -- should Your Honor take into

8     consideration a departure, we did a sentencing analysis of all

9     of the other sentences in this case.

10          Mr. Mamone, the organized crime ringleader of this

11    Indictment, received a nine-and-a-half year sentence and he did

12    cooperate.

13          Every single person involved in the racketeering, the

14    money laundering, stolen property, gambling, money laundering,

15    received no more than four years and eight months.

16          If the Court finds a basis to depart, I would like

17    the opportunity to discuss with the Court our perception of

18    what a reasonable and fair sentence would be.

19          I also have for the Court if we are at a sentencing

20    aspect -- in other words, if we are going right from this

21    downward departure to sentencing, I do have character letters

22    that I want Your Honor to review.

23          THE COURT:  All right.  Pass them up.

24          MR. ROSEN:  (Handing to the Court.)

25          MR. MCCORMICK:  I sent these to the Government

1    yesterday.

2          And the Court may have seen them from the Probation

3    Office.

4          The first one was Dr. Carter and that was in support

5    (inaudible) --

6          THE COURT:  I have read these.

7          MR. ROSEN:  All right, sir.

8          THE COURT:  Did you want them back?

9          MR. ROSEN:  I have got them.  I have got a copy.

10         Something else I wanted to bring to Your Honor's

11   attention.

12         Again in the aspect of Fred and David, David's

13   comment to this Court I got Fred to plead guilty.  I am the one

14   that's responsible.

15         Well, Your Honor, I don't know if the Court saw the

16   letter that came to Judge Anderson from David Stevens

17   (phonetic), who was the Assistant United States Attorney, dated

18   the January 17, 2003, but it states in there -- for the reason

19   to Judge Anderson why the case was being returned -- it states

20   in there that it's being returned because of David

21   Morgenstern.

22         David Morgenstern, through his attorney, lodged

23   objections.  Both of these objections are fact specific.  Any

24   ruling on them will have a dramatic impact on his guideline.

25         Further, based upon certain statements of David

1    Morgenstern during his aborted debriefing, I expect he

2    (phonetic) will have other objections.

3         Dropping down in the letter: Fred Morgenstern has

4    raised no objections to the Presentence Report.

5         And then he adds: However, I would anticipate that

6    he would do so.

7         In other words, at every point in this man's life --

8    and we know now why -- David Morgenstern has dragged him

9    through David Morgenstern's mud, and it's a sad thing, and I am

10   hopeful that the Court will see its way to guy around that

11   finally.

12        May I have one moment to talk to my client?

13        THE COURT: Sure.

14        MR. ROSEN: Thank you.

15        (Pause.)

16        MR. ROSEN: Your Honor, is it possible we can have a

17   five-minute recess?

18        THE COURT: You can just talk to him for five

19   minutes.

20        MR. ROSEN: May I step out? Should I stay here?

21        THE COURT: If you are comfortable there, that's

22   fine.

23        MR. ROSEN: Okay.

24        THE COURT: Just move the microphone away so nobody

25   can hear you.

```
 1          MR. ROSEN:  Thank you, Judge.

 2          (Pause.)

 3          THE DEFENDANT:  Thank you, Your Honor.

 4          I have attempted to weigh really what could I say

 5    that might have you see some of the things that I have just

 6    become to see.  I was not really fully aware maybe of the

 7    impact of my relationships and how it is that they affect my

 8    decisions.

 9          One in particular, this focus of my relationship with

10    my brother is a very hard relationship to confront as I have

11    now -- I guess I would say -- been exposed to that this kind of

12    thing has occurred and how it has effected me and how my whole

13    life I denied that, and not the shameful part, but just that I

14    could still stand up anyway, and the truth of it is I never

15    have.

16          And I want to be very clear that what I am saying

17    here is I wasn't unaware of what I was doing or that I was not

18    responsible in some way because he made my decisions for me.  I

19    made the decisions.  But I surely did believe the things he

20    said to me, and I surely trusted him, and to be very frank

21    about it, I trusted Mr. Womack and Mr. Silvestri, and

22    (unintelligible) now, as I say, this coaching I have seen the

23    last few days, I seem to trust a lot of very powerful speaking

24    and acting people and very often miss maybe what they are

25    really like or what their motives are, and I think that this is
```

1    some of the complications I have had in speaking with the

2    Government and attempting to cooperate is that I don't see what

3    I am like, but I do know what's happened to me, and what's

4    effected me in how I choose.

5         You know, I don't want to choose the wrong thing and

6    I don't want to have this happen like it is. You know, I --

7    like many, many defendants -- most that come before you -- I

8    have a wife very ill with alcoholism, very dedicated, but

9    losing at it to get better, and I have two children that hate

10   it that I am missing, but those things aren't very compelling

11   because they are so typical.

12        But I would ask you to really look into your heart of

13   what it must be like to love someone so much and in a way that

14   you don't understand. You can't even describe it when people

15   ask you why do you do that when David asks you to?

16        And what happens is I got my wires crossed about what

17   love is, I think, and I think that I don't want to see him hurt

18   and I don't want to see him harmed. I want to see that he

19   wins. And in a sad way even more than me. And so -- so many

20   times in my life I have subordinated my heart, I have

21   subordinated what I wanted. I have let go of girlfriends

22   because they were within his appetite (phonetic) so that he

23   could have what it was that he wanted. And that weakness that

24   I have, I believe made it bad for him, and I feel even worse

25   for that because without my mechanical ability and my systems

1    thinking, you know, maybe David wouldn't have been such a

2    danger to himself, and I am sad for that.

3            But I did not know until I encountered this

4    professional and I was in therapy for -- she said one year, but

5    it was closer to two -- and this woman in a very short time

6    penetrated into what must have been going on with me that kept

7    this wrestling with why I can't just say that I am wrong.

8            And the reason I can't say that I am wrong all the

9    time, Your Honor, is because it may hurt someone else.  I think

10   you saw that when I was asking for a new attorney.

11           I couldn't even come against Mr. Norris, who

12   admittedly made some mistakes, and I forgive him for that, but

13   I just don't have the kind of power to stand up to power.

14           And I understand that now the cost is huge.

15           I just want you to consider that I love my brother so

16   much and he asked me to do something when he got into

17   difficulty August 8, 2001.  He called me on the phone.  I

18   hadn't interacted with him for nearly two years.  He said he

19   was in trouble and I dropped everything I was doing to help

20   him.  That is the precursor to what led to all these events in

21   this case.

22           And what I think is particularly horrible here is

23   that along the way, I saw that Mr. Womack was evil and wrong in

24   stealing.  I discovered it in what I called the "gap," the gap

25   between the bonds being written by Mr. Silvestri, and what Mr.

```
 1   Womack had raised, and I confronted Mr. Silvestri and Womack

 2   and brought it to my brother's attention as well.  Where is the

 3   money that's in the gap?

 4        And all three of these people are powerful

 5   personalities if you met them all.  And I succumbed to their

 6   reasoning.  Oh, you must be adding wrong.  Oh, you don't

 7   understand that there is a rate of interest that fills the

 8   gap.

 9        And the thing is is I bought it.  But I knew -- I

10   knew it on that day, on August 12, 2001, that this wasn't right

11   and I didn't do anything about it.  I should have.  I could

12   have.  And I wish I would have.

13        So in just summary, I would ask you to understand

14   that bond that is so intense that I didn't know how to say no.

15   I believed.

16        And in that regard, I chose.  I am responsible for

17   that.

18        I just wish my brother would never have asked me.  I

19   would be okay today.

20        Thank you, Your Honor.

21        MR. ROSEN:  Judge, I just have last comments.  If I

22   may?

23        THE COURT:  Okay.

24        MR. ROSEN:  I guess one alternative Your Honor has

25   is -- where we are at -- is to impose the low end of the
```

1    guideline, which would be ten years, 120 months -- 121 months.

2           Certainly I would ask that the Court would be within

3    the guidelines.  It would recognize some degree of mitigation.

4    And I hope the Court -- I am sure the Court hasn't forgotten

5    that ten years is a long time to be away from a family and is

6    an appropriate punishment.

7           I would also ask the Court to consider that -- as I

8    proposed to Your Honor in my guideline analysis -- that a

9    sentence in the realm of five years to seven years by virtue of

10   coming down off the specific offense characteristic as a way of

11   mitigating Fred Morgenstern's role.

12          If the Court went at the high end of base offense

13   level 20, criminal history 3, by coming down halfway from the

14   specific offense characteristic of 10 to 5, we would end up

15   with a guideline range of 26 instead of 30.  That's 4 points

16   down.  That would give a guideline sentence of -- at the high

17   end -- of 97 months.  It was a way of my proposing that -- in

18   keeping with the guideline -- that a departure from a level 10

19   down to a level 5 and still imposing a very significant

20   sentence is a meaningful way to grant a departure based upon

21   Dr. Bourg Carter's findings and Mr. Fred Morgenstern's comments

22   to the Court today.

23          We have belabored the Court long enough.  I thank the

24   Court for its patience.

25          When sentencing is imposed, Your Honor, there are a

1    few other matters I need to raise with the Court.

2              THE COURT:  All right.

3              I think I have the discretion to do a 5K2.0 downward

4    departure either on either of the individual grounds alleged or

5    collectively on all of them combined, but I find that none of

6    the grounds alleged individually or collectively are out of the

7    heartland of cases that come before me or extraordinary that

8    would warrant a downward departure and I exercise my discretion

9    to deny the 5K2.0 request for a downward departure.  Although

10   those factors will be considered by me in deciding where to

11   sentence within the guidelines.

12             Are there any other objections to the Presentence

13   Investigation Report from the Government?

14             MS. FERNANDEZ:  No others, Your Honor.

15             I just would like to point out since we didn't have a

16   chance to respond to the 5K2.0 --

17             THE COURT:  Are you trying to change my mind on that?

18             MS. FERNANDEZ:  No, Your Honor.

19             But since -- the Court's comment that some of those

20   factors would be considered on where within the guidelines the

21   Court may impose sentence, I would just like to state the

22   Government's position --

23             THE COURT:  All right.

24             MS. FERNANDEZ:  -- that the Government believes that

25   this defendant has -- the Court has been -- already granted

1   some mitigation to the defendant in consideration of the

2   psychologist's testimony -- as the Court indicated -- and

3   adjusted his role downward two levels or -- I am sorry -- one

4   level from what it would have been or what the Government had

5   recommended.

6           THE COURT:  If I meant to say that Dr. Bourg Carter's

7   testimony was the sole basis of my finding that a three level

8   instead of a four-level enhancement was appropriate, I

9   misspoke.  I considered her testimony and in relation to all

10  the other evidence in the case decided a three instead of a

11  four-level adjustment was appropriate.

12          MS. FERNANDEZ:  Yes, Your Honor.  I understood that.

13  I didn't mean to say that it was solely on the psychologist's

14  testimony.

15          But the Government's position is that the Court has

16  given some consideration to this defendant already and that

17  given the guidelines now as they stand with the high end or low

18  end, the Government is recommending the high end of the

19  guidelines as they are now calculated.

20          THE COURT:  Any other objections to the Presentence

21  Investigation Report, Mr. Rosen?

22          MR. ROSEN:  Your Honor, may I just have one moment to

23  look at one document based upon the government's comments?

24          THE COURT:  Okay.

25          (Pause.)

1    MR. ROSEN:

2    THE COURT: I have no other objections, Your Honor.

3    THE COURT: All right.

4    Let me just say that any of the other objections that

5  I didn't specifically rule on would not have effected the

6  sentence in this particular case.

7    Any legal cause to show why sentence should not be

8  imposed?

9    Mr. Rosen.

10    MR. ROSEN: No, Your Honor.

11    THE COURT: The amount of restitution that the

12  Government is seeking in this case is how much?

13    MR. ROSEN: Your Honor, may I interject one thing?

14    THE COURT: Sure.

15    MR. ROSEN: I don't know if Fred Morgenstern will

16  ever bring a 2255, and I don't want it to be my statement that

17  there is no other legal objection to impose sentence, and I

18  just don't want to be seen ever one day waiving something that

19  he may have had a right to say or do and so --

20    THE COURT: I don't think that your saying that there

21  are no other legal objections waives Mr. Morgenstern's right to

22  file a 2255.

23    MR. ROSEN: I am just trying to be --

24    THE COURT: I mean he could waive that, but I don't

25  know that you on his behalf can waive that.

1          MR. ROSEN:   Thank you.

2          THE COURT:   What's the Government asking for

3    regarding the forfeiture and the restitution?

4          MS. FERNANDEZ:   I think I have the figures hopefully.

5          This is as we did it with David Morgenstern, Your

6    Honor.

7          As to the forfeiture, we are asking that the Court

8    reimpose the order of forfeiture and the money judgment in the

9    amount of -- can I just read it out instead of trying to say

10    it -- $31,273,273.58.   That would be the forfeiture.

11          As to the restitution, Your Honor, in keeping with

12    the Court's direction with David Morgenstern and in light of

13    the Plea Agreement, the remaining restitution since he would be

14    jointly and severally liable with his brother would be

15    $13,375,127.36.   That is considering the $16,800 returned in

16    South Carolina, along with the value of jewelry of $112,000.

17          THE COURT:   So I didn't consider the $16,000 on David

18    Morgenstern?

19          MS. FERNANDEZ:   Yes, you did, Your Honor.   That was

20    the figure that you ended up coming up with.

21          THE COURT:   I thought I said $13,391,000, which --

22    the difference between what you just said and that is $16,000.

23    So maybe I goofed up on David Morgenstern.

24          MS. FERNANDEZ:   As I said, I couldn't -- I didn't

25    quite catch the numbers as the Court read it.

120

1       THE COURT:  Right.

2       What I did was I just subtracted the value of the

3   jewelry from $13,503.000.

4       And what you are saying is I should have subtracted

5   the jewelry and the $16,000?

6       MS. FERNANDEZ:  If the Court is going to be giving

7   credit towards restitution against the order, our position

8   originally was that you shouldn't.  You should just enter the

9   full amount restitution.  The restitution gets credited as it

10  is received and disbursed.  It would be an automatic thing

11  within the Clerk's Office.  But if this Court wants to enter

12  some number other than what we had agreed upon, then you ought

13  to credit them both for it.

14      THE COURT:  I agree.

15      So, Patricia, we are going to need to change David

16  Morgenstern's restitution to $13,375,127.36.

17      MS. FERNANDEZ:  Correct, Your Honor.

18      THE COURT:  So instead of $503,000, it's $375,000.

19  I am sorry.

20  Go ahead, Ms. Fernandez.

21      MS. FERNANDEZ:  No.  I was just saying, Your Honor,

22  that's correct.  I believe that that's the exact amount.

23      And the Court retains on the restitution 90 days of

24  jurisdiction to correct the matter anyway.

25      THE COURT:  Anything further before I impose

1  sentence??

2          MR. ROSEN:  No, Your Honor.

3          THE COURT:  Anything further from the Government?

4          MS. FERNANDEZ:  Nothing from the Government, Your

5  Honor.

6          THE COURT:  All right.  It will be judgment of Court

7  and sentence of law that Mr. Morgenstern be sentenced to 61

8  months in prison on count one or on 00-6309, 60 months in

9  prison on 02-60101, consecutively for a total of 121 in prison.

10 I sentence him at the low of the guideline range based on his

11 acceptance of responsibility and also the testimony that I

12 heard here today.

13          Upon his release from prison, I place him on three

14 years of supervised release.  While on supervised release, he

15 shall not commit any crimes.  He shall be prohibited from

16 possessing a firearm or other dangerous device.  He shall not

17 possess any controlled substances.  He shall comply with the

18 standard conditions of supervised release, including the

19 special condition that he pay $13,375,127.36, joint and several

20 liability, restitution.  I order that he pay 50 percent of any

21 money that he might earn in prison towards the restitution.  If

22 he doesn't earn any money in prison, that he pay $25 quarterly

23 towards the restitution.  When he is released from prison, I

24 order that he pay ten percent of his gross earnings towards the

25 restitution.

1      I order forfeiture of $31,273,273.58 based on the

2  plea negotiations.

3      I order that he provide complete access to financial

4  information to his probation officer.

5      I order that he maintain full time legitimate

6  employment and not be unemployed for more than 30 days unless

7  excused by his probation officer and that he provide written

8  documentation of his employment to his probation officer.

9      I order that he not be engaged in any business that

10 offers securities, investments or other business opportunities

11 to the public, and I prohibit him from engaging in

12 telemarketing, direct mail or national advertising campaigns

13 for business purposes without the permission of his probation

14 officer.  And I order that he obtain prior written approval

15 from his probation officer before entering into any

16 self-employment.

17      I impose a $200 special assessment.

18      And given the amount of restitution, I find that he

19 is not able to pay a fine.

20      And I order the Probation Office to provide Mr.

21 Morgenstern with a written copy of all the conditions of

22 supervised release that I have just imposed.

23      Mr. Morgenstern, it's my duty to inform you that you

24 have ten days within which to appeal the judgment and sentence

25 of this Court.  Should you desire to appeal and be without

1    funds with which to prosecute an appeal, an attorney will be

2    appointed to represent you in connection with that appeal.

3    Should you fail to appeal within that ten-day period, it will

4    constitute a waiver of your right to appeal.

5            Also it's my duty to elicit from counsel for all

6    parties fully articulated objections to the Court's findings of

7    fact and conclusions of law as announced at this sentencing

8    hearing and to further elicit any objections which any party

9    may have to the manner in which the sentence was imposed in

10   this case.

11           Are there any objections from the Government?

12           MS. FERNANDEZ:  None, Your Honor.

13           THE COURT:  Mr. Rosen.

14           MR. ROSEN:  We would renew all of our previously made

15   objections.

16           And the Court went through the -- some of the special

17   conditions pretty quickly.

18           THE COURT:  That's why I directed the Probation

19   Office pursuant to 18 United States Code, Section 3583(f), to

20   provide Mr. Morgenstern with a copy of the conditions of

21   supervised release.

22           MR. ROSEN:  Your Honor -- well, in terms of my

23   entering an objection to any of them, one of them caught my

24   attention about a business opportunity to the public, and I

25   didn't catch the entire phraseology, but something struck me

124

1    as -- amiss about that and I would like to address the Court's

2    attention to it.

3            THE COURT:  I think I said that he not engage in any

4    business that offers securities, investments or business

5    opportunities to the public.

6            MR. ROSEN:  Your Honor, I would ask the Court to

7    reconsider that.  There is a difference -- because I think one

8    of the things that Mr. Morgenstern does is aid businesses in

9    financial consulting, and there is a difference between him

10   being engaged in the offering of --

11           THE COURT:  Let me do this then:  I will impose that

12   condition that he not do that without prior approval from his

13   probation officer.  So I won't forbid him from doing it.  He

14   just needs to get prior probation officer approval before he

15   does it.

16           MR. ROSEN:  Well, I appreciate that, Your Honor.  I

17   am still going to note an objection and I do that because

18   having experienced the probation officer's -- not this

19   particular gentleman -- view of these things, it becomes an

20   insurmountable hurdle.  I --

21           THE COURT:  I think he can get a hold of you or some

22   lawyer and file a motion with me to revisit it if the probation

23   officer is being unreasonable.

24           MR. ROSEN:  All right, Your Honor.

25           I note my objection.

125

1        Also I would ask the Court to -- again because of the

2   nature of what -- how Fred Morgenstern earns a living -- I

3   would ask the Court to give him a little more time.  You said

4   30 days for unemployment.  I would ask the Court to extend that

5   to 60 days just to give him some time to get his bearings

6   and --

7        THE COURT:  I am not going to throw him in jail if he

8   doesn't get a job for 31 days instead of 30.

9        MR. ROSEN:  Well, I -- Judge, we are looking at ten

10  years down the road, but I am just trying to think ahead.

11       THE COURT:  Well, hopefully I am going to be here at

12  that time and I will remember --

13       MR. ROSEN:  I hope you are and I hope you do.

14       THE COURT:  Or somebody can remind me.

15       MR. ROSEN:  Your Honor, there are a few matters after

16  the sentence is complete that I would like to raise with the

17  Court.

18       THE COURT:  Okay.  I think I am done.  So I am open

19  to objections or other requests at this point.

20       MS. FERNANDEZ:  Well, Your Honor, sentence having

21  been imposed, particularly on Indictment 00-6309, the

22  Government would move to dismiss the remaining counts as to

23  this defendant.

24       THE COURT:  Okay.  I grant that motion.

25       MS. FERNANDEZ:  Thank you.

126

1     MR. ROSEN:  Thank you.

2     Let me just tell the Court what my brief agenda is.

3     Number one is Mr. Morgenstern's family situation.

4     Number two, I want to ask the Court for an

5  exoneration of bond because his father has posted the bond and

6  I have a motion to file with the Court on that.

7     THE COURT:  Just file a motion with a proposed order.

8  I am sure the Government doesn't have any objection to it.

9     MR. ROSEN:  All right, Your Honor.  We have a written

10  motion and order prepared.

11     THE COURT:  Just show it to the Government.  If they

12  have no objection, I will sign the order.

13     MR. ROSEN:  All right.

14     Let me turn back to Mrs. Morgenstern.  She is in

15  court today.

16     I have -- and I only have one copy.  It was handed to

17  me today, Your Honor -- a document from the Drug Abuse

18  Foundation Of Palm Beach County, residential admission

19  appointment.

20     The Court may recall that we had asked and the Court

21  had granted Fred the opportunity to travel across the state to

22  be with his wife at a DUI offense --

23     THE COURT:  Wasn't it over around Tampa somewhere?

24     MR. ROSEN:  Yes, sir, it was.

25     And it was cancelled at the last minute -- they never

127

1   went -- because the prosecutor had other items and that's still

2   outstanding.

3          I want the Court to know that -- and I am raising

4   that because I want Your Honor to understand the problem with

5   Mrs. Morgenstern is a very significant one.

6          If the Court took note of what was going on in the

7   courtroom, Fred was in the back with his daughter Lauren

8   (phonetic), who is 18. She is not here now. She is the strong

9   one, I am told. His 17 year old son is not and he was not here

10  today.

11         I have an affidavit from Rudy Gorolla (phonetic), who

12  is Mrs. Morgenstern's lawyer, speaking to the situation of her

13  history of alcoholism should the Court have any debate about

14  that and I would the Court to just take a look at the affidavit

15  and the drug abuse admission.

16         I am telling the Court this for a reason. I think

17  the Court -- I know the Court's policy of surrender today and

18  Fred is prepared to surrender today. Because of the unusual

19  situation of Mrs. Morgenstern's situation, the children --

20  there are family that are willing to -- they are not family.

21  There are acquaintances that are willing to stop in and check

22  on them. Fred had asked me -- Fred had proposed to me a house

23  arrest, house detention, where he has got an ankle bracelet on.

24  We are asking the Court to take into consideration the two

25  minor children, one 18 and one 17. They are not babies, but

1    they are still kids.

2              And Mrs. Morgenstern is getting ready to be admitted.

3    It's a 60 day treatment program.  The policy of the hospital is

4    as soon as there is a bed available, she is in it.  She is the

5    first one there.  Apparently -- as Fred has told me -- there

6    are five beds that are open, but by contract they have to keep

7    those beds open for emergencies.  She is the sixth bed.  And we

8    have expected her to go in all week.  She hasn't.

9              I would ask the Court to allow Fred to remain at

10   home -- not as part of the sentence, but for the time that his

11   wife is in treatment.

12             She said to me -- Mrs. Morgenstern said -- I will

13   just wait.  I said you won't do your kids any good to wait.

14   Get in and get well or get started to get well so that you can

15   take care of them.  Fred is going to be gone for a while.

16             (Reporter changed paper.)

17             THE COURT:  Okay.  I have reviewed the two documents.

18             MR. ROSEN:  All right, Your Honor.

19             I am asking the Court to go against its ordinary

20   policy under unusual circumstances.  Whatever conditions that

21   aren't financial in matter (phonetic) that the Court would wish

22   to impose upon Fred, he is willing to do.

23             I hope the Court knows this is done in good faith and

24   quite frankly and solely for the benefit of the children

25   because if she doesn't get help and he is gone for ten years,

1    it will certainly not help anyone for that to happen.

2         THE COURT:  Well, certainly I hope Mrs. Morgenstern

3    gets the helps that she needs and I don't question the need for

4    the help, but I think an equally important consideration in

5    sentencing is finality.  Today is the day for sentencing.

6    Today is the day for Mr. Morgenstern to start the rest of his

7    life.  And I think it's counterproductive to impose a sentence

8    and then delay the imposition of the that sentence for a number

9    of reasons that I really don't think I need to go into today.

10        It's not an unusual situation for someone to commit a

11   crime and for the family members to in some respects suffer

12   more than the person who committed the crime, but if I didn't

13   sentence people because of that or didn't impose sentence

14   because of that, then the system would be effected

15   significantly.

16        So the motion to surrender later is denied.

17        Anything further?

18        MR. ROSEN:  Yes, Your Honor.

19        I am going to submit to the Court the motion for

20   exoneration of bond.  The Government does have an objection to

21   it and I will let Ms. Fernandez speak to the objection.

22        THE COURT:  If you are going to object to it, you can

23   file a written objection and I can rule on it or unless you

24   want to do it today.

25        MS. FERNANDEZ:  No, Your Honor.  What the Government

1    had informed Mr. Rosen, which I wanted to bring to the Court's

2    attention, is we just want some time to look at it.  The source

3    of the funds that were used was unusual because there is

4    reference here to Harold Morgenstern's credit card being used.

5    Harold Morgenstern's credit card, American Express, was one of

6    those that was getting paid off with Chemical Trust funds.

7            THE COURT:  Why don't we do this:  Why don't, Mr.

8    Rosen, you file the motion downstairs.

9            MR. ROSEN:  Yes, sir.

10           THE COURT:  And I will keep a copy of the proposed

11   order.

12           And I will defer ruling for how long, Ms. Fernandez?

13           MS. FERNANDEZ:  I would ask for the normal ten days.

14   Although we might resolve it earlier.  It's just how quickly

15   Mr. Rosen can get us the information and/or an affidavit that

16   we would request.

17           THE COURT:  All right.

18           So I will defer ruling for ten days on the motion for

19   exoneration of bond.

20           MR. ROSEN:  Your Honor, just on that issue for a

21   moment and so the Court is aware.  Every month Harold

22   Morgenstern, who is 91, is paying interest on a $20,000

23   outstanding credit card debt.

24           THE COURT:  If you can get a stipulation for the

25   exoneration, send in an agreed order and I will sign it sooner

1    than ten days.

2    MR. ROSEN:  All right, sir.

3    Last, Your Honor, at this time I would respectfully

4    move for leave to withdraw as Mr. Morgenstern's counsel.  I was

5    retained to be his attorney for sentencing.  I have completed

6    that.  Fred and I have talked about that.  He is aware of it

7    and in agreement with it.

8    He does not have funds to retain counsel and would

9    ask that the Court appoint appellate counsel for him.

10    THE COURT:  For what?  Didn't he waive his appellate

11    rights in his Plea Agreement?

12    MR. ROSEN:  Of course he did.  And -- as the Court

13    said -- that's between him and the Eleventh Circuit.  And I

14    would ask that he at least have the opportunity to review that.

15    THE COURT:  What's the Government's position on the

16    motion to withdraw and a request for, I guess, CJA counsel?

17    MR. MCCORMICK:  Your Honor, there has to be some sort

18    of a showing that Mr. Morgenstern is indigent.  Mr. Rosen is a

19    retained counsel on this matter.  And I guess a Tjoflat

20    hearing, or whatever you call it.  With that -- compliance with

21    that -- I suspect we would have no objection, Your Honor.

22    MR. ROSEN:  Well, the answer, I think, is pretty

23    evident.

24    Number one, the PSI --

25    THE COURT:  Let me interrupt you.

1      If they are asking for a Tjoflat hearing, I will

2  refer it to the Magistrate and the Magistrate can do an R and R

3  and a Tjoflat hearing.

4      MR. ROSEN:  That's fine.

5      THE COURT:  Okay.

6      Anything else we need to discuss?

7      MR. ROSEN:  No, Your Honor.

8      Thank you.

9      MS. FERNANDEZ:  Your Honor, I am not sure -- although

10  this has been long -- I am not sure whether the Court had

11  specifically advised this defendant of his right to appeal, and

12  so on, and so forth.

13      THE COURT:  I think I did.

14      MS. FERNANDEZ:  (Unintelligible) stopped in the

15  middle of the conditions of -- special conditions of --

16      THE COURT:  I think I did, but I will do it again.

17      MS. FERNANDEZ:  Thank you, Your Honor.

18      THE COURT:  I usually do that before I turn to you

19  and say are there any other objections?  But let me do it

20  again.

21      Mr. Morgenstern, it's my duty to inform you that you

22  have ten days within which to appeal the judgment and sentence

23  of this Court.  Should you desire to appeal and be without

24  funds with which to prosecute an appeal, an attorney will be

25  appointed to represent you in connection in with that appeal.

1  Should you fail to appeal within that ten-day period, it will

2  constitute a waiver of your right to appeal.

3      Also it's my duty to elicit from counsel for all

4  parties fully articulated objections to the Court's findings of

5  fact and conclusions of law as announced at this sentencing

6  hearing and to further elicit any objections which any party

7  may have to the manner in which the sentence was imposed in

8  this case.

9      Okay.  We have already been over the objections.

10     I think probably, Mr. Rosen, you are going to need to

11 file a notice of appeal, though.

12     MR. ROSEN:  I have discussed it with him already and

13 I intend to do that on his behalf.

14     THE COURT:  All right.

15     And then I will refer the Tjoflat hearing to the

16 Magistrate for an R and R.

17     And if there is nothing else to come before the

18 Court, the marshal will execute the sentence of the Court.

19     Good luck to you, Mr. Morgenstern.

20     (Proceedings concluded at 4:32 p.m.)

21

22

23

24

25

```
1

2

3                    REPORTER'S CERTIFICATION

4

5       I hereby certify that the foregoing is a true and accurate

6   transcript of the proceedings recorded by me and reduced to

7   typewriting at my direction.

8

9

10                              Court Reporter

11                              Robert Rydholt

12                              Date:  7-17-03

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6309-CR-DIMITROULEAS(s)(s)
CASE NO. 02-60101-CR-DIMITROULEAS(s)(s)

UNITED STATES OF AMERICA,　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　　　Plaintiff,　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　)
FRED MORGENSTERN　　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　　　Defendant.　　　　)
_____)

## AFFIDAVIT OF FRED MORGENSTERN

STATE OF FLORIDA

COUNTY OF SUMTER

BEFORE ME, the undersigned authority, duly authorized in the State and County named aforesaid to take oaths and administer acknowledgments, personally appeared Fred Morgenstern, who, being duly sworn, deposes and says:

1    I am *sui juris*, and over the age of eighteen (18).

2.    I am the defendant in this matter and I make this Affidavit from personal knowledge.

3.    Mr. William Norris was appointed to represent me on January 11, 2002 by the Honorable Magistrate Judge Barry Garber.

4.    Mr. Norris told me that Magistrate Garber had mandated him to take the case only

1

under the provision that he could not ask for any continuances.

5.      Communications with Mr. Norris were few and complicated by the fact that I was incarcerated in South Carolina for a period of thirty-five (35) days preceding my Plea Hearing. While I was incarcerated, communication was limited since Mr. Norris stopped accepting my collect calls due to the high cost of the calls.

6.      I met with Mr. Norris at the Federal Detention Center to discuss the case. My brother, David Morgenstern, who is a co-defendant in this case, was present and we discussed the possibility of a plea.

7.      My brother, David Morgenstern, explained that he had been negotiating a plea deal with the government while I was incarcerated.

8.      During this meeting Mr. Norris did not have any discussion with me regarding the Sentencing Guidelines, their implication on any plea or the viability of defending the case if it were to go to trial.

9.      Mr. Norris told me he had accepted the appointment of counsel under the impression that the case was going to plead out and that he had never intended to prepare for trial

10.      On or about May 20, 2002, I was transported to Broward County jail for a Status Conference set for the following day.

11.      On the morning of May 21, 2002, a Status Conference was held. At the Status Conference Mr. Norris notified the Court that a plea was being considered, but had not yet come to a final conclusion.

2

12. The Court advised that trial was set for the following day and that I would either have to plead that day or go to trial the following day.

13. My attorney, Mr. Norris had already advised me that he had not prepared for a trial, as he had not interviewed witnesses, formulated a defense or reviewed the evidence. Thus, Mr. Norris advised that if we were to go to trial the following day, that I would probably lose.

14. Mr. Norris advised the court he would need a 15 minute recess to discuss with me the possibility of entering a negotiated plea.

15. During this 15 minute recess, Mr. Norris again advised me that he was unprepared to proceed to trial the following day and that, pursuant to Judge Garber's instructions, he could not ask for a continuance.

16. I felt extreme pressure to plead that day due to the Court's statement.

17. When the Court reconvened after the 15 minute recess, Mr. Norris advised that I would be entering a negotiated plea and that there would also be a Superseding Information. Mr. Norris had not yet seen the Superseding Information or the Plea Agreement.

18. Mr. Norris informed me that the plea to the Superseding Information would have no effect on my sentence. Mr. Norris also advised that because any sentence imposed on the Information would run concurrently to any sentence imposed on the Indictment, I would not be exposing myself to additional jail time.

3

19. The Court then recessed until the afternoon to accept the plea.

20. During this recess, my brother, David Morgenstern met alone with AUSA Brian McCormick to finalize the terms of the plea.

21. When the Court reconvened that afternoon the Government presented a Plea Agreement and a Superseding Information to Mr. Norris and myself.

22. At no time did Mr. Norris ever review or discuss the effect of the Sentencing Guidelines on the Superseding Information or the Plea Agreement with me.

23. Based on the representations and advice of Mr. Norris, I had no choice but to accept the Plea Agreement and change my plea.

24. When the Court reconvened, I formerly changed my plea.

25. I was never advised by Mr. Norris about the Plea Hearing. Mr. Norris never explained to me the questions that were going to be asked by the Judge. My responses were not contemplated ones but were automatic as I believed Mr. Norris' representations to me that the Plea Hearing had no effect on the terms of the Plea Agreement.

26. If Mr. Norris had conducted a sentencing guideline analysis he could have advised me of their effect on the Plea Agreement and how my sentence would be calculated.

27. I did not agree to plead to a violation offense that would use 18 U.S.C. §1956 as the underlying activity.

28. If 18 U.S.C. §1956 was the offense conduct to which I was required to plead, I would not have pleaded guilty to the Superseding Information.

4

29. This was never explained to me by Mr. Norris as he, himself did not know the consequences since he never conducted a guideline analysis.

30. I had no choice but to plead based on Mr. Norris' recommendation and statements to me regarding his unpreparedness.

31. After the plea was accepted, I was advised that due to the plea on the Superseding Information, I was exposed to a higher guideline range. I did not understand the true consequences of this as Mr. Norris had never explained the sentencing guidelines to me.

Further Affiant Sayeth Naught

Fred Morgenstern

Sworn to and subscribed before me on 4|12, 2004, by Fred Morgenstern, who is/is not personally known to me and who has produced  Identification Card as identification.

Notary Public
State of Florida at Large

Tamara Mason
My Commission DD097768
Expires March 06, 2006

My Commission expires:

5